UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LINCOLN DODGE, INC; SMITHFIELD CHRYSLER JEEP, INC.; SIMON CHEVROLET-BUICK, LTD.; PAUL MASSE CHEVROLET, INC.; PAUL MASSE PONTIAC-CADILLAC-GMC, INC.; DELUXE AUTO SALES, INC.; TASCA AUTOMOTIVE GROUP, INC.; THE NEW BAY BUICK, INC., HURD CHEVROLET, INC., HURD BUICK PONTIAC-GMC TRUCK, INC., ALLIANCE OF AUTOMOBILE MANUFACTURERS; DAIMLERCHRYSLER CORPORATION; and GENERAL MOTORS CORPORATION,

*Plaintiffs*,

v.

W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management,

*Defendant*.

06 70 T

**COMPLAINT**

Plaintiffs Lincoln Dodge, Inc, Smithfield Chrysler Jeep, Inc., Simon Chevrolet-Buick, Ltd., Paul Masse Chevrolet, Inc., Paul Masse Pontiac-Cadillac-GMC, Inc., Deluxe Auto Sales, Inc., Tasca Automotive Group, Inc., The New Bay Buick, Inc., Hurd Chevrolet, Inc., Hurd Buick Pontiac-GMC Truck, Inc., the Alliance of Automobile Manufacturers, DaimlerChrysler Corporation and General Motors Corporation (collectively, "plaintiffs"), by and through their undersigned counsel, hereby file this Complaint and allege as follows:

## Introduction

1. This action seeks declaratory and injunctive relief under federal law against enforcement by defendant of a regulation adopted by the Rhode Island Department of Environmental Management (the "Department"). The regulation challenged here is preempted by federal statutes and regulations, is inconsistent with the Supremacy Clause in Article VI of the United States Constitution, constitutes an undue burden on interstate commerce under the Commerce Clause in Article I of the Constitution, and interferes with the foreign policy of the United States in violation of Articles I and II of the Constitution. This Court has authority to grant the relief sought under 28 U.S.C. §§ 1331, 1343, 2201 and 42 U.S.C. §§ 1983, 1988.

2. The motor vehicle standards and other requirements challenged in this action were adopted by the Department in 2004 and 2005, and are contained in Air Pollution Control Regulation No. 37, attached hereto as Exhibit A ("Regulation 37"). Unless declared unlawful and enjoined by this Court, Regulation 37 as amended in 2004 and 2005 will increase the prices of new vehicles in this State, reduce consumer choice among different vehicle models, create safety risks for the motoring public, and hinder Rhode Island's ability to meet federal standards for air quality.

*a.* *Preemption under the federal fuel economy laws.* As most recently amended by the Department in December 2005, Regulation 37 creates *de facto* fuel economy standards for new motor vehicles sold in Rhode Island. The federal Energy Policy and Conservation Act of 1975 ("EPCA") gives the U.S. Department of Transportation authority to regulate fuel economy, and prohibits any state regulation "related to fuel economy standards" once such federal standards are in place. 49 U.S.C. § 32919(a). Regulation 37 is expressly preempted by EPCA. In addition, Regulation 37 interferes with the specific objectives of the

federal fuel economy program, intrudes on a field of regulation assigned by Congress to the federal government, and is inconsistent with the uniform, national scheme for regulating fuel economy. Regulation 37 is therefore also subject to implied preemption under EPCA and federal programs that implement EPCA. (*See* Count I below.)

*b.* *Interference with the Foreign Policy of the United States.* As amended in 2005, one object of Regulation 37 is to address the trans-national issue of global climate change. It is not the prerogative of any individual State in the union to attempt to establish policy for global climate matters through the regulation of motor vehicles. The United States is committed to addressing global climate change through multilateral agreements, and to date has chosen to refrain from motor vehicle greenhouse gas controls at the international level. As a unilateral step not approved by the President or Congress, Regulation 37 weakens the diplomatic leverage of the federal government in negotiations on greenhouse gas standards with other nations, and it is therefore also preempted, separate and apart from EPCA, because it conflicts with the foreign policy of the United States. (*See* Count II below.)

*c.* *Preemption under the Federal Clean Air Act.* Under the federal Clean Air Act, a prerequisite for any state regulation of new motor vehicles is prior review and approval by the U.S. Environmental Protection Agency ("EPA"). Approval for several key features of the most recent amendments to Regulation 37 has not been obtained from EPA. Enforcement of those amendments is therefore preempted by the Clean Air Act. In addition, Regulation 37 violates federal prohibitions on quotas and similar limitations in the new-vehicle market in States like Rhode Island. (*See* Count III below.)

*d.* *Burden on Interstate Commerce.* The economic burdens on interstate commerce created by Regulation 37, as amended in December 2005, greatly outweigh the local

benefits (if any) attributable to the regulation in Rhode Island. For that reason, the Department's recent amendment to its motor vehicle regulations also violates the dormant Commerce Clause of the U.S. Constitution. (*See* Count IV below.)

*e. Preemption under Federal Antitrust Laws.* As amended in 2005, one portion of Regulation 37 would require cooperation among competitive manufacturers in the Rhode Island new-vehicle market, contrary to federal antitrust laws. The Department and defendants have not presented any valid basis for antitrust immunity for this feature of Regulation 37, which in this respect violates the Sherman Antitrust Act. (*See* Count V below.)

**Parties, Jurisdiction and Venue**

3. The plaintiffs in this action are 10 new motor vehicle dealers, an association of automobile manufacturers that produce and sell vehicles to those dealers, and two of those manufacturers.

4. Lincoln Dodge, Inc, Smithfield Chrysler Jeep, Inc., Simon Chevrolet-Buick, Ltd., Paul Masse Chevrolet, Inc., Paul Masse Pontiac-Cadillac-GMC, Inc., Deluxe Auto Sales, Inc. (doing business as Yankee Chevrolet) Tasca Automotive Group, Inc. (doing business as Tasca Ford Sales, Inc. and Tasca Lincoln Mercury), The New Bay Buick, Inc., Hurd Chevrolet, Inc., Hurd Buick Pontiac-GMC Truck, Inc. (collectively, the "dealer plaintiffs") are new motor vehicle dealerships operating throughout Rhode Island. The dealer plaintiffs are "dealers" under 49 U.S.C. § 32908, the federal fuel economy law. Regulation 37 directly regulates the dealer plaintiffs by prohibiting them from selling new motor vehicles that do not meet the standards and other requirements contained in the Department's regulations. As more fully stated below, the Department's regulations will reduce the sales of new vehicles, and as a direct result the dealer plaintiffs will lose profits and goodwill. (*See* ¶¶ 58-61 below.)

5. The Alliance of Automobile Manufacturers ("the Alliance") is an association of motor vehicle manufacturers including BMW Group, DaimlerChrysler Corporation, Ford Motor Company, General Motors Corporation, Mazda North American Operations, Mitsubishi Motor Sales of America, Inc., Porsche Cars North America, Inc., Toyota Motor North America, Inc., and Volkswagen of America, Inc. The Alliance represents its members' interests in this litigation.

6. General Motors Corporation ("GM") and DaimlerChrysler Corporation ("DCC") are manufacturers of new motor vehicles sold in Rhode Island and are subject to Regulation 37. GM and DCC sell their vehicles to independent dealers in Rhode Island including Paul Masse Chevrolet, Inc., Paul Masse Pontiac-GMC, Inc., Hurd Chevrolet, Inc., Hurd Buick Pontiac-GMC Truck, Inc., Lincoln Dodge, Inc., and Smithfield Chrysler Jeep, Inc. Regulation 37 will eliminate a substantial number of vehicle models from GM and DCC product lines in Rhode Island, and will increase the costs of some of the remaining GM and DCC models offered in the Rhode Island market by thousands of dollars.

7. The Department is an agency organized pursuant to R.L. Gen. Laws § 42-17.1.1 *et seq.* and existing under the laws of the State of Rhode Island. Regulation 37, adopted by the Department, is administered and enforced by W. Michael Sullivan, the Director of the Department, who is made the defendant in this action solely in his official capacity.

8. Each of the dealer plaintiffs in this action is located in the District of Rhode Island and each has suffered and will continue to suffer harm in this District as a result of defendant's actions described in this action that give rise the claims stated herein. Each of the manufacturers represented by the Alliance as a plaintiff does business in this District and has also suffered and

will continue to suffer harm in this District as a result of defendants' actions. Venue in this Court is proper under 28 U.S.C. § 1391(b).

9. This is an action for declaratory and injunctive relief under The Supremacy Clause in Article VI of the United States Constitution and 42 U.S.C. § 1983 challenging the provision of a state regulation which is preempted by federal law. This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. § § 1331, 1343 (a)(3) and 2201.

## **The Technical and Environmental Background of the Litigation**

### **A. Regulation and Control of Motor Vehicle Air Pollution**

10. Motor vehicles produce a number of air pollutants regulated by EPA under the Clean Air Act, including the gases that form ground-level ozone (or "smog"), carbon monoxide, and other toxic substances. EPA imposes tight controls on motor vehicle manufacturers, because various tailpipe pollutants, such as oxides of nitrogen and hydrocarbons, react in sunlight and heat to produce smog.

11. The formation of smog is a localized or regional phenomenon that is responsive to local (including state level or regional) controls. The Clean Air Act requires States, such as Rhode Island, to achieve and maintain compliance with various National Ambient Air Quality Standards, including standards for controlling smog. Rhode Island is classified as a "non-attainment" area for the federal ozone air quality standards, and has filed plans with EPA demonstrating how it intends to comply with those standards.

12. In order to support the efforts of Rhode Island and other States seeking to meet the federal ozone air quality standards, EPA is currently implementing strict new standards for the control of smog-forming emissions from motor vehicles. Over the course of this decade, EPA's exhaust emissions standards will reduce the emission of smog-forming pollutants to

nearly zero. Documents filed by the Department with EPA indicate that Rhode Island plans to achieve 35 to 40 percent reductions in smog-forming emissions over the period from 1999 to 2007 partly in reliance on the federal EPA motor vehicle air pollution standards.

**B. Greenhouse Gases and Their Control**

13. The amendments to Regulation 37 adopted by the Department in 2005 are ***not*** directed at the control of smog. Instead, the Department amended Regulation 37 to require, for the first time, the control of carbon dioxide from new cars and trucks sold in Rhode Island. (*See* Exhibit A at 5.)

14. Carbon dioxide, or "CO2," is not regulated by EPA or any other government agency as a constituent of smog. CO2 is not classified as an air pollutant by the federal government, and is not listed as an "air toxic" by the Department. Carbon dioxide is a natural by-product of the combustion of any material that includes carbon. It is exhaled by humans and other animals, and is critical to plant life and thus to the production of oxygen needed by humans and other animals.

15. In the upper atmosphere, carbon dioxide retains heat through a "greenhouse effect" that is an important part of the planet's biosphere. The heat-trapping properties of greenhouse gases, including carbon dioxide, cause the average surface temperature of the Earth to be approximately 59° Fahrenheit higher than it would be otherwise. The greenhouse effect is therefore critical to life on Earth in its current form.

16. Scientists have warned that a large increase in carbon dioxide from man-made sources could lead to excessive increases in the temperature of the biosphere, described as "global warming" or "global climate change." Many scientists have called for measures to

reduce man-made emissions of greenhouse gases, as well as measures to adapt to climate change to the extent such change cannot be avoided.

17. Two other features of carbon dioxide are of prime importance. First, the only way to achieve significant reductions in carbon dioxide from motor vehicles is to reduce the amount of carbon the vehicle burns -- and this, in turn, requires a reduction in a motor vehicle's fuel consumption. As EPA stated several years ago, "[n]o technology currently exists or is under development that can capture and destroy or reduce emissions of CO2, unlike other emissions from motor vehicle tailpipes. At present, the only practical way to reduce tailpipe emissions of CO2 is to improve fuel economy." (*See* 68 Fed. Reg. 52,922, 52,929 (Sept. 8, 2003).)

18. The second critical fact is that carbon dioxide disperses globally and is long-lived. As a result, effective control of CO2 levels cannot be adequately addressed by a single nation, much less an individual state within a nation. To the extent that carbon dioxide from man-made sources is having an impact on the global climate, that impact is not tied to the state or country of origin.

19. The global dispersal of carbon dioxide is significant. The global dispersal of CO2 means that any specific nation, region, or individual State cannot by itself have a significant impact on overall global climate conditions. The ambient temperature in a given State in the United States is not under the control of the State and its policymakers in the same way as the level of smog or some other harmful pollutant might be. The global dispersal of CO2 also means that coordinated international measures are the only effective means of addressing the issue of climate change. Each nation in the world has an interest in addressing the issue of climate change, and also in ensuring that the rest of the world is also participating in the effort to address the issue.

20. Cars and trucks are a significant source of the air pollution that can form smog and other air pollutants. But they are a relatively small source of the carbon dioxide that comprise greenhouse gases (approximately one-fifth) and that are the focus of the international effort to address the global warming issue. Experts have recognized that "most of the low-cost options for reducing carbon emissions are in other sections, particularly substituting other fuels for coal in electricity generation, not in gasoline conservation." (*See* Parry, *Should Fuel Economy Standards Be Raised?* RESOURCES MAGAZINE, Fall 2005.)

21. Consistent with the scientific consensus that carbon dioxide is not itself a harmful air pollutant, Congress and EPA have decided that CO2 should not be regulated in the same way as smog-forming automobile exhaust. In section 202(a) of the Clean Air Act Congress has directed EPA to regulate the emission of "pollutants" from new motor vehicles, including carbon monoxide, particulate matter, hydrocarbons, and oxides of nitrogen. 42 U.S.C. § 7521(a)(1). Consistent with the intent of Congress, EPA has concluded that there is no scientific basis to include limits on tailpipe emissions of carbon dioxide in its regulations under section 202 of the Clean Air Act. 68 Fed. Reg. 52,922 (Sept. 8, 2003).

**C. The Regulation of Motor Vehicle Fuel Economy**

22. In the United States, the primary program in place to regulate carbon dioxide emissions from motor vehicles at the national level is the federal fuel economy regulatory program administered by the National Highway Traffic Safety Administration ("NHTSA"), an agency within the U.S. Department of Transportation. NHTSA has regulated automotive fuel economy since 1978 under the requirements of EPCA. Because there is a direct chemical relationship between the amount of gasoline that a vehicle burns and the amount of carbon

dioxide that it releases, when NHTSA regulates motor vehicle fuel economy, it is also regulating the carbon dioxide emitted by the U.S. motor vehicle fleet.

23. NHTSA's fuel economy standards ensure that Rhode Island residents, like the citizens of all other States, have a wide variety of vehicles from which to choose, including vehicles that achieve high fuel efficiency levels. In the 2005 model year, the automobile industry offered more than 100 vehicle models that had estimated highway ratings of 30 miles per gallon or more, based on vehicle model classifications available at www.fueleconomy.gov. The average sport utility vehicle sold in model year 2004 gets about 50 percent better mileage than the average car before NHTSA's program began, and the average light-duty truck today gets better overall mileage than a compact car sold before federal regulation began.

24. The federal fuel economy program created in 1975 by EPCA is based on "corporate average fuel economy," or "CAFE," standards. Standards for cars are set separately from those for light trucks. The light-truck category includes most minivans, pickups, and sport-utility vehicles, as well as other vehicles. Fuel economy is determined by measuring how much carbon dioxide a vehicle emits and then using a specified formula to convert those CO2 emissions into a more familiar term -- the number of miles that a vehicle can travel on a gallon of gasoline, or "miles per gallon."

25. The federal CAFE standards do not apply to individual vehicles or models. Rather, they regulate the fuel economy of each manufacturer's entire fleet of cars or trucks, on a fleet-average basis. As a result, a manufacturer can generally produce and sell any combination of vehicles that the market demands, so long as the fuel economy of its fleet as a whole meets or exceeds the required average miles per gallon ("mpg") targets (as measured by carbon dioxide emissions) set by NHTSA over the appropriate time frame.

**1. "Maximum Feasible" Standards**

26. In deciding how to set and revise federal fuel economy standards, EPCA directs NHTSA to adopt and enforce what the statute designates as "maximum feasible" average fuel economy levels. The criteria to be used by NHTSA in order to determine "maximum feasible" levels are "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f). The federal fuel economy standards today reflect the careful balance that NHTSA strikes among those criteria, and are the product of extensive rulemaking activities and judicial review proceedings in the U.S. Court of Appeals for the District of Columbia Circuit.

27. The standard-setting process at NHTSA and the history of those standards in the D.C. Circuit have established the importance of three overall objectives for the federal program, which NHTSA is required to consider along with the national interest in reduced fuel consumption. As set forth below, those three additional objectives are (i) the preservation of consumer choice; (ii) the protection of the automobile industry in the United States; and (iii) the minimization of traffic safety risks.

*(i) Preservation of Consumer Choice*

28. The authors of the federal fuel economy law emphasized that CAFE standards had to "be carefully drafted" in order to improve fuel economy without "unduly limiting consumer choice." H.R. Rep. No. 340, 94th Cong., 1st Sess. 87 (1975). The averaging of the mpg results for a given manufacturer across its entire vehicle fleet was critical to the goals of EPCA. As one federal court has explained, this approach has led to "a series of graduated mileage requirements" that "ensure[s] wide consumer choice by leaving maximum flexibility to the

manufacturer" in deciding how to meet the specified CAFE levels. (*See Center for Auto Safety v. NHTSA*, 847 F.2d 843, 863-64, *vacated on unrelated grounds*, 856 F.2d 1557 (D.C. Cir. 1988) (quoting S. Rep. No. 179, 94th Cong., 1st Sess. (1975).)

29. Maintaining consumer choice has become a fundamental part of the NHTSA regulatory program. At various points in the history of the federal fuel economy program, NHTSA has been required to modify the federal standards in order to avoid undue restrictions on consumer choice. As one federal judge has stated with approval, "NHTSA clearly understands that Congress instructed it to administer the CAFE program so as not to induce product restrictions." (*See Competitive Enterprise Inst. v. NHTSA,* 901 F.2d 107, 125 (D.C. Cir. 1990) (D.H. Ginsburg, J., concurring) (internal quotation marks omitted).) The fact that the federal fuel economy standards permit manufacturers to comply with fleet average standards on a national basis enhances consumer choice, because it permits manufacturers to sell different mixes of vehicles in different local or regional markets, based on local or regional preferences.

*(ii) Promotion of the Automobile Industry in the United States*

30. NHTSA has also consistently interpreted the statutory criterion of "economic practicability" to include consideration of how fuel economy standards will affect employment in the automobile industry in the United States. Employment losses in the automobile industry nationwide can result from more stringent fuel economy standards for two reasons. First, the increases in retail prices for new vehicles that meet more stringent fuel economy standards can reduce overall demand, leading to a reduction in new-vehicle production and a loss of jobs at engine, transmission, and assembly plants, as well as factories that supply other components. Second, the job losses can be particularly large in production facilities that depend on the sale of larger, less fuel-efficient vehicles. If fuel economy standards are too strict, the production of

such vehicles will significantly decrease, because the vehicles will either largely disappear from the market (such as value-priced station wagons) or will only be sold in small numbers at high prices (such as high-performance sports cars).

31. NHTSA has therefore understood its standard-setting duties to include an obligation to "weigh the difficulties of individual manufacturers" in meeting specific standards -- an approach that has been approved by the federal courts reviewing NHTSA's actions. (*See Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1339 (D.C. Cir. 1986).) In the 1980s, for example, the Federal Trade Commission filed comments with NHTSA estimating that if the passenger car standards for model years 1989 and 1990 were not modified, total domestic employment in the automobile and related industries in the United States would decline by approximately 11,500 or 20,000 jobs, depending on various assumptions. NHTSA subsequently reduced the model year 1989 and 1990 passenger car standards. The Agency stated that it was not willing to accept "product restrictions [that] would result in sales losses well into the hundreds of thousands of units and job losses into the tens of thousands." (*See* 51 Fed. Reg. 35,594, 35,615 (Oct. 6, 1986).)

*(iii) Minimizing Safety Risks*

32. For many years, NHTSA and other safety organizations have recognized that, because reducing the weight of a given vehicle model will reduce its fuel consumption, increases in fuel economy standards can result in reductions in the weight of the motor vehicle fleet as a whole, or a particular segment of the overall fleet. Reductions in vehicle weight can also reduce vehicle crashworthiness. For example, the National Academy of Sciences found in one report that the down-weighting and downsizing that occurred in the late 1970's and early 1980's, some

of which the Academy attributed to the CAFE standards, probably resulted in an additional 1,300 to 2,600 traffic fatalities in one representative year (1993), and ten times more injuries.

33. The federal courts have also recognized that increasing fuel economy standards may lead to fleet downsizing, "which, without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries." (*See Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 120 n.11 (citing NHTSA, Final Rule: Passenger Automobile Average Fuel Economy Standards for Model Year 1989, 53 Fed. Reg. 39,275, 39,294 (Dec 30, 1988) (citing Department of Transportation and EPA, "Potential for Motor Vehicle Fuel Economy Improvements: Report to Congress")).)

34. The effect of fuel economy on safety has therefore always been an important factor in setting fuel economy standards under EPCA. In part for that reason, NHTSA is now considering revisions in the basic structure of the federal CAFE standards that would take better account of the trade-offs between CAFE increases and safety -- separate from, and as a logical precondition for, the consideration of any increases in the current CAFE standards.

35. When NHTSA sets fuel economy standards, it also considers how a mandated increase in fuel economy will affect the amount of driving that occurs. Rules that require substantial increases in motor vehicle fuel economy can reduce the cost of operating vehicles, at least for some consumers. Under the economic "first law of demand," when the cost of driving goes down, people drive more and for longer distances -- a result called the "rebound effect." One consequence of more stringent fuel economy standards will be more driving. Increased driving inevitably leads to an increased exposure to highway accidents. NHTSA has therefore developed predictive models of the rebound effect to determine how changes in the fuel

economy standards will affect the amount of driving that occurs, so that it can consider the potential increases in exposure to accidents as a result of more stringent fuel economy standards.

**2. Preemption of State Regulation**

36. A careful balancing among the factors that NHTSA applies in setting fuel economy standards for the nation would be imperiled if States could establish different requirements for the motor vehicle fleet in a specific part of the country or a given State. Accordingly, in EPCA, Congress preempted state regulation in the field of motor vehicle fuel economy:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919(a).

**<u>Environmental Consequences of the Department's CO2 Regulations</u>**

37. One of the principal ways of controlling smog-forming emissions from motor vehicles is through the use of modern catalytic converter technology. A catalytic converter changes the smog-forming emissions in motor vehicle exhaust into harmless substances (like water vapor). As a vehicle ages, however, its catalytic converter becomes less efficient in controlling smog-forming emissions. In addition, new advances in the design and control of air pollution from motor vehicles are now being implemented. Some of those innovations will take many years to be fully deployed in most motor vehicle models. As a result, a typical new passenger car sold in model year 2015 can be expected to have smog-forming exhaust levels that are more than 85 percent lower than a typical car on the road at that time.

38. The continued reduction in ozone-forming emissions from the motor vehicle fleet therefore depends on at least two factors: (1) the rate at which automotive engineers can develop

and produce improved pollution control systems on future vehicle models, and (2) the rate at which new, more advanced vehicles are purchased by Rhode Island motorists. A highly competitive new-vehicle market that offers consumers a wide variety of choices is thus an important part of the overall strategy for reducing ozone-forming emissions, because the reduction of pollution on a fleet-wide basis requires the steady retirement of older vehicles, in favor of newer vehicles that better control smog-forming pollution.

39. The rate at which older vehicles are replaced with newer, lower-emitting vehicles is called the "fleet turnover" effect. If the cost and price increases occasioned by new emissions regulations are small enough, the fleet turnover effect has a negligible impact on fleet-wide emissions. Larger increases in costs and prices can have a significant impact on the rate at which older vehicles are retired and replaced by newer vehicles. A significant body of peer-reviewed economic literature, including work by former Chairman of the Federal Reserve Alan Greenspan, has demonstrated that more stringent emissions standards can have the unintended effect of increasing fleet-wide air pollution, depending in part on the price increases that result from the more stringent standards.

40. The regulations primarily involved in this action are the product of a brief rulemaking process at the Department that completed in 2005. Those regulations are based on rules adopted by the State of California in 2004. According to estimates prepared by California, which the Department appears to have endorsed in its rulemaking, the pertinent regulations adopted in California in 2004 and Rhode Island in 2005 will add about $1,000 to the cost of an average new vehicle governed by those regulations, once the rules are fully implemented. A price increase of that magnitude was predicted by the State of California to result in a reduction in new-vehicle sales in California of between four and five percent. That reduction in new-

vehicle sales was also predicted by California to result in an increase in ozone-forming emissions from the regulated motor vehicle fleet in California.

41. Before adopting the amendments to Regulation 37 in 2005, the Department prepared no specific estimate of the impact of the fleet turnover effect on air pollution from the Rhode Island motor vehicle fleet, even though it had been warned about the fleet turnover effect, and had the results of the work in California available.

42. The only specific estimate of how pollution levels would change in Rhode Island as a result of the amendment to Regulation 37 was prepared by a group of independent researchers, led by a former Executive Officer of the California Air Resources Board and a former member of the faculty at Harvard's Kennedy School of Government. That study was based on earlier work by the same research team that had been sponsored by the Alliance of Automobile Manufacturers, which had examined the impact of the greenhouse gas rule on motor vehicle emissions in California. In the case of Rhode Island, the study showed an increase in fleet-wide emissions of smog-forming pollutants in Rhode Island, when taking account of the fleet turnover effect and other relevant factors.

43. In the case of Rhode Island, the study of fleet-wide emissions effects indicated, on a conservative basis, a rise in ozone precursor emissions from the regulated fleet of about 7.5 percent if the new rules are fully implemented. Other estimates included in the same study indicated higher increases in those emissions. Even a 7.5 percent increase in emissions under the most conservative analysis, considering the State's overall efforts to reduce smog-forming emissions and to attain national standards for ozone air quality, is significant.

44. In the case of California, the California regulatory agencies determined that the increases in smog-forming emissions from the regulated fleet would be more than offset by

reductions in smog-forming emissions from other sources, as an indirect result of the pertinent regulations. Even if this were true -- which it is not -- in the case of Rhode Island, those indirect effects would be too small to offset the increase in direct emissions from the motor vehicle fleet that will result from Regulation 37 as amended in 2005. This point was also demonstrated in the study of the impact of the greenhouse gas rule on smog-forming emissions in Rhode Island

45. The analysis of the impact of the greenhouse gas rule on ozone-forming emissions in Rhode Island were prepared using generally accepted and fully documented economic and environmental principles and methodologies, by experts in the relevant disciplines. The results of the analyses and the underlying work were supplied to the Department for its review. The Department's response to the study included a statement that "we [i.e., the Department] feel that the reductions in [greenhouse gas] emissions will be worth a slight increase in other pollutant emissions that will result from future car owners delaying their new car purchases." (*See* Exhibit B at 7.) Nevertheless, the Department did not (and could not) predict any measurable reduction in ambient temperatures, nor did it quantify any other positive change in any environmental condition of concern, as a result of its decision to amend Regulation 37.

46. Computer models are used to estimate the impact of various changes in greenhouse gas levels on the global biosphere. Even if the standards in Regulation 37 were fully implemented not only in Rhode Island, but in California and in the other States that are adopted similar requirements, the change in global temperature would be less than two one-thousandths of a degree Celsius (less than 0.002 degree C). That change can be predicted using results from the computer models. But as the California regulatory agency in charge of the matter acknowledged in 2005, such changes in temperature are too small to be identified in the real world, rather than with computer models.

**Count I**
**For Declaratory and Injunctive Relief under the Federal Fuel Economy Law and Regulation**

47. Plaintiffs repeat and re-allege paragraphs 1 through 45 of this Complaint as though fully set forth herein.

48. The Department first adopted emissions standards applicable to new motor vehicles sold in Rhode Island in 1996. In its original form, Regulation 37 provided for the sale in Rhode Island of new motor vehicles certified to the same standards as in effect in the State of California, but permitted manufacturers and dealers to sell vehicles certified to federal (rather than California) emissions standards up to and including model year 2007.

49. By virtue of amendments to Regulation 37 completed on or about December 21, 2004, the Department elected to require that new motor vehicles in certain classes and categories be required to comply with California emissions standards, starting in model year 2008, with no provision for alternative compliance to federal vehicle emissions standards. The 2008 model year will begin under applicable regulations on January 2, 2007.

50. In December 2005, the Department further amended Regulation 37 to require compliance with the California greenhouse gas and carbon dioxide regulations, beginning in model year 2009. The 2009 model year will begin under applicable regulations on January 2, 2008.

51. As amended in December 2005, Regulation 37 creates standards for new motor vehicle sold in Rhode Island expressed in terms of "carbon dioxide equivalent" (or "CO2e") emissions. Apart from the minor credits allowed for the control of non-CO2 emissions, Regulation 37 sets standards for passenger cars that range from 323 to 205 grams per mile of CO2-equivalent emissions, depending on the type of vehicle and model year. Manufacturers are

permitted to vary from the standards for several model years, but at specific points defined in the regulations, they must demonstrate achievement of the standards on a multi-year basis.

52. If fully implemented as intended by defendant, Regulation 37 will require a reduction in CO2-equivalent greenhouse gases from passenger cars of more than 30 percent. Because carbon dioxide accounts for more than 95 percent of greenhouse gases from a typical gasoline-powered motor vehicle, Regulation 37 will require substantial reductions in carbon dioxide from those vehicles. Such reductions in carbon dioxide can only be achieved with reductions in fuel consumption, and thus increases in fuel economy.

53. The applicable carbon dioxide standards that will be enforced under Regulation 37 (without the minor adjustments for potential non-CO2 controls) can be readily translated into fuel economy levels, expressed in miles per gallon as defined by the federal government, as illustrated on the Table below.

**Regulation 37's Fuel Economy Equivalent Levels for Cars and Small Trucks**

| **Model Year** | **DEM Standard for Cars and LDT1s** | |
|---|---|---|
| | Grams CO2e/mile | Mpg |
| 2009 | 323 | **27.4** |
| 2010 | 301 | **29.4** |
| 2011 | 267 | **33.2** |
| 2012 | 233 | **38.0** |
| 2013 | 227 | **39.0** |
| 2014 | 222 | **39.9** |
| 2015 | 213 | **41.6** |
| 2016 | 205 | **43.2** |

For purposes of comparison, the federal fuel economy standard for cars is 27.5 mpg. Starting in model year 2010, Regulation 37 will start to require much higher levels of fuel economy for cars sold in Rhode Island than required by federal law.

54. In the Table above, the term "LDT1" refers to smaller light-duty trucks, which under Regulation 37 are combined into the same category as passenger cars. In the federal fuel economy regulations, those trucks are included in a category separate from cars in order to determine compliance. The federal fuel economy standards for trucks are generally less stringent than the fuel economy requirements for cars, because trucks are more fuel-intensive than cars. By including some trucks in the same set of standards as cars, Regulation 37 makes the fuel economy requirements for cars produced by some manufacturer for sale in Rhode Island much more stringent than the 27.5 mpg federal standard for cars, starting in model year 2009. In addition, Regulation 37 does not encourage and give credit for the sale of vehicles equipped to operate on the renewable fuel blend of ethanol and gasoline in the same manner and extent as the federal fuel economy program, which conflicts with and impedes Congress' objectives to create incentives for the production and sale of such vehicles nationwide.

55. EPCA requires NHTSA to set future truck fuel economy standards, and to set those standards at least 18 months before the standards become effective, at the "maximum feasible" level. Accordingly, for more than a generation NHTSA has promulgated fuel economy standards for mid- and full-size trucks. NHTSA also has authority to get fuel economy standards for vehicles larger than typical passenger cars and light-duty trucks, if certain criteria in EPCA are satisfied.

56. In addition to requiring higher fuel economy levels for passenger cars than federal law requires or permits, Regulation 37 will also require much higher levels of fuel economy for mid- and full-size trucks, vans, sport-utility vehicles and other types of vehicles than required by NHTSA's standards or by any other standards that NHTSA could set, consistent with the criteria in EPCA, in future model years.

57. A primary purpose and effect of the Department's new CO2 standards will be to require dramatic increases in the fuel economy of cars and trucks sold in Rhode Island. Vehicles sold in Rhode Island will have to achieve much more stringent fuel economy levels than required by federal law and regulation. Many currently offered models of vehicles sold in Rhode Island will disappear from some manufacturers' product offerings, because it will be economically impractical to bring those models into compliance with Regulation 37. This will have serious negative affects on consumer choice, on the economic health of many automobile dealers in Rhode Island, and on employment in the automobile industry in the United States.

58. Several vehicle manufacturers have attested to the serious economic impact of state fuel economy rules like Regulation 37. In filings with the SEC, those manufacturers have alerted investors to the potential adverse effects of state CO2 standards if those standards were to withstand legal challenge. Those projected impacts include "severely restrict[ed] product offerings or close[d] plants" and "significantly restrict[ed] products." (*See* General Motors Corporation, Form 10-K (March 16, 2005)), at I-4; DaimlerChrysler Corporation, Form 20-F (filed Feb. 28, 2005), at 33; *see also* Ford Motor Company, Form 10-K (March 10, 2005), at 18.)

59. The businesses most directly impacted by Regulation 37 in Rhode Island will be automobile dealerships. The new-vehicle planning processes for at least two manufacturers (GM and DCC, two of the plaintiffs in this action) have proceeded to the point where those two companies can estimate how Regulation 37 will affect their product lines in jurisdictions like Rhode Island. GM and DCC have projected very substantial reductions in their product lines if rules like Regulation 37 take full effect. GM and DCC have also predicted large increases in the costs and therefore the prices of many of the vehicle models that they will try to keep in their product lines once rules like Regulation 37 are implemented.

60. The anticipated restrictions in product lines and the cost increases for remaining models have severe consequences for independent franchised dealers in Rhode Island. The fact that those businesses will, in the future, see substantial curtailments in their product lines and large price increases has already had an impact on their current value as going concerns. Automotive retail businesses in the State of California with the same current basic product lines as those in Rhode Island have been estimated to have already lost up to $4.6 million in their current value, even though the new California regulation does not apply to their product lines until model year 2009.

61. Starting in the 2009 model year, vehicles that do not meet the Department's CO2 requirements will not be legal for sale by dealers in Rhode Island. Based on the predictions of some manufacturers, many dealers in Rhode Island will not have a full line of compliant vehicles to market. In addition, many vehicles that can be brought into compliance with Regulation 37 will cost substantially more than comparable vehicles sold by other manufacturers. Dealers with restricted product lines, and/or with vehicles that have substantial cost penalties, will suffer significant competitive losses. Employees at those dealerships will lose income and some will lose their jobs.

62. Significant job losses will also occur outside Rhode Island, from the ranks of employees of the vehicle manufacturers and the suppliers of automotive parts and assemblies. On a national level the job losses that will result from implementation of state CO2 regulations like Regulation 37 will far exceed those that, in the 1980s, required the changes in the federal fuel economy rules described above.

63. In addition to ignoring the impact of Regulation 37 on dealers in Rhode Island and the industry as a whole, the Department did not account for the balance between fuel

economy regulation and safety risks that has been struck by NHTSA. Unlike NHTSA, the Department and defendants decided to increase the fuel economy requirements for vehicles to be sold in Rhode Island without any detailed consideration of the trade-offs between fuel economy, vehicle weight, and safety.

64. The precise method that will be used by each manufacturer to comply with the fuel economy requirements created by Regulation 37 in each model year are not currently defined. Nevertheless, if all or part of the industry complies with Regulation 37 in ways similar to the methods used to comply with the fuel economy increases mandated at the national level in earlier years, as recounted in the study cited above in paragraph 31, all or part of the industry likely would produce a fleet of smaller, lighter-weight vehicles for Rhode Island. Individual vehicles that meet Regulation 37's standards will also meet the safety standards set by the federal government. But, as a class, the vehicles that the industry will sell in Rhode Island would be lighter and therefore less crashworthy than vehicles subject to the federal fuel economy standards but not Regulation 37. In addition, Regulation 37 will result in increased driving, as a result of the rebound effect. (*See* ¶ 34 above.) The increase in driving will lead to more highway congestion, more vehicle miles traveled on average in Rhode Island, and thus to an increased exposure to traffic accidents, serious injuries, and fatalities.

65. While not all manufacturers are affected in the same way by the Department's regulations, all significant manufacturers in the U.S. market are now engaged in costly and ambitious programs to design and produce vehicles with improved fuel economy that consumers will want and at prices they can afford. Those programs include the use of new technologies that will provide customers with moderate but steady increases in fuel economy, but that can be produced at reasonable costs only at nationwide volumes, and only on a gradual basis.

66. The effort to introduce vehicles that provide moderate but steady increases in fuel economy nationwide is imperiled by rules like Regulation 37. The technologies and vehicle changes that the industry currently has under development to improve federal CAFE performance will not permit full compliance with Regulation 37.

67. Manufacturers face an immediate dilemma as a result of Regulation 37. They can continue with their current plans for future model years, and face serious sanctions for noncompliance in model year 2009 and thereafter. Alternatively, they can try to redesign the vehicles already slated for production in future model years by adding technology or expensive alterations to the extent such changes are technologically feasible, which even when technologically feasible will in many instances make the vehicles unprofitable. Another approach is to restrict or eliminate the sale of vehicles that threaten compliance with Regulation, and thereby forego the opportunity to recover the fixed investment and production costs for those vehicles.

68. The last option listed above -- restriction of product lines -- will ultimately produce untenable business results for a company that requires revenues from the North American vehicle market to stay in business, but for capital-constrained companies it is the only near-term option. To the extent that a manufacturer chooses the second option listed above -- redesign of its vehicles in order to try to comply with Regulation 37 -- it will have to reassign engineers and other development staff from other projects in order to work on the redesign effort. This will require the manufacturer to defer its efforts to introduce new products in markets outside Rhode Island and California that are needed in order to remain competitive outside Rhode Island and California. That manufacturer will lose sales in non-Rhode Island and non-California markets, and, along with its dealers, will lose profits and goodwill. Those effects will

be felt well before the start of the 2009 model year, as a manufacturer's product line languishes without the updates needed to remain competitive, due to a lack of engineering and production resources.

69. Some manufacturers may try to reduce some of the increased engineering and development burdens created by the Department's new rule by forming joint ventures or other arrangements to share resources, to the extent permitted by law. Those manufacturers face a Hobson's choice, however: if they pool their resources and share technological know-how, they give up valuable intellectual property to their fierce competitors in the marketplace. If they do not engage in joint development work, they have to devote more resources of their own to the engineering effort, which has other immediate adverse consequences.

70. Both because of its direct regulatory impacts and its effects on the federal fuel economy program and the automobile industry in the United States, Regulation 37 is "related to fuel economy standards and average fuel economy standards," and is preempted under 49 U.S.C. § 32919(a). Federal law prohibits the adoption of regulations related to such standards, separate and apart from any attempt to enforce such regulations.

71. In addition, Regulation 37 is inconsistent with NHTSA's determination of the "maximum feasible" corporate average fuel economy standards for cars and light-duty trucks, based upon NHTSA's assessment of technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy, 49 U.S.C. § 32902(f), and thereby frustrates the accomplishment of federal objectives. Regulation 37 intrudes upon a field of regulation occupied by the federal government, conflicts with federal law and regulation, and stands as an obstacle to achievement

of the objectives of Congress when it established a national program for the regulation of motor vehicle fuel economy.

72. Regulation 37 will have an acute, clear, direct and substantial adverse impact on the performance, price, and availability of vehicles that will be sold in Rhode Island. The Department's rule will also have an acute, direct, clear and substantial adverse impact on some manufacturers' efforts to comply with the national fuel economy standards as efficiently as possible, and in a manner that maximizes consumer choices and minimizes adverse effects on employment. In those respects it will interfere with and stand as an obstacle to the achievement of the goals of EPCA and the federal program under EPCA. As NHTSA has explained, "Since the way to reduce carbon dioxide emissions is to improve fuel economy, a state regulation seeking to reduce those emissions is a 'regulation related to fuel economy standards...." (*See* 70 Fed. Reg. 51,414, 51,457 (Aug. 30, 2005)). NHTSA found that such state regulations would interfere with its standard-setting, and thus were both expressly and impliedly preempted by the federal statute:

> [A] state may not impose a legal requirement relating to fuel economy, whether by statute, regulation or otherwise. ... ***A state law that seeks to reduce motor vehicle carbon dioxide emissions is both expressly and impliedly preempted.*** ... For example [such a law or regulation] would interfere [with] the careful balancing of various statutory factors and other related consideration [that] we must do in order to establish average fuel economy standards....

*Id.* (emphasis added).

73. The United States Constitution makes federal law and regulations "the supreme Law of the Land." United States Constitution, article VI, cl. 2. Plaintiffs have legally protected interests under the Constitution, EPCA, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal fuel economy laws against defendant's implementation of CO2 rules adopted by the Department. Plaintiffs will be actually and irreparably injured with

respect to their federally protected interests if Regulation 37 is not declared unlawful and if defendant is not enjoined from implementing that regulation.

74. A clear and judicially cognizable controversy exists between plaintiffs and defendant regarding whether Regulation 37 is preempted by the federal fuel economy laws. Plaintiffs contend that the regulation is preempted by the federal fuel economy laws and cannot be enforced. Defendant disagrees and will enforce Regulation 37 to the detriment of plaintiffs. Moreover, the federal fuel economy laws prohibit the adoption of the regulation challenged here, separate and apart from its enforcement.

75. There is no time for delay in deciding how to comply with Regulation 37. The lead-time needed to design, test and then produce new vehicles capable of meeting Regulation 37 is several years. For example, National Academy of Sciences has found that "[t]echnology changes require very long lead times to be introduced into the manufacturers' product lines. Any policy that is implemented too aggressively (that is, in too short a period of time) has the potential to adversely affect manufacturers, their suppliers, their employees, and consumers.... The widespread penetration of even existing technologies [to improve fuel economy] will probably require 4 to 8 years." (*See* National Academy of Sciences, Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards 5 (2002).)

76. Plaintiffs have no adequate legal remedy for the injuries they would suffer if the Regulation 37 as amended in 2005 goes into effect. For example, any capital investment or other expenses that manufacturers will incur in order to comply with Regulation 37 cannot be later recovered from the State of Rhode Island or from defendant under principles of sovereign and official immunity if the State regulations are found to be invalid or unenforceable by this Court. Some dealers in Rhode Island have already been adversely affected by the prospect that

Regulation 37 will severely limit their product offerings in future model years. Adjudication now of the legality of Regulation 37 and defendant's action is the only way to minimize irreparable harm to vehicle manufacturers and dealers.

77. Plaintiffs cannot obtain enforcement of federal preemption under EPCA in any federal administrative proceeding. For its part, the State of California has claimed in a recent administrative proceeding that EPA has no power to consider whether state regulations that include references to fuel economy standards would be preempted by EPCA. EPA has no authority to consider whether Regulation 37 violates EPCA and to grant relief from its enforcement in Rhode Island.

78. To redress the violations of federal law and the interference with plaintiffs' rights, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that Regulation 37 is preempted and unenforceable.

79. Defendant is now implementing and will continue to implement Regulation 37 in violation of federal law unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law under 42 U.S.C. §§ 1983, 1988 and other provisions of law.

80. An injunction will not impose hardship on defendant, who is required to comply with federal law in the administration of his office.

81. An injunction will protect the public interest by avoiding the increase in ozone-forming emissions otherwise caused by implementation of Regulation 37 as most recently amended, and will not otherwise adversely affect the public interest, because the federal

government retains plenary authority to regulate motor vehicles and to permit the implementation of lawful state motor vehicle regulations.

**<u>Count II</u>**
**For Declaratory and Injunction Relief under**
**Articles I and II of the United States Constitution**

82. Plaintiffs repeat and re-allege paragraphs 1 through 80 of this Complaint as though fully set forth herein.

83. As amended in 2005, Regulation 37 intrudes upon the foreign policy of the United States and the foreign affairs prerogatives of the President and Congress of the United States.

84. The President and Congress have committed the United States to the pursuit of multilateral agreements to reduce international greenhouse gas emissions, including the emissions of developing countries. Regulation 37 and defendant's enforcement of Regulation 37 each conflict with that foreign policy and interferes with the ability of the United States to speak with one voice upon the global issue of global climate change. Regulation 37 and defendant's action further diminish the bargaining power of the United States in negotiating multilateral reductions of greenhouse gases.

85. For the past 20 years, the United States has worked with other countries in an effort to develop a comprehensive, multilateral plan to reduce manmade greenhouse gas emissions, including carbon dioxide emissions, from all sources, not just automobiles. Congress has endorsed and extended this foreign policy on several occasions. In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning global climate change. (*See* Pub. L. 100-204, § 1103(c) (Dec. 22, 1987); 15 U.S.C. § 2901 note.) Pursuant to that law, EPA and the State Department sent a report to Congress

stressing the global nature of the climate change problem calling for "international consensus" and a "comprehensive" approach to "addressing potential climate change."

86. In 1992, the U.S. Senate ratified the United Nations Framework Convention on Climate Change (the "UNFCCC"). (*See* Sen. Exec. Rep. No. 102-55, 102d Cong., 2d Sess. (1992), at 9.) The UNFCCC recognized that "the global nature of climate change calls for the widest possible cooperation by all countries and their participation in an effective and appropriate international response." The treaty established a framework for international cooperation in an effort to "stabilize greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." (*See* UNFCCC, art 2.) Through the UNFCCC, the parties undertook to review their own national policies on greenhouse gases and to work together to negotiate future, binding commitments by which the nations of the world would agree to reduce greenhouse gas emissions.

87. The United States and other members of the UNFCCC worked to develop this multilateral framework through the Kyoto Protocols to the UNFCCC. While the Kyoto Protocol was being negotiated in 1997, the Senate (including both Rhode Island Senators) adopted by a 95-0 vote the Byrd-Hagel Resolution, which stated that the United States should not sign any protocol that would mandate new commitments to reduce U.S. greenhouse gas emissions unless the Protocol also mandated new commitments from developing countries as well. (*See* S. Res. 98, S. Rep. No. 105-54.) Because the final draft of the Protocols provided only for reductions in emissions from developed countries, President William J. Clinton did not submit the Kyoto treaty to the Senate for ratification.

88. In subsequent statutes, Congress has continued to express its opposition to any measure that would require the United States to reduce greenhouse gases, absent an international

agreement involving both developed and developing countries. On several occasions, Congress has attached riders to federal appropriation bills to prohibit the Executive Branch from using funds "to propose or issue rules, regulations, decrees, or orders for the purpose of implementation, or in preparation for implementation, of the Kyoto Protocol" without the ratification of that treaty by the Senate.

89. The current Administration has stated its agreement with Congress's view of the Kyoto Protocols, as expressed in the Byrd-Hagel Resolution. Rather than calling for the adoption of the Kyoto framework, the Executive Branch has promoted new technology and encouraged voluntary measures to reduce CO2 emissions, as well as programs to reduce scientific uncertainty regarding global change, including the Climate Change Research Initiative. In July 2005, the United States joined other industrialized nations in support of new measures to address the issue of global warming at the Gleneagles Summit, held in Scotland. The nations participating in the Gleneagles Summit are now in the process of developing specific measures to coordinate and implement greenhouse gas mitigation and adaptation programs.

90. To prevent interference with its efforts to negotiate international agreements addressing the issue of global warming, the Executive Branch has declined to undertake large-scale unilateral commitments to reduce greenhouse gases. As EPA has explained, one-sided greenhouse gas (or "GHG") commitments could weaken the nation's diplomatic efforts:

> Unilateral EPA regulation of motor vehicle GHG emissions could … weaken U.S. efforts to persuade key developing countries to reduce the GHG intensity of their economies. Considering the large populations and growing economies of some developing countries, increases in their GHG emissions could quickly overwhelm the effects of GHG reduction measures in developed countries. Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them.

68 Fed. Reg. at 52,931 (Sept. 8, 2003).

91. Articles I and II of the United States Constitution commit the creation and pursuit of foreign policy of the United States to the President and the Congress. Plaintiffs have legally protected interests under the Constitution and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal law against Regulation 37. Plaintiffs will be injured with respect to their federally protected interests by the regulation unless it is declared unlawful and unless defendants are enjoined from implementing the regulation. The public interest will be served by such declaratory and injunctive relief.

92. A clear and judicially cognizable controversy exists between plaintiffs and defendant regarding whether Regulation 37 intrudes upon the foreign policy of the United States and the foreign affairs powers of the President and the Congress. Plaintiffs contend that Regulation 37 intrudes upon the ability of the United States to speak with one voice on issues of global climate change and to negotiate multilateral commitments to reduce international greenhouse gases, including from developing countries. Defendant is presently implementing the regulation and will enforce it to the detriment of plaintiffs and the foreign policy of the United States.

93. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that Regulation 37 violates the foreign policy of the United States and the foreign affairs power of the President and the Congress.

94. An injunction will not impose hardship on defendant, who is required to comply with federal law in the administration of his office.

95. An injunction will protect the public interest by avoiding the increase of ozone-forming emissions otherwise caused by implementation of Regulation 37 as most recently amended, and will not otherwise adversely affect the public interest, because the federal government retains plenary authority to regulate motor vehicles in furtherance of national policy, and to permit the implementation of lawful state motor vehicle regulations.

**Count III**
**For Declaratory and Injunctive Relief under the Clean Air Act**

96. Plaintiffs repeat and re-allege paragraphs 1 through 94 of this Complaint as though fully set forth herein. This Count of the Complaint avers that defendants are acting in violation of the Clean Air Act, and is presented as an alternative ground for relief in the event the Court does not grant the relief sought by plaintiffs under Counts I and/or II of the Complaint.

97. Section 209(a) of the Clean Air Act generally preempts States and their political subdivisions from adopting or enforcing "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). In 1967, Congress granted the State of California unique authority to regulate automotive air pollutants, "in recognition of the unique problems faced by California as a result of its climate and topography," and in particular "[t]he acute smog problem" of southern California. (*See* H.R. Rep. No. 728, 90th Cong., 1st Sess. (1967) ("unique problems"); S. Rep. No. 192, 89th Cong., 1st Sess. (1965) ("acute smog").) Congress specified limits on the types of air pollution regulations that California was allowed to adopt and enforce, which are now contained in section 209(b) of the Clean Air Act. (*See* 42 U.S.C. § 7543(b).)

98. As a prerequisite for State enforcement of a California motor vehicle pollution standard, EPA must review and approve the standard under the criteria established by Congress

in section 209(b) of the Clean Air Act. The Clean Air Act does not give EPA the power to initiate, on its own, any review of the rules adopted by California. EPA's oversight cannot begin unless and until California sends a rule to EPA, and requests review.

99. The review of California emissions regulations at EPA under the Clean Air Act can take several years. The Clean Air Act contains no deadlines for EPA action with respect to California rules once they have been submitted for review. In addition, the Clean Air Act does not require that once California's rules are submitted to EPA for review, those rules must remain under review by EPA until approved or not disapproved. In the past California has sometimes submitted rules to EPA for review and put those rules into effect -- but then withdrawn the relevant submittals from EPA, frustrating any timely review.

100. The amendments to Regulation 37 adopted by the Department in 2004 and 2005 are based on California regulations that have been submitted to EPA for review under section 209(b), but EPA has not taken final action on those submittals. The 2004 and 2005 amendments to Regulation 37 are therefore preempted by the Clean Air Act, 42 U.S.C. § 7543(a).

101. Section 177 of the Clean Air Act prohibits any State, including Rhode Island, from attempting to enforce any regulation that has not received a waiver of federal preemption under section 209(b). 42 U.S.C. § 7507. Because California has not received approval for the regulations contained in the 2004 and 2005 amendments to Regulation 37, those requirements cannot be enforced in Rhode Island.

102. Separate and apart from the lack of any EPA approval for the 2004 and 2005 amendments to Regulation 37, enforcement of Regulation 37 would violate the Clean Air Act in other ways as well. Regulation 37 requires certain motor vehicle manufacturers, including GM, DaimlerChrysler and some members of the Alliance of Automobile Manufacturers, to ensure that

vehicles sold in Rhode Island conform to specific fleet-wide average emissions levels, and/or that the mix of different vehicle models sold in specified model years meet certain minimum percentages, starting in model year 2008. Those sale mix requirements are contained in sections 37.3.3 and 37.3.4 of Regulation 37.

103. Sections 37.3.3 and 37.3.4 of Regulation 37 will directly or indirectly force some manufacturers to restrict or limit the sale of some vehicles that would be legal for sale in California, and that could be sold in California in compliance with the CO2 rules in California. This will be necessary because for some manufacturers, the mix of various types of vehicles sold in Rhode Island differs substantially from the mix of vehicles sold in California. Manufacturers will be forced to limit the availability of some of their California product offerings in Rhode Island, to the detriment of Rhode Island dealers, consumers and themselves.

104. Enforcement of the sales mix requirements in sections 37.3.3 and 37.3.4 of Regulation 37 is an undue burden on the automobile industry and its customers, in violation of the Clean Air Act. In addition, the enforcement of such a requirement is specifically forbidden by section 177 of the Clean Air Act, which prohibits any State from limiting "directly or indirectly" the sale of any vehicle meeting California standards or requiring the sale of unique vehicles. 42 U.S.C. § 7507.

105. Regulation 37 also violates section 177 of the Clean Air Act, and is an undue burden on the automobile industry and its customers, because it requires manufacturers to comply with sales mix and other requirements in Rhode Island that are far more onerous and functionally complex, and that differ from, those in California. For example, under the California regulation included in the 2005 amendments to Regulation 37, as many as eight or ten vehicle manufacturers could be classified as "large volume manufacturers" in California, because

they either sell at least 60,000 vehicles per year in California, or are affiliated with firms that sell at least 60,000 vehicles per year in California. The sales of the top seven manufacturers in the Rhode Island market combined did not exceed 60,000 in one recent model year. The Rhode Island regulation treats a company that sells as few as 12,000 vehicles in Rhode Island the same way that California treats a company that five times that many vehicles in California. Vehicle manufacturers that sell 12,000 vehicles in California do not have to comply with the California rule until model year 2016; in Rhode Island, the same manufacturer selling only 12,000 vehicles has to comply with California rule in model year 2009.

106. Plaintiffs have legally protected interests under the Constitution, the Clean Air Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal Clean Air Act with respect to the portions of Regulation 37 that have not received approval from EPA under section 209(b) of the Clean Air Act.

107. Plaintiffs also have legally protected interests in the prohibition on direct or indirect limits on the sale of California-certified vehicles in section 177 of the Clean Air Act.

108. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by enforcement of the requirements of the Clean Air Act, if Regulation 37 is not declared unlawful and if defendant is not enjoined from enforcing Regulation 37. The public interest will be served by such declaratory and injunctive relief.

109. A clear and judicially cognizable controversy exists between plaintiffs and defendant regarding whether defendants may enforce the provisions of Regulation 37 that have not received approval from EPA under the federal Clean Air Act and the sales mix provisions in Regulation 37. Plaintiffs contend that the relevant provisions in Regulation 37 are preempted and cannot be enforced. Defendant is currently implementing Regulation 37 in its entirety and

will enforce it to the detriment of plaintiffs, without awaiting the completion of EPA review of the pertinent California regulations, and without regard to the requirements of section 177 of the Clean Air Act.

110. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that Regulation 37 is preempted by the Clean Air Act.

111. Defendant is now implementing and will continue to implement Regulation 37 in violation of the Clean Air Act and plaintiffs' rights under federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988 and other provisions of law.

112. An injunction will not impose hardship on defendant, who is required to comply with federal law in the administration of his office.

113. An injunction will protect the public interest by avoiding the increase in ozone-forming emissions otherwise caused by implementation of Regulation 37 as most recently amended, and will not otherwise adversely affect the public interest, because the federal government retains plenary authority to regulate motor vehicles and to permit the implementation of lawful state motor vehicle regulations.

## Count IV
## For Declaratory Relief under Article I Of the United States Constitution

114. Plaintiffs repeat and re-allege paragraphs 1 through 112 of this Complaint as though fully set forth herein.

115. Regulation 37 as amended in 2004 and 2005 burdens the production and sale of new motor vehicles by increasing the purchase price to the customer by thousands of dollars. The local benefits of Regulation 37, if any, are insubstantial.

116. Because the burden on interstate commerce of Regulation 37 as amended in 2004 and 2005 is excessive in relation to its local benefits, the regulation violates the Dormant Commerce Clause in Article I of the U.S. Constitution.

117. Plaintiffs have legally protected interests under the Constitution and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of federal law with respect to Regulation 37. Plaintiffs will be irreparably injured with respect to their federally protected interests by Regulation 37 unless it is declared unlawful and defendant is enjoined from implementing it. The public interest will be served by such declaratory and injunctive relief.

118. A clear and judicially cognizable controversy exists between plaintiffs and defendant regarding whether Regulation 37 violates the Dormant Commerce Clause in Article I of the U.S. Constitution. Plaintiffs contend that the regulation excessively burdens interstate commerce in relation to its local benefits. Defendant is presently implementing Regulation 37.

119. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that Regulation 37 as amended in 2004 and 2005 violates the Dormant Commerce Clause.

**Count V**
**For Declaratory and Injunctive Relief under the Sherman Antitrust Act**

120. Plaintiffs repeat and re-allege paragraphs 1 through 119 of this Complaint as though fully set forth herein.

121. Section 37.2.3 of Regulation 37 requires that if one manufacturer owns a 10 percent or greater share of another manufacturer, the two companies will be treated as a single manufacturer for compliance purposes.

122. Manufacturers attempt to control the mix of vehicles that are sold by raising and lowering prices to encourage and discourage sales of particular vehicle models or groups. A manufacturer attempting to comply with a fleet average fuel economy standard will have to ensure that the correct mix of vehicles is sold, and in order to ensure that another manufacturer in which the first manufacturer owns a 10 percent or greater share does not upset the overall mix of vehicles, price information will likely have to be exchanged and perhaps even fixed. The two manufacturers will need to coordinate the sale of vehicles according to their fuel economy, promoting the most fuel-efficient vehicles or restricting the less fuel efficient vehicles, as necessary. Such coordination will likely require the exchange of supply and price information.

123. As a practical matter, Regulation 37 requires manufacturers that are otherwise competitors to exchange production, supply, and price information regarding new motor vehicles. Such coordination -- and in particular, any price fixing -- will have a substantial effect on interstate commerce and is prohibited by federal antitrust law, which prohibits "[e]very contract ... or conspiracy[ ] in restraint of trade or commerce among the several States." (*See* 15 U.S.C. § 1.) Regulation 37 requires illegal coordination among manufacturers that are not a single economic entity.

124. Regulation 37 conflicts with and is preempted by federal law. Plaintiffs have legally protected interests under the Constitution, the Sherman Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the Sherman Act and the national policy of competition against the regulation. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by Regulation 37, unless it is declared unlawful and defendants are enjoined from implementing it. The dealer plaintiffs are injured as purchasers of the vehicles produced by manufacturers subject to the required restraint of trade. Plaintiff Alliance includes manufacturers subject to the required restraint of trade that will be potentially subject to antitrust liability unless the regulation is declared unlawful and its implementation and enforcement enjoined. The public interest will be served by such declaratory and injunctive relief.

125. A clear and judicially cognizable controversy exists between plaintiffs and defendant regarding whether Regulation 37 is preempted by the Sherman Act. Plaintiffs contend that Regulation 37 requires unlawful restraints of trade and cannot be enforced. Defendant is presently implementing Regulation 37 and will enforce it to the detriment of plaintiffs.

126. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that Regulation 37 is preempted by the Sherman Act.

127. Defendants are now implementing and will continue to implement Regulation 37 in violation of the Sherman Act and plaintiffs' rights under the United States Constitution and other federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988 and other provisions of law.

128. An injunction will not impose hardship on defendant, who is required to comply with federal law in the administration of his office.

129. An injunction will protect the public interest by avoiding the increase in ozone-forming emissions otherwise caused by implementation of Regulation 37 as most recently amended, and will not otherwise adversely affect the public interest, because the federal government retains plenary authority to regulate motor vehicles and to permit the implementation of lawful state motor vehicle regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

A A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that Regulation 37 violates federal law in the manner alleged above.

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendant from implementing or enforcing Regulation 37.

C. An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other provisions of federal law.

D. Such other relief available under federal law that may be considered appropriate under the circumstances, including other fees and costs of this action to the extent allowed by federal law.

Respectfully submitted,

Patricia K. Rocha (# 2793)
John A. Tarantino (#2586)
Katy A. Hynes (# 6659)
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607
*For All Plaintiffs*

Of Counsel:

Stuart A. C. Drake
Andrew B. Clubok
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000

*For Plaintiffs Alliance of Automobile Manufacturers, DaimlerChrysler Corporation, and General Motors Corporation*

Dated: February 13, 2006.

*371462_2*