ADLER POLLOCK & SHEEHAN P.C.

One Citizens Plaza, 8th floor
Providence, RI 02903-1345
Telephone 401-274-7200
Fax 401-751-0604 / 351-4607

175 Federal Street
Boston, MA 02110-2890
Telephone 617-482-0600
Fax 617-482-0604

www.apslaw.com

April 11, 2006

***Via Electronic Mail and Hand Delivery***

Tricia K. Jedele, Esquire
Michael Rubin, Esquire
Special Assistant Attorneys General
150 South Main Street
Providence, Rhode Island 02903

**Re: *Lincoln Dodge, Inc., et al. v. Sullivan,* Civil Action No. 06-70-T**
**(U.S. District Court, District of Rhode Island)**

Dear Trish and Mike:

I write in connection with the motion to dismiss filed by the State in the above-captioned matter. The State's motion has been presented under Rule 12(b)(1) of the Federal Rules of Civil Procedure. In order to respond to the motion, my colleagues and I need your assistance in clarifying the basis on which the State is questioning the jurisdiction of the District Court in this matter.

As you know there are two types of motion under Rule 12(b)(1). Some motions challenge jurisdiction based on the sufficiency of the facts alleged in the complaint. *See, e.g., Hernandez-Santiago v. Ecolab, Inc.*, 397 F.3d 30, 33 (1st Cir. 2005). Other motions challenge the accuracy of the facts in the complaint. *Id.* A party in the position of plaintiffs in this action must be given notice of the type of motion being presented, so that if necessary, it can "present relevant facts and arguments supporting [its] claim of jurisdiction." *McCulloch v. Velez*, 364 F.3d 1, 6 (1st Cir. 2004).

We cannot determine from the papers filed exactly what type of Rule 12(b)(1) motion the State is presenting. On one hand, the State's Memorandum of Law states (on page 5) that "[h]ere, Plaintiffs' have failed to allege facts 'giving rise to a "case or controversy" which is "ripe" for adjudication.'" On the other hand, the State later asserts (on page 10) that "the mere adoption of Reg. 37 does not cause Plaintiffs to suffer a direct or immediate harm that would warrant injunctive relief." Likewise, page 11 of the Memorandum of Law asserts that any "harm is not direct or immediate as it is wholly contingent upon EPA's decision to grant a waiver to the State of California." The latter two statements in the Memorandum of Law appear to deny that there is any direct or immediate harm to plaintiffs, although the Complaint pleads facts concerning harm in an extensive manner.

STATE CAPITAL
GLOBAL LAW FIRM GROUP

Member firms of the State Capital Global Law Firm Group practice independently and not in a relationship for the joint practice of law.

EXHIBIT
A

We need a clear statement from the State whether for purposes of the motion to dismiss the State is attempting to assert that the facts pleaded are legally insufficient or that the Complaint's allegations are inaccurate. I attach to this letter an excerpt from the Complaint, with particular facts pertinent to the Court's jurisdiction to provide pre-enforcement review of Regulation 37 shown in italics. My colleagues and I would appreciate your indicating to us by the close of business on April 13 whether you are accepting each of those allegations as true for purposes of the present motion. If you are not accepting them as true for purposes of this motion, we need to know immediately which ones the State is attempting to put into issue so that we can proceed accordingly and respond to the 12(b)(1) motion.

Thank you for your courtesy and assistance in this matter and for responding in such a limited period of time. Having given the State the extension of time for pleading that it requested earlier this year, we need to move forward as quickly as possible. Accordingly, if you do not believe that you will be in a position to respond fully to this request by the end of the day on April 13, please let me know by the end of the day tomorrow.

Sincerely,

Pat K Rocha

Patricia K. Rocha

cc: Stuart Drake, Esq.
John A. Tarantino, Esq.
Charles H. Haake, Esq.
Joseph V. Cavanagh, Jr., Esq.
Kristin E. Rodgers, Esq.

*378042_1.doc*

**Attachment A – *Lincoln Dodge, Inc., et al. v. W. Michael Sullivan, ex officio***
**Excerpts from Complaint filed Feb. 13, 2006**

¶ 2 *The motor vehicle standards and other requirements challenged in this action were adopted by the Department in 2004 and 2005, and are contained in Air Pollution Control Regulation No. 37, attached hereto as Exhibit A ("Regulation 37"). Unless declared unlawful and enjoined by this Court, Regulation 37 as amended in 2004 and 2005 will increase the prices of new vehicles in this State, reduce consumer choice among different vehicle models, create safety risks for the motoring public, and hinder Rhode Island's ability to meet federal standards for air quality.*

¶ 8 *Each of the dealer plaintiffs in this action is located in the District of Rhode Island and each has suffered and will continue to suffer harm in this District as a result of defendant's actions described in this action that give rise the claims stated herein. Each of the manufacturers represented by the Alliance as a plaintiff does business in this District and has also suffered and will continue to suffer harm in this District as a result of defendants' actions.* Venue in this Court is proper under 28 U.S.C. § 1391(b).

¶ 40 *The regulations primarily involved in this action are the product of a brief rulemaking process at the Department that completed in 2005. Those regulations are based on rules adopted by the State of California in 2004. According to estimates prepared by California, which the Department appears to have endorsed in its rulemaking, the pertinent regulations adopted in California in 2004 and Rhode Island in 2005 will add about $1,000 to the cost of an average new vehicle governed by those regulations, once the rules are fully implemented. A price increase of that magnitude was predicted by the State of California to result in a reduction in new-vehicle sales in California of between four and five percent.*

¶ 49 *By virtue of amendments to Regulation 37 completed on or about December 21, 2004, the Department elected to require that new motor vehicles in certain classes and categories be required to comply with California emissions standards, starting in model year 2008, with no provision for alternative compliance to federal vehicle emissions standards. The 2008 model year will begin under applicable regulations on January 2, 2007.*

¶ 50 *In December 2005, the Department further amended Regulation 37 to require compliance with the California greenhouse gas and carbon dioxide regulations, beginning in model year 2009. The 2009 model year will begin under applicable regulations on January 2, 2008.*

¶ 57 A primary purpose and effect of the Department's new CO2 standards will be to require dramatic increases in the fuel economy of cars and trucks sold in Rhode Island. *Vehicles sold in Rhode Island will have to achieve much more stringent fuel economy levels than required by federal law and regulation. Many currently offered models of vehicles sold in Rhode Island will disappear from some manufacturers' product offerings, because it will be economically impractical to bring those models into compliance with Regulation 37. This will have serious negative affects on consumer choice, on the economic health of many automobile dealers in Rhode Island, and on employment in the automobile industry in the United States.*

¶ 58 *Several vehicle manufacturers have attested to the serious economic impact of state fuel economy rules like Regulation 37. In filings with the SEC, those manufacturers have alerted investors to the potential adverse effects of state CO2 standards if those standards were to withstand legal challenge. Those projected impacts include "severely restrict[ed] product offerings or close[d] plants" and "significantly restrict[ed] products." (See General Motors Corporation, Form 10-K (March 16, 2005)), at I-4; DaimlerChrysler Corporation, Form 20-F (filed Feb. 28, 2005), at 33; see also Ford Motor Company, Form 10-K (March 10, 2005), at 18).*

¶ 59 *The businesses most directly impacted by Regulation 37 in Rhode Island will be automobile dealerships. The new-vehicle planning processes for at least two manufacturers (GM and DCC, two of the plaintiffs in this action) have proceeded to the point where those two companies can estimate how Regulation 37 will affect their product lines in jurisdictions like Rhode Island. GM and DCC have projected very substantial reductions in their product lines if rules like Regulation 37 take full effect. GM and DCC have also predicted large increases in the costs and therefore the prices of many of the vehicle models that they will try to keep in their product lines once rules like Regulation 37 are implemented.*

¶ 60 *The anticipated restrictions in product lines and the cost increases for remaining models have severe consequences for independent franchised dealers in Rhode Island. The fact that those businesses will, in the future, see substantial curtailments in their product lines and large price increases has already had an impact on their current value as going concerns. Automotive retail businesses in the State of California with the same current basic product lines as those in Rhode Island have been estimated to have already lost up to $4.6 million in their current value, even though the new California regulation does not apply to their product lines until model year 2009.*

¶ 61 *Starting in the 2009 model year, vehicles that do not meet the Department's CO2 requirements will not be legal for sale by dealers in Rhode Island. Based on the predictions of some manufacturers, many dealers in Rhode Island will not have a full line of compliant vehicles to market. In addition, many vehicles that can be brought into compliance with Regulation 37 will cost substantially more than comparable vehicles sold by other manufacturers. Dealers with restricted product lines, and/or with vehicles that have substantial cost penalties, will suffer significant competitive losses. Employees at those dealerships will lose income and some will lose their jobs.*

¶ 67 *Manufacturers face an immediate dilemma as a result of Regulation 37. They can continue with their current plans for future model years, and face serious sanctions for noncompliance in model year 2009 and thereafter. Alternatively, they can try to redesign the vehicles already slated for production in future model years by adding technology or expensive alterations to the extent such changes are technologically feasible, which even when technologically feasible will in many instances make the vehicles unprofitable. Another approach is to restrict or eliminate the sale of vehicles that threaten compliance with Regulation, and thereby forego the opportunity to recover the fixed investment and production costs for those vehicles.*

¶ 68 *The last option listed above -- restriction of product lines -- will ultimately produce untenable business results for a company that requires revenues from the North American vehicle market to stay in business, but for capital-constrained companies it is the only near-term option. To the extent that a manufacturer chooses the second option listed above -- redesign of its vehicles in order to try to comply with Regulation 37 -- it will have to reassign engineers and other development staff from other projects in order to work on the redesign effort. This will require the manufacturer to defer its efforts to introduce new products in markets outside Rhode Island and California that are needed in order to remain competitive outside Rhode Island and California. That manufacturer will lose sales in non-Rhode Island and non-California markets, and, along with its dealers, will lose profits and goodwill. Those effects will be felt well before the start of the 2009 model year, as a manufacturer's product line languishes without the updates needed to remain competitive, due to a lack of engineering and production resources.*

¶ 69 *Some manufacturers may try to reduce some of the increased engineering and development burdens created by the Department's new rule by forming joint ventures or other arrangements to share resources, to the extent permitted by law. Those manufacturers face a Hobson's choice, however: if they pool their resources and share technological know-how, they give up valuable intellectual property to their fierce competitors in the marketplace. If they do not engage in joint development work, they have to devote more resources of their own to the engineering effort, which has other immediate adverse consequences.*

¶ 75 *There is no time for delay in deciding how to comply with Regulation 37. The lead-time needed to design, test and then produce new vehicles capable of meeting Regulation 37 is several years. For example, National Academy of Sciences has found that "[t]echnology changes require very long lead times to be introduced into the manufacturers' product lines. Any policy that is implemented too aggressively (that is, in too short a period of time) has the potential to adversely affect manufacturers, their suppliers, their employees, and consumers.... The widespread penetration of even existing technologies [to improve fuel economy] will probably require 4 to 8 years." (See National Academy of Sciences, Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards 5 (2002).)*

¶ 76 Plaintiffs have no adequate legal remedy for the injuries they would suffer if the Regulation 37 as amended in 2005 goes into effect. For example, any capital investment or other expenses that manufacturers will incur in order to comply with Regulation 37 cannot be later recovered from the State of Rhode Island or from defendant under principles of sovereign and official immunity if the State regulations are found to be invalid or unenforceable by this Court. *Some dealers in Rhode Island have already been adversely affected by the prospect that Regulation 37 will severely limit their product offerings in future model years.* Adjudication now of the legality of Regulation 37 and defendant's action is the only way to minimize irreparable harm to vehicle manufacturers and dealers.

¶ 77 Plaintiffs cannot obtain enforcement of federal preemption under EPCA in any federal administrative proceeding. *For its part, the State of California has claimed in a recent administrative proceeding that EPA has no power to consider whether state regulations that include references to fuel economy standards would be preempted by EPCA.* EPA has no

authority to consider whether Regulation 37 violates EPCA and to grant relief from its enforcement in Rhode Island.

¶ 98 As a prerequisite for State enforcement of a California motor vehicle pollution standard, EPA must review and approve the standard under the criteria established by Congress in section 209(b) of the Clean Air Act. *The Clean Air Act does not give EPA the power to initiate, on its own, any review of the rules adopted by California. EPA's oversight cannot begin unless and until California sends a rule to EPA, and requests review.*

¶ 99 *The review of California emissions regulations at EPA under the Clean Air Act can take several years.* The Clean Air Act contains no deadlines for EPA action with respect to California rules once they have been submitted for review. In addition, the Clean Air Act does not require that once California's rules are submitted to EPA for review, those rules must remain under review by EPA until approved or not disapproved. *In the past California has sometimes submitted rules to EPA for review and put those rules into effect -- but then withdrawn the relevant submittals from EPA, frustrating any timely review.*

¶ 102 Separate and apart from the lack of any EPA approval for the 2004 and 2005 amendments to Regulation 37, enforcement of Regulation 37 would violate the Clean Air Act in other ways as well. *Regulation 37 requires certain motor vehicle manufacturers, including GM, DaimlerChrysler and some members of the Alliance of Automobile Manufacturers, to ensure that vehicles sold in Rhode Island conform to specific fleet-wide average emissions levels, and/or that the mix of different vehicle models sold in specified model years meet certain minimum percentages, starting in model year 2008. Those sale mix requirements are contained in sections 37.3.3 and 37.3.4 of Regulation 37.*

¶ 105 Regulation 37 also violates section 177 of the Clean Air Act, and is an undue burden on the automobile industry and its customers, because it requires manufacturers to comply with sales mix and other requirements in Rhode Island that are far more onerous and functionally complex, and that differ from, those in California. *For example, under the California regulation included in the 2005 amendments to Regulation 37, as many as eight or ten vehicle manufacturers could be classified as "large volume manufacturers" in California, because they either sell at least 60,000 vehicles per year in California, or are affiliated with firms that sell at least 60,000 vehicles per year in California. The sales of the top seven manufacturers in the Rhode Island market combined did not exceed 60,000 in one recent model year. The Rhode Island regulation treats a company that sells as few as 12,000 vehicles in Rhode Island the same way that California treats a company that five times that many vehicles in California. Vehicle manufacturers that sell 12,000 vehicles in California do not have to comply with the California rule until model year 2016; in Rhode Island, the same manufacturer selling only 12,000 vehicles has to comply with California rule in model year 2009.*