UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINCOLN DODGE, INC., et al. | : | C.A. No. 06-70T |
| | : | |
| v. | : | ORAL ARGUMENT REQUESTED |
| | : | |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management | : | EVIDENTIARY HEARING REQUESTED (CONDITIONALLY) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs hereby object to the Defendant's Motion to Dismiss. In support thereof, Plaintiffs file their Memorandum in Support of Opposition to Defendant's Motion to Dismiss contemporaneously herewith.

Pursuant to LR Cv 7(e), Plaintiffs request oral argument with an estimated time of 30 minutes. Plaintiffs also conditionally request an evidentiary hearing if the Court deems necessary.

Dated: April 25, 2006

PLAINTIFFS
By their attorneys,

Patricia K. Rocha (# 2793)
John A. Tarantino (#2586)
Katy A. Hynes (# 6659)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607
*For All Plaintiffs*

Stuart A. C. Drake by [signature]

Stuart A. C. Drake
Andrew B. Clubok
*Admitted Pro Hac Vice*
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000

*For Plaintiffs Alliance of Automobile Manufacturers, DaimlerChrysler Corporation, and General Motors Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of April, 2006, I caused to be served **via hand delivery**, a true copy of the within document on:

Tricia Jedele
Special Assistant Attorney General,
Environmental Advocate
Michael Rubin, Esq.
DEPARTMENT OF ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

Timothy Pavilonis, Esq.
Office of Legal Counsel
Rhode Island Department of
Environmental Management
235 Promenade Street
Providence, RI 02908

[signature: Debra Human]

*379365_1.doc*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| LINCOLN DODGE, INC.; SMITHFIELD CHRYSLER JEEP, INC.; SIMON CHEVROLET-BUICK, LTD.; PAUL MASSE CHEVROLET, INC.; PAUL MASSE PONTIAC-CADILLAC-GMC, INC.; DELUXE AUTO SALES, INC.; TASCA AUTOMOTIVE GROUP, INC.; THE NEW BAY BUICK, INC.; HURD CHEVROLET, INC.; HURD BUICK PONTIAC-GMC TRUCK, INC.; ALLIANCE OF AUTOMOBILE MANUFACTURERS; DAIMLERCHRYSLER CORPORATION; and GENERAL MOTORS CORPORATION, | : | **C.A. No. 06-70T** |
| Plaintiffs, | : | ORAL ARGUMENT REQUESTED |
| v. | : | |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management, | : | EVIDENTIARY HEARING REQUESTED (CONDITIONALLY) |
| Defendant. | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 1

II. BACKGROUND OF THE LITIGATION ..... 3

A. Defendant's Carbon Dioxide Regulation ..... 3

B. The Role of EPA ..... 5

C. Immediate Impact of the CO2 Rule ..... 8

III. ARGUMENT ..... 10

A. The Claims Presented in the Complaint are Ripe and Require the Full Exercise of Federal Jurisdiction. ..... 10

1. The Complaint States a Proper Case or Controversy under Article III ..... 10

2. The Legal Issues Here Are Fit for Judicial Action ..... 11

3. Plaintiffs' Injuries Are Not Contingent on Future Events and Any Delay in Adjudication Will Cause Significant Hardship ..... 12

B. The Argument Contained in Part II of Defendant's Motion Is Not Properly Raised under Rule 12(b)(1), And In Any Event Lacks Merit Because It Ignores The Limits on EPA's Review Powers. ..... 17

C. If the Court is Not Prepared to Deny the Motion Based on the Complaint's Allegations, It Should Proceed with Fact-Finding and If Necessary Conduct An Evidentiary Hearing ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)........................................ 15, 18

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999)........................................ 11

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Protection*,
208 F.3d 1 (1st Cir. 2000)........................................ 12, 18

*Bell v. Hood*,
327 U.S. 678 (1946)........................................ 19

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................ 11

*Bowen v. First Family Fin. Servs., Inc.*,
233 F.3d 1331 (11th Cir. 2000)........................................ 11

*Buckley v. Valeo*,
424 U.S. 1 (1976)........................................ 12

*Cal. Pro-Life Council, Inc. v. Getman*,
328 F.3d 1088 (9th Cir. 2003)........................................ 11

*Columbia Broadcasting System, Inc. v. United States*,
316 U.S. 407 (1942)........................................ 11

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*,
438 U.S. 59 (1978)........................................ 10, 11, 15, 17

*Ernst & Young v. Depositors Econ. Protection Corp.*,
45 F.3d 530 (1st Cir. 1995)........................................ 13

*Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs*,
44 F.3d 1178 (3d Cir. 1995)........................................ 16

*Hernandez-Santiago v. Ecolab, Inc.*,
397 F.3d 30 (1st Cir. 2005)........................................ 19

*International Truck & Engine Corp. v. Lloyd*,
No. 01-1245 (E.D. Cal. Oct. 24, 2001)........................................ 16

*Kucharek v. Hanaway*,
902 F.2d 513 (7th Cir. 1990)........................................ 14

*Lincoln House, Inc. v. Dupre*,
903 F.2d 845 (1st Cir. 1990) .......... 13

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 11

*Lujan v. Nat'l Wildlife Federation*,
497 U.S. 871 (1990) .......... 11

*Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*,
973 F.2d 18 (1st Cir. 1992) .......... 13

*McCall v. Dretke*,
390 F.3d 358 (5th Cir. 2004) .......... 10

*McCulloch v. Velez*,
364 F.3d 1 (1st Cir. 2004) .......... 20

*Motor & Equip. Mfrs. Ass'n v. EPA*,
627 F.2d 1095 (D.C. Cir. 1979) .......... 7

*Muniz-Rivera v. United States*,
326 F.3d 8 (1st Cir. 2003) .......... 19

*N.C. Right to Life, Inc. v. Bartlett*,
168 F.3d 705 (4th Cir. 1999) .......... 14

*Nat'l Treasury Employees Union v. United States*,
101 F.3d 1423 (D.C.Cir.1996) .......... 11

*New York v. United States*,
505 U.S. 144 (1992) .......... 16

*Nitke v. Gonzales*,
413 F. Supp. 2d 262 (S.D.N.Y. 2005) .......... 14

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) .......... 12, 16

*Regional Railroad Reorganization Act Cases*,
419 U.S. 102 (1974) .......... 11, 12, 14, 15

*Rhode Island v. Narragansett Indian Tribe*,
19 F.3d 685 (1st Cir. 1994) .......... 11, 12, 15

*Riva v. Massachusetts*,
61 F.3d 1003 (1st Cir. 1995) .......... 10, 15

*Ross-Simons of Warwick v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) ........ 11

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ........ 19

*The Wilderness Soc. v. Norton*,
434 F.3d 584 (D.C. Cir. 2006) ........ 19

*Va. Society for Human Life, Inc. v. FEC*,
263 F.3d 379 (4th Cir. 2001) ........ 14

*Vermont Right to Life v. Sorrell*,
221 F.3d 376 (2d Cir. 2000) ........ 14

**Statutes**

42 U.S.C. § 7507 ........ 5, 18, 19

42 U.S.C. § 7543 ........ 18

42 U.S.C. § 7543(b) ........ 5

49 U.S.C. § 32919(a) ........ 1

**Rules**

40 Fed. Reg. 30311 (July 18, 1975) ........ 5

67 Fed. Reg. 54180 (Aug. 21, 2002) ........ 6

68 Fed. Reg. 19811 (Apr. 22, 2003) ........ 6

68 Fed. Reg. 62295 (Nov. 3, 2003) ........ 6

69 Fed. Reg. 59920 (Oct. 6, 2004) ........ 6

69 Fed. Reg. 60995 (Oct. 14, 2004) ........ 6

71 Fed. Reg. 17566 (Apr. 6, 2006) ........ 1

National Research Council, EFFECTIVENESS AND IMPACT OF CORPORATE AVERAGE FUEL ECONOMY (CAFE) STANDARDS (2002) ........ 5

**Treatises**

E. Chemerinksy, FEDERAL JURISDICTION (4th ed. 2003) ........ 10

**MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS**

Plaintiffs respectfully submit this memorandum in opposition to defendant's motion to dismiss. For the reasons explained below, defendant's motion to dismiss should be denied outright, or the Court should proceed with an evidentiary hearing on the motion.

## I. PRELIMINARY STATEMENT

Since 1978, the federal government has enforced national fuel economy standards for automobiles pursuant to the Energy Policy and Conservation Act of 1975 ("EPCA"). In December 2005, defendant and the Department of Environmental Management ("DEM") adopted a competing regulation that, by its own terms, took effect in Rhode Island on January 11, 2006.

The State's December 2005 action had two key features: [1] it created more stringent fuel economy standards for Rhode Island vehicles than required by federal law; and [2] it ignored the safety and economic factors that EPCA requires the federal government to consider in setting the national fuel economy standards.

The main legal issue presented here is simple. In addition to requiring national fuel economy standards, EPCA generally preempts state fuel economy standards and regulations relating to such standards. *See* 49 U.S.C. § 32919(a). The federal agency in charge of the national fuel economy program, the National Highway Traffic Safety Administration ("NHTSA"), has addressed the preemption issue. NHTSA has declared that any state regulation of the type involved in this action "is expressly preempted [by EPCA,]" "would frustrate the objectives of Congress," and "conflict[s] with the efforts of NHTSA" to administer the national fuel economy program. 71 Fed. Reg. 17566, 17654, 17667 (Apr. 6, 2006).

The main purpose of this lawsuit is to enforce the preemption provision in EPCA, as NHTSA has interpreted it, to provide timely relief to plaintiffs. Defendant is attempting to block

the action on the theory that plaintiffs' claims are not ripe. His theory for dismissal has at least four insurmountable problems.

- Defendant's motion is based on his views about an administrative procedure under the federal Clean Air Act involving another federal agency, the Environmental Protection Agency ("EPA). He omits at least one crucial point: under the relevant process, EPA has no duty to decide whether state regulations like those involved in this case are preempted by EPCA. That is settled law under the Clean Air Act. The only method of enforcing EPCA's preemption provisions against a specific state regulation is judicial, and this is the only federal court that can grant relief against DEM's regulation.

- The statement in defendant's motion papers that formal "enforcement" of DEM's new regulation would await some future action by EPA is vague, subject to change, and as a practical matter useless. Designing and producing vehicles to meet new vehicle emissions standards is a multi-year process, particularly when the standards are as stringent as those adopted by DEM. If vehicle manufacturers were to await a decision by EPA on the legality of the standards challenged here, some manufacturers would be unable to bring themselves into compliance with DEM's regulation. As a result, manufacturers have to make the decision now whether to spend resources to ensure compliance. They have a clear right under the case law to obtain pre-enforcement review of DEM's regulation.

- By defendant's admission, any decision by EPA in the Clean Air Act process described in his brief is probably years away. In the interim, many Rhode Island dealerships have already been harmed, and will continue to be harmed, by DEM's regulation. The regulation will make some dealerships uncompetitive in important market segments. Their anticipated future losses have an immediate impact on their current value -- in some instances, seven-figure

losses in current business value. Like the manufacturers, the dealer plaintiffs in this action are therefore also entitled to this Court's review of DEM's regulation without delay.

- Defendant's challenge to this Court's jurisdiction ultimately rests on an incorrect premise that Congress has committed the decision about the scope of federal preemption to EPA. Defendant points to no federal statute withdrawing federal court jurisdiction. Even if one assumes that EPA would take the action that defendant wants, and would hold that the Clean Air Act legalizes an action that NHTSA recently declared to violate EPCA, this Court would still need to decide which statutory program (EPCA or the Clean Air Act) controlled. Plaintiffs are aware of no decision by any federal court granting a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, on the theory that a possible future decision by one federal agency bars the federal courts from hearing an otherwise cognizable claim presented under a statute administered by a different agency.

## II. BACKGROUND OF THE LITIGATION

Defendant's motion presents an incomplete description of the federal administrative processes on which his motion is based, and ignores the practical effects that DEM's regulation is already having in Rhode Island. It is therefore important to begin with a review of the governing federal regulatory programs and to explain briefly the consequences if defendant's motion were to be granted.

### A. Defendant's Carbon Dioxide Regulation

Defendant's regulation is carefully worded. It does not refer explicitly to the "fuel economy" of vehicles to be sold in Rhode Island. Instead, DEM's standards are expressed as a set of limits on the level of carbon dioxide ("CO2") and related substances that motor vehicles will be allowed to emit. Nevertheless, the only way that gasoline-powered vehicles will be able to achieve DEM's CO2-based standards is reducing fuel consumption, because CO2 is a natural

by-product of combustion. Rhode Island is one of several States that has recently enacted these *de facto* fuel economy standards under the guise of CO2 regulation. As one recent publication from one of the relevant States pointed out, the practical effect of such rules will be to "drastically" increase fuel efficiency.[1]

NHTSA addressed state regulation of carbon dioxide emissions in its *Federal Register* publication earlier this month. NHTSA explained that the States have for many years regulated smog-forming emissions from motor vehicles, which can be controlled with devices such as catalytic converters.[2] NHTSA found no conflict between such standards for smog-forming emissions and the preemption provisions of EPCA, because compliance with those standards would "only incidentally or tangentially affect fuel economy." 71 Fed. Reg. at 17669. NHTSA distinguished air pollution standards from a state CO2 standard that has "essentially all of the effects of a fuel economy standard, but is not labeled as one." *Id.* NHTSA concluded that "[t]he Clean Air Act authorizes the States to regulate emissions other than CO2, but not CO2 itself." *Id.* at 17670.

The methods for reducing CO2 emissions from motor vehicles (*i.e.*, increasing fuel economy) are frequently more complex than the control of smog-forming emissions and other pollutants. For present purposes, the key fact is that deployment of the needed technologies across a wide number of vehicle models takes many years. According to one independent study

---

[1] *See* Press Release, Office of the Governor of California, Gov. Schwarzenegger Hosts Climate Action Summit (Apr. 11, 2006), *available at* http://www.governor.ca.gov/state/govsite/gov_htmldisplay.jsp?sFilePath=/govsite/press_release/2006_04/20060411_GAAS22506_ClimateSummit.html&sCatTitle=Press%20Release.

[2] *See* 71 Fed. Reg. at 17670. Rhode Island adopted regulations to control automotive smog-forming emissions in 1996. *See* Affidavit of Stephen Majkut ("Majkut Aff.") ¶ 3.

completed by the National Research Council in 2002, the preparations to deploy fuel economy technologies can take four to eight years even when the technologies are readily available.[3]

**B. The Role of EPA**

The Clean Air Act grants EPA, a federal regulatory agency separate from the Department of Transportation and NHTSA, the authority to set standards for ozone-forming pollutants and toxic emissions from motor vehicles. (*See* Compl. ¶¶ 10-12). As indicated in defendant's motion and NHTSA's recent analysis, the Clean Air Act permits the States to regulate the same automotive air pollutants as EPA. The basic division of authority at the federal level is therefore as follows: [1] NHTSA regulates automotive fuel economy; and [2] EPA regulates automotive air pollutants.

In order for States like Rhode Island to regulate air pollution from new vehicles, the relevant state standards must first be adopted in California. *See* 42 U.S.C. § 7507. The California standards require review by EPA; otherwise, the Clean Air Act preempts enforcement of the state air pollution standards. *See* 42 U.S.C. § 7543(b). As a formal matter, EPA must "waive" the federal preemption of the state standards. Accordingly, the EPA review process for California standards is called a waiver proceeding. *See id.* § 7543(b).

Several basic points about the EPA waiver review process are important. First, when EPA completes its review of a new California emissions standard, its practice is to permit the new standard to apply in the first model year sought in California's application.[4] As defendant

---

[3] *See* National Research Council, EFFECTIVENESS AND IMPACT OF CORPORATE AVERAGE FUEL ECONOMY (CAFE) STANDARDS (2002) 5 ("widespread penetration of even existing [fuel economy] technologies will probably require 4 to 8 years").

[4] Only once in the history of the Clean Air Act, in 1975, did EPA require a delay in the start date for a regulation it was reviewing. In that instance, the delay was for a single year. *See* 40 Fed. Reg. 30311, 30314 (July 18, 1975).

states, new state regulations are treated as "operative and enforceable" the moment that EPA grants a waiver. (Deft.'s Mem. of Law at 3 n.2.)

Second, there are no time limits in the Clean Air Act for commencement of, or completion of, a waiver proceeding. As defendant admits, EPA's work "can take a number of years." (*Id.* at 3.) Because the waiver review process must be initiated and pursued by California, California can derail the EPA review process by simply withdrawing a request for EPA review from the Agency's consideration and promising to resubmit the rule later.[5] EPA frequently does not complete its review of a California rule until after the first model year of applicability has started in California. For example, EPA did not complete its work on some California tailpipe pollution standards that first applied to model year 2001 vehicles until September 2004. *See* 69 Fed. Reg. 60995 (Oct. 14, 2004); 68 Fed. Reg. 62295 (Nov. 3, 2003). EPA did not act on a separate California rule governing other emissions until four years after the California standard began to apply. *See* 67 Fed. Reg. 54180 (Aug. 21, 2002). EPA did not complete its review of California's emission regulations for some truck engines until more than six years after the regulations became effective in California. *See* 69 Fed. Reg. 59920 (Oct. 6, 2004).

The upshot is that although vehicle manufacturers participate in waiver proceedings concerning California standards, they cannot and do not wait for the completion of EPA's review of California's regulation before committing resources to the production of vehicles that meet new standards. Because the timing of EPA's decision-making process is unpredictable, and

5 *See, e.g.*, 68 Fed. Reg. 19811, 19811 (Apr. 22, 2003) (recounting California's submittal and withdrawal of waiver application for zero-emission vehicle and related standards).

manufacturers cannot quickly make major changes in their product plans, manufacturers must be prepared to comply with even "unenforceable" regulations.[6]

Defendant cannot contest any of those basic facts about the EPA waiver process. One important legal factor that DEM must also concede is that the Clean Air Act does not require EPA to decide whether a given regulation submitted by California complies with any statute other than the Clean Air Act. The D.C. Circuit determined more than 25 years ago that Congress did not require EPA to evaluate whether California regulations were consistent or inconsistent with other federal statutes, so long as the regulation met the specific criteria in the Clean Air Act (which defendant quotes on page 5 of his brief). *See Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1114-19 (D.C. Cir. 1979) ("*MEMA*") (holding that EPA is required to grant waiver unless the regulation is shown to be inconsistent with specific terms of 42 U.S.C. § 7543(b)).

The *MEMA* decision is important to the present situation. Putting aside the merits and the full reach of the *MEMA* precedent, there can be no question about what would happen if EPA tried to venture beyond the four corners of the Clean Air Act in its review of the current round of state CO2 standards. Such an action by EPA would be challenged in the D.C. Circuit by the proponents of the state CO2 standards, based on the *MEMA* decision. For example, California has consistently interpreted the Clean Air Act and *MEMA* decision to bar EPA's consideration of any issues under EPCA. As California stated in one waiver proceeding in 2002:

> EPCA is administered not by U.S. EPA but by the National Highway Traffic Safety Administration (NHTSA). Arguments raising constitutional claims and preemption issues not involving the [Clean Air Act] are *beyond the scope of the*

6 As Defendant explains, states like Rhode Island must adopt the California standards two years before the first model year of applicability, but can seek to enforce those standards the moment that EPA approves the standards. (*See* Deft.'s Mem. of Law at 8-9.) For example, DEM adopted some standards (for emissions other than CO2) in December 2004, to take effect in the 2008 model year, which starts on January 2, 2007. (*See* Compl. ¶ 49.) If EPA grants a waiver for those model year 2008 standards by January 1, 2007, the State will enforce them the next day.

> *Administrator's review* and a waiver or scope-of-the-waiver proceeding is *not the proper forum* for such claims.

*See* Exhibit A (emphasis added). A decision by EPA denying a waiver for California's standards as inconsistent with EPCA (rather than some provision of the Clean Air Act) will not be the last word on the matter.[7] Nor is a denial of a waiver on any other grounds likely to be accepted by the State of California without an appeal to the D.C. Circuit.

### C. Immediate Impact of the CO2 Rule

Although its CO2 regulation is a recent development (enacted in 2004), California's smog-fighting regulations date back many years. In 1996, Rhode Island adopted the California smog-control regulations for motor vehicles. Until 2004, however, the Rhode Island regulations allowed the sale of either California or federally-approved new vehicles in the State. (*See* Majkut Aff. ¶ 3.) When the 2008 model year starts, it will generally be unlawful for a dealer to sell a new vehicle to a Rhode Island resident that does not comply with the California regulation.[8]

In addition to requiring heavy investment by nearly all vehicle manufacturers, the CO2 regulation is so stringent that some manufacturers will have only a limited product line of new models available for the Rhode Island market; as the regulation escalates in stringency, those manufacturers' product lines will shrink. (*See id.* at ¶ 57.) This results from the fact that the CO2 regulation is structured in a manner that requires different manufacturers to spend different

---

[7] Defendant's brief does not contradict this. His brief explains DEM's position on what happens if EPA approves the CO2 standards, *see* Deft's Mem. of Law at 12-13, but reserves any statement on what action it or other States would take if EPA decides to disapprove those standards.

[8] *See* Compl. ¶ 61. DEM had the option of continuing with its earlier approach, which permitted the sale of federally-approved vehicles in Rhode Island. The federal air pollution standards will reduce smog-forming emissions to near-zero level and to date have substantially cut pollution here. *See* Compl. ¶ 12.

sums to bring their products into compliance with the CO2 limits. The regulation is also much more stringent for some truck manufacturers than others. Internal studies by vehicle manufacturers and independent reviews have developed precise estimates of compliance costs for different types of vehicles and manufacturers.[9] At least two manufacturers (the individual plaintiff manufacturers in this case) have concluded that the only way they can remain in any part of the Rhode Island new-vehicle market will be to eliminate major parts of their product lines, and to concentrate on the remaining segments in which they may be able to remain cost-competitive and profitable. This is confirmed by the affected manufacturers' SEC business disclosures, which indicate that if required to comply with these rules, they will be forced to restrict product lines.[10]

The cut-backs in some manufacturers' product lines resulting from the CO2 regulation is several years away. But for the members of the automobile industry who are in the front lines to remain competitive -- the independent retail automotive dealers of Rhode Island -- the loss in future sales directly translates into a reduction in the current value of their businesses. For those dealers, it is immaterial that actual "enforcement" of the regulation also lies in the future. For the present, the fact that the dealers face future limitations on their product lines (absent judicial relief) has a real and present impact on how they, their lenders, and prospective purchasers value their businesses.

---

[9] One plaintiff in this action, the Alliance of Automobile Manufacturers, represents a broad range of manufacturers. Because the Alliance does not take positions on competitive issues within the automobile industry, it takes no position on the portions of the evidence offered by other plaintiffs on the competitive impacts of the California rule.

[10] *See* Compl ¶ 58. If the Court determines that it cannot deny the motion to dismiss based on the allegations of the Complaint, the plaintiffs are prepared to prove the necessary facts at an evidentiary hearing. *See* pp. 19-20 below.

This immediate impact of the regulation, which is pleaded in the Complaint, has been quantified by an independent expert who has studied the financial condition of Rhode Island dealers. (*See* Affidavit of Donald P. Wisehart, Exhibit B.) His study indicates that 18 of the dealerships whose records he examined are suffering a "real and present" diminution in value estimated at about $26 million in the aggregate as a result of the product line restrictions predicted by the manufacturers. His study also concludes that, in all likelihood, the regulation will make eight other Rhode Island dealerships "not ... economically viable." (*Id.* ¶ 3) In other words, 18 businesses whose records have been studied have already lost substantial value, and eight more are threatened with regulatory extinction.

## III. ARGUMENT

### A. The Claims Presented in the Complaint are Ripe and Require the Full Exercise of Federal Jurisdiction.

"[Q]uestions of ripeness are analyzed under a familiar framework," which "considers the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Massachusetts*, 61 F.3d 1003, 1009 (1st Cir. 1995). As explained below, this case meets both the "fitness" and hardship tests for ripeness and all other components of federal jurisdiction.

#### 1. The Complaint States a Proper Case or Controversy under Article III

Federal courts normally hold that a party with Article III standing to sue normally satisfies any constitutional requirement for ripeness. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81 (1978).[11] To satisfy Article III's threshold standing

---

[11] *See also* E. Chemerinksy, FEDERAL JURISDICTION 125 (4th ed. 2003); *McCall v. Dretke*, 390 F.3d 358, 362 (5th Cir. 2004) ("[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements (Continued...)

requirement at the pleading stage, plaintiffs must allege three things: [1] an injury-in-fact that is [2] traceable to the challenged action and [3] redressable by a favorable judicial decision. *See Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

The Complaint here satisfies those minimal pleading requirements. It alleges (among other cognizable injuries) that DEM's regulation will force manufacturers to undertake massive current expenditures and alter longstanding business plans, and that it has reduced the value of dealers' businesses and jeopardized their long-term financial health. (*See* Compl. ¶¶ 57-69.) Those injuries would be redressed if this Court invalidates or enjoins DEM's regulation. Nothing more is required. *See, e.g.*, *Bennett*, 520 U.S. at 168; *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422-23 (1942).[12] Because the plaintiffs have Article III standing and the parties are adverse, the constitutional aspects of the ripeness inquiry are satisfied. *Duke Power*, 438 U.S. at 81.

**2. The Legal Issues Here Are Fit for Judicial Action**

The first prong of the ripeness test asks "whether an issue is fit for review." *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994). That criterion is easily met.

---

of the ripeness doctrine will necessarily be satisfied.") (quoting *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1428 (D.C.Cir.1996)); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003) (standing and constitutional ripeness are "the same"); *ACLU v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999); *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 n.7 (11th Cir. 2000).

[12] "[A] substantive rule which as a *practical matter* requires the plaintiff to adjust his conduct immediately ... is 'ripe' for review at once," *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990) (emphasis added), and that is precisely what DEM's rule requires of manufacturers. The fact that defendant's action does not immediately "compel action ... or impose penalties" on dealers is irrelevant, because their business prospects have already been adversely affected. *See CBS*, 316 U.S. at 422. The current losses in the value of dealers' businesses establish their right to be heard, and the prospect of future competitive injury would be treated in this Circuit as irreparable injury, properly addressed in a pre-enforcement review action. *See Regional Railroad Reorganization Act Cases ("RRR Cases")*, 419 U.S. 102, 124-25 (1974); *Ross-Simons of Warwick v. Baccarat, Inc.*, 217 F.3d 8, 13-14 (1st Cir. 2000) (competitive injury is irreparable).

Where the issues presented are predominantly legal, the issues are typically "fit for review" under the first prong of the prudential ripeness inquiry.[13] Federal preemption cases are by definition predominantly legal.[14]

The legal issues of preemption under EPCA have come into particularly sharp focus since publication of NHTSA's analysis earlier this month in the *Federal Register*. If NHTSA is correct, any standard regulating CO2 emissions is preempted by EPCA. Defendant may contend that EPCA's preemption provisions conflict with state authority under the Clean Air Act, but it is the business of federal courts to address situations when two federal statutes are supposedly "in tension," and to reconcile them. *Id.* at 706 (Coffin, J., dissenting on other grounds). The scope of federal preemption of state motor vehicle regulations is ultimately an issue not for administrative agencies like EPA, "but *for the courts alone* to decide." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Protection*, 208 F.3d 1, 5 (1st Cir. 2000) ("*AIAM*") (emphasis added) (reconsidering prior order remitting legal preemption issues under Clean Air Act to EPA).

### 3. Plaintiffs' Injuries Are Not Contingent on Future Events and Any Delay in Adjudication Will Cause Significant Hardship

Defendant's main effort to block pre-enforcement review is based on suggestions that future events might make it unnecessary for the Court to decide the federal preemption questions presented here, making this case "premature." (Deft's Mem. of Law at 12.) The first problem

---

[13] *See, e.g., Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n ("PG&E")*, 461 U.S. 190, 201 (1983); *Buckley v. Valeo*, 424 U.S. 1, 116-17 (1976); *RRR Cases*, 419 U.S. at 140-43.

[14] *See PG&E*, 461 U.S. at 201 (noting that "question of preemption is predominantly legal"). Although this case may involve a few factual issues that underpin the EPCA preemption claim, those factual issues will not be resolved in any further administrative proceedings.

with defendant's analysis is that it overlooks the facts pleaded in the Complaint.[15] The Complaint alleges, and plaintiffs are prepared to prove, ***present*** harm to the dealers, and an ***immediate*** need for manufacturers to commit unrecoverable resources on compliance with the regulation.

There is nothing contingent about the impact of defendant's regulation -- it is happening now. In the cases cited by defendant on the issue of contingencies, in which claims have been dismissed, the future contingencies were important because harm to the plaintiffs was itself contingent. *See*, *e.g.*, *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990) (explaining that "Lincoln's alleged injury is clearly contingent" on future events); *Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992) (case unripe because the "alleged injury is contingent upon events that may not occur as anticipated or may not occur at all.").[16] There is nothing contingent about the harm in this case; both manufacturers and dealers are currently harmed by the regulation.

No case cited by defendant supports dismissal on facts like those pleaded (and offered for proof) here. Under defendant's approach, the dealer plaintiffs and the manufacturers should wait for a decision by EPA on issues arising under the Clean Air Act (which may or may not address the EPCA preemption issue), and if they are dissatisfied, then quickly file a lawsuit to prevent enforcement of the challenged regulation. Even if EPA and the D.C. Circuit concluded their work on the California regulation in record time, a federal trial court could not address the issues

---

[15] Alternatively, defendant expects the Court to disregard the evidence supporting the Complaint, make no findings of fact, and to dismiss the Complaint. As to that approach, *see* pp. 19-20 below.

[16] *See also Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 537 (1st Cir. 1995). Unlike *Ernst & Young*, in which the court explained that the case was unripe because for the plaintiff to be harmed *eight* different events had to occur, *id.* at 538, there is nothing contingent about the harm currently experienced by the Rhode Island dealers and the need for the manufacturers to take immediate steps to comply with the challenged regulation.

on a normal schedule before the start of the relevant model year. In such a scenario, as the Supreme Court noted long ago, judicial review can be either "too hasty" or "too late." *RRR Cases*, 419 U.S. at 145.

In addition, defendant's entire argument requires an assumption that his agency will not change its interpretation of its regulation. The regulation does not preclude enforcement prior to the granting of waiver to California by EPA. Rather, it states that it became effective on January 11, 2006, and purports to regulate CO2 emissions starting in the 2009 model year. For its part, California has reserved the argument that no EPA waiver is needed for its standard. (*See* Deft's Exh A at 1, note 1.) Defendant's current litigation position that the regulation will not be enforced until the California CO2 standards are granted an EPA waiver -- which is based on the ambiguous text providing that the regulation is to be enforced in "accordance with" federal law -- is insufficient either to rewrite the regulatory text, or to defeat federal jurisdiction. *See Vermont Right to Life v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000).[17] Indeed, based on the regulatory text and California's position, the defendant remains free to "chang[e] his mind," *id.*, and proceed with what he calls "enforcement," depending on future events.

Most importantly of all, deferral of the EPCA preemption issues until the situation has passed the eleventh hour for *manufacturers* ignores the present harm to the *dealers*. Even if the federal courts could step into the process at some future moment preferred by defendant, doing so would not redress the erosion in the current value of the dealer plaintiffs. The decisions of both the Supreme Court and the First Circuit require the exercise of federal jurisdiction in such

17 *See also Va. Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710-11 (4th Cir. 1999); *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990); *Nitke v. Gonzales*, 413 F. Supp. 2d 262, 267 (S.D.N.Y. 2005).

circumstances to relieve plaintiffs from current injuries. *See, e.g.*, *Riva*, 61 F.3d at 1010, 1012 ("even when the direct application of such a statute is subject to some degree of contingency," a case is ripe when the challenged state law makes it impossible for plaintiff "prudently to arrange his fiscal affairs").[18] A regulation that is inflicting millions of dollars in lost business value on some Rhode Island dealerships, and imperiling the survival of others, certainly interferes with "prudent[] fiscal" arrangements.

According to defendant, there is no "legal obligation" to comply with DEM's regulation at the present time. (Deft's Mem. of Law at 6.) But the need to commit resources to comply with DEM's regulation is no more a voluntary "business decision," *id.*, for the manufacturer plaintiffs in this case than the "immediate and significant change in the conduct of plaintiffs' affairs" demonstrated by the plaintiffs in *Abbott Laboratories.*[19] Defendant's position makes even less sense when the situation of the dealer plaintiffs is considered. The dealer plaintiffs certainly need the "practical assistance" of the Court in "setting ... to rest" the question of whether the CO2 rules are enforceable. *Narragansett Indian Tribe*, 19 F.3d at 694; *see also RRR Cases*, 419 U.S. at 124-25 (potential for "erosion" in value of stock, assets and business constituted hardship warranted federal jurisdiction); *Freehold Cogeneration Assocs., L.P. v. Bd.*

---

[18] *Duke Power*, 438 U.S. at 81 ("delayed resolution of these issues would foreclose any relief from the present injury suffered"); *RRR Cases*, 419 U.S. at 144 (despite fact that a step remained in ratification of challenged program, case was ripe when "decisions to be made now or in the short future may be affected" by the legality of the challenged action).

[19] *See Abbott Labs. v. Gardner*, 387 U.S. 136, 152-53 (1967). Vehicle manufacturers that do not start work soon on compliance with this regulation will not be able to do so efficiently later, and even if they proceed efficiently, costs will run into the hundreds of millions of dollars.

*of Regulatory Comm'rs*, 44 F.3d 1178, 1188-89 (3d Cir. 1995). No cases support the denial of federal jurisdiction in a case that is based on facts like those pleaded here.[20]

Two Supreme Court cases demonstrate how the ripeness doctrine is properly applied here. In *PG&E*, utilities challenged state regulations regarding nuclear power plants. The Court agreed to decide whether a regulation that imposed a moratorium on the certification of new nuclear power plants violated federal law, even though it was possible that future administrative proceedings could make it unnecessary to decide the issue as currently framed. The Court explained that "[t]o require the industry to proceed without knowing whether the [challenged state law] is valid would impose a palpable and considerable hardship on the utilities." 461 U.S. at 201-02. Here, defendant posits that EPA's future action may resolve this case. But just as in *PG&E*, the industry has to make decisions about future product plans without knowing what EPA will do. The need to make compliance decisions years in advance and spend unrecoverable sums in order to comply with defendant's regulation is surely a "palpable and considerable" hardship for the plaintiffs in this case.[21]

---

[20] In this regard, the unpublished district court decision in *International Truck & Engine Corp. v. Lloyd*, No. 01-1245 (E.D. Cal. Oct. 24, 2001), cited by defendant at page 6 of his Memorandum is fully consistent with the Supreme Court and First Circuit cases supporting jurisdiction in this case. *Lloyd* involved a challenge to a California heavy-duty engine test procedure that had not yet been approved by EPA. On a page of the unpublished *Lloyd* decision that defendant did not provide to this Court, the judge hearing the *Lloyd* case distinguished the situation before him, and cases in which "the very promulgation of a law may itself affect a party enough to satisfy the constitutional requirement." The judge in *Lloyd* was apparently able to conclude that the complaint before him did not allege that the state regulation "require[d] immediate changes in its present conduct so it could avoid future sanctions," which is certainly not a conclusion permitted by the manufacturers' allegations in the Complaint here. Likewise, the *Lloyd* court was not offered proof that the regulation challenged in that action had already imposed more than $26 million in lost business value. (Plaintiffs call upon defendant to provide an entire copy of any unpublished opinions to the Court, if defendant intends to rely on any part of it.)

[21] *See also New York v. United States*, 505 U.S. 144, 175 (1992) (case ripe despite significant time period until law took effect because it would "take[] many years" to comply with the law). The *PG&E* Court found the challenge to a regulation that regulated a nuclear plant's storage capacity unripe because the regulation operated on a case-by-case basis and due to the Court's decisions on the merits regarding the moratorium the Court found that the storage regulation was unlikely to affect the plaintiff's behavior. 461 U.S. at 203.

In the case of the dealers, defendant (having overlooked the dealers in his opening papers) is likely to suggest that they are not properly concerned about potential future losses in business, because in defendant's view such losses are unlikely. Defendant cannot square his position with *Duke Power.* In *Duke Power*, all Justices of the Court found sufficient hardship for the plaintiffs because the law being challenged might, in the future, result in the construction of nuclear power plants that might, in the future, injure plaintiffs' interests. *See* 438 U.S. at 81-82. The causal nexus pleaded in *Duke Power* was that a government insurance provision would cause the construction of private facilities that would otherwise not be constructed. The Rhode Island dealers' harm does not depend upon speculation about the future construction of nuclear power plants in response to a federal insurance program. It depends upon basic facts about the competitive nature of the new-vehicle market in Rhode Island that defendant either must take as a given, or be prepared to dispute at an evidentiary hearing.

### B. The Argument Contained in Part II of Defendant's Motion Is Not Properly Raised under Rule 12(b)(1), And In Any Event Lacks Merit Because It Ignores The Limits on EPA's Review Powers.

Part II of defendant's argument states that "[u]ntil EPA rules on California's waiver request … and especially if EPA denies the waiver request, any decision this Court renders … would be an advisory in nature only."[22] To the extent that defendant is offering anything other than a reprise of his argument for delay or deferral of the merits based on the "enforceability" of the regulation, his second argument cannot survive careful scrutiny.

---

[22] Deft's Mem. of Law at 11. Notably, defendant is not seeking a primary-jurisdiction referral to EPA, or seeking a stay of this proceeding pending disposition of other litigation in California or elsewhere. Nor could he plausibly do so, given the allegations of harm in the Complaint.

First, defendant is simply wrong, if he is suggesting that EPA rather than the federal judiciary has the ultimate power finally to determine the scope of EPCA preemption. Absent a Congressional directive to the contrary -- and defendant points to none -- the federal courts, not EPA, decide preemption questions. *See AIAM*, 208 F.3d at 5; *cf. Abbott Labs.*, 387 U.S. at 139-148 (federal jurisdiction to review federal regulation exists absent specific Congressional withdrawal of jurisdiction). Stated another way, Congress has not instructed the federal courts to remove themselves from cases of this nature; and once this Court decides the issue of EPCA preemption, and regardless of what EPA may or may not say on that issue, the Court's decision will be final and binding.

Second, turning specifically to Count III of the Complaint -- which is the main focus of Part II of his argument -- defendant has apparently overlooked Count III's actual contents. Count III presented plaintiffs' claims under the Clean Air Act. The Clean Air Act contains two different provisions that govern state adoption and enforcement of motor vehicle emissions standards that have primary relevance here. As indicated above, sections 177 and 209 prevent the formal enforcement of a state regulation unless and until California receives a waiver of federal preemption. *See* 42 U.S.C. §§ 7507, 7543. Defendant appears (for the present) to have agreed with plaintiffs that the Clean Air Act would forbid it to ban any vehicles from sale in Rhode Island, unless EPA grants waivers to California.[23]

The other relevant provision of the Clean Air Act, also contained in section 177, prohibits state regulations outside California that would "directly or indirectly" limit the sale of

---

23 Plaintiffs were obliged to include their claim that the State cannot formally "enforce" regulations that lack a waiver because DEM's position on the issue was doubtful before the litigation began -- and, as noted above, is still of questionable legal significance. *See* p. 14 above.

California-approved vehicles in a given State. *Id.* § 7507. Starting with the 2008 model year, one element of the DEM regulation would enforce such sales limits in Rhode Island, which, as pleaded in Count III, violates section 177. (*See* Compl. ¶¶ 102-104.) While defendant presumably does not agree with the merits of the section 177 claim in Count III, he cannot point to any administrative proceeding at EPA that will decide them, and none could exist.

Third, and with respect to all Counts of the Complaint, defendant confuses the role of a pleading under Rule 12(b)(1) with that of a pleading under Rule 12(b)(6) or Rule 12(c). Defendant interprets federal law to provide that if EPA grants a waiver for a California rule, that decision sweeps away any issue that might arise under the other federal statutes applied in the Complaint, as well as the Commerce Clause. Even assuming defendant was correct, such a position on the *merits* does not affect the *subject-matter jurisdiction* of the federal courts. *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998); *Bell v. Hood*, 327 U.S. 678, 682 (1946). "[N]o court in the modern era" has accepted the principle that the merits of a plaintiff's arguments affects the jurisdiction of the court to adjudicate them. *See The Wilderness Soc. v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006).

### C. If the Court is Not Prepared to Deny the Motion Based on the Complaint's Allegations, It Should Proceed with Fact-Finding and If Necessary Conduct An Evidentiary Hearing.

There is one additional important difficulty with the defendant's method of pleading. Parties challenging jurisdiction under Rule 12(b)(1) can either challenge the legal sufficiency of the complaint, or the accuracy of the facts alleged in the complaint. *See Hernandez-Santiago v. Ecolab, Inc.*, 397 F.3d 30, 33 (1st Cir. 2005). If the court determines that the motion is a challenge to the sufficiency of the complaint, the court must accept all "well-pleaded factual averments [in the complaint] as true and indulg[e] all reasonable inferences in the plaintiff[s'] favor." *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003). If this Court decides to

engage in factfinding to resolve the motion, plaintiffs "must be given notice that the issue is in dispute and an adequate opportunity to ascertain and present relevant facts and arguments supporting his claim of jurisdiction." *McCulloch v. Velez*, 364 F.3d 1, 6 (1st Cir. 2004).

It is unclear exactly what variant of a Rule 12(b)(1) motion the defendant is interposing. Plaintiffs attempted to clarify which route defendant has taken, in order to respond succinctly to defendant's motion. Defendant declined to specify the basis for his jurisdictional attack. (*See* Plaintiffs' Motion to Exceed Page Limits, filed Apr. 18, 2006.) Plaintiffs therefore have submitted some written evidence in addition to relying on the well-pleaded factual averments in the Complaint, in order to permit the Court to adjudicate defendant's motion promptly without the necessity of further rounds of briefing and document submission. *Cf. McCulloch*, 364 F.3d at 6. If the Court is not prepared to deny the motion to dismiss on this basis, or on the basis of the pleadings, plaintiffs respectfully request that the Court conduct an evidentiary hearing and provide an opportunity for plaintiffs to proffer additional written evidence.

**CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss for lack of subject-matter jurisdiction should be denied.

Dated: April 25, 2006

Pat K Rocha

Patricia K. Rocha (# 2793)
John A. Tarantino (#2586)
Katy A. Hynes (# 6659)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607
*For All Plaintiffs*

Stuart A. C. Drake
Andrew B. Clubok
*Admitted Pro Hac Vice*
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000

*For Plaintiffs Alliance of Automobile Manufacturers, DaimlerChrysler Corporation, and General Motors Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of April, 2006, I caused to be served **via hand delivery** a true copy of the within document on:

Tricia Jedele
Special Assistant Attorney General,
Environmental Advocate
Michael Rubin, Esq.
DEPARTMENT OF ATTORNEY
GENERAL
150 South Main Street
Providence, RI 02903

Timothy Pavilonis, Esq.
Office of Legal Counsel
Rhode Island Department of
Environmental Management
235 Promenade Street
Providence, RI 02908

*379510_1.doc*