UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINCOLN DODGE, INC., et al. | : | C.A. No. 06-70T |
| | : | |
| v. | : | ORAL ARGUMENT REQUESTED |
| | : | |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management | : | EVIDENTIARY HEARING REQUESTED (CONDITIONALLY) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

In accordance with leave of court granted at the chambers conference of May 25, 2006, Plaintiffs hereby object to the Defendant's Motion to Dismiss. In support thereof, Plaintiffs file their supporting memorandum contemporaneously herewith.

Pursuant to LR Cv 7(e), Plaintiffs request oral argument with an estimated time of 30 minutes. Plaintiffs also conditionally request an evidentiary hearing if the Court deems necessary.

Dated: May 31, 2006

PLAINTIFFS
By their attorneys,

Pat K Rocha

Patricia K. Rocha (# 2793)
John A. Tarantino (#2586)
Katy A. Hynes (# 6659)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607
*For All Plaintiffs*

Stuart A. C. Drake (admitted *pro hac vice*)
Andrew B. Clubok (admitted *pro hac vice*)
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000

*For Plaintiffs Alliance of Automobile Manufacturers, DaimlerChrysler Corporation, and General Motors Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2006, I caused to be served via first class mail, postage prepaid, a true copy of the within document on:

Tricia Jedele
Michael Rubin, Esq.
Department of Attorney General
150 South Main Street
Providence, RI 02903

Timothy Pavilonis, Esq.
Office of Legal Counsel
Rhode Island Department of
Environmental Management
235 Promenade Street
Providence, RI 02908

Debra Humm [signature]

*383233_1.doc*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| LINCOLN DODGE, INC.; SMITHFIELD CHRYSLER JEEP, INC.; SIMON CHEVROLET-BUICK, LTD.; PAUL MASSE CHEVROLET, INC.; PAUL MASSE PONTIAC-CADILLAC-GMC, INC.; DELUXE AUTO SALES, INC.; TASCA AUTOMOTIVE GROUP, INC.; THE NEW BAY BUICK, INC.; HURD CHEVROLET, INC.; HURD BUICK PONTIAC-GMC TRUCK, INC.; ALLIANCE OF AUTOMOBILE MANUFACTURERS; DAIMLERCHRYSLER CORPORATION; and GENERAL MOTORS CORPORATION, | **C.A. No. 06-70T** |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management, | EVIDENTIARY HEARING REQUESTED (CONDITIONAL) |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 1

II. BACKGROUND OF THE LITIGATION ..... 5

A. Fuel Economy Regulation ..... 5

B. Impacts of the Department's CO2 Rule ..... 7

C. The Role of EPA ..... 10

III. ARGUMENT ..... 14

A. The Claims Presented in the Complaint are Ripe and Require the Full Exercise of Federal Jurisdiction. ..... 14

1. Defendant Appears to Concede Article III Standing, Which Establishes A Valid "Case or Controversy" Meeting the Test for Constitutional Ripeness ..... 15

2. Plaintiffs' Evidence of Hardship Also Meets the Test for Prudential Ripeness ..... 17

B. The Argument Contained in Part II of Defendant's Motion Is Not Properly Raised under Rule 12(b)(1), And In Any Event Lacks Merit Because It Ignores The Limits on EPA's Review Powers. ..... 24

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ........ 21, 24

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ........ 16

*Ass'n of Int'l Auto. Mfrs., Inc. v. Commissioner, Mass. Dep't of Envtl. Protection*,
208 F.3d 1 (1st Cir. 2000) ........ 15, 24

*Bell v. Hood*,
327 U.S. 678 (1946) ........ 26

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 15, 16

*Bowen v. First Family Fin. Servs., Inc.*,
233 F.3d 1331 (11th Cir. 2000) ........ 16

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........ 15

*Cal. Pro-Life Council, Inc. v. Getman*,
328 F.3d 1088 (9th Cir. 2003) ........ 16

*Clinton v. New York*,
524 U.S. 417 (1998) ........ 15, 16

*Columbia Broadcasting System, Inc. v. United States*,
316 U.S. 407 (1942) ........ 16, 18

*Doe v. Bush*,
323 F.3d 133 (1st Cir. 2003) ........ 17

*Duke Power Co. v. Carolina Envtl. Study Group*,
438 U.S. 59 (1978) ........ 3, 16, 20, 23

*Ernst & Young v. Depositors Econ. Protection Corp.*,
45 F.3d 530 (1st Cir. 1995) ........ 18

*Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs*,
44 F.3d 1178 (3d Cir. 1995) ........ 21

*Green Mountain Chrysler Plymouth Dodge Jeep, et al. v. Torti*,
Case No. 2:05-cv-302 (D.Vt., May 3, 2006) ........ 4

*Houlton Citizens Council v. Town of Houlton*,
175 F.3d 178 (1st Cir. 1999) ........ 16

*International Truck and Engine Corp. v. Lloyd*,
No. 01-1245 (E.D. Cal. Oct. 24, 2001) ........ 22

*John Roe # 2 v. Ogden*,
253 F.3d 1225 (10th Cir. 2001) ........ 18

*Kucharek v. Hanaway*,
902 F.2d 513 (7th Cir. 1990) ........ 19

*Lincoln House, Inc. v. Dupre*,
903 F.2d 845 (1st Cir. 1990) ........ 17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 15

*Lujan v. Nat'l Wildlife Federation*,
497 U.S. 871 (1990) ........ 18

*Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*,
973 F.2d 18 (1st Cir. 1992) ........ 18

*McCall v. Dretke*,
390 F.3d 358 (5th Cir. 2004) ........ 16

*Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*,
772 F.2d 404 (8th Cir. 1985) ........ 21

*Motor & Equip. Mf'rs Ass'n v. EPA*,
627 F.2d 1095 (D.C. Cir. 1979) ........ 13

*N.C. Right to Life, Inc. v. Bartlett*,
168 F.3d 705 (4th Cir. 1999) ........ 19

*Nat'l Treasury Employees Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996) ........ 16

*New York v. United States*,
505 U.S. 144 (1992) ........ 23

*Nitke v. Gonzales*,
413 F. Supp. 2d 262 (S.D.N.Y. 2005) ........ 19

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ........ 14, 15, 23

*Penobscot Air Serv., Ltd. v. FAA*,
164 F.3d 713 (1st Cir. 1999) ........ 15

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925) ........ 15

*Regional Railroad Reorganization Act Cases*,
419 U.S. 102 (1974) ........ passim

*Rhode Island v. Narragansett Indian Tribe*,
19 F.3d 685 (1st Cir. 1994) ........ 21, 22

*Riva v. Massachusetts*,
61 F.3d 1003 (1st Cir. 1995) ........ 14, 20, 21

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ........ 26

*The Wilderness Soc. v. Norton*,
434 F.3d 584 (D.C. Cir. 2006) ........ 26

*Town of Rye v. Skinner*,
907 F.2d 23 (2d Cir. 1990) ........ 21

*Va. Society for Human Life, Inc. v. FEC*,
263 F.3d 379 (4th Cir. 2001) ........ 19

*Vermont Right to Life v. Sorrell*,
221 F.3d 376 (2d Cir. 2000) ........ 19, 20

*Vogel v. Foth & Van Dyke Associates, Inc.*,
266 F.3d 838 (8th Cir. 2001) ........ 18

*Volvo NA v. Mens International Professional Tennis Council*,
857 F.2d 55 (2d Cir. 1988) ........ 17, 21

**Statutes**

42 U.S.C. § 7507 ........ 10, 25

42 U.S.C. § 7543 ........ 25

42 U.S.C. § 7543(b) ........ 10, 13

49 U.S.C. § 32919(a) ........ 1

**Other Authorities**

40 Fed. Reg. 30311 (July 18, 1975) ........ 11

67 Fed. Reg. 54180 (Aug. 21, 2002) .......... 11

68 Fed. Reg. 19811 (Apr. 22, 2003) .......... 12

68 Fed. Reg. 62295 (Nov. 3, 2003) .......... 11

69 Fed. Reg. 59920 (Oct. 6, 2004) .......... 12

69 Fed. Reg. 60995 (Oct. 14, 2004) .......... 11

71 Fed. Reg. 17566 (Apr. 6, 2006) .......... 2, 6

**Rules**

H.R. Rep. No. 94-340 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762 .......... 5

National Research Council, EFFECTIVENESS AND IMPACT OF CORPORATE AVERAGE FUEL ECONOMY (CAFE) STANDARDS (2002) .......... 7

**Treatises**

3 K. Davis & R. Pierce, Administrative Law Treatise 13-14 (3d ed. 1994) .......... 16

E. Chemerinksy, FEDERAL JURISDICTION 116 (2d ed. 1994) .......... 16

Glenn G. Munn *et al.*, ENCYCLOPEDIA OF BANKING & FINANCE 821 (9th ed. 1991) .......... 8

## MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS

By leave of Court granted at the chambers conference on May 25, 2006, plaintiffs Lincoln Dodge, Inc., *et al.* respectfully submit their objections to defendant's motion to dismiss.

## I. PRELIMINARY STATEMENT

This is a lawsuit of extraordinary importance for the new vehicle retail market in Rhode Island, and anyone who participates in that market. The plaintiffs are 10 new-vehicle dealers in this State, two manufacturers who supply the dealer plaintiffs with vehicles for sale in Rhode Island, and an association representing those and other new-vehicle manufacturers. They seek pre-enforcement review of regulations adopted by the Rhode Island Department of Environmental Management ("DEM" or "the Department") in 2004 and 2005, the most recent of which became effective under State law on January 11, 2006.

The main legal issues regarding the merits are simple. Since 1978, the federal government has enforced national fuel economy standards for automobiles pursuant to the Energy Policy and Conservation Act of 1975 ("EPCA"). In addition to requiring national fuel economy standards, EPCA preempts state fuel economy standards and regulations relating to such standards. *See* 49 U.S.C. § 32919(a).

The regulations challenged in this action have, for present purposes, two key features. First, the Department's regulations create more stringent fuel economy standards than required by federal law under the guise of regulating the carbon dioxide ("CO2") released from cars and trucks. In that respect, these rules are similar to other regulations recently adopted by other states, all patterned on regulations adopted by the State of California in 2004. The federal agency in charge of the national fuel economy program, the National Highway Traffic Safety Administration ("NHTSA"), has already addressed the legality of regulations like those challenged here. NHTSA has determined that any state regulation of the type involved in this

action "is expressly preempted [by EPCA,]" "would frustrate the objectives of Congress," and "conflict[s] with the efforts of NHTSA" to administer the national fuel economy program and is therefore also impliedly preempted by EPCA. 71 Fed. Reg. 17566, 17654, 17667 (Apr. 6, 2006).

Second, defendant's *de facto* fuel economy standards are already having an adverse effect on the Rhode Island dealer plaintiffs, and other similarly situated dealers in Rhode Island. Whether or not intended to do so, the Department's regulations will make it impossible for a large number of Rhode Island dealerships to compete effectively in the new-vehicle market because the regulations impose widely different compliance costs on different vehicle manufacturers. The affected dealers will lose sales, and in some instances entire product lines, from their inventories. That future loss of business has a current impact on the value of the relevant dealerships because their current value is largely dependent on future sales and profits. An independent analysis indicates that for some dealerships, more than a million dollars in current business value has already been lost, and that other dealerships may simply be unable to survive due to this regulation.[1]

Despite the importance of the legal issues and the immediate impact of his rules on Rhode Island businesses, defendant claims that this lawsuit is not ripe. According to defendant, it is possible that another federal authority, the U.S. Environmental Protection Agency ("EPA"), may resolve matters by either granting or denying California's waiver request pursuant to the federal Clean Air Act. Defendant's theory for dismissal has several insurmountable problems.

---

[1] *See* pp. 8-9 *infra*. One plaintiff in this action, the Alliance of Automobile Manufacturers, represents a broad range of manufacturers. Because the Alliance does not take positions on competitive issues within the automobile industry, it takes no position on the portions of the evidence offered by other plaintiffs on the competitive impacts of the challenged regulation.

First, by defendant's admission, any decision by EPA on the legality of the regulations challenged in this action is probably years away. But the impact of the Department's regulation — which presumably defendant considers lawful, and which he plans to enforce as soon as possible — is already being felt by dealers in Rhode Island. The Complaint alleges, and if necessary the evidence will show, that the Department's regulation will effectively ban many Rhode Island dealers from selling some of their most popular current models by making it uneconomical for some manufacturers to bring those models into compliance with the CO2 standards. For a dealer who has lost the future ability to sell a full product line of vehicles in Rhode Island at competitive prices, there is nothing remote, contingent or transitory about the impact of this regulation; rather, it is currently harmed. Such a dealership is worth less today if the dealer wanted to sell it, or to borrow money against its future profitability, than it was before the Department adopted the CO2 rule. If defendant wants to challenge the evidence of how his regulation is currently affecting the Rhode Island dealers, and has a sufficient basis for doing so, then he must offer that evidence in the proper manner. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 67-78 (1978) (discovery and evidentiary hearing on ripeness prior to consideration of merits).

Second, it is questionable whether EPA would ever determine the legality of defendant's CO2 regulations under EPCA. The Clean Air Act creates no duty for EPA to decide whether state regulations like those involved in this case are preempted by EPCA. That is settled law under the Clean Air Act. (*See* pp. 12-13 *infra*.) Designing and producing vehicles to meet new emissions standards is a multi-year process, particularly when the standards are as stringent as those adopted by the Department. No responsible manufacturer in the automobile industry is awaiting the outcome of an administrative proceeding at EPA before deciding whether to commit

resources to compliance with the CO2 rules in Rhode Island and elsewhere. (*Id.* at 12.) Due to these long lead times, the regulations have the practical effect of requiring manufacturers to decide now whether to commit resources to compliance with the challenged regulation.

Defendant responds to the foregoing point by suggesting that even if the Rhode Island rule is enjoined, compliance with CO2 limits by the manufacturer plaintiffs will still be necessary in other jurisdictions with similar rules. The same argument could be used to deflect federal jurisdiction in any State where a rule similar to the one in Rhode Island has been adopted and challenged. Taken to its logical conclusion, such an argument would mean that identical or similar state regulations could not be challenged pre-enforcement anywhere. Such a theory for dismissal has no support in the federal caselaw. Treated as a type of motion for a stay of litigation here, while the preemption issues are litigated elsewhere, defendant's theory has already been rejected by another federal court hearing a case similar to this one.[2] Defendant's argument also ignores the current harm to the dealer plaintiffs and the benefits that manufacturers can derive for knowing in which markets they must plan to comply with the challenged regulations. These harms will be completely remedied by a favorable judgment.

Ultimately, defendant's challenge to this Court's jurisdiction rests on an incorrect premise that Congress has committed the decision about the scope of federal preemption to EPA. Defendant points to no federal statute withdrawing federal court jurisdiction to consider issues of EPCA preemption, and giving EPA the final and unreviewable authority to determine the legality of rules like those involved here. Even if one assumes that EPA would take the action that defendant wants, and would hold that the Clean Air Act legalizes an action that NHTSA recently

---

[2] *Green Mountain Chrysler Plymouth Dodge Jeep, et al. v. Torti*, Case No. 2:05-cv-302 (D.Vt., May 3, 2006). The District of Vermont's decision in *Green Mountain* was lodged with this Court by letter dated May 12, 2006.

declared to violate EPCA, this Court would still need to decide which statutory program (EPCA or the Clean Air Act) controlled. Plaintiffs are aware of no decision by a federal court deferring a federal preemption challenge when the available evidence demonstrated *current* and specifically quantified harm to plaintiffs. Either the motion to dismiss should be denied outright, or this case should be scheduled for an evidentiary hearing to determine jurisdiction.

## II. BACKGROUND OF THE LITIGATION

Because defendant's motion attempts to explain how the legal issues presented here can be resolved in an unrelated administrative forum, it is important to review the federal regulatory program in some detail, and to explain briefly the consequences if defendant's motion were to be granted. The regulatory review starts with EPCA.

### A. Fuel Economy Regulation

Congress enacted EPCA in the fall of 1975, amid concern about energy independence and national security.[3] President Gerald R. Ford's signature on the new law made the United States the first country in the world to regulate motor vehicle fuel economy. The statute specified fuel economy levels for some model years, directed the Secretary of Transportation to set the "maximum feasible" standards for the rest of the fleet, and required enforcement through civil penalties. The fuel economy of the U.S. fleet has risen sharply since enactment of EPCA. (*See* Compl. ¶ 23.)

The Secretary of Transportation assigned responsibility for fuel economy standards to NHTSA. In setting those standards, NHTSA uses a balancing process that takes account of the conditions of the domestic automobile industry and the possible impacts of higher fuel economy

---

[3] *See* H.R. Rep. No. 94-340 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762

standards on vehicle safety, as well as the need of the nation to conserve energy.[4] NHTSA's rulemaking under EPCA has spawned a detailed set of criteria used by the agency and the courts to set the appropriate level of stringency in fuel economy standards. (*See* Compl. ¶¶ 26-35.)

Defendant's regulation does not refer specifically to the "fuel economy" of vehicles to be sold in Rhode Island. Instead, the standard is expressed as a set of limits on the level of CO2 and related substances that motor vehicles will be allowed to emit. Nevertheless, the only way that gasoline-powered vehicles will be able to achieve DEM's CO2-based standards is reducing fuel consumption because CO2 is a natural by-product of combustion. Rhode Island is one of several States that has recently enacted these *de facto* fuel economy standards under the guise of CO2 regulation.

NHTSA addressed state regulation of carbon dioxide emissions in its recent *Federal Register* publication. As NHTSA noted, the States have authority to regulate automotive emissions that form air pollution — but CO2 is not an air pollutant under current federal law. NHTSA explained that the States have for many years regulated smog-forming emissions from motor vehicles, which can be controlled with devices such as catalytic converters. NHTSA found no conflict between such standards for smog-forming emissions and the preemption provisions of EPCA, because compliance with those standards would "only incidentally or tangentially affect fuel economy." *See* 71 Fed. Reg. at 17699. NHTSA distinguished air pollution standards from a state CO2 standard that has "essentially all of the effects of a fuel economy standard, but is not labeled as one." *Id.* NHTSA concluded that "[t]he Clean Air Act authorizes the States to regulate emissions other than CO2, but not CO2 itself." *Id.* at 17670.

---

4 Increases in fuel economy standards can lead to reductions in vehicle mass, which can reduce vehicle crashworthiness — a major concern at the federal level. *See* 71 Fed. Reg. at 17572-73.

**B. Impacts of the Department's CO2 Rule**

The methods for reducing CO2 emissions from motor vehicles (*i.e.*, increasing fuel economy) are frequently more complex than the control of smog-forming emissions and other pollutants. For present purposes, the key fact is that deployment of the needed technologies across a wide number of vehicle models takes many years. According to one independent study completed by the National Research Council in 2002, the preparations to deploy fuel economy technologies can take four to eight years even when the technologies are readily available.[5]

In addition to requiring heavy investment by nearly all vehicle manufacturers, the CO2 regulation is so stringent that some manufacturers will have only a limited product line of new models available for the Rhode Island market. As the regulation escalates in stringency, those manufacturers' product lines will shrink. (*See* Compl. ¶ 57.) This results from the fact that the CO2 regulation is structured in a manner that requires different manufacturers to spend different sums to bring their products into compliance with the CO2 limits.

In order to respond to defendant's motion to dismiss, plaintiffs are attaching an affidavit that summarizes a detailed analysis of how the Rhode Island regulation will affect compliance costs for different types of vehicles and manufacturers.[6] The independent study indicates that the likely difference in per-vehicle compliance costs will exceed the average per-vehicle profits in some model lines for the relevant manufacturers.[7] The only way those manufacturers will be able to remain in the Rhode Island new-vehicle market will be to eliminate major parts of their

---

[5] *See* National Research Council, EFFECTIVENESS AND IMPACT OF CORPORATE AVERAGE FUEL ECONOMY (CAFE) STANDARDS (2002) 5 ("widespread penetration of even existing [fuel economy] technologies will probably require 4 to 8 years"); *see also* Exhibit A (Affidavit of Thomas C. Austin) ¶¶ 4-10.

[6] *See* Exhibit A ¶¶ 3, 11-16.

[7] *See* Exhibit A ¶ 16.

product lines, and to concentrate on the remaining segments in which they may be able to remain cost-competitive and profitable.[8] This is consistent with the internal analyses of the two manufacturer plaintiffs, which are also summarized in accompanying affidavits.[9]

The cut-backs in some manufacturers' product lines resulting from the CO2 regulation is several years away (though they must make their plans now). But for the members of the automobile industry who are in the front lines to remain competitive — the independent retail automotive dealers of Rhode Island — the loss in future sales directly translates into a reduction in the current value of their businesses. For those dealers, it is immaterial that "enforcement" of the regulation also lies in the future. For the present, the fact that the dealers face future limitations on their product lines (absent judicial relief) has a real and present impact on how they, their lenders, and prospective purchasers value their businesses. *See, e.g.*, Glenn G. Munn *et al.*, ENCYCLOPEDIA OF BANKING & FINANCE 821 (9th ed. 1991) (present value is a reflection of future cash flows).

This immediate and negative impact of the regulation, which is pleaded in the Complaint, has been quantified by an independent expert who has studied the financial condition of Rhode Island dealers.[10] His study indicates that 18 of the dealerships whose records he examined are suffering a "real and present" diminution in value estimated at about $26 million in the aggregate as a result of the product line restrictions predicted by the manufacturers. His study also

---

8 *See* Exhibit A ¶ 16.

9 *See* Exhibit B (Affidavit of Reginald R. Modlin) ¶ 5; Exhibit C (Affidavit of Alan R. Weverstad) ¶ 5.

10 *See* Exhibit D (Affidavit of Donald P. Wisehart). Mr. Wisehart is a certified public accountant practicing in Rhode Island who was provided with detailed information about the finances of more than two dozen dealerships in Rhode Island who sell vehicles produced by the two manufacturer plaintiffs.

concludes that in all likelihood, the regulation will make eight other Rhode Island dealerships "not ... economically viable."[11] In other words, 18 businesses whose records have been studied have already lost substantial value, and eight more are threatened with regulatory extinction.[12]

In addition to being the only federal court in which Rhode Island dealers can seek relief against DEM's regulation, this is the only forum in which dealers can expect *timely* relief. Two cases are pending in two other federal district courts, against two other state administrative agencies, brought by dealers in those two other States.[13] The first trial in the other two cases (filed in California in 2004, where the first CO2 regulation was adopted) is scheduled for January 2007. In addition to having sought (and indicating that she may continue to seek) postponements of that trial, the official defendant in the California case has made it clear that she will not accept invalidation of the CO2 regulation in the trial court without an appeal to the Ninth Circuit, as is her right. *See* Deft.'s Reply Mem. in Support of Mot. to Dismiss *in Central Valley Chrysler-Jeep, Inc. v. Witherspoon*, Civ. F.-04-6663 (E.D. Cal) (filed on May 27, 2005).

Presumably, the defendant in this case (like the California defendant) cannot agree now to be bound by the decision on the merits at the trial presently set for January 2007 in California. It is also fair to assume that the defendant here (and the defendant in California) will not proceed with repeal of the CO2 regulations if the rules are also invalidated in the Ninth Circuit, unless

---

[11] *See* Exhibit D ¶ 3.

[12] Contrary to defendant's claim, the evidence indicates that the burden imposed by the Department's rule is much greater for some dealers than for others: the dealers who will sustain the product line losses and the highest cost increases are those supplied by the manufacturer plaintiffs; other manufacturers and their dealers will not be placed at the same competitive disadvantage. *See* Exhibit C ¶ 3; Exhibit A ¶ 13.

[13] Brought by the dealers, their suppliers and the Alliance of Automobile Manufacturers, those cases are *Central Valley Chrysler-Jeep, Inc., et al v. Witherspoon*, CIV F-04-6663 (E.D. Cal.) and *Green Mountain Chrysler Plymouth Dodge Jeep et al v. Torti*, Docket No. 2:05-CV-302 (D. Vt.).

and until denied a stay of the mandate by the Circuit Justice for the Ninth Circuit pending *certiorari*.

The end result is that if deprived of this forum, the Rhode Island dealers will continue to suffer harm until the following possible events, each with an uncertain time-line of its own, are completed: (1) trial in California, (2) review in the Ninth Circuit; and (3) disposition of the petition for a stay of the mandate in the Ninth Circuit. While the shadow-boxing continues out-of-State, the value of the dealer plaintiffs' businesses in Rhode Island would continue to erode and they will continue to suffer higher costs of doing business as a result of their decreased value. The Rhode Island dealer plaintiffs are in this Court because they will obtain an answer to the preemption issues presented here far earlier here than through a convoluted and lengthy process elsewhere.

### C. The Role of EPA

The Clean Air Act grants EPA, a federal regulatory agency separate from the Department of Transportation and NHTSA, the authority to set standards for ozone-forming pollutants and toxic emissions from motor vehicles. (*See* Compl. ¶¶ 10-12). The Clean Air Act also permits the States to regulate the same automotive air pollutants as EPA. The basic division of authority at the federal level is therefore as follows: [1] NHTSA regulates automotive fuel economy; and [2] EPA regulates automotive air pollutants.

In order for States like Rhode Island to regulate air pollution from new vehicles, the relevant state standards must first be adopted in California. *See* 42 U.S.C. § 7507. The California standards require review by EPA; otherwise, the Clean Air Act preempts enforcement of the state air pollution standards. *See* 42 U.S.C. § 7543(b). As a formal matter, EPA must "waive" the federal preemption of the state standards. Accordingly, the EPA review process for California standards is called a waiver proceeding. *See id.* § 7543(b).

Several basic points about the EPA waiver review process are important. First, when EPA completes its review of a new California emissions standard, its practice is to permit the new standard to apply in the first model year sought in California's application. As defendant states, new state regulations are treated as "operative and enforceable" the moment that EPA grants a waiver. (Deft.'s Mem. of Law at 3 n.2.) In particular, there is neither any statutory requirement, or regulatory practice, for EPA to grant a period of grace between the time when it approves a California regulation and the time when the California rule becomes fully enforceable.[14]

Second, there are no time limits in the Clean Air Act for commencement of, or completion of, a waiver proceeding. As defendant admits, EPA's work "can take a number of years." (*Id.* at 3.). Whether or not the practice is consistent with the original intent of Congress, *EPA frequently does not complete its review of a California rule until after the first model year of applicability has started in California.* For example, EPA did not complete its work on some California tailpipe pollution standards that first applied to model year 2001 vehicles until September 2004. *See* 69 Fed. Reg. 60995 (Oct. 14, 2004); 68 Fed. Reg. 62295 (Nov. 3, 2003). EPA did not act on a separate California rule governing other emissions until four years after the California standard began to apply. *See* 67 Fed. Reg. 54180 (Aug. 21, 2002). EPA did not complete its review of California's emission regulations for some truck engines until more than

---

[14] Only once in the history of the Clean Air Act, in 1975, did EPA require a delay in the start date for a regulation it was reviewing. In that instance, the delay was for a single year. *See* 40 Fed. Reg. 30311, 30314 (July 18, 1975).

six years after the regulations became effective in California. *See* 69 Fed. Reg. 59920 (Oct. 6, 2004).[15]

Third, and regardless of political administrations, EPA has never denied a California waiver request in its entirety, and in recent times has never denied such a request even in part. The upshot is that although vehicle manufacturers participate in EPA waiver proceedings, they cannot and do not wait for the completion of EPA's review of California's regulation before committing resources to the production of vehicles that meet new standards.[16] Because the timing of EPA's decision-making process is unpredictable, and manufacturers cannot quickly make major changes in their product plans, manufacturers must be prepared to, and as a practical matter are forced to, comply with even "unenforceable" California regulations.[17]

Defendant cannot contest any of those basic facts about the practical aspects of the EPA waiver process. One important legal point that he must also concede is that the Clean Air Act does not require EPA to determine whether California regulations were consistent or inconsistent with other federal statutes, so long as the regulation met the specific criteria in the Clean Air Act

---

[15] Because the waiver review process must be initiated and pursued by California, California can derail the EPA review process by simply withdrawing a request for EPA review from the Agency's consideration and promising to resubmit the rule later. *See, e.g.*, 68 Fed. Reg. 19811, 19811 (Apr. 22, 2003) (recounting California's submittal and withdrawal of waiver application for zero-emission vehicle and related standards).

[16] *See* Exhibit A ¶ 10 ("EPA's review of requests for a waiver of preemption under the Clean Air Act can take years. A prudent manufacturer will not await the completion of the EPA waiver process under section 209 of the Clean Air Act before starting to spend capital and other resources on compliance with the regulation involved in this litigation. … I am not aware of a single instance in which a major manufacturer awaited completion of an EPA review process under section 209, before deciding how to comply with a California regulation and before committing the necessary resources to compliance.")

[17] As Defendant explains, states like Rhode Island must adopt the California standards two years before the first model year of applicability, but can seek to enforce those standards the moment that EPA approves the standards. (*See* Deft.'s Mem. of Law at 8-9.) For example, DEM adopted some standards (for emissions other than $CO_2$) in December 2004, to take effect in the 2008 model year, which starts on January 2, 2007. (*See* Compl. ¶ 49.) If EPA grants a waiver for those model year 2008 standards by January 1, 2007, the State will enforce them the next day.

(which defendant quotes on page 5 of his brief). *See Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1114-19 (D.C. Cir. 1979) *("MEMA")* (holding that EPA is required to grant waiver unless the regulation is shown to be inconsistent with specific terms of 42 U.S.C. § 7543(b)). Thus, even if EPA tried to address the issue of EPCA preemption, any decision denying a waiver to the California CO2 rule on EPCA grounds would be challenged in the court of appeals.[18]

The uncertainties and delays inherent in the EPA waiver process explain in part why the plaintiffs are in this Court, and why similar actions are now pending in other district courts. Even if EPA decided the waiver issue with unusual promptness, and even if EPA were to deny a waiver to California, the result would not be an end to the current controversy. Rather, EPA's decision would only be a postponement of the legal issues to resolution in one or more judicial forums — the D.C. Circuit which would hear the challenge to EPA's denial of California's waiver request, and any district courts located in States that had already adopted the California rules. In those district courts, the industry would need to enforce EPA's waiver decision against the State agency or environmental groups claiming that EPA's decision should not be given the force of law (or both).[19] Pre-enforcement review of the CO2 rules under EPCA is far and away

---

[18] California, for its part, has made it clear that it would challenge such a decision. As California stated in one waiver proceeding in 2002:

> EPCA is administered not by U.S. EPA but by the National Highway Traffic Safety Administration (NHTSA). Arguments raising constitutional claims and preemption issues not involving the [Clean Air Act] are *beyond the scope of the Administrator's review* and a waiver or scope-of-the-waiver proceeding is *not the proper forum* for such claims.

*See* Exhibit E (emphasis added).

[19] It is noteworthy that the State of California has expressly reserved the power to try to enforce its CO2 standards even if EPA denies a waiver. *See* Def's Exhibit A at 1 n.1. Likewise, defendant's brief explains DEM's position on what happens if EPA approves the CO2 standards, *see* Deft's Mem. of Law at 12-13, but reserves any statement on what action it or other States would take if EPA decides to disapprove those standards. Regarding the legal weight to be given to statements by defendant's affiant, Mr. Majkut, *see* pp. 19-20 below. Moreover, the environmental intervenors in this case and in other cases have not taken any definitive and binding position on whether California

(Continued...)

the fastest way to determine the legality of those rules. Given the current impact of the Department's rules, and the simplicity of the issues arising under EPCA, the plaintiffs have resorted to pre-enforcement review in this Court.

## III. ARGUMENT

Each group of plaintiffs in this action — the dealers and the manufacturers — has a compelling need for pre-enforcement review of defendant's regulation under federal law. Their claims readily meet the tests for both constitutional and prudential ripeness. (*See* Part A *infra.*) To the extent that defendant is seeking dismissal because he believes that once EPA "rule[s]" on California's waiver request this case should be over, defendant is making a merits argument, and not offering a ground for subject-matter dismissal. (*See* Part B *infra.*) The motion to dismiss therefore either should be denied outright, or the Court should proceed with an evidentiary hearing, if necessary, to confirm that sufficient proof of harm is available to permit the case to proceed.

### A. The Claims Presented in the Complaint are Ripe and Require the Full Exercise of Federal Jurisdiction.

"[Q]uestions of ripeness are analyzed under a familiar framework," which "considers the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Massachusetts*, 61 F.3d 1003, 1009 (1st Cir. 1995). Because defendant does not appear to contest the fitness of the issues for judicial decision,[20] we primarily address the issue of hardship.

---

or any other State needs a waiver of federal preemption in order to enforce the CO2 rules, or on the correct judicial procedure to follow if EPA decides to grant a waiver without allowing time for judicial review of its decision, or an adequate opportunity for litigation of the EPCA preemption issues.

[20] Where the issues presented are predominantly legal, the issues are "fit for review." *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n ("PG&E")*, 461 U.S. 190, 201 (1983); *Buckley v. Valeo*, 424 (Continued…)

### 1. Defendant Appears to Concede Article III Standing, Which Establishes A Valid "Case or Controversy" Meeting the Test for Constitutional Ripeness

Before dealing with the specific elements of defendant's claims, it is important to note that he does not appear to challenge the Article III standing of any of the plaintiffs to bring this action — nor could he properly do so. To satisfy Article III's threshold standing requirement plaintiffs must allege three things: [1] an injury-in-fact that is [2] traceable to the challenged action and [3] redressable by a favorable judicial decision. *See Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Complaint alleges (among other cognizable injuries) that the Department's regulation will force manufacturers to undertake massive current expenditures and alter longstanding business plans, and that it has reduced the value of dealers' businesses and jeopardized their long-term financial health. (*See* Compl. ¶¶ 57-69.) These competitive injuries are easily sufficient to meet the Article III threshold. *See, e.g., Clinton v. New York*, 524 U.S. 417, 431, 433 (1998); *Penobscot Air Serv., Ltd. v. FAA*, 164 F.3d 713, 727 (1st Cir. 1999) ("higher costs constitute concrete injury"); *cf. Pierce v. Soc'y of Sisters*, 268 U.S. 510, 531 (1925) (pre-enforcement review warranted when 'enforcement ... would seriously impair, and perhaps destroy, the profitable features of [plaintiffs'] business and greatly diminish the value of their property").[21] Those

---

U.S. 1, 116-17 (1976); *Regional Railroad Reorganization Act Cases ("RRR Cases")*, 419 U.S. at 140-43 (1974). Federal preemption cases are by definition predominantly legal. *See PG&E*, 461 U.S. at 201 (noting that "question of preemption is predominantly legal"). The scope of federal preemption of state motor vehicle regulations is ultimately an issue not for administrative agencies like EPA, "but for the courts alone to decide." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Protection*, 208 F.3d 1, 5 (1st Cir. 2000). Although this case may involve a few factual issues that underpin the EPCA preemption claim, those factual issues will not be resolved in any further administrative proceedings.

[21] The decision in *Clinton* is instructive. In that case, New York had applied to the federal Secretary of Health and Human Services for a waiver of certain welfare liabilities. Congress acted to remove the contingent liability, but the president exercised the line item veto to reimpose the contingent liability. The City of New York then filed suit alleging that the line item veto was unconstitutional. The Solicitor General argued that there was no "justiciable

(Continued...)

injuries are being caused by the challenged regulations. A favorable decision here would redress all of the dealer plaintiffs' injuries and would allow the manufacturers to properly plan their compliance strategy which will vary depending on where they must comply with a CO2 standard. Nothing more is required. *See, e.g.*, *Bennett*, 520 U.S. at 168; *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422-23 (1942). Once this Court finds that one of the plaintiffs has standing, it need not inquire further because Article III has been satisfied. *Houlton Citizens Council v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999).

The constitutional aspects of ripeness are satisfied if the plaintiffs can meet the test for Article III standing. *See Duke Power*, 438 U.S. at 81 (explaining that when a party has met the test for standing it generally has satisfied the constitutional portion of the ripeness doctrine); *see also* E. Chemerinksy, FEDERAL JURISDICTION 116 (2d ed. 1994); *McCall v. Dretke*, 390 F.3d 358, 362 (5th Cir. 2004) ("[I]f a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.") (quoting *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003) (standing and constitutional ripeness are "the same"); *ACLU v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999); *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 n.7 (11th Cir. 2000).

---

dispute where the occurrence of the [financial obligations] is contingent on the outcome of an as-yet unresolved waiver application." Brief of the United States, *Clinton v. New York*, 524 U.S. 417 (1998) (No. 97-1374), at 20. The Court rejected that argument. Even though the ultimate imposition of liability was still dependent on the decision of the Secretary of HHS, the Court found that it had jurisdiction because the mere imposition of a *contingent* liability was a sufficient injury because it "immediately and directly affects the borrowing power, financial strength, and fiscal planning" of the plaintiff. *Clinton*, 524 U.S. at 431; *see also id.* at 433 ("The Court routinely recognizes probably economic injury resulting from governmental actions that alter the competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' . . . . It follows logically that any petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies this part of the standing test.") (quoting parenthetically 3 K. Davis & R. Pierce, Administrative Law Treatise 13-14 (3d ed. 1994)).

Plaintiffs have adequately alleged, and are prepared to prove, that they have Article III standing. As a result, the constitutional aspects of ripeness are met by this case.

### 2. Plaintiffs' Evidence of Hardship Also Meets the Test for Prudential Ripeness

Defendant's primary ripeness challenge is prudential (and because the plaintiffs have Article III standing there are no constitutional ripeness questions in this case). He tries to emphasize the precedents from this Circuit establishing that courts dismiss cases when the claimed injuries depended upon "uncertain and contingent events that may not occur as anticipated." *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990); *see* Deft's Mem. of Law at 7. But the Complaint in this action alleges, and plaintiffs are prepared to prove, ***present*** harm to the dealers, and an ***immediate*** need for manufacturers to commit unrecoverable resources on compliance with the regulation. There is nothing contingent about the impact of defendant's regulation — it is happening now and plaintiffs are "suffer[ing] present injury from a future contemplated event." *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003) (internal quotations omitted); *see also Volvo NA v. Mens International Professional Tennis Council*, 857 F.2d 55, 63 (2d Cir. 1988) (challenge to proposed, but not enacted, rule was ripe because it was causing actual harm to the plaintiffs).

In the cases cited by defendant on the issue of contingencies, in which claims have been dismissed, the future contingencies were important because harm to the plaintiffs was itself contingent. *See, e.g.*, *Lincoln House*, 903 F.2d at 847 (explaining that "Lincoln's alleged injury is clearly contingent" on future events); *Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police*

*Dep't*, 973 F.2d 18, 20 (1st Cir. 1992) (case unripe because the "alleged injury is contingent upon events that may not occur as anticipated or may not occur at all.").[22]

As defendant must surely concede, the doctrine of prudential ripeness is not used to deny relief because there exists some chance that future events may make a controversy moot. *See, e.g., John Roe # 2 v. Ogden*, 253 F.3d 1225, 1232 (10th Cir. 2001); *cf Vogel v. Foth & Van Dyke Associates, Inc.*, 266 F.3d 838, 840 (8th Cir. 2001) (challenge to defendants conduct that caused lot adjacent to plaintiffs property to be selected as a finalist for new landfill was ripe because listing of adjacent lot as finalist caused immediate harm). The fact that defendant's action does not immediately "compel action … or impose penalties" on dealers is irrelevant, because their business prospects have already been adversely affected. *See CBS*, 316 U.S. at 422. The current losses in the value of dealers' businesses establish their right to be heard, especially since the legal issues under EPCA are framed as clearly now as they will ever be. *See RRR Cases*, 419 U.S. 102, 124-25 (1974). As the Supreme Court has explained: "[A] substantive rule which, *as a practical matter*, requires the plaintiff to adjust his conduct immediately . . . is 'ripe' for review at once." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990) (emphasis added).

No case cited by defendant supports dismissal on facts like those pleaded (and offered for proof) here. Under defendant's approach, the dealer plaintiffs and the manufacturers should wait for a decision by EPA on issues arising under the Clean Air Act (which may or may not address

---

[22] *See also Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 537 (1st Cir. 1995). In *Ernst & Young*, the court explained that the case was unripe because the alleged injury — an increased difficulty in evaluating damages for settlement purposes — was indirect and contingent on a "stretched chain of events." *Id.* at 538-40. Here, there is nothing contingent about the harm currently experienced by the Rhode Island dealers, and indeed there has been a specific quantification of the extent of that harm, measured in current loss of business value. As the *Ernst & Young* court recognized, "even when the direct application of a statute is to some degree remote or contingent, its collateral effects may inflict present injuries that, though indirect, are adequate to support a finding of ripeness." *Id.* at 536. This is such a case.

the EPCA preemption issue), and if they are dissatisfied, then quickly file a lawsuit to prevent enforcement of the challenged regulation. Even if EPA and the D.C. Circuit concluded their work on the California regulation in record time, a federal trial court could not address the issues on a normal schedule before the start of the relevant model year and the plaintiffs would effectively be forced to comply with the regulation. In such a scenario, as the Supreme Court noted long ago, judicial review can be either "too hasty" or "too late." *RRR Cases*, 419 U.S. at 145.

In addition, defendant's argument requires an assumption that his agency will not change its interpretation of its regulation. The regulation does not preclude enforcement prior to the granting of a waiver to California by EPA. Rather, it states that it became effective on January 11, 2006, and purports to regulate CO2 emissions starting in the 2009 model year. For its part, California has reserved the argument that no EPA waiver is needed for its standard. (*See* Deft's Exh. A at 1 n.1.) Defendant's current litigation position that the regulation will not be enforced until the California CO2 standards are granted an EPA waiver — which is based on the ambiguous text providing that the regulation is to be enforced in "accordance with" federal law — is insufficient either to rewrite the regulatory text, or to defeat federal jurisdiction. *See Vermont Right to Life v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (credible threat of prosecution exists when there is a reasonable reading of the statute that would prohibit the plaintiff from undertaking its desired course of conduct and threat cannot be defeated by a stated intent to not enforce the statute).[23] Indeed, based on the regulatory text and California's position, the

---

[23] *See also Va. Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710-11 (4th Cir. 1999); *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990); *Nitke v. Gonzales*, 413 F. Supp. 2d 262, 267 (S.D.N.Y. 2005).

defendant remains free to "chang[e] his mind," *id.*, and proceed with what he calls "enforcement," depending on future events.

Most importantly of all, deferral of the EPCA preemption issues until the situation has passed the eleventh hour for *manufacturers* ignores the present harm to the *dealers*. Even if the federal courts could step into the process at some future moment preferred by defendant, doing so would not redress the erosion in the current value of the dealer plaintiffs. The decisions of both the Supreme Court and the First Circuit require the exercise of federal jurisdiction in such circumstances, to relieve plaintiffs from current injuries. *See, e.g.*, *Duke Power*, 438 U.S. at 81 ("delayed resolution of these issues would foreclose any relief from the present injury suffered"); *RRR Cases*, 419 U.S. at 144 (despite fact that a step remained in ratification of challenged program, case was ripe when "decisions to be made now or in the short future may be affected" by the legality of the challenged action); *Riva*, 61 F.3d at 1010, 1012 ("even when the direct application of such a statute is subject to some degree of contingency," a case is ripe when the challenged state law makes it impossible for plaintiff "prudently to arrange his fiscal affairs"). A regulation that is inflicting millions of dollars in lost business value on some Rhode Island dealerships, and imperiling the survival of others, certainly interferes with "prudent[] fiscal" arrangements.

According to defendant, there is no "legal obligation" to comply with DEM's regulation at the present time. (Deft's Mem. of Law at 6.) But the need to commit resources to comply with DEM's regulation is no more a voluntary "business decision," *id.*, for the manufacturer plaintiffs in this case than the "immediate and significant change in the conduct of plaintiffs'

affairs" demonstrated by the plaintiffs in *Abbott Laboratories*.[24] Defendant's position makes even less sense when the situation of the dealer plaintiffs is considered. The dealer plaintiffs certainly need the "practical assistance" of this Court in "setting ... to rest" the question of whether the CO2 rules are enforceable. *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 694 (1st Cir. 1994); *see also RRR Cases*, 419 U.S. at 124-25 (potential for "erosion" in value of stock, assets and business constituted hardship warranted federal jurisdiction); *Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs*, 44 F.3d 1178, 1188-89 (3d Cir. 1995); *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 413 (8th Cir. 1985). A loss in the potential for business growth, even when there is some uncertainty about whether a challenged requirement will go into effect, is sufficient to establish ripeness. *See, e.g., Riva*, 61 F.3d at 1010, 1012 ("even when the direct application of such a statute is subject to some degree of contingency," a case is ripe when the challenged state law makes it impossible for plaintiff "prudently to arrange his fiscal affairs"); *Volvo*, 857 F.2d at 63 (challenge to proposed, but not yet enacted rule, was ripe because "the prospect of fear of future events may have a real impact on present affairs such that a preemptive challenge is ripe ... [and] to withhold consideration until the rule is actually adopted might work considerable hardship on appellants." ); *cf. Town of Rye v. Skinner*, 907 F.2d 23, 24 (2d Cir. 1990) (uncertainty about legal status, creating potential difficulty in obtaining project funding, established hardship and ripeness). Indeed, no cases support the denial of federal jurisdiction in a case that is based on facts like those pleaded here, and which plaintiffs are prepared if necessary to prove. As the First Circuit has explained:

---

[24] *See Abbott Labs. v. Gardner*, 387 U.S. 136, 152-53 (1967). Vehicle manufacturers that do not start work soon on compliance with this regulation will not be able to do so efficiently later, and even if they proceed efficiently, costs will run into the hundreds of millions of dollars. *See* Exhibit A ¶¶ 4-10.

> We believe that this part of the inquiry [*i.e.*, hardship] should focus on the judgment's usefulness. Rather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest.

*Narragansett Indian Tribe*, 19 F.3d at 694.

In this regard, the unpublished district court decision in *International Truck and Engine Corp. v. Lloyd*, No. 01-1245 (E.D. Cal. Oct. 24, 2001), cited by defendant at page 6 of his Memorandum is fully consistent with the Supreme Court and First Circuit cases supporting jurisdiction in this case. *Lloyd* involved a challenge to a California heavy-duty engine test procedure that had not yet been approved by EPA. The judge hearing the *Lloyd* case distinguished the situation before him, and cases in which "the very promulgation of a law may itself affect a party enough to satisfy the constitutional requirement." The judge in *Lloyd* was apparently able to conclude that the complaint before him did not allege that the state regulation "require[d] immediate changes in its present conduct so it could avoid future sanctions," *see id.*, which is certainly not a conclusion permitted by the manufacturers' allegations in the Complaint here, and the evidence tendered in opposition to this motion.[25] Likewise, the *Lloyd* court was not offered proof that the regulation challenged in that action had already imposed more than $26 million in lost business value.

Two Supreme Court cases demonstrate how the ripeness doctrine is properly applied here -- one case being especially pertinent to the situation of the manufacturer plaintiffs, and the other to that of the dealers. In *Pacific Gas & Electric Co. v. State Energy Resources Conservation &*

---

[25] *See* Exhibit A ¶ 5 (CO2 regulation requires product changes requiring many years of lead-time to implement); Exhibit C ¶ 3 ("These standards require more than just compliance with a new type of emissions test; they require basic changes in the design and performance of our engines and vehicles.")

*Development Commission*, 461 U.S. 190, (1983) ("*PG&E*"), utilities challenged state regulations regarding nuclear power plants. The Court agreed to decide whether a regulation that imposed a moratorium on the certification of new nuclear power plants violated federal law, even though it was possible that future administrative proceedings could make it unnecessary to decide the issue as currently framed. The Court explained that "[t]o require the industry to proceed without knowing whether the [challenged state law] is valid would impose a palpable and considerable hardship on the utilities." 461 U.S. at 201-02. Here, defendant posits that EPA's future action may resolve this case. But just as in *PG&E*, the industry has to make decisions about future product plans without knowing what EPA will do (or whether the State would abide by an adverse EPA ruling). The need to make compliance decisions years in advance and spend unrecoverable sums in order to comply to comply with defendant's regulation is surely a "palpable and considerable" hardship for the plaintiffs in this case.[26]

In the case of the dealers, defendant's position cannot be squared with the decision in *Duke Power*. In *Duke Power*, all Justices of the Court found sufficient hardship for the plaintiffs because the law being challenged might, in the future, result in the construction of nuclear power plants that might, in the future, injure plaintiffs' interests. *See* 438 U.S. at 81-82. The causal nexus pleaded in *Duke Power* was that a government insurance provision would cause the construction of private facilities that would otherwise not be constructed. The Rhode Island dealers' harm does not depend upon speculation about the future construction of nuclear power plants in response to a federal insurance program. It depends upon basic facts about the

[26] *See also New York v. United States*, 505 U.S. 144, 175 (1992) (case ripe despite significant time period until law took effect because it would "take[] many years" to comply with the law). The *PG&E* Court found the challenge to a regulation that regulated a nuclear plant's storage capacity unripe because the regulation operated on a case-by-case basis and, due to the Court's decisions on the merits regarding the moratorium, that the storage regulation was unlikely to affect the plaintiffs' behavior. 461 U.S. at 203.

competitive nature of the new-vehicle market in Rhode Island that defendant either accept, or be prepared to dispute at an evidentiary hearing.

**B. The Argument Contained in Part II of Defendant's Motion Is Not Properly Raised under Rule 12(b)(1), And In Any Event Lacks Merit Because It Ignores The Limits on EPA's Review Powers.**

Part II of defendant's argument states that "[u]ntil EPA rules on California's waiver request ... and especially if EPA denies the waiver request, any decision this Court renders ... would be an advisory in nature only."[27] To the extent that defendant is offering anything other than a reprise of his argument for delay or deferral of the merits based on the "enforceability" of Regulation 37, his second argument cannot survive careful scrutiny.

First, defendant is simply wrong if he is suggesting that EPA rather than the federal judiciary has the ultimate power finally to determine the scope of EPCA preemption. Absent a Congressional directive to the contrary — and defendant points to none — the federal courts, not EPA, decide preemption questions. *See Ass'n of Int'l Auto. Mfrs.*, 208 F.3d at 5; *cf. Abbott Labs.*, 387 U.S. at 139-148 (federal jurisdiction to review federal regulation exists absent specific Congressional withdrawal of jurisdiction). Stated another way, Congress has not instructed the federal courts to remove themselves from cases of this nature; and once this Court decides the issue of EPCA preemption, and regardless of what EPA may or may not say on that issue, the Court's decision will be final and binding.

Second, turning specifically to Count III of the Complaint — which is the main focus of Part II of his argument — defendant has apparently overlooked Count III's actual contents.

[27] Deft's Mem. of Law at 11. Notably, defendant is not seeking a primary-jurisdiction referral to EPA, or seeking a stay of this proceeding pending disposition of other litigation in California or elsewhere. Nor could he plausibly do so, given the allegations of harm in the Complaint.

Count III presented plaintiffs' claims under the Clean Air Act. The Clean Air Act contains two different provisions that govern state adoption and enforcement of motor vehicle emissions standards and that have primary relevance here. As indicated above, sections 177 and 209 prevent the formal enforcement of a state regulation unless and until California receives a waiver of federal preemption. *See* 42 U.S.C. §§ 7507, 7543. Defendant appears (for the present) to have agreed with plaintiffs that the Clean Air Act would forbid him from banning any vehicles from sale in Rhode Island unless EPA grants a waiver to California.[28]

The other relevant provision of the Clean Air Act, also contained in section 177, prohibits state regulations outside California that would "directly or indirectly" limit the sale of California-approved vehicles in a given State. *Id.* § 7507. Starting with the 2008 model year, one element of the DEM regulation would enforce such sales limits in Rhode Island, which, as pleaded in Count III, violates section 177. (*See* Compl. ¶¶ 102-104.) While defendant presumably does not agree with the merits of the section 177 claim in Count III, he cannot point to any administrative proceeding at EPA that will decide them. They are certainly not part of the waiver proceedings concerning the California regulations to which he refers.

Third, and with respect to all Counts of the Complaint, defendant confuses the role of a pleading under Rule 12(b)(1) with that of a pleading under Rule 12(b)(6) or Rule 12(c). Defendant makes it plain that he interprets federal law to provide that if EPA grants a waiver for a California rule, that decision sweeps away any issue that might arise under the other federal statutes applied in the Complaint, as well as the Commerce Clause. Plaintiffs, of course,

---

[28] Plaintiffs were obliged to include their claim that the State cannot formally "enforce" regulations that lack a waiver because DEM's position on the issue was doubtful before the litigation began — and as noted above, is still of questionable legal significance. *See* pp. 19-20 *supra.*

disagree with his position on the merits, as noted above. But even assuming defendant was correct, such a position on the *merits* does not affect the *subject-matter jurisdiction* of the federal courts. *See, e.g., Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998); *Bell v. Hood*, 327 U.S. 678, 682 (1946). Defendant must surely agree that "no court in the modern era" has accepted the principle that the merits of a plaintiff's arguments affects the jurisdiction of the court to adjudicate them. *See The Wilderness Soc. v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). Defendant can certainly file a motion under Rule 12(c) on the merits and try to have this Court adjudicate his position about the relationships among various federal statutes, but he cannot deploy his theory of statutory construction as a ground for subject-matter dismissal.

**CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss for lack of subject-matter jurisdiction should be denied.

Dated: May 31, 2006

Stuart A. C. Drake (admitted *pro hac vice*)
Andrew B. Clubok (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000
*For Plaintiffs Alliance of Automobile Manufacturers, DaimlerChrysler Corporation, and General Motors Corporation*

Pat K Roch
Patricia K. Rocha (#2793)
John A. Tarantino (#2586)
Katy A. Hynes (#6659)
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607
*For All Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2006, I caused to be served via first class mail, postage prepaid, a true copy of the within document on:

Tricia Jedele, Esq.
Michael Rubin, Esq.
Department of Attorney General
150 South Main Street
Providence, RI 02903

Timothy Pavilonis, Esq.
Office of Legal Counsel
Rhode Island Department of
Environmental Management
235 Promenade Street
Providence, RI 02908

Debra Humm

*383257_1.doc*