**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| LINCOLN DODGE, INC., *et al.*, Plaintiffs. | : | |
| v. | : | |
| | : | C.A. No. 06-70T |
| W. MICHAEL SULLIVAN, Defendant. | : | |

**AFFIDAVIT OF THOMAS C. AUSTIN**

I, Thomas C. Austin, being duly sworn on oath, say as follows under penalty of perjury:

1. I am an expert in the fields of automotive fuel economy and emissions control, compliance with fuel economy standards, and compliance with automotive air pollution control standards. I am currently a Senior Partner at Sierra Research, Inc. ("Sierra"), an environmental consulting firm. Previously, I was the Executive Officer of the California Air Resources Board ("CARB") and was in charge of all automotive and non-automotive regulatory programs at the agency. Prior to my employment by CARB I was a member of the inter-agency team within the federal government that developed proposals for national fuel economy standards, and have authored peer-reviewed papers on the subject of automotive fuel economy. I have served on peer review committees for publications by the Society of Automotive Engineers.

2. I have analyzed the requirements of the regulation adopted by the Rhode Island Department of Environmental Management ("DEM") in 2005 involved in this litigation, based on information I have obtained from public sources, meetings and communications with automobile manufacturers, and my own expertise in the field. [1]

---

[1] My analysis includes an evaluation of the impact of the regulation on different manufacturers. Because one plaintiff (the Alliance of Automobile Manufacturers) does not take positions on competitive issues, I have completed that portion of my analysis on behalf of plaintiffs other than the Alliance.

**Summary of Opinions**

3. I have concluded that if manufacturers intend to comply with DEM's regulation and remain in a substantial part of the new-vehicle market in Rhode Island over the long term, they would have to immediately begin expending significant engineering and capital resources and could not defer such expenses for the years that may be required for the EPA review process under section 209 of the Clean Air Act. My analysis of DEM's regulation also indicates that, even with significant near-term expenditures, some manufacturers will not be able to remain competitive in a substantial portion of the new-vehicle market in Rhode Island. For those manufacturers, the only viable compliance strategy consistent with the need to achieve profitability will be to discontinue sales in part of that market, while devoting capital, engineering and other resources to the market segments in which they may be able to remain competitive. The market segments in which the most affected manufacturers will no longer be competitive are the passenger car and small light-truck segments.

**Lead-time for Compliance**

4. In its rulemaking documents, DEM referred to an analysis which estimated that, in order to comply with the new regulation, more than half of the full-size trucks and SUVs produced by Daimler Chrysler, Ford and General Motors would need to be equipped with "near term technologies" for carbon dioxide ("$CO_2$") control by model year 2011 and nearly 100 percent would need to deploy such technologies by model year 2012. The "near term technologies" identified by CARB included changes in vehicle engines, transmissions, electrical systems and other features. Those technologies would be used to reduce fuel consumption, in order to reduce the levels of $CO_2$ emitted from the vehicles.

5. It takes several years to design, develop and deploy technologies to reduce fuel consumption in specific vehicle models. This is called "lead -time." A report prepared for the

National Research Council ("NRC") in 2002 concluded that the widespread use of technologies to reduce fuel consumption like those listed in the CARB analysis would require four to eight years of lead-time. That estimate by NRC is consistent with my opinion regarding the lead-time requirements for CARB's near-term technologies, which is described below.

6. The 2011 model year starts in less than four years, and the 2012 model year starts in less than five years. If the CARB analysis to which I refer in paragraph 6 above is taken as correct, and accepting NRC's lead-time estimate, work on the deployment of CARB's "near term" technologies must begin immediately.

7. DEM's regulatory analysis, though limited, confirms that DEM's $CO_2$ regulation is intended to require changes in engines and transmissions of the vehicles destined for the Rhode Island market. Because DEM's $CO_2$-based standards are the same as those of California, the same implementation schedule for new technologies would be required in both jurisdictions.

8. In my opinion, the development and deployment of new or significantly modified engines or transmissions for a given vehicle can require more than four years of lead-time. For example, although some significant product design changes could theoretically be made by some manufacturers by 2010, manufacturers do not have sufficient engineering resources to make significant changes across their full model line all at once. The lifecycle for engines and transmissions is approximately 12 years. The lifecycle for vehicle bodies is approximately eight years. These product lifetimes are consistent with the magnitude of the investment required in an all-new product and the time scale over which significant technological advancements can be expected to occur, necessitating the replacement of older designs.

9. Because engineering resources are limited, the replacement of old technology with new technology must be staggered. On an industry-wide average, approximately 8.3% of

engines and transmissions are replaced with all new designs each year and 12.5% of the bodies are all new. Combined with "major" updates, each year about 25% of all engines, transmissions, and bodies are either all new or substantially modified. The engineering resources that exist within the automotive industry are sufficient to achieve this rate of new product introduction, but not significantly more. In addition, the capacity of the machine tool industry is based on this historical level of new product introduction.

10. EPA's review of requests for a waiver of preemption under the Clean Air Act can take years. A prudent manufacturer will not await the completion of the EPA waiver process under section 209 of the Clean Air Act before starting to spend capital and other resources on compliance with the regulation involved in this litigation. Indeed, in my decades of experience in advising the automobile industry, I am not aware of a single instance in which a major manufacturer awaited completion of an EPA review process under section 209, before deciding how to comply with a California regulation and before committing the necessary resources to compliance.

**Competitive Impacts of the DEM Regulation**

11. Like the California regulation on which it is based, the DEM regulation imposes different compliance costs on different manufacturers. This is the result in part of the fact that each manufacturer is required to meet the same overall standards. Some manufacturers will have to make far more extensive changes in their vehicle models or in their overall product lines than other manufacturers in order to comply with the DEM regulation.

12. To estimate the competitive impact of the DEM regulation on manufacturers who produce vehicles for the Rhode Island market, I developed an analysis that is described in materials that Sierra provided to DEM during DEM's 2005 rulemaking process. In brief, I estimated the costs of using various technologies to reduce $CO_2$ from specific types of vehicles,

the impact of using those technologies, and the specific bundles of technologies that each manufacturer could employ in order to try to comply with DEM's standards in the most cost-effective manner possible.

13. My analysis indicates that the compliance costs of the different manufacturers in the Rhode Island market differ significantly. Each manufacturer currently sells a mix of vehicles that is unique to that manufacturer; some manufacturers use more of the necessary technologies on current vehicles than others do; and consequently, each manufacturer has its own distance to go in order to meet the $CO_2$ standards set by DEM.

14. My analysis is premised on the need for each manufacturer to compete as effectively as possible in the Rhode Island market, consistent with a need to cover the costs of compliance with the regulation on a company-wide, long-term basis. My analysis also assumes that the regulation in Rhode Island remains identical (in terms of the numerical standards in the regulatory text) with the California rule, and that all States on the West Coast, and all the Northeast States other than New Hampshire have decided to enforce the $CO_2$ standards. My analysis further assumes that each manufacturer has sufficient resources to spend on compliance with the regulation and would choose to allocate those resources on compliance.

15. My analysis indicates that for seven of the largest manufacturers doing business in Rhode Island, the average price increase necessary to cover the cost of compliance if each manufacturer remained in all its current segments of the Rhode Island market varies by more than the average estimated North American profit per vehicle for Daimler Chrysler, Ford and General Motors. (The profit estimate I have used is contained in 2004 "Harbour Report" for North America, published by Harbour Consulting, Inc.) A business plan that is based on selling vehicles that have a price penalty against the competition that exceed average vehicle profit

would fail. No company seeking to maximize profits in the intensively competitive global automobile industry would follow such a strategy.

16. To reduce compliance costs and remain as competitive as possible in Rhode Island, my analysis indicates that Daimler Chrysler, Ford and General Motors will need largely to exit from the Rhode Island passenger car and small truck market segments, on a gradual basis, as the $CO_2$ standards become progressively more stringent on a year-over-year basis. This will allow those manufacturers to concentrate the resources that I assume are available for compliance on full-size trucks and SUVs. While each of those three companies would still have to make heavy investments and spend large sums on compliance in the full-size truck and SUV markets, their competitors would also have to make substantial investments in those types of vehicles in order to comply with the $CO_2$ standards in those market segments. It should be noted, however, that even in the large truck and SUV segments, there are likely to be some product restrictions, because it would be impractical to bring some particularly fuel-intensive vehicles into compliance with the regulation in a cost-competitive manner.

Thomas C. Austin
______________________
Thomas C. Austin

State of California
County of Sacramento

Signed and sworn to before me a
Notary Public this 30th day of
May 2006. in Sacramento, California

X Personally known to me
to be the person who appeared before me.

Kathryn L. Hendryx
Signature of Notary Public

KATHRYN L. HENDRYX
Commission # 1379367
Notary Public - California
Sacramento County
My Comm. Expires Oct 10, 2006