**REDACTED VERSION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINCOLN DODGE, INC., et al. | : | |
| | : | |
| v. | : | C.A. No. 06-70T |
| | : | |
| W. MICHAEL SULLIVAN, in his official capacity only as Director of the Rhode Island Department of Environmental Management | : | **Contains Confidential Business Information – <u>Filed Under Seal</u>** |

## AFFIDAVIT OF DONALD P. WISEHART

I, Donald P. Wisehart, being duly sworn upon oath, do hereby depose and state:

1. I make this Affidavit in support of Plaintiffs' Opposition to Defendant's Motion to Dismiss and based upon my personal knowledge of the facts set forth herein. I could and would testify under oath to the same if called as a witness before the Court.

2. I am the President and founder of Wisehart, Inc. I am a certified public accountant, having been credentialed in 1973 by the American Institute of Certified Public Accountants. Moreover, I am credentialed as a CVA, Certified Valuation Analyst, ABV, Accredited in Business Valuations, and ASA, Accredited Senior Appraiser, having received such credentials in 1996, 1998 and 2002 by the National Association of Certified Evaluation Analysts, American Institute of Certified Public Accountants, and American Society of Appraisers, respectively. I have a Bachelor's of Arts in Accounting from Kent State University, received in 1968, and a Master's of Taxation from Bryant College, received in 1984. I am a member of the American Society of Appraisers, American Institute of Certified Public Accountants, National Association of Certified Valuation Analysts, and the Rhode Island Society of Certified Public Accountants. During the period 2003-2005, I served on the ABV Credential Committee of the American Institute of Certified Public Accountants. From the period 2005 to the present, I have

served on the NACVA – 2006 National Conference "Advanced Business Valuation" Committee as Chairperson, and for the period 2000 to the present I have served on the Business Valuation Committee of the Rhode Island Society of CPAs.

I have also participated in courses and presentations, and have authored various publications. I have testified in various Superior Courts, the Rhode Island Family Court, and the United States District Court for the District of Rhode Island, as well as in depositions.

## Conclusion

3. In my opinion, real and present harm has been experienced by new motor vehicle dealers in Rhode Island affiliated with the Manufacturer Plaintiffs in this action as a result of the Department of Environmental Management regulation referred to in this litigation as Regulation 37. I have examined records of 31 Rhode Island dealerships. I have concluded that 18 of the Rhode Island dealerships I have examined are suffering a diminution in the value of their businesses as a result of Regulation 37 in the aggregate amount of $26,388,104. Additionally, based upon my review of the records that I have studied, in all likelihood it would not be economically viable for another 8 dealerships to remain in business as a result of Regulation 37. I did not have sufficient financial information from the remaining 5 dealerships to calculate their likely losses. Attached as **Exhibit A** is a schedule that reflects the present loss in dealership value as a result of Regulation 37 for the new motor vehicle dealers in Rhode Island whose businesses I have studied.

## Bases for Conclusion

4. I have received confidential financial statements pertaining to 31 new motor vehicle dealers in Rhode Island provided by the Manufacturer Plaintiffs, including the financial statements of certain of the Dealer Plaintiffs. These financial statements include new car sales by

model over the past three to five years. The financial statements are comprised of balance sheets and income statements. In the interest of consistency and relevance, I determined that the data needed to cover, at a minimum, three consecutive years ending at December 31, 2005. The financial statements from 5 of the dealerships were not able to meet this criterion. Therefore, I analyzed the remaining 26 dealerships, using primarily the income approach as discussed below.

5. The basis for the determination of loss referenced in paragraph 3 relies upon the income approach pursuant to the Business Valuation Standard VII, II of the American Society of Appraisers.[1]

6. Due to the changes in pre-tax net income in years 2006 through 2014 resulting from Regulation 37, the discounted cash flow method of the income approach was applied.

7. Prior year gross profits on new car sales of each model were first averaged to approximate a normalized and expected gross profit for the base year, 2006. This averaged gross profit was then increased by an estimated average inflation rate of 3% beginning with 2006. For each model, gross profit was increased annually by 3% up to the year of proscription, if applicable. Accordingly, for those models where proscription was not a factor, their corresponding gross profits grew by 3% each year to 2014.

---

[1] That standard states, in part:

"II. The Income Approach

A. The income approach is a general way of determining a value indication of a business, business ownership interest or security using one or more methods wherein a value is determined by converting anticipated benefits.

B. Both capitalization of benefits methods and discounted future benefits methods are acceptable. In capitalization of benefits methods, a representative benefit level is divided or multiplied by a capitalization factor to convert the benefit to value. In discounted future benefits methods, benefits are estimated for each of several future periods. These benefits are converted to value by the application of a discount rate using present value techniques."

8. All new car "semi-variable" expenses were treated along with new car "variable" expenses and increased or decreased in the same proportion as new car gross profits. Moreover, all fixed expenses were increased each year beginning in 2006 by the estimated rate of inflation. I used a discount rate of 20%, including data reported by Ibbotson Associates and using the build-up methodology, a generally accepted method for the development of discount rates.[2]

9. An estimated long-term growth of 3% was used in the determination of loss for each dealership.[3]

10. The estimated impact on values should be considered a minimum impact for the following reasons:

(a) No decrease in profitability from collateral or convoyed sales, such as warranty, service and parts, was assumed for the purpose of estimating impact of Regulation 37 on value, whereas some decrease is likely, which would further increase the amount of the impact.

(b) The ability of the Plaintiffs to mitigate a loss in new vehicle sales by reducing fixed costs will be hampered by long-term lease commitments and plant size,

---

[2] The build-up analysis is as follows:

***Discount Rate Used on Net Income To Equity: - Build-Up***

| | | |
|---|---|---|
| Long-term (20-year) U.S. Treasury Coupon Bond Yield December 2005 | | 4.60% |
| Long-horizon expected equity risk premium (ERP): | | |
| Supply side | | 6.30 |
| Expected small stock premium | | 6.36 |
| Subjected risk premium | | 2.00 |
| **Discounted Rate** | | 19.26% |
| | Rounded | 20.0% |

[3] Nominal long-term growth includes both real growth and inflation. Over the past 76 years, the U.S. real growth (gross domestic product or GDP) has averaged 3.4% per year, and it is estimated that inflation will increase at an annual rate of 2.6% for the next 20 years. Therefore, I selected a conservative growth rate of 3%, which is just above the estimated rate of inflation.

and, in fact, certain additional costs may be incurred to adjust to smaller operations, which could further impact value negatively.

(c) Because new vehicle semi-variable expenses are, to some degree, "fixed," even if new vehicles sales decrease as a result of Regulation 37, the fixed costs would not similarly decrease, and, therefore, the losses I have calculated would be even greater.

11. In conclusion and based upon my analysis and review of relevant information,[4] it is my opinion to a reasonable degree of professional certainty that there is real and present harm to new motor vehicle dealers in Rhode Island as a result of Regulation 37 as demonstrated by the effects on current value of the businesses I have studied. A conservative estimate of the likely minimum effects on value of the dealerships resulting from Regulation 37 includes an aggregate loss in the amount of $26,388,104. This excludes those dealerships that would not remain

---

[4] In reaching my conclusion, I reviewed the following information:

- The Complaint filed on February 13, 2006 in the above-referenced matter.
- The Declarations and Interrogatory Answers filed in litigation pending in the United States District Court for the Eastern District of California-Fresno encaptioned *Central Valley Chrysler Jeep, Inc., et al. v. Catherine E. Witherspoon, in her official capacity as Executive Officer of the California Air Resources Board*, including General Motors Corporation's (GM) Supplemental Response to Defendant's First Set of Interrogatories Propounded to Plaintiff, DaimlerChrysler Corporation's (DMC) Supplemental Response to Defendant's First Set of Interrogatories Propounded to Plaintiffs, and Declaration of Stuart H. Harden in Opposition to Defendant's Motion to Dismiss or Transfer.
- The Affidavit of Richard S. Bower in the litigation pending in the United States District Court for the District of Vermont encaptioned *Green Mountain Chrysler Plymouth Dodge Jeep, et al. v. Thomas W. Torti.*
- The dealer prepared balance sheets and statement of operations provided by GM for the three to five years ended December 31, 2005, 2004, 2003, 2002 and 2001, and by DCC for the three to five years ended December 31, 2005, 2004, and 2003, respectively.
- SBBI, Stocks, Bonds, Bills and Inflation, Evaluation Edition 2006, Ibbotson Associates, Chicago, Illinois.

economically viable as a result of Regulation 37 and those dealerships whose financial information did not meet our minimum criteria.

Donald P. Wisehart

Subscribed to and sworn before me
this 21st day of April, 2006.
Edward H. Torgen Notary Public
Notary Public
My Commission Expires:

EDWARD H. TORGEN
NOTARY PUBLIC
MY COMMISSION EXPIRES
JUNE 12, 2009

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of April, 2006, I caused to be served via ~~first class mail, postage prepaid~~ hand delivery, a true copy of the within document on:

Tricia Jedele
Special Assistant Attorney General,
Environmental Advocate
Michael Rubin, Esq.
DEPARTMENT OF ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903

Timothy Pavilonis, Esq.
Office of Legal Counsel
Rhode Island Department of
Environmental Management
235 Promenade Street
Providence, RI 02908

Debra Hunn

*379236_1.doc*