SAGASER, FRANSON & JONES
2445 Capitol Street, 2nd Floor
Post Office Box 1632
Fresno, California 93717-1632
Telephone: (559) 233-4800

Timothy Jones #119841

KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000

Eric B. Wolff #197147

Attorneys for all plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – FRESNO

| | |
|---|---|
| CENTRAL VALLEY CHRYSLER-JEEP, INC., KITAHARA PONTIAC GMC BUICK, INC., MADERA FORD MERCURY, INC., MADERA CHEVROLET, FRONTIER DODGE, INC., TOM FIELDS MOTORS, INC., PISTORESI CHRYSLER DODGE JEEP, BOB WILLIAMS CHEVROLET, COURTESY OLDSMOBILE CADILLAC, INC., MERLE STONE CHEVROLET, INC., MERLE STONE PORTERVILLE, INC., STURGEON AND BECK INCORPORATED, SWANSON FAHRNEY FORD, INC., GENERAL MOTORS CORPORATION, DAIMLERCHRYSLER CORPORATION, TULARE COUNTY FARM BUREAU, and the ALLIANCE OF AUTOMOBILE MANUFACTURERS,<br><br>Plaintiffs,<br><br>v.<br><br>Catherine E. WITHERSPOON, in her official capacity as Executive Officer of the California Air Resources Board,<br><br>Defendant. | **Case No. 1:04-cv-06663-REC-LJO**<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>**[28 U.S.C. §§ 1331, 1343, 2201]** |

Plaintiffs, Central Valley Chrysler-Jeep, Inc., Kitahara Pontiac GMC Buick, Inc., Madera Ford Mercury, Inc., Madera Chevrolet, Frontier Dodge, Inc., Tom Fields Motors, Inc., Pistoresi



PDF created with pdfFactory trial version www.pdffactory.com

Chrysler Dodge Jeep, Bob Williams Chevrolet, Courtesy Oldsmobile Cadillac, Inc., Merle Stone Chevrolet, Inc., Merle Stone Porterville, Inc., Sturgeon and Beck Incorporated, Swanson Fahrney Ford, Inc., General Motors Corporation, DaimlerChrysler Corporation, Tulare County Farm Bureau and the Alliance of Automobile Manufacturers (collectively, "plaintiffs"), state the following claims for declaratory and injunctive relief against the Executive Officer of the California Air Resources Board ("CARB"):

## JURISDICTION

1. This is an action for declaratory and injunctive relief under the Supremacy Clause in Article VI of the United States Constitution and 42 U.S.C. § 1983. It challenges the requirements of a state law and a regulation implementing the state law that are preempted by federal law. Defendant is the state officer charged with enforcement of the preempted law and regulation. This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 1343(a)(3), 2201.

## INTRODUCTION

2. The state law involved in this proceeding is concerned with the control of carbon dioxide from motor vehicles. Carbon dioxide, or "CO2," is produced by the combustion of any substance that contains carbon, such as wood, coal, or gasoline. Carbon dioxide is also exhaled by humans and other animals and is critical to plant life. Plants use carbon dioxide to produce the oxygen needed for human and other animal life. Carbon dioxide is nonflammable and under normal conditions it is stable, inert, and nontoxic. Carbon dioxide is not regulated by the United States Environmental Protection Agency ("EPA") as a pollutant. It is not listed on the web-site of the San Joaquin Valley Air Pollution Control District as one of the ten pollutants for which there exist federal or state limits. Carbon dioxide is also not listed among the more than 200 substances classified by CARB as toxic air contaminants in the State of California.

3. Carbon dioxide disperses evenly through the upper atmosphere, making up less than one percent of dry air. This layer of carbon dioxide retains heat in the Earth's atmosphere through a "greenhouse effect" that is an important part of the planet's biosphere. An uncontrolled increase in carbon dioxide could lead to higher temperatures in the Earth's atmosphere, described as "global warming" or "global climate change." The United States



PDF created with pdfFactory trial version www.pdffactory.com

government is studying the possible means of controlling or adapting to increases in carbon dioxide, in concert with the international scientific community and foreign governments, in order to address global warming issues.

4. The most systematic controls on carbon dioxide from combustion sources in this country apply to automobiles and trucks. For more than 25 years, the United States Department of Transportation has regulated the fuel economy of new motor vehicles sold in the United States. Because carbon dioxide is an unavoidable by-product of the combustion of gasoline, there is a direct relationship between the amount of fuel consumed by a vehicle and the amount of carbon dioxide emitted by that vehicle. Therefore, regulations that require vehicles to burn less gasoline will limit the release of carbon dioxide from those vehicles and vice versa. By setting fuel economy standards, the national government has regulated the level of greenhouse gases released by cars and trucks sold in this country. Since 1975, when the federal fuel economy program started, the average fuel economy of new passenger cars sold in the United States has improved by nearly 100 percent, and the average fuel economy of new light-duty trucks has improved by about 50 percent. More stringent national truck fuel economy standards are currently being implemented, at a conservative estimated direct cost of more than $860 million by model year 2007.

5. The carbon dioxide produced by California passenger cars and light-duty trucks currently amounts to less than two percent of total greenhouse gas emissions in the United States, and constitutes a much smaller fraction of global greenhouse gas emissions from man-made sources worldwide. Greenhouse gas emissions in the developing world and in some industrialized nations are increasing. It is beyond the power of the State of California or the United States government to control those increases, and, in the absence of effective and enforceable international treaties, those emissions will continue to increase. Because greenhouse gases disperse evenly in the atmosphere, any rule that California might adopt applicable to new motor vehicles sold in this State will have no more than a trivial effect in reducing the concentration of greenhouse gas emissions in the upper atmosphere above California, much less the national or global atmosphere.





PDF created with pdfFactory trial version www.pdffactory.com

6. The state law giving rise to this litigation was adopted by the 2001-2002 Regular Session of the California Legislature as Assembly Bill 1493 ("A.B. 1493"). A.B. 1493 was approved by Governor Gray Davis in July 2002 and is codified at section 43018.5 of the California Health & Safety Code. Defendant and CARB have interpreted A.B. 1493 to require the adoption and enforcement of rules to limit the release of carbon dioxide from new motor vehicles sold in California beginning in the 2009 model year, which starts in calendar year 2008.

7. A.B. 1493 directed CARB to develop and adopt any regulations authorized by A.B. 1493 no later than January 1, 2005. To comply with that statutory deadline, CARB adopted its greenhouse gas regulation in September 2004. CARB is the body authorized by state law to adopt regulations governing new motor vehicles in California, and no further action by CARB is required in order to implement the provisions of A.B. 1493.

8. CARB adopted its regulation at a public hearing in Los Angeles, held on September 23-24, 2004. Based on their interpretation of the state law, Defendant proposed and CARB adopted a regulation that according to CARB would require substantial reductions in CO2 from some portions of the California motor vehicle fleet. Despite the stringency of the standards that were proposed and adopted, there was no evidence from any witness at the September 2004 hearing, or from the CARB technical staff, that predicted either (1) any measurable reduction in global temperatures, or (2) any reduction in temperatures in California, as a result of the regulation. Nevertheless, CARB approved Defendant's proposed regulation, with minor revisions, in Resolution No. 04-28, dated September 24, 2004. (*See* Exhibit A.)

9. This action seeks to restrain enforcement of CARB's regulations by the Executive Officer on the following five grounds, any one of which warrants declaratory and injunctive relief:

a. *Federal fuel economy laws and regulations.* The CARB regulations are preempted by the federal statute that created the authority for the Department of Transportation to regulate fuel economy, and the federal regulations enacted under that statutory authority. First and foremost, federal law expressly prohibits any state regulation "related to fuel economy standards." 49 U.S.C. § 32919(a). In addition, the adopted rule could not be enforced without





PDF created with pdfFactory trial version www.pdffactory.com

interference with the national motor vehicle fuel economy program established under the federal fuel economy statute. (*See* Count I below.)

b. *Federal Clean Air Act.* State emissions regulations are also expressly preempted by the federal Clean Air Act. In some circumstances California can obtain a waiver of that preemption from U.S. EPA in order to address air pollution conditions that compel unique and specific regulation to address the needs of California. The A.B. 1493 regulations, however, are squarely precluded by the plain text of the Clean Air Act and the U.S. EPA's authoritative interpretation of that text in September 2003. Contrary to Defendant's interpretation of the Clean Air Act, U.S. EPA has concluded that greenhouse gases are not "pollutants" under section 202(a) of the Clean Air Act, and regulation of motor vehicle fuel economy is assigned not to EPA but to the Department of Transportation. The Clean Air Act precludes enforcement of the California regulation, and California has not sought U.S. EPA's reconsideration of its September 2003 decision. (*See* Count II below.)

c. *National control of foreign policy matters.* With respect to the issue of global warming, it is not the prerogative of either the Executive Officer or the State of California to try to set national greenhouse gas control policy for new motor vehicles. The United States is committed to addressing global climate change through multilateral agreements. The A.B. 1493 regulation is therefore also preempted because it conflicts with national policy and weakens the diplomatic leverage of the federal government in negotiations on greenhouse gas standards with other nations. (*See* Count III below.)

d. *Burden on interstate commerce.* The economic burdens created by the A.B. 1493 regulation disproportionately outweigh any putative benefits of the rule. For that reason the rule also violates the dormant Commerce Clause of the U.S. Constitution. (*See* Count IV below.)

e. *Federal antitrust laws.* Some elements of the A.B. 1493 rule would require cooperation among otherwise competitive manufacturers in the California new-vehicle market, contrary to federal antitrust laws. The Executive Officer has not articulated any valid basis for antitrust immunity for this feature of the California regulation. (*See* Count V below.)





PDF created with pdfFactory trial version www.pdffactory.com

## ADDITIONAL JURISDICTIONAL FACTS

10. The plaintiffs in this action are 13 new motor vehicle dealers in the Southern San Joaquin Valley, an association of automobile manufacturers that produce and sell vehicles to those dealers, two of those manufacturers, and an association of farmers and ranchers in the Southern San Joaquin Valley whose members are among the purchasers of the new motor vehicles produced by the manufactures and sold by the dealers at the retail level.

11. The economy of the Southern San Joaquin Valley includes a mixture of agriculture and industry The new vehicle market in this area is dominated by trucks, often used by their owners in agricultural and other types of businesses. Small businesses are an important part of the new vehicle customer base for any dealer in this area, other than the rare dealer who specializes in luxury automobiles. Except in the luxury market, new vehicles offered for sale to small businesses in the Southern San Joaquin Valley compete against a strong used-vehicle market, particularly for trucks.

12. The new motor vehicle market in this part of California is highly competitive. The most important factor in that competition is usually the retail price of the new car or truck. Dealers compete not only among themselves for new vehicle sales, but also against the used vehicle market. Even small increases in the prices of new vehicles can cause consumers to purchase used cars and trucks, or to forgo or defer any vehicle purchase altogether. The personal disposable income of vehicle owners in this area is generally lower than in the metropolitan areas surrounding San Francisco, Los Angeles, San Diego, and the interstate highway corridors leading to those coastal cities from the East. New vehicle sales in the San Joaquin Valley are therefore particularly sensitive to price increases.

13. The evidence provided to CARB at its September 2004 public hearing included written comments from dealers attesting to the conditions in the new vehicle market in this area. The evidence also included testimony from independent experts employed by the Alliance, who demonstrated that the regulation proposed by Defendant would result in major changes in the California new motor vehicle fleet. The cost of a new car or truck was predicted to increase by thousands of dollars. The effect of those price increases will be to reduce demand





PDF created with pdfFactory trial version www.pdffactory.com

for new vehicles, and thus to reduce the revenues of California motor vehicle dealers derived from retail sales. The CARB staff's experts conceded that Defendant's rule would increase prices and reduce vehicle sales. The only major disagreements between the CARB experts and the Alliance experts related to the correct range for the likely cost increases, and the estimated extent of the reductions in new vehicle sales

14. The cost increases imposed by Defendant's rule will have a disproportionate effect on new vehicle dealers and purchasers in the Southern San Joaquin Valley. The treatment of agricultural-use vehicles in Defendant's rule will also have a particularly large impact on the dealer plaintiffs and Central Valley farmers. Trucks used in farming usually need more horsepower and towing capacity than the average truck. Farm trucks therefore often require more powerful engines and consume more gasoline, compared to other vehicles. Mindful of the needs of farmers, the sponsors of A.B. 1493 limited CARB's rulemaking power to vehicles primarily used in "non-commercial" applications, and circulated statements during the debate claiming that CARB could not use the legislation to regulate vehicles used in agriculture. Nevertheless, the rule approved by CARB in September 2004 regulates vehicles without distinction between commercial use and personal use, and applies equally to vehicles used in farming applications and for other purposes.

15. As a result of Defendant's regulation, some types of trucks needed for agricultural and related businesses in the Southern San Joaquin Valley may no longer be available, or will become much more expensive, and will have even higher cost premiums than the other vehicles subject to her rule. This will have a negative effect on the agricultural industry, the automotive industry and the overall economy in the Southern San Joaquin Valley, greater than the effects of the rule in other areas of the State characterized by, for example, a higher concentration of suburban drivers and a more white-collar employment base. The only specific consideration of the impact of Defendant's rule on automotive businesses prepared by CARB estimated the impact of the rule on automotive businesses in San Diego County, where economic conditions differ significantly from other parts of California, including the Southern San Joaquin Valley.



PDF created with pdfFactory trial version www.pdffactory.com

16. Central Valley Chrysler-Jeep, Inc. is an automobile dealer located in Stanislaus County at 4460 North McHenry Avenue, Modesto, California. Central Valley Chrysler-Jeep, Inc., formerly Central Valley Chrysler-Plymouth, Inc., has been in business for 30 years and has annual sales of approximately 850 new vehicles, about 60 percent of which are trucks. Central Valley Chrysler-Jeep, Inc. is a "dealer" as that term is defined in the federal fuel economy law. 49 U.S.C. § 32908 (a)(2).

17. Kitahara Pontiac GMC Buick, Inc., is an automobile dealer located in Fresno County at 5515 North Blackstone Avenue in Fresno, California. Kitahara Pontiac GMC Buick, Inc. has been in business since 1998, and has annual sales of about 1300 new vehicles per year, approximately 870 of which are full-size trucks. Approximately 40 percent of those trucks are estimated to be intended for agricultural use. Kitahara Pontiac GMC Buick, Inc. is a "dealer" under 49 U.S.C. § 32908 (a)(2).

18. Madera Ford Mercury, Inc. is an automobile dealer located in Madera County at 200 Madera Avenue, Madera, California. Madera Ford Mercury, Inc. is a "dealer" under 49 U.S.C. § 32908 (a)(2).

19. Madera Chevrolet is an automobile dealer located at 1300 Country Club Drive in Madera, California. Madera Chevrolet has annual sales of about 400 vehicles, including about 290 full-size trucks, of which approximately 50 percent are estimated to be sold for agricultural use.

20. Frontier Dodge, Inc. is an automobile dealer conducting its business under the name Fireside Dodge Hyundai, located in Stanislaus County at 4620 North McHenry Avenue, Modesto, California. Frontier Dodge, Inc. sells approximately 900 new vehicles per year, of which about 90 percent are trucks. Frontier Dodge, Inc. is a "dealer" under 49 U.S.C. § 32908 (a)(2).

21. Tom Fields Motors, Inc. is an automobile dealer conducting its business under the name Turlock Auto Plaza, located in Stanislaus County at 1600 Auto Mall Drive, Turlock, California. Tom Fields Motors, Inc. has annual sales of approximately 1000 new vehicles, and





PDF created with pdfFactory trial version www.pdffactory.com

typically more than 80 percent are trucks. Tom Fields Motors, Inc. is a "dealer" under 49 U.S.C. § 32908 (a)(2).

22. Pistoresi Chrysler Dodge Jeep is an automobile dealer located in Madera County at 1100 Madera Avenue, Madera, California. Pistoresi Chrysler Dodge Jeep is a "dealer" under 49 U.S.C. § 32908 (a)(2).

23. Bob Williams Chevrolet is an automobile dealer located in Kings County at 1356 W. Iona Avenue, Lemoore, California. Bob Williams Chevrolet has annual sales of over 300 new vehicles, and typically more than 60 percent are full-size trucks. Bob Williams Chevrolet is a "dealer" under 49 U.S.C. § 32908 (a)(2).

24. Courtesy Oldsmobile Cadillac, Inc. is an automobile dealer located in Merced County at 1485 W. 15th Street, Merced, California. Courtesy Oldsmobile Cadillac, Inc. has annual sales of approximately 1000 new vehicles, and typically more than 60 percent are full-size trucks. Courtesy Automotive Center is a "dealer" under 49 U.S.C. § 32908 (a)(2).

25. Merle Stone Chevrolet, Inc. is an automobile dealer located in Tulare County at 2100 E. Tulare Avenue, Tulare, California. Merle Stone Chevrolet, Inc. has annual sales of over 600 new vehicles, and typically more than 70 percent are full-size trucks. Merle Stone Chevrolet, Inc. is a "dealer" under 49 U.S.C. § 32908(a)(2).

26. Merle Stone Porterville, Inc. is an automobile dealer located in Madera County at 800 West Henderson Avenue, Porterville, California. Merle Stone Porterville, Inc. has annual sales of over 500 new vehicles, and typically more than 50 percent are full-size trucks. Merle Stone Chevrolet Cadillac, Inc. is a "dealer" under 49 U.S.C. § 32908 (a)(2).

27. Sturgeon and Beck Pontiac Incorporated is an automobile dealer located in Tulare County at 350 S. L Street, Tulare, California. Sturgeon and Beck Incorporated has annual sales of over 250 new vehicles, and typically more than 70 percent are full-size trucks. Sturgeon and Beck Incorporated is a "dealer" under 49 U.S.C. § 32908 (a)(2).

28. Swanson Fahrney Ford, Inc., is an automobile dealer located at 3105 Highland Avenue in Selma, California. Swanson Fahrney Ford is a "dealer" under 49 U.S.C. § 32908 (a)(2).





PDF created with pdfFactory trial version www.pdffactory.com

29. Tulare County, California, is home to a large number of farmers and ranchers. In 2003, Tulare County produced the second highest amount of agricultural produce in California, and was among the top counties in the nation in the value of its agricultural production. The five leading products of the Tulare County farmers and ranchers in 2003 were milk, oranges, grapes, plums, and cattle. The Tulare County Farm Bureau is a voluntary, nongovernmental, nonpartisan association of farm and ranch families who reside in Tulare County, organized "to protect farmers from unfair competition and unjust legislation," and "to represent, protect and advance the social, economic and educational interests of the farmers and ranchers of the County of Tulare," among other purposes, as stated in its articles of incorporation. It is organized under the California Nonprofit Mutual Benefit Corporation Law (Cal. Corp. Code §§ 7110 *et seq.*) and is located at 737 North Ben Maddox Way, Visalia, California. Among its members are farmers and ranchers who will be harmed in their business by the higher prices and more restricted availability of pick-up trucks that will result from Defendant's regulation. Members unable to afford new vehicles that comply with Defendant's regulation will pay higher maintenance costs keeping their used vehicles in service longer.

30. The Alliance of Automobile Manufacturers ("the Alliance") is an association of motor vehicle manufacturers including BMW of North America, LLC, DaimlerChrysler Corporation, Ford Motor Company, General Motors Corporation, Mazda North American Operations, Mitsubishi Motor Sales of America, Inc., Porsche Cars North America, Inc., Toyota Motor North America, Inc., and Volkswagen of America, Inc. The Alliance represents its members' interests in this litigation. Alliance members that choose to remain in the California new-vehicle market after MY 2008 will be required to sell vehicles that meet the A.B. 1493 regulations and that will cost more than if those regulations were not in effect. That incremental cost will be reflected in the prices of new cars and trucks sold in California, including those sold by each of the dealer plaintiffs in this action, and those purchased by members of the Tulare County Farm Bureau.

31. General Motors Corporation ("GM") and DaimlerChrysler Corporation ("DCC") are manufacturers of new motor vehicles sold in California and are subject to the A.B.





PDF created with pdfFactory trial version www.pdffactory.com

1493 regulations. In addition to raising the prices of some new vehicle models, compliance with the A.B. 1493 rule may require GM and DCC to withdraw one or more vehicle models from sale in California, including in the Southern San Joaquin Valley, because it would be economically impracticable to make them comply with the A.B. 1493 regulation. This would reduce the range of choices in the new vehicle market upon which the dealer plaintiffs in this action depend, and the number of options that members of the Tulare County Farm Bureau and other members of the public will have when they are considering the purchase of a new vehicle.

32. CARB is an agency in the executive branch of the California government. The current Executive Officer of CARB is Defendant Catherine E. Witherspoon, who is made a defendant to this action in her official capacity only. Defendant Witherspoon, in her official capacity, resides in this District.

33. Each of the dealer plaintiffs and members of plaintiff Tulare County Farm Bureau are residents of this District, and each will suffer harm in this District as a result of Defendant's actions. Each of the manufacturers represented by the Alliance as a plaintiff does business in this District and will also suffer harm in this District as a result of CARB's regulations. Venue in this Court is proper under 28 U.S.C. § 1391(b).

## FEDERAL STATUTORY BACKGROUND

*A. Overview*

34. The United States Congress long ago devised two separate statutory regimes for the regulation of new motor vehicle fuel economy, and for the regulation of motor vehicle air pollution. The separate regulatory programs for vehicular fuel economy and air pollutants are more fully described in ¶¶ 41-46 and ¶¶ 47-51 below, respectively. In addition, Congress and the federal government have asserted and maintained control over national policy to address the global issue of climate change and the need to study and, if necessary, regulate greenhouse gases in order to manage climate change, in coordination with foreign governments and intergovernmental organizations. (*See* ¶¶ 52-57 below.) One of the principal purposes of exclusive federal control over the regulation of new motor vehicles, since the very beginning, has





PDF created with pdfFactory trial version www.pdffactory.com

been to prevent a patchwork of state and local regulation from creating "chaos insofar as manufacturers, dealers, and users are concerned." S. Rep. No. 89-192, at 6 (1965).

35. New motor vehicle fuel economy is regulated under the Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 (1975), codified at 49 U.S.C. §§ 329021-32919 ("EPCA"). New motor vehicle fuel economy standards are established and enforced by NHTSA, an agency within the Department of Transportation. Congress provided that once federal fuel economy standards were in place, no state or political subdivisions, including California, could "adopt or enforce a law or regulation related to fuel economy standards." 49 U.S.C. § 32919(a). Under the terms of EPCA, the only permissible fuel economy standards that any state (including California) may impose are for the new vehicles that a state purchases for its own use. 49 U.S.C. § 32919(c).

36. Motor vehicles can be a source of various air pollutants, including carbon monoxide, certain toxic substances like benzene, and the gases that form smog. For over 30 years, the goal of motor vehicle emissions control has been to treat pollutants from the combustion process so that a motor vehicle emits only two nontoxic byproducts: carbon dioxide and water vapor. The chief statute governing motor vehicle air pollution control in this country is the federal Clean Air Act, as amended in 1990. Title II of the federal Clean Air Act requires the U.S. EPA to adopt and enforce comprehensive regulations to reduce motor vehicle "pollutants" that contribute to urban ozone (or "smog").

37. The motor vehicle air pollutants regulated under the Clean Air Act are frequently controlled by hardware that treats or otherwise captures the pollutants and prevents their emission into the ambient air, by converting the pollutants to water and carbon dioxide. The control of carbon dioxide -- which is not toxic in the ambient atmosphere and which the federal government has never classified as a pollutant -- cannot be accomplished through catalytic converters or other vehicle hardware. As EPA recently emphasized, "[n]o technology currently exists or is under development that can capture and destroy or reduce emissions of CO2, unlike other emissions from motor vehicle tailpipes. At present, the only practical way to reduce tailpipe emissions of CO2 is to improve fuel economy." Notice of denial of petition for





PDF created with pdfFactory trial version www.pdffactory.com

rulemaking, *Control of Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg. 52922, 52929 (Sept. 8, 2003).

38. Carbon dioxide is also unlike the Clean Air Act pollutants when it enters the environment. Whereas oxides of nitrogen and hydrocarbons react in sunlight and heat to produce ground-level ozone, which is a localized (or at most regional) phenomenon, carbon dioxide disperses globally throughout the upper atmosphere. To the extent that such carbon dioxide emissions have a resulting impact on global climate, it is unrelated to the state or country that emitted the carbon dioxide. In other words, "a ton of greenhouse gases emitted in the United States has the same impact as a ton emitted in Malaysia." Pew Center on Global Climate Change (2003).

39. Congress has ensured that NHTSA and EPA are the exclusive regulators, respectively, of new motor vehicle fuel economy and emissions. In addition to preempting state regulation of new motor vehicle fuel economy, Congress also has broadly preempted state regulation of new motor vehicle emissions in the Clean Air Act, which provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). California has limited authority to regulate new motor vehicle pollutants, but only as necessary to address "compelling and extraordinary" conditions, and only "consistent with" EPA's own regulatory power. 42 U.S.C. § 7543(b)(1)(B).

40. Federal policy with respect to global climate change has been established in multiple federal laws and executive agreements, including the Global Climate Protection Act of 1987, and the United Nations Framework Convention on Climate Change (the "UNFCCC"), which was ratified by the Senate in 1992. Sen. Exec. Rep. No. 102-55, 102d Cong., 2d Sess. (1992).

*B. The Federal Fuel Economy Program*

41. To regulate motor vehicle fuel economy, Congress in 1975 established a program of "corporate average fuel economy" standards, or "CAFE" standards. Standards for cars (called "passenger automobiles" in the statute) are set separately from those for light trucks



PDF created with pdfFactory trial version www.pdffactory.com

(called "non-passenger automobiles"). The light-truck category includes most minivans, pickups, and sport-utility vehicles, as well as other vehicles. CAFE standards do not apply to individual vehicles or models. Rather, they regulate the average fuel economy of each manufacturer's entire fleet of cars or trucks. As a result, a manufacturer can produce and sell any combination of vehicles that the market will bear, so long as the fuel economy of its fleet as a whole meets or exceeds the required average. For example, a manufacturer that sells cars having higher miles per gallon ("mpg") than the 27.5 mpg standard can use those sales to offset sales of vehicles achieving lower mpg. Manufacturers manage their fleet average by controlling production, supply, and price in response to market demands. For example, if consumer demand for larger, less fuel-efficient vehicles increases, a manufacturer might be forced to limit supply or raise prices for those vehicles. The fuel economy regulations thus can have significant effects on the supply of vehicles available to consumers.

42. Congress established the CAFE standard for passenger automobiles, which is currently 27.5 mpg. 49 U.S.C. § 32902(b). Congress also gave the Secretary of Transportation authority to amend the standard to the "maximum feasible average fuel economy level," an authority subsequently delegated to NHTSA. 49 U.S.C. § 32902(c)(1); 49 C.F.R. § 1.49(f). Any amendment increasing the standard above 27.5 mpg (or reducing it below 26.0 mpg) was subject to a legislative veto. 49 U.S.C. § 32902(c)(2). Congress established no CAFE standard for light-duty trucks. Instead, Congress directed the Secretary to set CAFE standards for each model year, again at the "maximum feasible" level. 49 U.S.C. § 32902(a). The current CAFE standard for light trucks is 21.0 mpg, and is scheduled to rise to 22.2 mpg by model year 2007. See 49 C.F.R. § 533.5(a).

43. Congress understood the significant burden of producing new vehicles meeting heightened fuel economy standards. The CAFE standard applicable to cars produced in model year 1985 and later years cannot be increased above 27.5 mpg, even if NHTSA determines the "maximum feasible" level is higher, unless it is first submitted to Congress for review and possible disapproval. 49 U.S.C. § 32902(c)(2). The statute also provides for judicial review thereafter. *Id.* § 32909(a). Amendments relaxing the standard, by contrast, do not require





PDF created with pdfFactory trial version www.pdffactory.com

Congressional review unless they lower the standard by more than 1.5 mpg. *Id.* § 32902(c)(2). Manufacturers that fail to comply with the CAFE standards must pay civil penalties. Since 1978, NHTSA has collected more than $500 million for violations of the CAFE standards.

44. The corporate averaging approach was critical to the goals of EPCA. Congress sought significant fuel economy increases through "a series of graduated mileage requirements" that would "ensure wide consumer choice by leaving maximum flexibility to the manufacturer" in deciding how to meet the specified CAFE levels. *Center for Auto Safety v. NHTSA*, 847 F.2d 843, 863-64 (D.C. Cir.) (separate opinion of Buckley, J.), *vacated on unrelated grounds*, 856 F.2d 1557 (1988) (quoting S. Rep. No. 179, 94th Cong., 1st Sess. (1975)) (internal quotation marks omitted). The authors of the 1975 Act emphasized that CAFE standards had to "be carefully drafted" in order to improve fuel economy without "unduly limiting consumer choice." H.R. Rep. No. 340, 94th Cong., 1st Sess. 87 (1975). When setting or revising CAFE standards, NHTSA must specify "maximum feasible average" standards, and in doing so "consider technological feasibility, economic practicability, the effect of other standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C § 32902(f). The impact of CAFE standards on motor vehicle safety has always been a critical factor in NHTSA's assessment of practicability. The complex rulemakings needed to establish and revise the CAFE standards have produced more than a dozen published decisions in the D.C. Circuit.

45. Fuel economy standards established by NHTSA are stated in terms of miles/gallon. Those standards are enforced, however, in terms of carbon-dioxide-grams/mile. NHTSA's regulations require measurement of fuel economy by way of "procedures established by the Administrator of the Environmental Protection Agency." 49 C.F.R. §§ 531.6(a) & 533.6(b). EPA's regulations include procedures to measure hydrocarbons, carbon monoxide, and carbon dioxide. *See* 40 C.F.R. § 86.144. Those tests produce a grams/mile finding with respect to carbon dioxide. Pursuant to a formula found at 40 C.F.R. § 600.113-93(e), EPA then converts the carbon dioxide emissions to miles/gallon for comparison against NHTSA's fuel economy standards.





PDF created with pdfFactory trial version www.pdffactory.com

46. To prevent interference with "maximum feasible" fuel economy standards established by NHTSA, Congress expressly preempted the field of new motor vehicle fuel economy regulation. *See* 49 U.S.C. § 32919(a). The only exception is that States and their political subdivisions are permitted to "prescribe requirements for fuel economy for automobiles obtained for [their] own use." *Id.* § 32919(c).

*C. The Federal Clean Air Act*

47. Section 202(a) of the Clean Air Act amendments of 1970 requires EPA to regulate the emission of "pollutants" from new motor vehicles. "Pollutants" include carbon monoxide, particulate matter, hydrocarbons, and oxides of nitrogen. Those substances either contribute significantly to the formation of potentially harmful gases in the ambient atmosphere (such as smog) or are themselves harmful to humans in concentrations that can be encountered in the ambient atmosphere (such as carbon monoxide). Carbon dioxide is neither a significant precursor to harmful gases nor itself harmful at levels found in the ambient atmosphere. (*See* ¶ 2 above.)

48. EPA has concluded that section 202(a) does not authorize emission standards for carbon dioxide or other greenhouse gases because EPA is only authorized to regulate "pollutants" under section 202(a), and Congress in the Clean Air Act did not intend that carbon dioxide and greenhouse gases could be treated as "pollutants." *See* Notice of Denial of Petition for Rulemaking, *Control of Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg. 52922 (Sept. 8, 2003). California, among other petitioners, has attempted to challenge EPA's conclusion by filing a petition for review in the United States Court of Appeals for the D.C. Circuit. *Massachusetts, et al. v EPA*, No. 03-1361 (Consolidated) (scheduled for argument April 8, 2005). EPA's determination that Congress did not intend to treat carbon dioxide as "pollutants" under the statute is the federal government's authoritative construction of section 202(a) of the Clean Air Act unless it is reversed and vacated in the *Massachusetts* matter.

49. Section 209(a) of the Clean Air Act broadly preempts States and their political subdivisions from adopting or enforcing "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines."





PDF created with pdfFactory trial version www.pdffactory.com

50. Beginning in 1967, Congress granted California unique authority to regulate automotive air pollutants, "in recognition of the unique problems faced by California as a result of its climate and topography," and in particular "[t]he acute smog problem" of southern California. *See* H.R. Rep. No. 728, 90th Cong., 1st Sess. (1967) ("unique problems"); S. Rep. No. 192, 89th Cong., 1st Sess. (1965) ("acute smog"). Congress believed that "the State of California ha[d] demonstrated compelling and extraordinary circumstances sufficiently different from the Nation as a whole to justify standards on automobile emissions which may, from time to time, need [to] be more stringent than national standards." S. Rep. No. 403, 90th Cong., 1st Sess. (1967). California had also adopted standards for the control of emissions from new motor vehicles prior to March 30, 1966, to address California's acute smog. As noted above, carbon dioxide does not contribute to smog. Prior to amendment of the Clean Air Act in 1990, California's emission standards for smog-forming pollutants were more stringent than the federal standards imposed by EPA for the rest of the nation. The federal "Tier II" emission standards adopted in 1999 and effective beginning in model year 2004 are now comparable in stringency with California's regulations.

51. Section 209(b) of the Clean Air Act circumscribes California's authority to regulate emissions from new motor vehicles. Under section 209(b), any California regulation must be "consistent with" section 202(a) of the Clean Air Act. As EPA authoritatively concluded on September 8, 2003, carbon dioxide is not a "pollutant" under section 202(a) and cannot be regulated under section 202(a). *See* Notice of Denial of Petition for Rulemaking, *Control Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg. 52922 (Sept. 8, 2003). California cannot adopt motor vehicle carbon dioxide regulations unless EPA changes its current determination concerning carbon dioxide from motor vehicles. California has not sought reconsideration of EPA's determination and has instead elected to proceed with the A.B. 1493 regulation as if no such determination had been made.

*D. National Management of the Issue of Global Climate Change*

52. While maintaining exclusive federal control over motor vehicle fuel economy, for the past 20 years the United States has worked with other countries in an effort to develop a





PDF created with pdfFactory trial version www.pdffactory.com

comprehensive, multilateral plan to reduce manmade greenhouse gas emissions, including carbon dioxide emissions, for all sources, not just automobiles. Congress has endorsed and extended this foreign policy on several occasions. In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning global climate change. Pub. L. 100-204, § 1103(c) (Dec. 22, 1987); 15 U.S.C. § 2901 note. Pursuant to that law, EPA and the State Department sent a report to Congress in the early 1990s, stressing the global nature of the climate change problem calling for "international consensus" and a "comprehensive" approach to "addressing potential climate change."

53. President George H. W. Bush signed the United Nations Framework Convention on Climate Change (the "UNFCCC"), which was ratified by the Senate in 1992. Sen. Exec. Rep. No. 102-55, 102d Cong., 2d Sess. (1992), at 9. The UNFCCC recognized that "the global nature of climate change calls for the widest possible cooperation by all countries and their participation in an effective and appropriate international response." The treaty established a framework for international cooperation in an effort to "stabilize greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." UNFCCC, art 2. Through the UNFCCC, the parties undertook to review their own national policies on greenhouse gases and to work together to negotiate future, binding commitments by which the nations of the world would agree to reduce greenhouse gas emissions.

54. The United States and other members of the UNFCCC worked to develop this multilateral framework through the Kyoto Protocols to the UNFCCC. While the Kyoto Protocol was being negotiated in 1997, the Senate adopted by a 95-0 vote the Byrd-Hagel Resolution, which stated that the United States should not sign any protocol that would mandate new commitments to reduce U.S. greenhouse gas emissions unless the Protocol also mandated new commitments from developing countries as well. See S. Res. 98, S. Rep. No. 105-54. Because the final draft of the Protocols provided only for reductions in emissions from developed countries, President Clinton did not submit the Kyoto treaty to the Senate for ratification.

55. In subsequent statutes, Congress continued to express its opposition to any measure that would require the United States to reduce greenhouse gases, absent an international



PDF created with pdfFactory trial version www.pdffactory.com

agreement involving both developed and developing countries. On several occasions, Congress has attached riders to federal appropriation bills to prohibit the Executive Branch from using funds "to propose or issue rules, regulations, decrees, or orders for the purpose of implementation, or in preparation for implementation, of the Kyoto Protocol" without the ratification of that treaty by the Senate.

56. President George W. Bush has stated his agreement with Congress's view of the Kyoto Protocols. Rather than calling for the adoption of the Kyoto framework, President Bush has promoted new technology and encouraged voluntary measures to reduce CO2 emissions. President Bush has implemented programs to reduce scientific uncertainty regarding global change, including the Climate Change Research Initiative. President Bush has also encouraged technological development that could be critical to any successful response to global climate change, including the FreedomCAR initiative, which seeks to promote the development of hydrogen-powered cars and trucks.

57. In the face of current diplomatic overtures, the Executive Branch has stated authoritatively that the United States should not undertake unilateral commitments to reduce greenhouse gases. As EPA has recently explained, such unilateral commitments could weaken the President's diplomatic efforts: "Unilateral EPA regulation of motor vehicle GHG emissions could ... weaken U.S. efforts to persuade key developing countries to reduce the GHG intensity of their economies. Considering the large populations and growing economies of some developing countries, increases in their GHG emissions could quickly overwhelm the effects of GHG reduction measures in developed countries. *Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them.*" 68 Fed. Reg. at 52931 (Sept. 8, 2003) (emphasis added). Obviously, Congress and the President -- in an exercise of their enumerated powers -- could decide in the future that state regulation of new motor vehicles is permissible and consistent with United States foreign policy. Until that time, however, no federal law or policy permits California's regulation of greenhouse gas emissions from new motor vehicles for purposes of addressing global climate change.





PDF created with pdfFactory trial version www.pdffactory.com

**CARB'S REGULATION OF MOTOR VEHICLE FUEL ECONOMY**

58. In the past, the State of California has advocated changes in the federal fuel economy standards. In doing so, the State has recognized the direct relationship between fuel economy regulation and the level of carbon dioxide released from motor vehicles. For example, in 1989-90, the State participated in a challenge to NHTSA's standards based on a claim that the federal government had paid too little heed to the "consequences of global warming" when setting fuel economy standards that would affect the level of carbon dioxide released from motor vehicles. *City of Los Angeles v. NHTSA*, 912 F.2d 478 (D.C. Cir. 1990)(affirming NHTSA's action). In another case decided in 1988, the State was among petitioners claiming unsuccessfully that NHTSA had inadquately considered the environmental interests at stake when setting fuel economy standards. *Public Citizen v. NHTSA*, 848 F.2d 256 (D.C. Cir. 1988) (same).

59. The State was unable to prevail in its various direct legal challenges to NHTSA's fuel economy rulemakings. More recently it has taken a different approach. Twice in the last four years, California has established and attempted to implement fuel economy standards, in the guise of carbon dioxide standards, for new motor vehicles sold in California. The first such standards were adopted as part of the zero-emission vehicle (or "ZEV") regulation, in 2001. (*See* ¶¶ 60-67 below.) The second such standards are the A.B. 1493 rules (*See* ¶¶ 68-74 below.)

*A. CARB's 2001 Regulation Of Carbon Dioxide*

60. In 2001 CARB amended its ZEV regulation by adding standards for a type of gasoline-powered hybrid electric vehicle that CARB termed an "advanced technology partial zero-emission vehicle" (or "ATPZEV"). Under the 2001 amendments to the ZEV rule, some ATPZEVs had to achieve specific fuel economy levels. Those fuel economy levels were expressed in two different metrics: by measuring fuel consumption on a miles/gallon basis, and by measuring carbon dioxide emissions on a grams/mile basis.

61. In addition, CARB awarded extra compliance credit for a category of ATPZEVs whose measured fuel economy exceeded the average fuel economy of vehicles with





PDF created with pdfFactory trial version www.pdffactory.com

similar size by more than 50 percent. This was called the "High Efficiency Multiplier," and it was a fuel economy standard based upon the vehicle's carbon dioxide emissions.

62. One of CARB's stated purposes in adopting the fuel economy standards as part of the 2001 amendments to the ZEV program was to reduce the emission of greenhouse gases, such as carbon dioxide, as a response to global climate change. In a December 2001 publication, CARB stated that its aims included the achievement of "significant reductions in emissions of CO2 and other greenhouse gases," along with "less air and water pollution resulting from reduced gasoline demand" and the promotion of "energy diversity."

63. On January 3, 2002, litigation was commenced in this Court under the Supremacy Clause of the U.S. Constitution and 42 U.S.C. § 1983 to restrain CARB and its Executive Officer from implementation of the amended ZEV regulation, because the ZEV regulation related to fuel economy, conflicted with NHTSA's role as the exclusive regulator of fuel economy, and was preempted by EPCA. On June 11, 2002, the Court preliminarily enjoined CARB's Executive Officer from enforcing the ZEV amendments. *See Central Valley Chrysler-Plymouth v. California Air Resources Bd.*, 2002 U.S. Dist. LEXIS 20403 (E.D. Cal., June 11, 2002). The Court found that the ZEV regulation had both an unlawful "purpose" and the "practical effect of regulating fuel economy."

64. CARB's Executive Officer appealed to the Ninth Circuit, and the United States filed an *amicus curiae* brief that urged affirmance of the preliminary injunction. The United States said of CARB's regulation, including the carbon dioxide standards: "At bottom, the State asks this Court to ignore the statutory language ... [w]hen state regulations by their terms make compliance by the vehicle manufacturer dependent in whole or in part on a vehicle's fuel economy, as these regulations do, the terms and purpose of the preemption provision are implicated directly." Brief of the United States, *Central Valley Chrysler-Plymouth v. Kenny*, No 02-16395 (9th Cir., filed Oct. 9, 2002) (citing 49 U.S.C. § 32919(a)).

65. In a later statement while the appeal to the Ninth Circuit was pending, NHTSA reiterated the scope of federal law: "California has, in recent court filings, asserted that NHTSA has not treated the CAFE statute as preempting state efforts to engage in CAFE related





PDF created with pdfFactory trial version www.pdffactory.com

regulation ... The State misses the point.... Our statute contains a broad preemption provision making clear the need for a uniform, federal system ... [the United States] has a substantial interest in enforcing the federal fuel economy standards and in ensuring that states adhere to the Congressional directive prohibiting them from adopting or enforcing any law or regulation related to fuel economy or average fuel economy standards." Notice of proposed rulemaking, *Light Truck Average Fuel Economy Standards Model Years 2005-07*, 67 Fed. Reg. 77015, 77025 (Dec. 16, 2002).

66. In discovery in the *Central Valley* litigation, the Executive Officer admitted that carbon dioxide is not a localized pollutant similar to any of the criteria pollutants under the Clean Air Act, and that there is a direct relationship between carbon dioxide emissions and fuel economy. The Executive Officer's brief on appeal in the Ninth Circuit also formally conceded that "California could not ... enact a statute that simply set CAFE standards at a different level than the federal government." Appellant's Opening Brief at 34, *Central Valley Chrysler-Plymouth v. Kenny*, No. 02-16395 (9th Cir., filed Aug. 21, 2002).

67. In the spring of 2003, following submission to the Ninth Circuit but prior to the issuance of an opinion, and after CARB agreed to modify the ZEV regulations to delete the standards relating to fuel economy, the *Central Valley* litigation was settled.

*B. CARB's Regulation Of Carbon Dioxide Under A.B. 1493*

68. On July 1, 2002, less than a month after CARB's first carbon dioxide standards were preliminarily enjoined, the California legislature passed A.B. 1493. It required CARB to "develop and adopt regulations that achieve the maximum feasible and cost-effective reduction of greenhouse gas emissions from motor vehicles." Cal. Health & Safety Code § 43018.5(a). "Greenhouse gas emissions" were defined as carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride, though only the first four are associated with motor vehicles. *Id.* § 43018(i)(1); *id.* § 42801.1(h).

69. In its consideration of A.B. 1493 and related legislative proposals, the Legislature was advised that regulation of greenhouse gases could result in regulation of motor vehicle fuel economy. For example, in its analysis of the bill that became A.B. 1493, the





PDF created with pdfFactory trial version www.pdffactory.com

California Department of Finance stated that "the Air Board [*i.e.*, CARB] advises that the easiest and most cost-effective way to reduce carbon dioxide emissions is to make vehicles more fuel efficient." Despite its questionable legal status, the legislation was presented by some supporters as an appropriate response to the decision by the national government not to go forward with the Kyoto Protocols.

70. Shortly after CARB adopted the A.B. 1493 regulations in 2004, the Secretary of the California Environmental Protection Agency, which oversees CARB's actions, transmitted a letter to representatives of the Canadian national government and coordinated a visit to Canada by one or more members of the California Legislature. Press reports of the trip indicate that the Secretary's purpose was to invite the Canadian officials to talk in detail about how, through coordinated greenhouse gas regulation, California and Canada could, in the Secretary's words, "cooperate and leverage each other's market forces to accomplish our mutual goals." Subsequently, it has been reported that high-ranking officials of the Canadian government have met with the Secretary of the California Environmental Protection Agency and CARB officials in California regarding California and Canadian regulatory efforts. At least one report indicates that the intent of some participants in these meetings is to create global pressure on the automobile industry to make the California regulations a *de facto* requirement for any company that wishes to maintain consistent global production plans.

71. Defendant's regulations approved by CARB in September 2004 create greenhouse gas emissions standards for new motor vehicles sold in California beginning with model year 2009. The regulation establishes four classifications of vehicles: passenger cars (vehicles designed for personal transportation of up to 12 persons), "LDT1s" (light-duty trucks with a loaded vehicle weight of 0-3750 pounds), "LDT2s" (light-duty trucks with a loaded vehicle weight of 3751 pounds to a gross vehicle weight of 8500 pounds), and "MDPVs" (medium-duty passenger vehicles with a gross vehicle weight rating of less than 10,000 pounds).

72. Defendant's regulation presents its standards in terms of "carbon dioxide equivalent" (or "CO2e") emissions, which allow minor credits for the control of greenhouse gases in addition to carbon dioxide. Apart from those non-CO2 credits, which would reduce the





PDF created with pdfFactory trial version www.pdffactory.com

required control of $CO_2$ by a very small amount, the standards range from 439 to 205 grams per mile of $CO_2$-equivalent emissions. On that basis Defendant's standards require the levels of fuel economy control for the defined classes of vehicles in the model years shown on the Table below.

**August 6, 2004 Regulation's CO2e/Fuel Economy Standards**

| Model Year | CARB Standard for Cars plus LDT1s* | | CARB Standard for LDT2 plus MDPV** | |
|---|---|---|---|---|
| | Grams CO2e/mile | Mpg | Grams CO2e/mile | Mpg |
| 2009*** | 323 | **27.4** | 439 | **20.2** |
| 2010 | 301 | **29.4** | 420 | **21.1** |
| 2011 | 267 | **33.2** | 390 | **22.7** |
| 2012 | 233 | **38.0** | 361 | **24.5** |
| 2013 | 227 | **39.0** | 355 | **25.0** |
| 2014 | 222 | **39.9** | 350 | **25.3** |
| 2015 | 213 | **41.6** | 341 | **26.0** |
| 2016 | 205 | **43.2** | 332 | **26.7** |

*Current federal standard for cars is 27.5 mpg

**Current federal standard for trucks below 8500 pounds gross vehicle weight rating is 21.0 mpg. By federal law, 49 U.S.C. § 32901(a)(3) and 49 C.F.R. § 523.3, there is no federal standard for vehicles above 8500 pounds gross vehicle weight rating.

***Falling short of the above standards in any particular year must be covered by credits earned in later years, banked from prior years or acquired from other manufacturers. No credits or deficit may be carried for more than five model years.

73. The federal fuel economy standards treat passenger automobiles and light-duty trucks separately. As indicated on the Table above, Defendant's regulation splits the light-duty truck category into two groups, by creating one "emissions category" that combines smaller light trucks ("LDT1s") with passenger cars, and placing all other trucks subject to the rule ("LDT2s") in a separate category. Under Defendant's regulation, the LDT2s are classified together with certain heavier vehicles, called Medium Duty Passenger Vehicles ("MDPVs"), for purposes of carbon dioxide regulation. MDPVs are not regulated under the federal fuel economy standards.



PDF created with pdfFactory trial version www.pdffactory.com

74. Defendant's rule also requires that "the annual sales from different firms shall be aggregated in the following situations: (1) vehicles produced by two or more firms, each one of which either has a greater than 10% equity ownership in another or is more than 10% owned by another; or (2) vehicles produced by any two or more firms if a third party has equity ownership of greater than 10% in each firm."

**EFFECTS OF THE A.B. 1493 REGULATION**

*A. Federal Regulation of Fuel Economy*

75. The national fuel economy standards specified by Congress and NHTSA represent the federal government's assessment of the "maximum feasible" average fuel economy levels that can be achieved consistent with the broad criteria for standard-setting spelled out in EPCA. Those criteria are "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f).

76. More specifically, under a body of administrative and judicial precedent developed since passage of EPCA in 1975, the federal fuel economy standards today reflect the federal government's judgment about the appropriate balance between improvements in fuel economy and the burdens that more stringent standards place on the automobile industry. *See Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1339 (D.C. Cir. 1986) (noting congressional direction that NHTSA "weigh the 'difficulties of individual manufacturers'" in meeting specific standards, as well as the "industry-wide effect" of its fuel economy regulations) (citation omitted). Maintaining consumer choice is also a fundamental part of EPCA and the federal regulations that implement it. *See Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 125 (D.C. Cir. 1990) ("NHTSA clearly understands that Congress instructed it to administer the CAFE program so as not to induce product restrictions") (D.H. Ginsburg, J., concurring) (internal quotation marks omitted).

77. Defendant's regulation will require motor vehicles to attain substantially higher fuel economy than required by federal regulation, at higher retail prices to the consumer, and with much higher costs and burdens on the industry, than under the federal fuel economy





PDF created with pdfFactory trial version www.pdffactory.com

regulations. A fleet of new motor vehicles that meets the federal fuel economy standards (and all other lawful federal and State standards for sale in California), but not the California greenhouse gas emissions standards, will not conform with the A.B. 1493 rule unless it also meets the additional, differing requirements of that rule. To meet the requirements of the A.B. 1493 rule, the fuel economy performance and other attributes of vehicles intended for sale or distribution in California will require major changes. The A.B. 1493 rule will have an acute, clear, direct and substantial impact the performance, price, and availability of vehicles that will be sold in California. Defendant's rule will also have an acute, direct, clear and substantial impact on some manufacturers' activities to comply with the national fuel economy standards as efficiently and safely as possible, and in a manner that maximizes consumer choices and minimizes adverse effects on employment.

78. For example, the federal fuel economy standard for "passenger automobiles" is 27.5 miles/gallon. *See* 49 C.F.R. § 531.5. As indicated above (*see* ¶ 72), once fully implemented, Defendant's regulation will require those vehicles -- together with certain vehicles categorized as light trucks under the federal fuel economy program -- to meet an average fuel economy level for some passenger vehicles approaching 44 miles/gallon, for those manufacturers that are subject to the most stringent standards contained in the regulation.

79. The federal fuel economy standard in model year 2007 for "light duty trucks" is 22.2 miles/gallon *See* 49 C.F.R. § 533.5. Once fully implemented, CARB's regulation establishes a fuel economy standard approaching 27 miles/gallon for the heaviest of those trucks, combined with the even heavier category of MDPVs, for certain manufacturers. The differences in classification between the vehicle fleets as defined in the federal fuel economy regulations, and the fleets as defined by CARB, means that the CARB standards are even more stringent than they appear relative to the federal standards, by a substantial margin.

80. In order to produce MDPVs that do not meet that mileage standard on their own, a manufacturer subject to the regulation would need to take other measures to increase the fuel economy of its other trucks far above the levels called for under federal law. This would





PDF created with pdfFactory trial version www.pdffactory.com

result in higher compliance costs, and higher prices, for the class of trucks regulated by the A.B. 1493 rule as a group.

81. While not all manufacturers produce MDPVs, all manufacturers subject to the A.B. 1493 regulation are directly regulated in other ways. For example, the 2005 auto shows have featured newly designed vehicles for model year 2006 that manufacturers plan to sell in their current design without significant architectural alterations through model year 2009 and beyond. The development process for new vehicles in model year 2009 is well underway. While manufacturers have already planned what vehicles will be produced in model year 2009 and beyond, manufacturers cannot sell that full line of vehicles -- with all of the differing varieties of size, engines, horsepower, towing capacities and other performance features -- once Defendant's regulations are fully implemented, without redesign of their vehicles. Manufacturers thus face an immediate dilemma in their product plans: (1) continue with current plans and face serious sanctions for noncompliance in model year 2009 and thereafter; (2) redesign the vehicles already slated for production in model 2009 and beyond, adding technology or expensive alterations to the extent such changes are technologically feasible, which even when technologically feasible will in many instances make the vehicles unprofitable; (3) restrict or eliminate the sale of vehicles that threaten compliance, and thereby forego the opportunity to recover the fixed investment and production costs for those vehicles that could only be recovered through several years of sales, as well as the profits that were anticipated from those vehicles; or (4) some combination of (2) and (3).

82. To the extent that a manufacturer chooses the second option listed above -- redesign of its vehicles in order to try to meet the California rule -- it will have to reassign engineers and other development staff from other projects in order to work on the redesign effort. This will require the manufacturer to defer its efforts to introduce new products in markets outside California that are needed in order to remain competitive outside California. That manufacturer will lose sales in non-California markets, and along with its dealers will lose profits and goodwill. Those effects will be felt well before the start of the 2009 model year in



PDF created with pdfFactory trial version www.pdffactory.com

California, as a manufacturer's product line languishes without the updates needed to remain competitive, due to a lack of engineering and production resources.

83. Some manufacturers may try to reduce some of the increased engineering and development burdens created by the California rule by forming joint ventures or other arrangements to share resources, to the extent permitted by law. Those manufacturers face a Hobson's choice, however: if they pool their resources and share technological know-how, they give up valuable intellectual property to their fierce competitors in the marketplace. If they do not engage in joint development work, they have to devote more resources of their own to the engineering effort, which has other immediate adverse consequences. (*See* ¶ 82.)

84. Expert analysts of the automobile industry predict that some manufacturers will have to restrict or eliminate the sale of some types of vehicles in California, in part because complete redesign of a full product line for California is impractical. Many types of full-size, value-priced family sedans and trucks that the federal CAFE law allows manufacturers and dealers to produce and sell will simply disappear from the new-vehicle market in California. Consumers unable to afford the vehicles that they prefer, will choose to forego the purchase of such vehicles, and either resort to the used-vehicle market or select other vehicles less suited to their demands, which in the case of farmers and ranchers includes the demands of their business. Dealers who depend on either "work trucks" or full-size, value-priced family sedans for a substantial part of their livelihood will no longer remain viable in this state, without drastic changes in their businesses.

85. Federal law gives NHTSA sole authority to set fuel economy levels for passenger cars and trucks provided that more stringent fuel economy levels are "feasible" under the factors established by Congress. The federal standards create pressure on the automobile industry to continually improve the fuel economy of specific vehicle models, while also allowing manufacturers to produce vehicles with attributes that most consumers value more than fuel economy, such as horsepower, size and convenience features. Manufacturers are now engaged in costly and ambitious programs to design and produce vehicles with improved fuel economy that consumers will want and at prices they can afford. Those programs include the use of new





PDF created with pdfFactory trial version www.pdffactory.com

technologies that will provide customers with moderate but steady increases in fuel economy, but that can be produced at reasonable costs only at nationwide volumes, and only on a gradual basis.

86. The effort to introduce vehicles that provide moderate but steady increases in fuel economy nationwide is imperiled by the California regulation. The technologies and vehicle changes that the industry currently has under development to improve federal CAFE performance will not permit full compliance with the A.B. 1493 regulations in California. In order to comply with the A.B. 1493 regulations, the automobile industry will have to abandon or curtail current vehicle development programs and instead reallocate human and capital resources to much more expensive technologies and vehicles. The additional costs associated with these technologies and vehicles will exceed what the average consumer is willing to pay. CARB's regulation thus redirects the automobile industry's engineering and capital resources away from manufacturers' planned responses to the federal CAFE standards and consumer demand, and toward rules and technology that neither federal law nor the market would require.

87. In addition, NHTSA and other safety organizations have recognized that increases in fuel economy standards can result in reductions in the weight of the motor vehicle fleet as a whole because, as indicated above, reducing the weight of a given vehicle model can be used to reduce its fuel consumption. Reductions in vehicle weight can also reduce vehicle crashworthiness. For example, the National Academy of Sciences found in one report that "the down-weighting and downsizing that occurred in the late 1970's and early 1980's, some of which was due to CAFE standards, probably resulted in an additional 1,300 to 2,600 traffic fatalities" in one representative year (1993), and ten times more injuries.

88. Congress recognized that increasing fuel economy standards may lead to fleet downsizing, "which, without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries." *Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 120 n.11 (citing NHTSA, Final Rule: Passenger Automobile Average Fuel Economy Standards for Model Year 1989, 53 Fed. Reg. 39275, 39294 (Dec. 30, 1988), *citing* Department of Transportation and EPA, "Potential for Motor Vehicle Fuel Economy Improvements: Report to Congress").





PDF created with pdfFactory trial version www.pdffactory.com

89. The effect of fuel economy on safety has therefore always been an important factor to consider in setting fuel economy standards under EPCA. *Competitive Enterprise Inst. v. NHTSA*, 956 F.2d 321, 323 (D.C. Cir. 1992) (remanding agency's decision not to lower fuel economy standard in light of agency's failure to articulate how it balanced into its decisionmaking "the overwhelming likelihood that a 27.5 mpg standard reduces the supply of safe cars available to American consumers"). In part for that reason, NHTSA is now considering revisions in the basic structure of the federal CAFE standards that would take better account of the trade-offs between CAFE increases and safety -- separate from, and as a logical precondition for, the consideration of any increases in the current CAFE standards. *See* Advanced Notice of Proposed Rulemaking, *Reforming the Automobile Fuel Economy Standards Program*, 68 Fed. Reg. 74908, 74916 (Dec. 29, 2003). One factor being considered by NHTSA in its current deliberations is the relationship between vehicle weight and safety, and the potential impact of the CAFE standards on weight and safety. One possible goal of NHTSA's efforts is to ensure that more stringent fuel economy standards will not adversely affect safety.

90. Unlike NHTSA, Defendant and CARB decided to increase the fuel economy requirements for vehicles to be sold in California without any apparent consideration of the trade-offs between fuel economy, vehicle weight, and safety. The California regulation sets an increasing, single fleet-wide standard for all trucks with a "loaded vehicle weight" under 3750 pounds and all passenger cars regardless of weight, and would require sharp reductions in fuel consumption by those classes of vehicles. The California rules will therefore likely require the industry to produce a fleet of smaller, lighter-weight vehicles for California, once those rules are fully implemented. This likelihood was noted by the independent experts retained by CARB to conduct a "peer review" of Defendant's standards, and was confirmed by other independent experts retained by the Alliance.

91. Individual vehicles within fleets that meet Defendant's fuel economy standards will also meet the safety standards set by the federal governments and other norms by which motor vehicle safety is sometimes judged. But, as a class, the vehicles that the industry will sell in California will be lighter and therefore less crashworthy than other vehicles that





PDF created with pdfFactory trial version www.pdffactory.com

would be subject to the federal fuel economy standards but not Defendant's standards. The result is that a portion of the California motor vehicle fleet will expose the public to risks of injury and death that, but for Defendant's regulations, would not exist. The analysis prepared for the Alliance using NHTSA's predictive model, and submitted to CARB in September 2004, estimated an increase of 258 fatalities in California in 2020, once Defendant's regulation had been fully in effect for a few years, rising to 530 increased fatalities in 2030.

92. The analysis provided to CARB in September 2004 applied Defendant's assumption in the A.B. 1493 rulemaking that the industry would attempt to comply with the A.B. 1493 regulation by producing and selling the same types of vehicles nationwide as those that would be sold in California -- a strategy that, according the analysis provided in September 2004, would include major vehicle weight reductions. The potential change in fatality rates could change if manufacturers chose different compliance strategies that might involve different weight reductions. For its part, however, CARB did not apply NHTSA's predictive model developed for fuel economy standard-setting when deciding what standards (if any) to adopt under A.B. 1493. CARB also did not estimate or quantify the extent to which the A.B. 1493 would result in weight reductions. CARB thus ignored an important factor that would be considered in any federal rulemaking to set or revise fuel economy standards.

*B. National Control of Greenhouse Gas Policy and Regulation*

93. Treated separately under the other applicable statutory rubrics, CARB's regulation also conflicts with ongoing national efforts to address the issue of greenhouse gases in an international context.

94. Several years ago, a petition was filed at EPA that sought control of carbon dioxide from motor vehicles under section 202 of the federal Clean Air Act. EPA concluded that section 202(a) of the Clean Air Act does not authorize regulation of carbon dioxide and greenhouse gases because Congress never intended that such emissions be considered "pollutants" for purposes of section 202(a). In addition, EPA has emphasized that any regulation of carbon dioxide is equivalent to a fuel economy standard, and Congress has designed a separate and distinct statutory regime overseen by the Department of Transportation for regulation of





PDF created with pdfFactory trial version www.pdffactory.com

motor vehicle fuel economy. CARB's regulation of carbon dioxide and other greenhouse gases is not "consistent with" section 202(a) of the Clean Air Act, either on the face of the statute or as interpreted by EPA. Congress never intended to permit California to present the issue of global climate change -- which is the ostensible focus of the A.B. 1493 regulation -- as a "compelling and extraordinary" condition in California that would permit California to adopt its own emission standards, unlike every other state in the nation.

95. The A.B. 1493 regulation also conflicts with U.S. foreign policy. It is the express foreign policy of the U.S. not to commit to mandatory reductions of greenhouse gases in the absence of multilateral commitments, including developing countries. Such a multilateral agreement ensures the best chance for effective mitigation of global climate change, and it also ensures that expensive and painful U.S. reductions in greenhouse gases will not be merely a symbolic gesture The A.B. 1493 regulation interferes with the U.S. speaking with one voice on matters of global climate change, and it diminishes the President's leverage in negotiating multilateral commitments to reduce greenhouse gases. The President's bargaining power is reduced even further if other states adopt California's fuel economy standards. Far from attempting to conform their actions to the position of the national government, California officials, including the Secretary of the California Environmental Protection Agency and CARB officials beneath him, are actively campaigning for adoption of CARB's regulation by at least one foreign government (Canada), to make federal fuel economy policy irrelevant or much less important in the global automobile industry. (*See* ¶ 70 above.)

96. The A.B. 1493 regulation also conflicts with federal law by effectively requiring some companies to install equipment on their vehicles nationwide in order to meet the California greenhouse gas standards. For example, the A.B. 1493 rule would make it necessary for some manufacturers seeking to comply at the lowest possible cost with the California regulation to install new types of air conditioning systems on their California vehicles. (Air conditioning emissions are, according to CARB, a significant source of greenhouse gases, in addition to tailpipe releases of carbon dioxide.) For some manufacturers, producing one type of air conditioning system for California, and another for other U.S. markets, is likely to be more





PDF created with pdfFactory trial version www.pdffactory.com

costly than producing the California system nationwide. Such manufacturers would install the California system on vehicles sold outside California, even though such systems were not required outside California, and even though U.S. EPA has already determined that the selection of appropriate controls for greenhouse gases is a matter reserved to the U.S. Congress and the President. (*See* ¶¶ 34-40, 47-57.)

*C. Near Term Industry Impacts*

97. CARB and Defendant will enforce the A.B. 1493 regulation along with other regulations adopted over many years that apply to new motor vehicles Defendant enforces those rules by requiring the manufacturers of new motor vehicles to demonstrate compliance with CARB's rules that apply in any given model year on a prospective basis. Before a given model year begins, representatives of each motor vehicle manufacturer meet with Defendant or her staff to review the vehicle models that the manufacturer plans to produce for sale in California in the relevant model year. Each manufacturer also supplies any test data or other information that Defendant or her staff require in order to demonstrate compliance with CARB's regulations. If satisfied with the compliance demonstration, Defendant issues written approval documents (called "Executive Orders") that permit the manufacturer to sell its vehicles in California. The sale of vehicles not covered by Defendant's Executive Orders creates liability for substantial civil penalties and exposes those engaged in such sales to actions for prohibitory injunctions under the California Health & Safety Code.

98. Defendant has interpreted California's Health & Safety Code as requiring that, before new vehicle models can be sold in California, she must determine that the models meet all applicable motor vehicle standards contained in the CARB regulations. On that interpretation, the Executive Officer would deny or withhold Executive Orders (and access to the California market) for any vehicle models in model year 2009 that are subject to the A.B. 1493 regulations, unless she finds that those models comply with the A.B. 1493 regulations. If a manufacturer obtains Executive Orders, but then fails actually to comply with its representations to the Executive Officer that were material to obtaining the Executive Orders, Defendant can initiate



PDF created with pdfFactory trial version www.pdffactory.com

administrative or judicial proceedings to obtain compliance and to deter similar conduct in the future.

99. In practice, it is essential for manufacturers subject to rules like the A.B. 1493 regulations to obtain approval of their vehicle models well before the relevant model year begins. A manufacturer whose approval status is in doubt cannot prudently undertake mass production of a given vehicle model, and cannot plan for distribution or sale of its vehicles by its independent franchised dealers. For their part, the dealers need to know well before a model year begins what specific vehicle models will be available for them to purchase and sell to their customers. This is critical to the efficient operation of their businesses in an increasingly competitive retail vehicle market. Compliance with the A.B. 1493 regulations, including the initial approval of a plan for compliance with the regulations by Defendant well prior to the start of model year 2009, is thus essential to the economic viability of each manufacturer subject to the regulation, and to the ability of their dealers to stay in business in California.

100 The first model year to which Defendant's rule would apply is the 2009 model year, which begins as early as January 2, 2008, under California and federal regulations. Some manufacturers already have new vehicle designs for model year 2006 that they planned to sell through model year 2009 and beyond without expensive design alteration, and that sales-life is necessary for manufacturers to recover their investment costs and earn a profit on those newly designed vehicles. Because of CARB's regulation, those product plans must be altered (to the extent feasible), new vehicles must be designed, and some manufacturers will have to restrict or eliminate particular vehicles they had planned to sell in California.

101. According to CARB, work on the technologies needed for vehicles starting production in January 2008 would only have to begin three years earlier, in early 2005. The lead time estimated by others is much longer. (*See* ¶ 102.) But even taking CARB's estimates at face value, immediate commitments of new resources and a redirection of their current vehicle programs will be required in order for some manufacturers to comply with the A.B. 1493 regulation. Before seeking approval for their product plans from Defendant for model year





PDF created with pdfFactory trial version www.pdffactory.com

2009, the work needed for some manufacturers to comply with the CARB standards includes the following:

a. Development of company-wide product plans that will require some manufacturers to eliminate some models from their product lines and to allocate scarce engineering and capital resources to those models that could remain in production for California. Some programs designed for the national market that would achieve gradual but steady increases in national fuel economy will have to be cancelled so that resources can be devoted to other programs just for California. Once shut down, those programs can take years to regain lost ground if they are later reactivated. If a manufacturer does not re-focus its product development effort now on the A.B. 1493 regulation, it will not be able to comply with the California rule. But if it takes that course, and the CARB rule is eventually enjoined, it will have compromised its efforts to compete effectively within the framework of the national CAFE program.

b. Signing contracts with suppliers to provide the equipment needed to produce newly redesigned vehicles, several years before the start of mass production, sometimes coupled with direct investment in those suppliers' production facilities to ensure that the supplier can meet the terms of the contract. While the contracts can sometimes be cancelled at a later time, doing so normally requires the payment of cancellation fees to protect the suppliers against the uncertainties involved in regulatory efforts like those of CARB. Money invested in the suppliers' plants cannot be recovered. In some situations it may be less costly to invest in production facilities directly owned by the manufacturers in order to comply with the California rules; in that event, the early investments will also be unrecoverable if the California rule is later invalidated.

c. Allocating engineers and prototype production resources to build newly redesigned vehicles. Given the complexity and scope of the California fuel economy regulations, the manufacturers in the industry that must register the most significant reductions in fuel consumption for their California models will have to spend hundreds of millions of dollars on this effort, long before the first model year 2009 vehicle starts mass production. Those investments must begin now in order for those companies to have any hope of remaining



PDF created with pdfFactory trial version www.pdffactory.com

competitive in California and complying with the A.B. 1493 rules, even with limited product lines. The manufacturers that will bear the main brunt of the A.B. 1493 regulation will have to try to recover their compliance costs for the regulation by generating sufficient revenue through price increases, which will reduce sales and goodwill both for themselves and the dealers at the retail level.

102. The technologies that will be required for vehicle manufacturers to remain in the California market include new gasoline engines, new transmissions and new gasoline-electric hybrid engines. Automotive engineers other than those employed by CARB informed CARB that its technological assumptions were inaccurate and that even the lead-time for many of the technologies identified by the CARB staff are far longer than three years. The National Academy of Sciences has found that "[t]echnology changes require very long lead times to be introduced into the manufacturers' product lines. Any policy that is implemented too aggressively (that is, in too short a period of time) has the potential to adversely affect manufacturers, their suppliers, their employees, and consumers… The widespread penetration of even existing technologies [to improve fuel economy] will probably require 4 to 8 years." National Academy of Sciences, Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards at 5 (2002). If a manufacturer were to seek to comply with vehicles operating on alternative fuels, such as hydrogen, time would also be needed to develop the necessary system of fueling stations and other infrastructure to provide the alternative fuel.

103. Production of model year 2009 vehicles can begin as early as January 2, 2008. For model year 2009, manufacturers must provide CARB staff with a compliance plan by the summer of 2007, so that orderly production and distribution plans can be implemented. At present, manufacturers have already planned which vehicles will be produced in model year 2009, but those plans will now have to be revised to meet Defendant's fuel economy standards. The impact of Defendant's regulation is direct and immediate and requires changes in manufacturers' present conduct. Specifically, (1) current product plans must be scrapped, (2) engineering resources must be assigned to the California regulations, allowing the projects those engineers would otherwise address -- in particular, vehicle designs for markets other than



PDF created with pdfFactory trial version www.pdffactory.com

California -- to languish, (3) supply contracts must be negotiated, and (4) investments in new production facilities must be made, long before meeting with CARB staff in the summer of 2007.

104. Substantial hardship also arises when other investments by manufacturers must be eliminated or delayed, or if investment in compliance with Defendant's regulation is unnecessary because Defendant's regulation is eventually held unlawful. Some manufacturers in the U.S. automobile industry are capital-constrained. The bond ratings of several manufacturers have recently experienced highly publicized down-grades. These conditions make it very difficult and costly for those companies to find the resources for new vehicle programs on the scale required by CARB's regulation, assuming that there is any economically practicable method for those companies to comply. Capital must be spent wisely and future vehicle programs require very careful advance planning. Even under better economic conditions, those companies cannot afford to spend money on any program that is not absolutely required either to meet anticipated customer requirements, or clear and stable future regulatory requirements.

105. The need for judicial review of the A.B. 1493 regulation has been underscored by recent events outside California. An official from the New York State Department of Environmental Conservation recently released preliminary rulemaking documents, in which he outlines a proposal to adopt and to commence enforcement of the California greenhouse gas rules on the same schedule as California, beginning in model year 2009. The legality of such an action by New York depends in part on whether California's rules are lawful; if California cannot enforce such rules, New York cannot enforce them either. But in the absence of judicial relief, manufacturers will have to comply with those rules in a substantial part of the total U.S. new vehicle market -- California and New York combined. The potential obligation to comply with the A.B. 1493 regulation both in California and in New York will increase the technological and economic challenges faced by some vehicle manufacturers, and makes it even more important for them to receive prompt review of the California rules in this Court.

106. Plaintiffs have no adequate legal remedy for the injuries they would suffer if the CARB regulation goes into effect, and they are forced to challenge the rule in an enforcement action by asserting defenses under federal law. Any capital investment or other expenses that





PDF created with pdfFactory trial version www.pdffactory.com

manufacturers will incur in order to comply with the A.B. 1493 law and regulation cannot be later recovered from the State of California or from Defendant, under principles of sovereign and official immunity, if the CARB regulations are found to be invalid or unenforceable by this Court. This Court has previously found such unrecoverable expenses to be irreparable injury warranting a pre-enforcement injunction. *See Central Valley Chrysler-Plymouth v. California Air Resources Bd.*, (E.D. Cal., April 5, 2002), slip op. at 16-17 (Exhibit B).

107. Decisions to be made now or in the near future will be affected by whether the legality of Defendant's regulation can be resolved this year. Manufacturers face an immediate dilemma between attempting to comply with this new regulation, or facing insurmountable compliance obstacles or serious sanctions in the future if compliance is not undertaken this year. Adjudication now of the legality of Defendant's regulation is the only way to prevent, or at least minimize, irreparable harm to manufacturers.

*D. Environmental Issues*

108. The relief sought in this action will not have any negative effect on CARB's efforts to control air pollution. EPA and CARB regulate smog-forming or toxic air pollutants from motor vehicles independent of those vehicles' rate of gasoline consumption, by limiting the amount of pollution allowed from a vehicle over a given distance or under defined static test conditions. Vehicles with higher levels of fuel consumption can and frequently do emit fewer pollutants than other vehicles with lower levels of fuel consumption. Indeed, as then-Circuit Judge Ruth Bader Ginsburg observed in one case, a change in the fuel economy standards involved in the case before her court "would have no significant effect on air quality." *Public Citizen v. NHTSA*, 848 F.2d 256, 267 (D.C. Cir. 1988) (R.B. Ginsburg, J.). "[P]assenger car emissions will not increase ... unless cars are driven more miles." *Id.* If vehicles are driven the same number of miles, there will be no increase in smog-forming or toxic air pollutants, regardless of the fuel economy or carbon dioxide limits that apply to them.

109. CARB has predicted no significant change in the amount of driving as a result of the A.B. 1493 rule. Other estimates of the impact of the A.B. 1493 rule, however, predict significant increases in the number of miles that Californians will drive if the rule goes into



PDF created with pdfFactory trial version www.pdffactory.com

effect. Under the economic "first law of demand," as the cost of a given activity goes down (such as driving), the level of that activity will increase. Lower costs of driving, which would be the supposed result of the California rule, will thus lead to more driving in California. That increase in driving will lead to significant increases in motor vehicle pollution in California, as well as more congestion on California road and potentially more vehicle accidents.

110 In addition, the A.B. 1493 regulation will raise vehicle prices, and those price increases will slow the rate at which newer gasoline powered vehicles replace older vehicles in California. Older gasoline-powered vehicles have higher emissions of smog-forming and other pollutants than newer gasoline-powered vehicles. To clean up the vehicle fleet as a whole, it is essential for older vehicles to be replaced with newer ones, as rapidly as possible. The A.B. 1493 regulation conflicts with the effort to reduce smog-forming emissions in California, because the rule will slow the turn-over of the fleet to new vehicles. In other words, smog-forming emissions from motor vehicle operation in California will be *higher* if the A.B 1493 rule is implemented than if the rule is not implemented.

111. With regard to global warming, the A.B. 1493 regulations have not been claimed by CARB to result in any reduction in ambient temperatures in California, nor could such a claim be sustained in a scientifically credible manner. This is because the level of greenhouse gas emissions in the atmosphere over California is largely determined by the level of industrial activity and other activities occurring on a global basis, and that activity is beyond the control of the California regulatory process. Implementation of the A.B. 1493 rule will not reduce global warming in California, and the relief sought in this action will have no effect on California temperatures.

## CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF

### *Count I – Preemption under the Federal Fuel Economy Laws*

112. Plaintiffs repeat and re-allege paragraphs 1 through 111 of this Complaint as though fully set forth herein.

113. The regulation adopted by CARB on September 24, 2004, in Resolution 04-28, which Defendant is charged with implementing, is "related to fuel economy standards and





PDF created with pdfFactory trial version www.pdffactory.com

average fuel economy standards," and is preempted under 49 U.S.C. § 32919(a). Federal law prohibits the adoption of regulations related to such standards, separate and apart from any attempt to enforce such regulations. *See id.*

114. The regulation adopted by CARB in Resolution 04-28, which Defendant is charged with implementing, intrudes upon a field of regulation occupied by the federal government, conflicts with federal law and regulation, and stands as an obstacle to achievement of the objectives of Congress when it established a national program for the regulation of motor vehicle fuel economy.

115. The regulation adopted by CARB in Resolution 04-28, which Defendant is charged with implementing, is inconsistent with NHTSA's determination of the "maximum feasible" corporate average fuel economy standards for cars and light-duty trucks, based upon NHTSA's assessment of technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy, 49 U.S.C. § 32902(f), and thereby frustrates the accomplishment of federal objectives.

116. The United States Constitution makes federal law and regulations "the supreme Law of the Land." United States Constitution, article VI, cl. 2. Plaintiffs have legally protected interests under the Constitution, EPCA, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal fuel economy laws against Defendant's implementation of A.B. 1493 and the A.B. 1493 regulation.

117. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests if the regulation adopted in Resolution 04-28 is not declared unlawful and if Defendant is not enjoined from implementing that regulation. Whether Defendant's regulation is preempted by the federal fuel economy laws is purely or predominantly a legal question that is fit for adjudication now, and the fitness of adjudication will not be assisted by future factual developments outside this litigation.

118. A clear and judicially cognizable controversy exists between Plaintiffs and Defendant regarding whether the regulation adopted in Resolution 04-28 is preempted by the



PDF created with pdfFactory trial version www.pdffactory.com

federal fuel economy laws. Plaintiffs contend that the regulation approved by Resolution 04-28 is preempted by the federal fuel economy laws and cannot be enforced. Defendant is presently implementing that regulation by undertaking steps to permit her to enforce the rule under California statutes that create civil liability for noncompliance with the rule, and will enforce it to the detriment of Plaintiffs. The federal fuel economy laws prohibit the adoption of the regulation challenged here, separate and apart from its enforcement.

119. To redress the violations of federal law and the interference with Plaintiffs' rights, and pursuant to 28 U.S.C. §§ 1331,1343, 2201 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, Plaintiffs request a declaration that the regulation adopted by Resolution 04-28 is preempted and unenforceable.

120. Defendant is now and will continue to implement A.B. 1493 and the A.B. 1493 regulation in violation of federal law unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law under 42 U.S.C. §§ 1983, 1988 and other provisions of law.

***Count II – Preemption under the Federal Clean Air Act***

121. Plaintiffs repeat and re-allege paragraphs 1 through 120 of this Complaint as though fully set forth herein.

122. The regulation adopted by CARB on September 24, 2004, in Resolution 04-28, is a standard related to the control of emissions from new motor vehicles. The regulation is preempted by section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a). In addition, the regulation conflicts with the Clean Air Act and stands as an obstacle to the objectives of Congress in its comprehensive approach to environmental regulation of motor vehicles.

123. EPA has determined that regulation of carbon dioxide and greenhouse gases to address global climate change is not authorized by section 202(a) of the Clean Air Act. Notice of Denial of Petition for Rulemaking, *Control Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg. 52922 (Sept. 8, 2003). That authoritative determination by EPA precludes California from adopting any new motor vehicle emission standards for carbon dioxide or greenhouse gases. California must, at a legal minimum, seek reconsideration of EPA's



PDF created with pdfFactory trial version www.pdffactory.com

interpretation of section 202(a) before California may adopt new motor vehicle emission standards for carbon dioxide or greenhouse gases.

124. Plaintiffs have legally protected interests under the Constitution, the Clean Air Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal Clean Air Act against CARB's regulation. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by CARB's actions, if CARB's actions are not declared unlawful and if Defendant is not enjoined from implementing the regulation adopted by Resolution 04-28. The public interest will be served by such declaratory and injunctive relief. Whether Defendant's regulation is preempted by the Clean Air Act is purely or predominantly a legal question that is fit for adjudication now, and the fitness of adjudication will not be assisted by future factual developments outside this litigation.

125. A clear and judicially cognizable controversy exists between Plaintiffs and Defendant regarding whether the regulation adopted in Resolution 04-28 is preempted by the federal Clean Air Act. Plaintiffs contend that the regulation is preempted and cannot be enforced. Defendant is presently implementing that regulation and will enforce it to the detriment of Plaintiffs. The federal Clean Air Act prohibits the *adoption* of the regulation challenged here, separate and apart from its enforcement.

126. To redress the violations of federal law and the interference with Plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, Plaintiffs request a declaration that the regulation adopted by Resolution 04-28 is preempted by the Clean Air Act.

127. Defendant is now and will continue to implement the regulation adopted in Resolution 04-28 in violation of the Clean Air Act and plaintiffs' rights under federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988 and other provisions of law.





PDF created with pdfFactory trial version www.pdffactory.com

*Count III -- Preemption Under The Foreign Policy Of The United States And The Foreign Affairs Powers Of The Federal Government*

128. Plaintiffs repeat and re-allege paragraphs 1 through 127 of this Complaint as though fully set forth herein.

129. The regulation adopted by CARB on September 24, 2004, in Resolution 04-28, intrudes upon the foreign policy of the United States and the foreign affairs prerogatives of the President and Congress of the United States.

130. The President and Congress have committed the United States to the pursuit of multilateral agreements to reduce international greenhouse gas emissions, including the emissions of developing countries. The regulation adopted by Resolution 04-28 conflicts with that foreign policy and interferes with the ability of the United States to speak with one voice upon matters of global climate change. It further diminishes the bargaining power of the United States in negotiating multilateral reductions of greenhouse gases.

131. Articles I and II of the United States Constitution commit the creation and pursuit of foreign policy of the United States to the President and the Congress. Plaintiffs have legally protected interests under the Constitution and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal law against CARB's regulation. Plaintiffs will be injured with respect to their federally protected interests by CARB's actions, if CARB's actions are not declared unlawful and if Defendant is not enjoined from implementing the regulation adopted by Resolution 04-28. The public interest will be served by such declaratory and injunctive relief. Whether Defendant's regulation intrudes upon the foreign policy and foreign affairs power of the federal government is purely or predominantly a legal question that is fit for adjudication now, and the fitness of adjudication will not be assisted by future factual developments outside this litigation.

132. A clear and judicially cognizable controversy exists between Plaintiffs and Defendant regarding whether the regulation adopted by Resolution 04-28 intrudes upon the foreign policy of the United States and the foreign affairs powers of the President and the Congress. Plaintiffs contend that the regulation intrudes upon the ability of the United States to speak with one voice on issues of global climate change and to negotiate multilateral



PDF created with pdfFactory trial version www.pdffactory.com

commitments to reduce international greenhouse gases, including from developing countries. Defendant is presently implementing the regulation and will enforce it to the detriment of Plaintiffs and the foreign policy of the United States.

133. To redress the violations of federal law and the interference with Plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, Plaintiffs request a declaration that the regulation adopted by Resolution 04-28 violates the foreign policy of the United States and the foreign affairs power of the President and the Congress.

*Count IV – Dormant Commerce Clause*

134. Plaintiffs repeat and re-allege paragraphs 1 through 133 of this Complaint as though fully set forth herein.

135. The regulation adopted by CARB on September 24, 2004, in Resolution 04-28, burdens the production and sale of new motor vehicles by increasing the purchase price to the customer by thousands of dollars.

136. The regulation adopted in Resolution 04-28 provides no local environmental benefit, or insubstantial local benefits at best.

137. Because the burden on interstate commerce of the regulation adopted in Resolution 04-28 is excessive in relation to its local benefits, the regulation violates the Dormant Commerce Clause of the U.S. Constitution. Whether Defendant's regulation violates the Dormant Commerce Clause is purely or predominantly a legal question that is fit for adjudication now, and the fitness of adjudication will not be assisted by future factual developments outside this litigation.

138. Plaintiffs have legally protected interests under the Constitution and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal law against CARB's regulation. Plaintiffs will be irreparably injured with respect to their federally protected interests by CARB's actions, if CARB's actions are not declared unlawful and if Defendant is not enjoined from implementing the regulation adopted in Resolution 04-28. The public interest will be served by such declaratory and injunctive relief.





PDF created with pdfFactory trial version www.pdffactory.com

139. A clear and judicially cognizable controversy exists between Plaintiffs and Defendant regarding whether the regulation adopted in Resolution 04-28 violates the Dormant Commerce Clause of the U.S. Constitution. Plaintiffs contend that the regulation adopted by Resolution 04-28 excessively burdens interstate commerce in relation to its local benefits. Defendant is presently implementing the regulation.

140. To redress the violations of federal law and the interference with Plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983. 1988, Plaintiffs request a declaration that the regulation adopted in Resolution 04-28 violates the Dormant Commerce Clause..

***Count V -- Sherman Act***

141. Plaintiffs repeat and re-allege paragraphs 1 through 140 of this Complaint as though fully set forth herein.

142 The regulation adopted by CARB on September 24, 2004, in Resolution 04-28, requires that if one manufacturer owns a ten percent or greater share of another manufacturer, the two companies will be treated as a single manufacturer for compliance purposes.

143. Manufacturers attempt to control the mix of vehicles that are sold by raising and lowering prices to encourage and discourage sales of particular vehicle models or groups. A manufacturer attempting to comply with a fleet average fuel economy standard will have to ensure that the correct mix of vehicles is sold, and in order to ensure that another manufacturer in which the first manufacturer owns a 10 percent or greater share does not upset the overall mix of vehicles, price information will likely have to be exchanged and perhaps even fixed. The two manufacturers will need to coordinate the sale of vehicles according to their fuel economy, promoting the most fuel-efficient vehicles or restricting the less fuel efficient vehicles, as necessary. Such coordination will likely require the exchange of supply and price information. The regulation adopted in Resolution 04-28 thus *de facto* requires manufacturers that are otherwise competitors to exchange production, supply, and price information regarding new motor vehicles. Such coordination -- and in particular, any price fixing -- will have a substantial effect on interstate commerce and is prohibited by federal antitrust law, which prohibits "[e]very





PDF created with pdfFactory trial version www.pdffactory.com

contract ... or conspiracy[ ] in restraint of trade or commerce among the several States." 15 U.S.C. § 1. CARB's regulation requires illegal coordination among manufacturers that are not a single economic entity. Whether Defendant's regulation is preempted by the Sherman Act is purely or predominantly a legal question that is fit for adjudication now, and the fitness of adjudication will not be assisted by future factual developments outside this litigation.

144. Defendant's regulation conflicts with and is preempted by federal law. Plaintiffs have legally protected interests under the Constitution, the Sherman Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the Sherman Act and the national policy of competition against CARB's regulation. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by CARB's actions, if CARB's actions are not declared unlawful and if Defendant is not enjoined from implementing the regulation adopted in Resolution 04-28. The dealer plaintiffs are injured as purchasers of the vehicles produced by manufacturers subject to the required restraint of trade. Plaintiff Alliance includes manufacturers subject to the required restraint of trade that will be potentially subject to antitrust liability unless the regulation is declared unlawful and its implementation and enforcement enjoined. The public interest will be served by such declaratory and injunctive relief.

145. A clear and judicially cognizable controversy exists between Plaintiffs and Defendant regarding whether the regulation adopted in Resolution 04-28 is preempted by the Sherman Act. Plaintiffs contend that the regulation requires unlawful restraints of trade and cannot be enforced. Defendant is presently implementing that regulation and will enforce it to the detriment of Plaintiffs.

146. To redress the violations of federal law and the interference with Plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, Plaintiffs request a declaration that the regulation adopted in Resolution 04-28 is preempted by the Sherman Act.

147. Defendant is now and will continue to implement the regulation approved by Resolution 04-28 in violation of the Sherman Act and Plaintiffs' rights under the United States



PDF created with pdfFactory trial version www.pdffactory.com

Constitution and other federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988 and other provisions of law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that the regulation adopted by CARB and Defendant on September 24, 2004, in Resolution 04-28 violates federal law in the manner alleged above

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendant from implementing or enforcing the regulation adopted by CARB in Resolution 04-28, or any substantially similar regulation.

C. An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other provisions of federal law.

D. Such other relief available under federal law that may be considered appropriate under the circumstances, including other fees and costs of this action to the extent allowed by federal law.

Dated: February 16, 2005.

Respectfully submitted,

SAGASER, FRANSON & JONES

Timothy Jones
Attorneys for all Plaintiffs



PDF created with pdfFactory trial version www.pdffactory.com

```
  ####              ##            ##
    #                #             #                     #
    #    ####    ### #   ####      #     ####           #####
    #   #    #  #   ##  #    #     #    #    #           #
#   #   ######  #    #  ######     #    ######           #
#   #   #       #    #  #          #    #                #
#   #   #       #   ##  #          #    #                #   #
 ###     #####   ### ##  #####   #####   #####            ###

                                               ########
```

Job : 189
Date: 4/8/2008
Time: 5:33:43 PM

PDF created with pdfFactory trial version www.pdffactory.com