U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 NOV 18 PM 12 25

CLERK
BY ________
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

GREEN MOUNTAIN CHRYSLER PLYMOUTH DODGE JEEP; GREEN MOUNTAIN FORD MERCURY; JOE TORNABENE'S GMC; CODY CHEVROLET, INC.; ALLIANCE OF AUTOMOBILE MANUFACTURERS; DAIMLERCHRYSLER CORPORATION; and GENERAL MOTORS CORPORATION,

Plaintiffs,

v.

THOMAS W. TORTI, Secretary of the Vermont Agency of Natural Resources; JEFFREY WENNBERG, Commissioner of the Vermont Department of Environmental Conservation; and RICHARD VALENTINETTI, Director of the Air Pollution Control Division of the Vermont Department of Environmental Conservation,

Defendants.

Docket No. 05-CV-302

## COMPLAINT

Plaintiffs GREEN MOUNTAIN CHRYSLER PLYMOUTH DODGE JEEP, GREEN MOUNTAIN FORD MERCURY, JOE TORNABENE'S GMC, CODY CHEVROLET, INC., ALLIANCE OF AUTOMOBILE MANUFACTURERS, DAIMLERCHRYSLER CORPORATION, and GENERAL MOTORS CORPORATION (collectively, "plaintiffs"), by their attorneys Gravel and Shea, state the following claims against defendants THOMAS W. TORTI, JEFFREY WENNBERG, and RICHARD VALENTINETTI (collectively, "defendants").

GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Nature of the Action

This is an action for declaratory and injunctive relief under the Supremacy Clause in Article VI of the United States Constitution. It challenges a regulation adopted by the Vermont Department of Environmental Conservation, on the ground that the regulation is preempted by federal law. Defendants are state officers charged with enforcement of the preempted regulation. Jurisdiction over the claims presented here and authority to grant the requested relief arise under 28 U.S.C. §§ 1331, 1343, 2201 and 42 U.S.C. §§ 1983, 1988.

Introduction

1. Since the 1970s, the federal government has enforced a comprehensive program to control air pollution from motor vehicles and to regulate motor vehicle fuel economy. Federal law permits some States to adopt their own rules to control motor vehicle air pollution, provided the state rules are consistent with federal regulations. With very few exceptions, federal law prohibits any state regulation of motor vehicle fuel economy.

2. In 1996, the Vermont Department of Environmental Conservation ("DEC") adopted a set of rules to control automotive air pollution. DEC's rules created the Vermont "Low Emission Vehicle" program, which was based on a similar program previously adopted by the State of California, and which conformed with federal requirements for such state air pollution control programs. DEC amended its Low Emission Vehicle rules in 2000, 2001, 2003 and 2004.

3. When first adopted, the stated purpose of the Vermont Low Emission Vehicle rules was to maximize the control of potentially harmful emissions from motor vehicles sold in Vermont. Plaintiffs and other members of the automobile industry have supported Vermont's



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

efforts to reduce air pollution, and have attempted to ensure compliance with the Vermont Low Emission Vehicle regulations as adopted in 1996 and amended in 2000-2004.

4. This lawsuit is necessitated by a recent, significant change in DEC's vehicle regulations, which has carried those rules far beyond their original stated purpose. As most recently amended by DEC, the Vermont Low Emission Vehicle Program will force Vermont citizens to pay thousands of dollars more for new vehicles than residents of most other States in the nation -- but will do nothing concrete to improve air quality or the health of Vermont residents. (*See* ¶¶ 31, 65-74.)

5. In addition, the new regulations inflict severe competitive injury on some Vermont new-vehicle dealers, their employees and their families. (*See* ¶¶ 62-64 below.) One reason why the U.S. Congress has long provided for national regulation of the automobile is to ensure that the nation as a whole shares in the burdens and costs of regulation. DEC's new rules single out specific types of businesses in Vermont (the dealerships most affected by the regulations) for the sake of a symbolic effort to address the phenomenon of "global warming" as described below. These rules deserve careful pre-enforcement review under federal law before they impose further injuries on Vermont businesses and consumers.

<u>Background of the Litigation</u>

6. The specific change in the Vermont regulations that was recently completed by DEC would extend the reach of the Low Emission Vehicle rules from the regulation of harmful air pollutants, to the control of carbon dioxide from new motor vehicles sold in Vermont. Carbon dioxide, or "CO2," is not classified as an air pollutant by the federal government, and is not listed as hazardous air contaminant in Vermont's Air Pollution Control Regulations. Carbon dioxide is a natural by-product of the combustion of any material that includes carbon. It is



Gravel and Shea
Attorneys at Law
P. O. Box 369
Burlington, Vermont
05402-0369

exhaled by humans and other animals, and is critical to plant life and thus to the production of oxygen needed by humans and other animals. Carbon dioxide is inert, nonflammable and nontoxic.

7. Carbon dioxide disperses evenly through the atmosphere. In the atmosphere, carbon dioxide retains heat in the Earth's atmosphere, through a "greenhouse effect" that is an important part of the planet's biosphere. The heat-trapping properties of greenhouse gases, including carbon dioxide, cause the average surface temperature of the Earth to be approximately 59° Fahrenheit higher than it would be otherwise. The greenhouse effect is therefore critical to life on Earth in its current form.

8. Scientists have warned that a large increase in carbon dioxide from man-made sources could lead to excessive increases in the temperature of the biosphere, described as "global warming" or "global climate change." Many scientists have called for measures to reduce man-made emissions of greenhouse gases, measures to adapt to climate change to the extent such change cannot be avoided, or both.

9. Because carbon dioxide disperses globally, effective control of CO2 levels requires international coordination. The consistent position of United States government, in both Democratic and Republican administrations, has been that the issue of global warming cannot be solved by any one country or region. The U.S. Congress has directed the Executive Branch to pursue multinational strategies that will ensure that each nation does its share to address the global warming issue, and that will protect the American economy against having to shoulder an unreasonable share of that burden. (*See* ¶¶ 49-54.)

10. Carbon dioxide is the principal greenhouse gas produced by motor vehicle operation. The United States already has a program in place that controls carbon dioxide



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

emissions from cars and trucks. Since the 1978 model year, the National Highway Traffic Safety Administration ("NHTSA") has regulated automotive fuel economy, pursuant to the Energy Policy and Conservation Act of 1975 ("EPCA"). There is a direct chemical relationship between the amount of gasoline that a vehicle burns and the amount of carbon dioxide that it releases. By regulating automotive fuel economy, NHTSA also regulates carbon dioxide emissions from motor vehicles. NHTSA vigorously enforces its fuel economy regulations, and has collected more than $500 million for violations of its standards since 1978.

11. The pace of automotive fuel economy regulation by NHTSA has accelerated in recent years. Under rules either already promulgated or now being finalized by NHTSA, the fuel economy standards for trucks sold in the U.S. will have increased in each model year from 2005 to 2011. Fuel economy standards adopted by NHTSA several years ago will cost the nation more than $860 million by model year 2007. NHTSA's proposed standards for model years after 2007 through model year 2011 have been estimated conservatively to cost about $6.3 billion.

12. The costs of NHTSA's new fuel economy standards will be spread nationwide. Those standards ensure that Vermont residents, like the citizens of all other States, have a wide variety of vehicles from which to choose, including vehicles that achieve high fuel efficiency levels. Average fuel economy levels for cars has increased more than 100 percent since the inception of the federal regulatory program, and for light trucks (minivans, cars, sport utility vehicles and pickup trucks) has increased 53 percent. In the 2005 model year, the automobile industry offered more than 100 vehicle models that had estimated highway ratings of 30 miles per gallon or more, based on vehicle model classifications available at www.fueleconomy.gov.

13. The automobile industry has improved fuel economy across the full product line, both to comply with the NHTSA standards and to meet consumer demand. The average sport



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

utility vehicle sold in model year 2004 gets about 50 percent better mileage than the average car before NHTSA's program began, and the average light-duty truck today gets better overall mileage than a compact car sold before federal regulation began. Thousands of engineers and technicians work every day in the automobile industry solely on the effort to improve fuel economy while maintaining the vehicle performance, safety and other features that American drivers expect.

14 To ensure that the federal government can maintain control over fuel economy policy and regulation, EPCA generally prohibits the States from adopting fuel economy standards or related requirements. The statute provides:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter

49 U.S.C. § 32919(a). This preemption provision in EPCA is in full effect because, as stated above, NHTSA long ago established federal fuel economy standards.

15. State motor vehicle standards for carbon dioxide are preempted by the above-quoted provision in EPCA -- a point recently confirmed by NHTSA, in its latest regulatory publication concerning fuel economy standards. As NHTSA stated: "Since the way to reduce carbon dioxide emissions is to improve fuel economy, a state regulation seeking to reduce those emissions is a 'regulation' related to fuel economy standards ..." (*See* 70 Fed. Reg. 51,414, 51,457 (Aug. 30, 2005). Noting that state CO2 rules would interfere with the federal fuel economy program, NHTSA concluded, "A state law that seeks to reduce motor vehicle carbon dioxide emissions is both expressly and impliedly preempted." (*Id.*) NHTSA's position is



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

consistent with that of the U.S. Environmental Protection Agency ("EPA"), the federal agency that supervises other types of automobile regulation in this country. (*See* ¶¶ 38-48 below.)

Parties, Jurisdiction and Venue

16. The plaintiffs in this action are four new motor vehicle dealers, an association of automobile manufacturers that produce and sell vehicles to those dealers, and two of those manufacturers.

17. Green Mountain Chrysler Plymouth Dodge Jeep and Green Mountain Ford Mercury are new-vehicle dealerships located in East Dorset, Vermont. Joe Tornabene's GMC is a new-vehicle dealership located in Pownal, Vermont. Cody Chevrolet, Inc., is a new-vehicle dealership located in Montpelier, Vermont. Green Mountain Chrysler Plymouth Dodge Jeep, Green Mountain Ford Mercury, Joe Tournabene's GMC and Cody Chevrolet, Inc. (collectively, the "dealer plaintiffs") are "dealers" under 49 U.S.C. § 32908, the federal fuel economy law. The dealer plaintiffs are also directly subject to DEC's regulations, which prohibits dealers in Vermont from selling new motor vehicles that do not comply with the standards adopted by DEC.

18. As described more fully below, the DEC's new standards will reduce the new-vehicle sales of the dealer plaintiffs, who will suffer losses in profits and goodwill. The prospect of enforcement of the amended rules has already had an adverse effect on the value of businesses operated by the dealer plaintiffs as going concerns. (*See* ¶¶ 62-64 below.)

19. The Alliance of Automobile Manufacturers ("the Alliance") is an association of motor vehicle manufacturers including BMW Group, DaimlerChrysler Corporation, Ford Motor Company, General Motors Corporation, Mazda North American Operations, Mitsubishi Motor Sales of America, Inc., Porsche Cars North America, Inc., Toyota Motor North America, Inc.,



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

and Volkswagen of America, Inc. The Alliance represents its members' interests in this litigation.

20. General Motors Corporation ("GM") and DaimlerChrysler Corporation ("DCC") are manufacturers of new motor vehicles sold in Vermont and are subject to DEC's motor vehicle regulations. GM and DCC sell their vehicles to independent dealers in Vermont including Green Mountain Chrysler Plymouth Dodge Jeep, Joe Tournabene's GMC and Cody Chevrolet, Inc. DEC's amended regulations will eliminate a substantial number of vehicle models from GM and DCC product lines in Vermont, and will increase the costs of some of the remaining GM and DCC models offered in the Vermont market by thousands of dollars.

21. The Agency of Natural Resources is a component of the Executive Branch of the Vermont government, and DEC is a department within the Agency of Natural Resources. The motor vehicle emissions regulations challenged in this action are administered and enforced by the Agency of Natural Resources, by DEC, and by DEC's Air Pollution Control Division. (*See* Exhibit A, "Annotated Rule Text," amending Subchapter XI of DEC's Low Emission Vehicle Rules.)

22. Thomas W. Torti, Jeffrey Wennberg, and Richard Valentinetti are the state officers in charge of the Agency of Natural Resources, DEC and the Air Quality Division of DEC, respectively. They are made defendants in this action solely in their official capacities. Each defendant resides in the District of Vermont.

23. Each of the dealer plaintiffs in this action is located in the District of Vermont and each has suffered and will continue to suffer harm in this District as a result of defendants' action to adopt and enforce the motor vehicle CO2 regulations. Each of the manufacturers represented by the Alliance as a plaintiff does business in this District and has also suffered and will continue



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

to suffer harm in this District as a result of defendants' regulations. Venue in this Court is proper under 28 U.S.C. § 1391(b).

The Technical Context for Regulation

24. Motor vehicles are a source of various air pollutants regulated by EPA under the Clean Air Act. These include carbon monoxide, a number of other toxic substances, and the gases that form ground-level ozone (or "smog"). Various tailpipe pollutants, such as oxides of nitrogen and hydrocarbons, react in sunlight and heat to produce smog. Concentrations of smog depend upon rapid chemical reactions in the presence of sunlight. The formation of smog is a localized or regional phenomenon, and is therefore responsive to local (including state-level or regional) controls.

25. The harmful air pollutants from motor vehicles regulated by EPA under the Clean Air Act are usually controlled by hardware installed on the vehicle at the factory. The best-known such device is the catalytic converter, which oxidizes and reduces smog-forming and other pollutants from the engine into water and carbon dioxide.

26. The control of carbon dioxide from motor vehicles cannot be accomplished with catalytic converters or similar hardware. As EPA stated several years ago, "[n]o technology currently exists or is under development that can capture and destroy or reduce emissions of CO2, unlike other emissions from motor vehicle tailpipes. At present, the only practical way to reduce tailpipe emissions of CO2 is to improve fuel economy." (*See* 68 Fed. Reg. 52,922, 52,929 (Sept. 8, 2003).)

27. Carbon dioxide is also unlike the Clean Air Act pollutants when it enters the environment. Unlike smog and the pollutants emitted from vehicle tailpipes, which accumulate in the lower atmosphere to the place where they were emitted, carbon dioxide disperses globally



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

throughout the upper atmosphere. To the extent that carbon dioxide emissions have a resulting impact on global climate, it is unrelated to the state or country that emitted the carbon dioxide -- and it is therefore not responsive to local, state-level or regional controls. For example, a given quantity of CO2 emitted from sources in China, Mexico or Australia has the same effect on the global climate as the same quantity of CO2 emitted from sources in the United States, Japan or Great Britain.

28. Cars and trucks are a significant source of the air pollution that can form smog in this country, as well as the other air pollutants regulated by EPA. But they are a relatively small source of the carbon dioxide that comprise greenhouse gases and that are the focus of the international effort to address the global warming issue. An article published in the journal *Science* in 2003 estimated that U.S. cars and light-duty trucks (which are the vehicles covered by DEC's regulation) emit less than one-fifth of the carbon dioxide from man-made sources in this country, and less than half the amount produced in generating electricity from fossil fuels.

29. The article in *Science* concluded that long-term management of the global climate would require major changes in automobiles, but that other sources also warranted control, and that those other sources should probably be controlled to very stringent levels prior to the automobile, if the goal is to get the most improvement possible with available resources, as quickly as possible. The *Science* article stated as follows:

> Global $CO_2$ emissions must decline by about an order of magnitude in order to stabilize atmospheric concentrations, so major emission reductions will eventually be required from cars. Cost-effective climate policy, however, starts with low-cost emissions reductions and proceeds at a measured pace. Analysis of optimal climate policy typically shows that to stabilize concentrations below a doubling of pre-industrial levels, overall emissions do not need to be reduced by more than 30% below business-as-usual until after 2040. When emission mitigation opportunities across the economy are ordered by their cost (to form a supply curve), deep reductions in automobile emissions [of carbon dioxide] are not in the



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

> cheapest 30%. All else equal, it is therefore wasteful to devote substantial resources to achieving deep reductions in auto emissions [of carbon dioxide] until after 2040.

Keith & Farrell, *Rethinking Hydrogen Cars*, 301 SCIENCE 315, 316 (2003) (references omitted).

30. The automobile industry is not waiting until some future year like 2040 to address the issue of global warming. The automobile industry is spending billions of dollars on advanced technologies that do not require fossil fuels, and is striving to bring those technologies to market well before the target date suggested by the authors of the *Science* article. State carbon dioxide regulations such DEC's new rules, however, divert resources away from those efforts. One study indicates that if U.S.-based manufacturers attempted to comply with regulations like those adopted by DEC in the manner expected by DEC, the cost will exceed $2.5 billion by 2009 -- which would be $2.5 billion that could not be spent on developing advanced technologies that would diversity the nation's energy sources for the transportation sector.

31. The diversion of resources away from long-term solutions to rules like those adopted by DEC will have no practical impact on the global climate, in part because those rules are based on changes in fossil-fuel-powered vehicles. The only public studies that have attempted to quantify the change in global climate that would result from the new CO2 standards for cars and trucks show that even if every State in the nation adopted the same standards as DEC, there would be no measurable change in temperature in the global biosphere. Indeed, neither DEC nor the California regulatory agency that first adopted the automotive CO2 rules has claimed that the regulations involved in this case will have any specific impact on the global climate.

<u>The Federal Statutory Framework</u>

*A. Background*



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

32. Federal regulation of new motor vehicle emissions and fuel economy proceeds under two separate federal statutes. One statute is the federal fuel economy law (EPCA), administered by NHTSA, an agency within the U.S. Department of Transportation. The other relevant federal statute is the Clean Air Act. Under the Clean Air Act, the U.S. Environmental Protection Agency ("EPA") regulates motor vehicle emissions that are classified either as harmful pollutants or as substances that form harmful pollutants.

33. The separate regulatory programs for vehicular fuel economy and air pollutants are more fully described in ¶¶ 34-37 and ¶¶ 38-48 below, respectively. In addition, Congress and the federal government have asserted and maintained control over national policy to address the global issue of climate change, in coordination with foreign governments and intergovernmental organizations. (*See* ¶¶ 49-54 below.)

*B. The Federal Fuel Economy Program*

34. To regulate motor vehicle fuel economy, the EPCA statute passed by Congress in 1975 established a program of "corporate average fuel economy," or "CAFE," standards. Standards for cars are set separately from those for light trucks. The light-truck category includes most minivans, pickups, and sport-utility vehicles, as well as other vehicles. Fuel economy is determined by measuring how much carbon dioxide a vehicle emits, and then using a specified formula to convert those $CO_2$ emissions into a more familiar term, which is the number of miles that a vehicle can travel on a gallon of gasoline, or "miles per gallon."

35. The federal CAFE standards do not apply to individual vehicles or models. Rather, they regulate the fuel economy of each manufacturer's entire fleet of cars or trucks, on a fleet average basis. As a result, a manufacturer can produce and sell any combination of vehicles



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

that the market will bear, so long as the fuel economy of its fleet as a whole meets or exceeds the required average miles per gallon ("mpg").

36. The authors of the federal fuel economy law emphasized that CAFE standards had to "be carefully drafted" in order to improve fuel economy without "unduly limiting consumer choice." (*See* H.R. Rep. No. 340, 94th Cong., 1st Sess. 87 (1975).) The averaging of the mpg results for a given manufacturer across its entire vehicle fleet was critical to the goals of EPCA. As one federal court has explained, this approach has led to "a series of graduated mileage requirements" that "ensure[s] wide consumer choice by leaving maximum flexibility to the manufacturer" in deciding how to meet the specified CAFE levels. (*See Center for Auto Safety v. NHTSA*, 847 F.2d 843, 863-64 (D.C. Cir.), *vacated on unrelated grounds*, 856 F.2d 1557 (1988) (quoting S. Rep. No. 179, 94th Cong., 1st Sess. (1975).)

37. Regulation of fuel economy at a sub-national level would have constrained the flexibility that was the hallmark of the CAFE program established by Congress. Congress therefore preempted state regulation in the field of motor vehicle fuel economy. (*See* 49 U.S.C. § 32919(a), quoted in ¶ 12 above.) The only exception allowed by Congress was that States and their political subdivisions would be permitted to "prescribe requirements for fuel economy for automobiles obtained for [their] own use." (*Id.* § 32919(c).)

C. *The Federal Clean Air Act*

38. The federal Clean Air Act is a complex, evolving instrument that has allocated federal and state responsibility for air pollution control for more than three decades. Its provisions relevant to motor vehicles can be divided into three parts: (1) the provisions that govern federal regulation of motor vehicle emissions; (2) the provisions that govern separate



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

state regulation of those emissions; and (3) the provisions for federal oversight of state actions that regulate motor vehicle emissions.

*(1) Federal Regulatory Authority*

39. Section 202(a) of the Clean Air Act Amendments of 1970 directed the U.S. Environmental Protection Agency ("EPA") to regulate the emission of "pollutants" from new motor vehicles. (*See* 42 U.S.C. § 7521(a)(1).) "Pollutants" include carbon monoxide, particulate matter, hydrocarbons, and oxides of nitrogen, but not carbon dioxide. Those substances other than CO2 either contribute significantly to the formation of potentially harmful gases in the ambient atmosphere (such as ground-level ozone or "smog") or are themselves harmful to humans in concentrations that can be encountered in the ambient atmosphere (such as carbon monoxide).

40. Carbon dioxide is neither a significant precursor to harmful gases nor itself harmful at levels found in the ambient atmosphere. (*See* ¶¶ 7-9 above.) As recently as 2003, EPA concluded that there was no current scientific basis to include limits on tailpipe emissions of carbon dioxide in its regulations under section 202 of the Clean Air Act. (*See* 68 Fed. Reg. 52,922 (Sept. 8, 2003).) In reaching that conclusion, EPA also noted that regulation of tailpipe emissions of CO2 under the Clean Air Act would be inconsistent with the assignment of federal regulatory authority over fuel economy to NHTSA in the EPCA statute. EPA stated that "Congress' care in designing the CAFE program makes it clear that EPCA is the only statutory vehicle for regulating the fuel economy of cars and light duty trucks." (*Id.* at 52,929.)

*(2) State Regulatory Authority*

41. Section 209(a) of the Clean Air Act generally preempts States and their political subdivisions from adopting or enforcing "any standard relating to the control of emissions from



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). In 1967, however, Congress granted the State of California unique authority to regulate automotive air pollutants, "in recognition of the unique problems faced by California as a result of its climate and topography," and in particular "[t]he acute smog problem" of southern California. (*See* H.R. Rep. No. 728, 90th Cong., 1st Sess. (1967) ("unique problems"); S. Rep. No. 192, 89th Cong., 1st Sess. (1965) ("acute smog").) Congress specified limits on the types of air pollution regulations that California was allowed to adopt and enforce, which are now contained in section 209(b) of the Clean Air Act. (*See* 42 U.S.C. § 7543(b).) California soon thereafter adopted its own regulations in conformity with section 209(b).

42. In 1977, Congress added a new provision to the Clean Air Act, in what is now section 177 of the statute, in order to permit some States to adopt and enforce the same motor vehicle emissions control regulations as those in effect in California under section 209(b). Thirteen years later, Congress amended section 177 to ensure that enforcement of state-level regulations would not unduly burden the new-vehicle market in any States that elected to follow California's lead. Thus, the 1990 Clean Air Act Amendments provided that the authority to opt into the California air pollution standards under section 177 of the statute should not "be construed as authorizing any [opt-in] State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle" that meets the California standards. (*See* 42 U.S.C. § 7507.) That provision was designed to permit the sale of any type or quantity of vehicles demanded by the market in any State opted into the California program, so long as each vehicle complied with California's standards for tailpipe emissions and other pollutants.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

*(3) Federal Regulatory Review*

43. Before any State can begin enforcement of the California automotive air pollution control rules, those rules must have been reviewed and approved by EPA, under the criteria established by Congress in section 209(b) of the Clean Air Act. Those criteria include consistency with the federal emissions regulations for motor vehicles under section 202(a) of the Clean Air Act. (*See* 42 U.S.C. § 7543(b)(10)(C).)

44. In 2004, California adopted standards for the control of greenhouse gases (including carbon dioxide) from motor vehicles. DEC has referred to those California standards as a prime motivation, if not the sole reason, for the adoption of the motor vehicle greenhouse gas/carbon dioxide standards involved in this litigation.

45. The federal courts held long ago that the Clean Air Act confines EPA's review of California's motor vehicle rules to a determination of whether the California rules comply with criteria specified in section 209(b) of the statute. EPA has no authority to consider whether a California regulation violates any provision of law other than the Clean Air Act. (*See Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1115-17 (D.C. Cir. 1979).) Based on that precedent, California claimed in a recent administrative proceeding that the Clean Air Act gives EPA no power to consider whether state regulations that include references to fuel economy standards would be preempted by EPCA.

46. The Clean Air Act permits EPA to disapprove California's greenhouse gas/carbon dioxide regulations if the Agency finds them to be inconsistent with the scope of EPA's own regulatory power under section 202(a) of the statute. (*See* ¶ 40 above.) However, California has not yet submitted its CO2 regulations to EPA for review under section 209(b) of the Clean Air Act. The Clean Air Act does not give EPA the power to initiate, on its own, any review of the



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

rules adopted by California. EPA's oversight cannot begin unless and until California sends a rule to EPA, and requests review.

47. The review of California emissions regulations at EPA under the Clean Air Act can take several years. The Clean Air Act contains no fixed deadlines for the submission by California of its regulations to EPA for review, nor any deadlines for EPA action with respect to California rules once they have been submitted for review. In some instances, California motor vehicle regulations have gone into effect in California and other States before EPA has completed a review for consistency with the Clean Air Act.

48. California officials have advised officials in other States that in their view, California does not have to wait for approval of their greenhouse gas/carbon dioxide standards by EPA before California can enforce those standards. According to the California officials, enforcement of the standards can proceed concurrently with any review by EPA to determine whether the standards are lawful under the Clean Air Act. California and other States like Vermont intend to implement the CO2 regulations without awaiting the completion of any review process by EPA.

D. *National Management of the Issue of Global Climate Change*

49. In addition to maintaining exclusive federal control over motor vehicle fuel economy, for the past 20 years the United States has worked with other countries in an effort to develop a comprehensive, multilateral plan to reduce manmade greenhouse gas emissions, including carbon dioxide emissions, from all sources, not just automobiles. Congress has endorsed and extended this foreign policy on several occasions. In the Global Climate Protection Act of 1987, Congress directed the Secretary of State to coordinate U.S. negotiations concerning global climate change. (*See* Pub. L. 100-204, § 1103(c) (Dec. 22, 1987); 15 U.S.C.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

§ 2901 note.) Pursuant to that law, EPA and the State Department sent a report to Congress in the early 1990s, stressing the global nature of the climate change problem calling for "international consensus" and a "comprehensive" approach to "addressing potential climate change."

50. In 1992, the U.S. Senate ratified the United Nations Framework Convention on Climate Change (the "UNFCCC"). (*See* Sen. Exec. Rep. No. 102-55, 102d Cong., 2d Sess. (1992), at 9.) The UNFCCC recognized that "the global nature of climate change calls for the widest possible cooperation by all countries and their participation in an effective and appropriate international response." The treaty established a framework for international cooperation in an effort to "stabilize greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." (*See* UNFCCC, art 2.) Through the UNFCCC, the parties undertook to review their own national policies on greenhouse gases and to work together to negotiate future, binding commitments by which the nations of the world would agree to reduce greenhouse gas emissions.

51. The United States and other members of the UNFCCC worked to develop this multilateral framework through the Kyoto Protocols to the UNFCCC. While the Kyoto Protocol was being negotiated in 1997, the Senate (including both Vermont Senators) adopted by a 95-0 vote the Byrd-Hagel Resolution, which stated that the United States should not sign any protocol that would mandate new commitments to reduce U.S. greenhouse gas emissions unless the Protocol also mandated new commitments from developing countries as well. (*See* S. Res. 98, S. Rep. No. 105-54.) Because the final draft of the Protocols provided only for reductions in emissions from developed countries, President William J. Clinton did not submit the Kyoto treaty to the Senate for ratification.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

52. In subsequent statutes, Congress continued to express its opposition to any measure that would require the United States to reduce greenhouse gases, absent an international agreement involving both developed and developing countries. On several occasions, Congress has attached riders to federal appropriation bills to prohibit the Executive Branch from using funds "to propose or issue rules, regulations, decrees, or orders for the purpose of implementation, or in preparation for implementation, of the Kyoto Protocol" without the ratification of that treaty by the Senate.

53. The current Administration has stated its agreement with Congress's view of the Kyoto Protocols, as expressed in the Byrd-Hagel Resolution. Rather than calling for the adoption of the Kyoto framework, the Executive Branch has promoted new technology and encouraged voluntary measures to reduce CO2 emissions, as well as programs to reduce scientific uncertainty regarding global change, including the Climate Change Research Initiative. In July 2005, the United States joined other industrialized nations in support of new measures to address the issue of global warming at the Gleneagles Summit, held in Scotland. The nations participating in the Gleneagles Summit are now in the process of developing specific measures to coordinate and implement greenhouse gas mitigation and adaptation programs.

54. To prevent interference with its efforts to negotiate international agreements addressing the issue of global warming, the Executive Branch has declined to undertake large-scale unilateral commitments to reduce greenhouse gases. As EPA has explained, one-sided greenhouse gas (or "GHG") commitments could weaken the nation's diplomatic efforts:

> Unilateral EPA regulation of motor vehicle GHG emissions could ... weaken U.S. efforts to persuade key developing countries to reduce the GHG intensity of their economies. Considering the large populations and growing economies of some developing countries, increases in their GHG emissions could quickly overwhelm the effects of GHG reduction measures in developed countries. Unavoidably,



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

> climate change raises important foreign policy issues, and it is the President's prerogative to address them.

68 Fed. Reg. at 52,931 (Sept. 8, 2003).

<u>The Vermont Standards for Carbon Dioxide Control</u>

55. As stated above, the Vermont CO2 regulations are modeled on rules adopted in California in 2004. In both California and Vermont, the new CO2 rules apply to motor vehicles produced in or after model year 2009. Manufacturers and dealers commonly introduce new models in the calendar year prior to a given model year. Thus, model year 2009 will start for most or all manufacturers and dealers in calendar year 2008. EPA rules provide that the 2009 model year can start as early as January 2, 2008.

56. Although they apply to several other greenhouse gases in addition to carbon dioxide, the rules developed in California in 2004 that have now been adopted in Vermont primarily regulate carbon dioxide. CO2 emissions account for nearly 97 percent of the greenhouse gas emissions from the vehicles subject to the regulations. The standards adopted by Vermont require a reduction in CO2-equivalent greenhouse gas emissions from passenger cars of more than 30 percent. DEC's rules therefore require substantial reductions in carbon dioxide, which can only be achieved with reductions in fuel consumption, and thus increases in fuel economy.

57. Like the California rules on which they are based, DEC's new regulations create requirements for new vehicles to be sold in Vermont that are expressed in terms of "carbon dioxide equivalent" (or "CO2e") emissions. Apart from the minor credits allowed for the control of non-CO2 emissions, DEC's standards for passenger cars range from 323 to 205 grams per mile of CO2-equivalent emissions, depending on the type of vehicle and model year.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Manufacturers are permitted to vary from the standards for several model years, but at specific points defined in the regulations, they must demonstrate achievement of the standards on a multi-year basis.

58. The applicable carbon dioxide standards that will be enforced by DEC (without minor adjustments for potential non-CO2 controls) standards can be readily translated into fuel economy levels, based on miles per gallon, as illustrated on the Table below. The Table summarizes the portion of the DEC rule that applies to passenger cars; separate standards not summarized below apply to some other types of vehicles. For purposes of comparison, the federal standard for cars is 27.5 mpg.

**DEC Standards -- Fuel Economy Equivalent Levels**

| Model Year | DEC Standard for Cars and LDT1s | |
|---|---|---|
| | Grams CO2e/mile | Mpg |
| 2009 | 323 | 27.4 |
| 2010 | 301 | 29.4 |
| 2011 | 267 | 33.2 |
| 2012 | 233 | 38.0 |
| 2013 | 227 | 39.0 |
| 2014 | 222 | 39.9 |
| 2015 | 213 | 41.6 |
| 2016 | 205 | 43.2 |

59. In the Table above, the term "LDT1" refers to smaller light-duty trucks, which under DEC's rules are combined into the same category as passenger cars. In the federal fuel economy regulations, those trucks are included in a category separate from cars in order to determine compliance. The federal fuel economy standards for trucks are generally less stringent than the fuel economy requirements for cars, because trucks are more fuel-intensive than cars. By including some trucks in the same set of standards as cars, DEC's rules make the fuel

GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

economy requirements for cars produced by some manufacturers for sale in Vermont much more stringent than the 27.5 mpg federal standard for cars.

60. The stated purpose and the practical effect of DEC's new CO2 standards will be to require dramatic increases in the fuel economy of cars and trucks sold in Vermont. Vehicles sold in Vermont will have to achieve much more stringent fuel economy levels than required by federal law and regulation. Many currently offered models of vehicles sold in Vermont will disappear from some manufacturer's product offerings, because it will be economically impractical to bring those models into compliance with DEC's standards. This will have serious negative affects on consumer choice, the economic health of many automobile dealers in Vermont, and on employment in the automobile industry in the United States.

61. Several vehicle manufacturers have attested to the adverse effects of regulations like that recently adopted by DEC. In filings with the SEC, those manufacturers have alerted investors to the potential adverse effects of State CO2 standards if those standards were to withstand legal challenge. Those projected impacts include "severely restrict[ed] product offerings or close[d] plants" and "significantly restrict[ed] products." (*See* General Motors Corporation, Form 10-K (March 16, 2005)), at I-4; DaimlerChrysler Corporation, Form 20-F (filed Feb. 28, 2005), at 33; *see also* Ford Motor Company, Form 10-K (March 10, 2005), at 18.)

62. The businesses most directly impacted by the CO2 rules in Vermont will be automobile dealerships. The new-vehicle planning processes for at least two manufacturers -- GM and DCC, two of the plaintiffs in this action -- have proceeded to the point where those two companies can estimate how the CO2 rule will affect their product lines in jurisdictions like Vermont. GM and DCC have predicted very substantial reductions in their product lines if the new CO2 rules take full effect in any State where those rules would apply. This has severe



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. Box 369
BURLINGTON, VERMONT
05402-0369

consequences for independent franchised dealers in Vermont, including the plaintiffs in this action.

63. Starting in the 2009 model year, vehicles that do not meet DEC's CO2 requirements will not be legal for sale by dealers in Vermont. Based on the predictions of some manufacturers, many dealers in Vermont will not have a full line of compliant vehicles to market, starting in model year 2009. In addition, many vehicles that can be brought into compliance with the CO2 standards will cost substantially more than comparable vehicles sold by other manufacturers. Dealers with restricted product lines, and/or with vehicles that have substantial cost penalties, will suffer significant competitive losses.

64. DEC's rule is already having an adverse impact on Vermont dealers. The prospect of losing a full product line, or of having to try to sell vehicles that cost substantially more than the vehicles offered by other dealers, reduces the present value of the retail automotive businesses that have been placed at a competitive disadvantage by the new CO2 rule. A study of how the CO2 rule will affect automotive retail businesses in California, which was completed earlier this year, showed that some California automotive retail businesses had already lost up to $4.6 million in their current value, even though the new regulation does not go into full effect for several more years. The owners of Vermont dealerships are similarly impacted.

Environmental Consequences of DEC's Regulation

65. The hardship that the new DEC regulation will inflict on Vermont dealers might be justifiable as a policy matter, if the rule would benefit the environment. Based on DEC's published summary of comments on regulations, no participant in the DEC rulemaking or in the earlier similar rulemaking in California made any attempt to quantify a specific reduction in



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

temperature, or any other specific public health benefit, that would result from the new standards.

66. Even more important, the best available evidence shows that the CO2 regulation in Vermont will actually increase the emissions that were originally the target of the Low Emission Vehicle program -- specifically, the emissions that form ground-level ozone, or that are classified as harmful to human health, such as carbon monoxide, particulates and toxic air pollutants. The reasons for this unintended result of DEC's new regulation are described below.

67. To understand the environmental impacts of the new regulation, it is necessary to start with the economics of the new-car market. Although DEC's new rule will increase the costs and prices of new vehicles sold in Vermont, DEC has not attempted to estimate those costs or prices itself. Instead, DEC relied upon economic analyses prepared by other parties, including the State of California.

68. In 2004, prior to adopting its CO2 regulations, California obtained an estimate of the costs of compliance with the new rules, based on hypothetical vehicle models that California considered to be "representative" of the fleet as a whole. California admitted that in preparing those estimates, it had not estimated the costs of compliance for all vehicle models produced by all manufacturers. Even so, California's estimate of the average retail price increase for the hypothetical models it considered representative approached $1,000 per vehicle.

69. When the prices of new vehicles increases, demand falls. Using its estimated price increases, California projected that when fully implemented, the CO2 rules would reduce new-vehicle sales by between four and five percent, compared to a scenario in which the new CO2 rules did not apply.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

70. The predicted reduction in new-vehicle sales resulting from the CO2 regulation has environmental consequences. When the prices of new vehicles rise sharply, as they will when the new DEC rules go into effect, and when product lines shrink, as they will for many dealers, many people will defer the purchase of a new car or truck, or will buy a replacement vehicle when they need one from the used-car market. Older vehicles usually have higher emissions of smog-forming pollutants and other harmful emissions than new vehicles. By slowing the rate of new-vehicle sales, the CO2 regulation will keep older vehicles in service longer. Because older vehicles will remain in use in Vermont longer, the State will see higher overall pollution levels than if the CO2 rules were not in effect. In the economic and regulatory studies, this impact is called the "fleet turnover effect." Other factors also will make pollution levels higher once the CO2 rules go into effect.

71. For their part, the California regulators agreed that the fleet turnover effect in California would increase some smog-forming emissions and other pollution levels from the regulated fleet of vehicles, once the new rules were fully in effect. But the California officials then identified various offsetting factors that in their view would cancel out those emissions increases. For example, the California officials concluded that the CO2 rule would significantly reduce the consumption of gasoline by the vehicle fleet in California, estimated to include more than 30 million cars and light-duty trucks by 2020. According to California, the reduction in gasoline consumption would translate into lower emissions from the ships and trucks used to transport gasoline into California and from other sources.

72. Just as in California, the fleet turnover effect and other factors will increase emissions of numerous pollutants from the Vermont motor vehicle fleet, once DEC's amendments begin to affect the composition of the new-vehicle product line and prices in



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Vermont. Importantly, however, the offsets that the California officials claim for California are largely missing in Vermont. For example, the California regulators assumed that reduced gasoline consumption in California would reduce the need to import gasoline into California by ocean-going tanker vessels, which can generate significant pollution. In Vermont, gasoline arrives by rail car and tanker truck, not by ship. The Vermont motor vehicle fleet is estimated to be less than two percent of the size of the California fleet in 2020. Any reductions in gasoline consumption on a fleet-wide basis in Vermont will be much smaller than in California, and any associated reductions in pollution will be too small to offset the fleet turnover effect in Vermont.

73. The only complete analysis of how the new California-based CO2 rule would affect pollution levels in Vermont was completed earlier this year by a team of independent researchers in work sponsored by the Alliance. A former Executive Officer of the California Air Resources Board, and a former faculty member at the Kennedy School of Government at Harvard University, headed the study team. Their study applied data from the Vermont motor vehicle fleet, and used cost and price estimates for the entire range of motor vehicles in the Vermont motor vehicle fleet, not just the "representative" hypothetical models in the analysis prepared by California. Their study also included estimates of the other factors that would affect overall emissions levels in Vermont.

74. The results of the independent researchers working on behalf of the Alliance showed that, even under conservative assumptions, the CO2 rule would increase emissions of smog-forming and other regulated pollutants in Vermont by approximately one to four *tons per day* in 2020, when the rule would be fully implemented. That increase will include emissions that form smog, and that are classified as harmful or hazardous -- which are exactly the types of emissions that DEC indicated that it sought to control when the Low Emission Vehicle program



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

was enacted in 1996. To put the estimate in perspective, the increase in pollution caused by the $CO_2$ rule would be the equivalent to adding about 40,000 to 160,000 cars to Vermont's roads in 2020.

Interference with the Federal Fuel Economy Program

75. In addition to having unintended adverse effects on air pollution control, DEC's new rule directly and substantially interferes with the national fuel economy program. In the EPCA statute, Congress established a federal requirement to adopt and enforce what the statute designates as "maximum feasible" average fuel economy levels. The criteria to be used by NHTSA in order to determine "maximum feasible" levels are "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." (*See* 49 U.S.C. § 32902(f).) The federal fuel economy standards reflect the balance that NHTSA strikes among those criteria. State regulations that have the effect of creating more stringent fuel economy standards than those set by federal law interfere with NHTSA's efforts to balance the criteria for fuel economy standards created by Congress.

*A. "Economic Practicability"*

76. In determining what is "economically practicable," NHTSA and the federal courts reviewing NHTSA's regulations have developed a substantial body of precedent. The federal fuel economy standards today reflect NHTSA's judgment about the appropriate balance between improvements in fuel economy and the burdens that more stringent standards place on the automobile industry. NHTSA has understood its standard-setting duties to include an obligation to "weigh the difficulties of individual manufacturers" in meeting specific standards, an



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

approach that has been approved by the federal courts reviewing NHTSA's actions. (*See Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1339 (D.C. Cir. 1986).)

77. Maintaining consumer choice is also a fundamental part of EPCA and the federal regulations that implement it. At various points in the history of the federal fuel economy program, NHTSA has been required to modify the federal standards in order to avoid undue restrictions on consumer choice. As one federal judge has stated with approval, "NHTSA clearly understands that Congress instructed it to administer the CAFE program so as not to induce product restrictions." (*See Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 125 (D.C. Cir. 1990) (D.H. Ginsburg, J., concurring) (internal quotation marks omitted).) Significant product restrictions are, however, an inevitable consequence of DEC's new regulations, as some manufacturers have already advised their independent dealers and the public. (*See* ¶¶ 62-64 above.)

78. NHTSA has also consistently interpreted the statutory criterion of "economic practicability" to include consideration of how fuel economy standards will affect employment in the automobile industry in the United States. Employment losses in the automobile industry nationwide can result from more stringent fuel economy standards for two reasons. First, the increases in retail prices for new vehicles that meet more stringent fuel economy standards reduces overall demand, leading to a reduction in new-vehicle production and a loss of jobs at engine, transmission and assembly plants, as well as factories that supply other components. Second, the job losses can be particularly large in production facilities that depend on the sale of larger, less fuel-efficient vehicles that either largely disappear from the market (such as value priced station wagons) or that can only be sold in small numbers at high prices (such as high-performance sports cars).



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

79. The history of the CAFE standards illustrates the importance of this factor in the federal program. For example, in the 1980s, the Federal Trade Commission filed comments with NHTSA estimating that if the passenger car standards for model years 1989 and 1990 were not reduced, total domestic employment in the automobile and related industries in the United States would decline by approximately 11,500 or 20,000 jobs, depending on various assumptions. NHTSA subsequently reduced the model year 1989 and 1990 passenger car standards. The Agency stated that it was not willing to accept "product restrictions [which] would result in sales losses well into the hundreds of thousands of units and job losses into the tens of thousands." (*See* 51 Fed. Reg. 35,594, 35,615 (Oct. 6, 1986).)

80. DEC's regulations do not balance the goals of increased fuel economy against the economic consequences of regulation in the same way as the federal regulations. DEC's rules will cause huge job losses in the already precarious U.S. automobile industry -- far more than the losses that lead to the necessary changes in the federal standards in the 1980s described above. The California regulators themselves acknowledged that overall new-vehicle sales would decline when the CO2 rules would be fully implemented. When asked to consider how the rules would affect automobile industry employment across the nation, however, California treated the issue as irrelevant -- according to the California officials, they did not need to consider how the rule would affect employment anywhere other than in California.

81. For its part, in Vermont's rulemaking, DEC simply rubber-stamped the California approach and never looked seriously at how the regulation will affect the employees of automobile dealers or other automobile industry employees. The end result is that DEC has adopted standards that NHTSA itself could not implement, consistent with NHTSA's longstanding construction and implementation of the "economic practicability" term in the



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

federal statute, owing to the severe impact of DEC's standards on employment in the U.S. automobile industry.

*B. Interference with NHTSA's Efforts to Balance Fuel Economy and Safety Goals*

82. DEC's standards present other serious conflicts with the administration of the federal fuel economy program. For many years, NHTSA and other safety organizations have recognized that increases in fuel economy standards can result in reductions in the weight of the motor vehicle fleet as a whole because reducing the weight of a given vehicle model can be used to reduce its fuel consumption. Reductions in vehicle weight can also reduce vehicle crashworthiness. For example, the National Academy of Sciences found in one report that the down-weighting and downsizing that occurred in the late 1970's and early 1980's, some of which the Academy attributed to the CAFE standards, probably resulted in an additional 1,300 to 2,600 traffic fatalities in one representative year (1993), and ten times more injuries.

83. The federal courts have also recognized that increasing fuel economy standards may lead to fleet downsizing, "which, without a concurrent upgrading of their occupant protection capability, would likely lead to an increase in the rate of highway deaths and serious injuries." (*See Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 120 n.11 (citing NHTSA, Final Rule: Passenger Automobile Average Fuel Economy Standards for Model Year 1989, 53 Fed. Reg. 39,275, 39,294 (Dec 30, 1988), *citing* Department of Transportation and EPA, "Potential for Motor Vehicle Fuel Economy Improvements: Report to Congress").)

84. The effect of fuel economy on safety has therefore always been an important factor to consider in setting fuel economy standards under EPCA. In part for that reason, NHTSA is now considering revisions in the basic structure of the federal CAFE standards that would take better account of the trade-offs between CAFE increases and safety -- separate from,



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

and as a logical precondition for, the consideration of any increases in the current CAFE standards.

85. As with the consideration of economic factors, DEC's rules do not respect the balance between fuel economy regulation and safety risks that has been struck by NHTSA. Unlike NHTSA, DEC decided to increase the fuel economy requirements for vehicles to be sold in Vermont without any detailed consideration of the trade-offs between fuel economy, vehicle weight, and safety. The DEC rules will likely require the industry to produce a fleet of smaller, lighter-weight vehicles for Vermont, once those rules are fully implemented, and assuming the industry adopts compliance strategies that emphasize the use of new vehicle designs to comply with the regulations and have the resources necessary to deploy those designs on the scale apparently intended by DEC and California.

86. Individual vehicles within fleets that meet DEC's new standards will also meet the safety standards set by the federal government. But, as a class, the vehicles that the industry will sell in Vermont will be lighter and therefore less crashworthy than other vehicles that would be subject to the federal fuel economy standards but not Vermont's CO2 standards, under the assumptions presented above. The result is that a portion of the Vermont motor vehicle fleet could expose the public to risks of injury and death that, but for the State's regulations, would not exist.

<u>The Need for Timely Judicial Action</u>

87. While not all automobile manufacturers and dealers are affected by DEC's rules in the same way, all manufacturers are already experiencing significant disruptions in their efforts to comply with the federal fuel economy rules in the most efficient possible manner.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

88. The federal fuel economy standards create pressure on the automobile industry to improve continually the fuel economy of specific vehicle models, while also allowing manufacturers to produce vehicles with attributes that most consumers value more than fuel economy, such as horsepower, size and convenience features. Manufacturers are now engaged in costly and ambitious programs to design and produce vehicles with improved fuel economy that consumers will want and at prices they can afford. Those programs include the use of new technologies that will provide customers with moderate but steady increases in fuel economy, but that can be produced at reasonable costs only at nationwide volumes, and only on a gradual basis.

89. The effort to introduce vehicles that provide moderate but steady increases in fuel economy nationwide is imperiled by the new CO2 regulation adopted by DEC. The technologies and vehicle changes that the industry currently has under development to improve federal CAFE performance will not permit full compliance with DEC's new regulation. The development process for new vehicles in model year 2009 is well underway. Manufacturers will not be able to offer their currently planned full line of vehicles once DEC's new regulations are fully implemented, and even though their vehicles would meet all applicable federal fuel economy standards.

90. Manufacturers thus face an immediate dilemma in their product plans: (1) continue with current plans and face serious sanctions for noncompliance in model year 2009 and thereafter; (2) redesign the vehicles already slated for production in model 2009 and beyond, adding technology or expensive alterations to the extent such changes are technologically feasible, which even when technologically feasible will in many instances make the vehicles unprofitable; (3) restrict or eliminate the sale of vehicles that threaten compliance, and thereby



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

forego the opportunity to recover the fixed investment and production costs for those vehicles that could only be recovered through several years of sales, as well as the profits that were anticipated from those vehicles; or (4) some combination of the above measures.

91. To the extent that a manufacturer chooses the second option listed above -- redesign of its vehicles in order to try to meet DEC's new rule -- it will have to reassign engineers and other development staff from other projects in order to work on the redesign effort. This will require the manufacturer to defer its efforts to introduce new products in markets outside Vermont and California that are needed in order to remain competitive outside Vermont and California. That manufacturer will lose sales in non-Vermont and non-California markets, and, along with its dealers, will lose profits and goodwill. Those effects will be felt well before the start of the 2009 model year, as a manufacturer's product line languishes without the updates needed to remain competitive, due to a lack of engineering and production resources.

92. Some manufacturers may try to reduce some of the increased engineering and development burdens created by DEC's new rule by forming joint ventures or other arrangements to share resources, to the extent permitted by law. Those manufacturers face a Hobson's choice, however: if they pool their resources and share technological know-how, they give up valuable intellectual property to their fierce competitors in the marketplace. If they do not engage in joint development work, they have to devote more resources of their own to the engineering effort, which has other immediate adverse consequences. (*See* ¶ 91.)

93. There is no time for delay in deciding how to comply with the new CO2 rules. The California regulatory agency that developed the regulations has stated that it expects manufacturers to start producing vehicles that use new designs and systems to comply with the CO2 standards beginning in 2009. (*See* California Air Resources Board, Final Statement of



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Reasons for Regulations to Control Greenhouse Gas Emissions from Motor Vehicles at 192 (2005).) The lead-time needed to design, test and then produce new vehicles capable of meeting the CO2 rules recently adopted by DEC takes many years. For example, National Academy of Sciences has found that "[t]echnology changes require very long lead times to be introduced into the manufacturers' product lines. Any policy that is implemented too aggressively (that is, in too short a period of time) has the potential to adversely affect manufacturers, their suppliers, their employees, and consumers.... The widespread penetration of even existing technologies [to improve fuel economy] will probably require 4 to 8 years." (*See* National Academy of Sciences, Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards 5 (2002).)

94. Plaintiffs have no adequate legal remedy for injuries they would suffer if the new DEC regulation goes into effect. Any capital investment or other expenses that manufacturers will incur in order to comply with the CO2 regulation cannot be later recovered from the State of Vermont or from defendants, under principles of sovereign and official immunity, if the State regulations are found to be invalid or unenforceable by this Court. As described above (¶¶ 62-64), dealers in Vermont have already been adversely affected by the forecasts of how the new regulations on their competitive positions and their businesses. Adjudication now of the legality of DEC's new regulation and defendants' action is the only way to prevent, or at least minimize, irreparable harm to vehicle manufacturers and dealers.

CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF

*Count I Express and Implied Preemption under the Federal Fuel Economy Laws*

95. Plaintiffs repeat and re-allege paragraphs 1 through 94 of this Complaint as though fully set forth herein.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

96. The CO2 regulation adopted by DEC is now or will soon be in effect, by operation of Vermont law, and defendants are now responsible for its implementation. That regulation is "related to fuel economy standards and average fuel economy standards," and is preempted under 49 U.S.C. § 32919(a). Federal law prohibits the adoption of regulations related to such standards, separate and apart from any attempt to enforce such regulations.

97. The regulation adopted by DEC applies not only to vehicles purchased by state agencies or for public use, but also to vehicles sold to the general public. DEC's regulation, which defendants are charged with implementing, intrudes upon a field of regulation occupied by the federal government, conflicts with federal law and regulation, and stands as an obstacle to achievement of the objectives of Congress when it established a national program for the regulation of motor vehicle fuel economy.

98. The regulation adopted by DEC, which defendants are charged with implementing, is inconsistent with NHTSA's determination of the "maximum feasible" corporate average fuel economy standards for cars and light-duty trucks, based upon NHTSA's assessment of technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy, 49 U.S.C. § 32902(f), and thereby frustrates the accomplishment of federal objectives. DEC's rule will have an acute, clear, direct and substantial adverse impact on the performance, price, and availability of vehicles that will be sold in Vermont. DEC's new rule will also have an acute, direct, clear and substantial adverse impact on some manufacturers' efforts to comply with the national fuel economy standards as efficiently as possible, and in a manner that maximizes consumer choices and minimizes adverse effects on employment.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

99 The United States Constitution makes federal law and regulations "the supreme Law of the Land." United States Constitution, article VI, cl. 2. Plaintiffs have legally protected interests under the Constitution, EPCA, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal fuel economy laws against defendants' implementation of CO2 rules adopted by DEC. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests if the CO2 regulation adopted by DEC is not declared unlawful and if defendant are not enjoined from implementing that regulation.

100. A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether the CO2 regulation adopted by DEC is preempted by the federal fuel economy laws. Plaintiffs contend that the regulation is preempted by the federal fuel economy laws and cannot be enforced. Defendants disagree and will enforce the CO2 rule to the detriment of plaintiffs. Moreover, the federal fuel economy laws prohibit the adoption of the regulation challenged here, separate and apart from its enforcement.

101. To redress the violations of federal law and the interference with plaintiffs' rights, and pursuant to 28 U.S.C. §§ 1331,1343, 2201 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that DEC's CO2 regulation is preempted and unenforceable.

102. Defendants are now implementing and will continue to implement the CO2 regulation in violation of federal law unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law under 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, and other provisions of law.

*Count II -- Preemption Under the Federal Clean Air Act -- Enforcement of Standards That Have Not Received Review by EPA*



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

103. Plaintiffs repeat and re-allege paragraphs 1 through 102 of this Complaint as though fully set forth herein. This Count of the Complaint avers that defendants are acting in violation of the Clean Air Act, and is presented as an alternative ground for relief in the event the Court does not grant the relief sought by plaintiffs under Count I of the Complaint.

104. The CO2 regulation adopted by DEC is a standard related to the control of emissions from new motor vehicles. The regulation is preempted by section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a).

105. EPA has determined that regulation of carbon dioxide and greenhouse gases to address global climate change is not authorized by section 202(a) of the Clean Air Act. (*See* Notice of Denial of Petition for Rulemaking, *Control Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg. 52,922 (Sept. 8, 2003).) That authoritative determination by EPA precludes any State from adopting any new motor vehicle emission standards for carbon dioxide or greenhouse gases. At a minimum, any State that disagrees with EPA's position must seek reconsideration of EPA's interpretation of section 202(a) before it may adopt new motor vehicle emission standards for carbon dioxide or greenhouse gases.

106. Plaintiffs' objections to enforcement of the CO2 regulations within the framework of the Clean Air Act have been presented to DEC, which has rejected those objections in reliance on the interpretations of the Clean Air Act developed by the State of California. Under those interpretations of the Clean Air Act, California and other States can enforce the CO2 regulations concurrent with any review of those standards by EPA, and without awaiting the completion of such a review by EPA.

107. Plaintiffs have legally protected interests under the Constitution, the Clean Air Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Clean Air Act against DEC's CO2 regulation. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by DEC's CO2 regulation, if the regulation actions are not declared unlawful and if defendants are not enjoined from implementing the regulation. The public interest will be served by such declaratory and injunctive relief.

108. A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether DEC's CO2 regulation is preempted by the federal Clean Air Act. Plaintiffs contend that the regulation is currently preempted and cannot be enforced, unless and until approved by EPA and unless otherwise consistent with federal law, including laws other than the Clean Air Act. Defendants are presently implementing DEC's regulation and will enforce it to the detriment of plaintiffs. In addition to its prohibition on enforcement of the regulation, the federal Clean Air Act prohibits the adoption of the regulation challenged here, separate and apart from its enforcement.

109. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that DEC's CO2 regulation is preempted by the Clean Air Act.

110. Defendants are now implementing and will continue to implement DEC's CO2 regulation in violation of the Clean Air Act and plaintiffs' rights under federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, and other provisions of law.

*Count III – Enforcement of Standards That Limit the Sale of California-Certified Vehicles*



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

111. Plaintiffs repeat and re-allege paragraphs 1 through 110 of this Complaint as though fully set forth herein. This Count of the Complaint avers that defendants are acting in violation of the Clean Air Act, and is presented as an alternative ground for relief in the event the Court does not grant the relief sought by plaintiffs under Count I of the Complaint.

112. The CO2 regulation adopted by DEC requires manufacturers to ensure that the mix of vehicles sold in Vermont meets specific average CO2 levels on a multi-year basis. This element of the Vermont regulation is on its face identical to the requirements of the California CO2 rule adopted in California in 2005.

113. Although nominally identical to the California regulation, as applied in Vermont DEC's CO2 rule will directly or indirectly force some manufacturers to restrict or limit the sale of some vehicles that would be legal for sale in California, and that could be sold in California in compliance with the CO2 rules in California. This will be necessary because for some manufacturers, the mix of various types of vehicles sold in Vermont differs substantially from the mix of vehicles sold in California. Manufacturers will be forced to limit the availability of some of their California product offerings in Vermont, to the detriment of Vermont dealers, consumers and themselves.

114. Enforcement of the fleet mix requirements in DEC's CO2 regulations is an undue burden on the automobile industry and its customers, in violation of the Clean Air Act. In addition, the enforcement of such a requirement is specifically forbidden by the 1990 Clean Air Act Amendments, which prohibits any State from limiting "directly or indirectly" the sale of any vehicle meeting California standards.

115. Plaintiffs have legally protected interests under the Constitution, the Clean Air Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Clean Air Act against DEC's CO2 regulation. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by DEC's CO2 regulation, if the regulation actions are not declared unlawful and if defendants are not enjoined from implementing the regulation. The public interest will be served by such declaratory and injunctive relief.

116. A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether DEC's CO2 regulation is preempted by the federal Clean Air Act. Plaintiffs contend that the sales mix requirement in DEC's regulation is preempted by the Clean Air Act. Defendants disagree and are presently implementing DEC's regulation and will enforce it to the detriment of plaintiffs. In addition to its prohibition on enforcement of the regulation, the federal Clean Air Act prohibits the adoption of the regulation challenged here, separate and apart from its enforcement.

117. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that DEC's CO2 regulation is preempted by the Clean Air Act.

118. Defendants are now implementing and will continue to implement DEC's CO2 regulation in violation of the Clean Air Act and plaintiffs' rights under federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, and other provisions of law.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

*Count IV -- Preemption Under The Foreign Policy Of The United States And The Foreign Affairs Powers Of The Federal Government*

119. Plaintiffs repeat and re-allege paragraphs 1 through 118 of this Complaint as though fully set forth herein.

120. The CO2 regulation adopted by DEC intrudes upon the foreign policy of the United States and the foreign affairs prerogatives of the President and Congress of the United States.

121. The President and Congress have committed the United States to the pursuit of multilateral agreements to reduce international greenhouse gas emissions, including the emissions of developing countries. The CO2 regulation adopted by DEC conflicts with that foreign policy and interferes with the ability of the United States to speak with one voice upon matters of global climate change. It further diminishes the bargaining power of the United States in negotiating multilateral reductions of greenhouse gases.

122. Articles I and II of the United States Constitution commit the creation and pursuit of foreign policy of the United States to the President and the Congress. Plaintiffs have legally protected interests under the Constitution and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal law against DEC's regulation. Plaintiffs will be injured with respect to their federally protected interests by the regulation unless it is declared unlawful and unless defendants are enjoined from implementing the regulation. The public interest will be served by such declaratory and injunctive relief.

123. A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether DEC's CO2 regulation intrudes upon the foreign policy of the United States and the foreign affairs powers of the President and the Congress. Plaintiffs



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

contend that the regulation intrudes upon the ability of the United States to speak with one voice on issues of global climate change and to negotiate multilateral commitments to reduce international greenhouse gases, including from developing countries. Defendants are presently implementing the regulation and will enforce it to the detriment of Plaintiffs and the foreign policy of the United States.

124. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, plaintiffs request a declaration that DEC's CO2 regulation violates the foreign policy of the United States and the foreign affairs power of the President and the Congress.

*Count V -- Dormant Commerce Clause*

125. Plaintiffs repeat and re-allege paragraphs 1 through 124 of this Complaint as though fully set forth herein.

126. The CO2 regulation adopted by DEC burdens the production and sale of new motor vehicles by increasing the purchase price to the customer by thousands of dollars. The local benefits of the regulation, if any, are insubstantial.

127. Because the burden on interstate commerce of DEC's CO2 regulation is excessive in relation to its local benefits, the regulation violates the Dormant Commerce Clause of the U.S. Constitution. Whether DEC's regulation violates the Dormant Commerce Clause is purely or predominantly a legal question that is fit for adjudication now, and the fitness of adjudication will not be assisted by future factual developments outside this litigation.

128. Plaintiffs have legally protected interests under the Constitution and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the federal law against DEC's CO2



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

regulation. Plaintiffs will be irreparably injured with respect to their federally protected interests by DEC's regulations, unless it is declared unlawful and defendants are enjoined from implementing it. The public interest will be served by such declaratory and injunctive relief.

129. A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether DEC's CO2 regulation violates the Dormant Commerce Clause of the U.S. Constitution. Plaintiffs contend that the regulation excessively burdens interstate commerce in relation to its local benefits. Defendants are presently implementing the regulation.

130. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, plaintiffs request a declaration that DEC's CO2 regulation violates the Dormant Commerce Clause.

*Count VI -- Sherman Act*

131. Plaintiffs repeat and re-allege paragraphs 1 through 130 of this Complaint as though fully set forth herein.

132. The CO2 regulation adopted by DEC requires that if one manufacturer owns a ten percent or greater share of another manufacturer, the two companies will be treated as a single manufacturer for compliance purposes.

133. Manufacturers attempt to control the mix of vehicles that are sold by raising and lowering prices to encourage and discourage sales of particular vehicle models or groups. A manufacturer attempting to comply with a fleet average fuel economy standard will have to ensure that the correct mix of vehicles is sold, and in order to ensure that another manufacturer in which the first manufacturer owns a 10 percent or greater share does not upset the overall mix of vehicles, price information will likely have to be exchanged and perhaps even fixed. The two



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

manufacturers will need to coordinate the sale of vehicles according to their fuel economy, promoting the most fuel-efficient vehicles or restricting the less fuel efficient vehicles, as necessary. Such coordination will likely require the exchange of supply and price information.

134. As a practical matter, DEC's CO2 regulation requires manufacturers that are otherwise competitors to exchange production, supply, and price information regarding new motor vehicles. Such coordination -- and in particular, any price fixing -- will have a substantial effect on interstate commerce and is prohibited by federal antitrust law, which prohibits "[e]very contract ... or conspiracy[ ] in restraint of trade or commerce among the several States." (*See* 15 U.S.C. § 1.) DEC's CO2 regulation requires illegal coordination among manufacturers that are not a single economic entity.

135. DEC's CO2 regulation conflicts with and is preempted by federal law. Plaintiffs have legally protected interests under the Constitution, the Sherman Act, and other federal laws (including 42 U.S.C. § 1983) in the full enforcement of the Sherman Act and the national policy of competition against the regulation. Plaintiffs will be actually and irreparably injured with respect to their federally protected interests by the regulation, unless the rule is declared unlawful and defendants are enjoined from implementing it. The dealer plaintiffs are injured as purchasers of the vehicles produced by manufacturers subject to the required restraint of trade. Plaintiff Alliance includes manufacturers subject to the required restraint of trade that will be potentially subject to antitrust liability unless the regulation is declared unlawful and its implementation and enforcement enjoined. The public interest will be served by such declaratory and injunctive relief.

136. A clear and judicially cognizable controversy exists between plaintiffs and defendants regarding whether DEC's CO2 regulation is preempted by the Sherman Act.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

Plaintiffs contend that the regulation requires unlawful restraints of trade and cannot be enforced. Defendants are presently implementing that regulation and will enforce it to the detriment of plaintiffs.

137. To redress the violations of federal law and the interference with plaintiffs' rights described herein, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201-2202 and other provisions of law, including 42 U.S.C. §§ 1983, 1988, plaintiffs request a declaration that DEC's CO2 regulation is preempted by the Sherman Act.

138. Defendants are now implementing and will continue to implement DEC's CO2 regulation in violation of the Sherman Act and plaintiffs' rights under the United States Constitution and other federal law, unless enjoined by this Court from doing so. Plaintiffs are therefore also entitled to injunctive relief restraining and redressing these violations of federal law and their rights under 42 U.S.C. §§ 1983, 1988, and the Supremacy Clause, and other provisions of law.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that DEC's CO2 regulations violate federal law in the manner alleged above.

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendants from implementing or enforcing DEC's CO2 regulations.

C. An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other provisions of federal law.



GRAVEL AND SHEA
ATTORNEYS AT LAW
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

D. Such other relief available under federal law that may be considered appropriate under the circumstances, including other fees and costs of this action to the extent allowed by federal law.

Dated: November 18, 2005.

Respectfully submitted,

Robert B. Hemley
Matthew B. Byrne (Clerk)*
Gravel and Shea
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
*For All Plaintiffs*

Of Counsel:

Stuart A. C. Drake
Andrew B. Clubok
Derek S. Bentsen
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000
*For Plaintiffs Alliance of Automobile Manufacturers, DaimlerChrysler Corporation, and General Motors Corporation*

*Mr. Byrne is admitted to practice in Illinois, and is fulfilling his three-month clerkship requirement prerequisite to seeking admission to the Vermont bar.



Gravel and Shea
Attorneys at Law
P. O. Box 369
Burlington, Vermont
05402-0369

AP3-00

# ADOPTING PAGE

Note This form must be filed three times during the rulemaking process, viz., with the Proposed Rule Cover Sheet, Final Proposal Cover Sheet, and Adopted Rule Cover Sheet.

Please complete the following:

1. Title of rule:
   Air Pollution Control Regulations, Subchapter XI, Low Emission Vehicles – Regulations to Control Greenhouse Gas Emissions from Motor Vehicles

2. Agency:
   Agency of Natural Resources

3. Agency's reference number, if any:
   N/A

4. This is a(n)

☒ Amendment- changes to an already existing rule.

☐ New rule- adopts a rule that did not previously exist.

☐ Repeal-repeals a rule that previously existed.

Except for new rules, please give the name of the existing rule and the date on which it was last amended or adopted: Air Pollution Control Regulations, Subchapter XI, Low Emission Vehicles; last amendment effective on April 21, 2004.

Note: To satisfy the requirement for an annotated text, an agency must submit the entire rule in annotated form with the filings of proposed rules and final proposals. Filing a paragraph or page of a larger rule is not sufficient. Similarly, if the rules of the agency have been published as part of the Code of Vermont Rules, the agency shall file the annotated text, if possible, using the appropriate page or pages of the Code of Vermont Rules as a basis for the annotated version. New rules need not be accompanied by an annotated text.

Subchapter XI. Low Emission Vehicle Program.

5-1101 DEFINITIONS

The terms defined in this section shall apply to this subchapter only, and for purposes of this subchapter shall supersede definitions contained in any other regulation or in statutes. The definitions contained in *Air Pollution Control Regulations* § 5-101 shall govern in the absence of a superseding definition in this section.

(a) "*California-certified*" means approved by CARB for sale in California.

(b) " *CARB*" means the California Air Resources Board.

(c) " *Dealer*" means any person engaged in the business of selling, offering to sell, soliciting or advertising the sale of new vehicles who holds a valid sales and service agreement, franchise or contract, granted by the *manufacturer or distributor* for the retail sale of said *manufacturer's or distributor's new vehicles*.

(d) " *Emergency Vehicle*" means any authorized *vehicle* publicly owned and operated that is used by a peace officer, used for fighting fires or responding to emergency fire calls, used by emergency medical technicians or paramedics, used for towing or servicing other vehicles, or used for repairing damaged lighting or electrical equipment.

(e) " *Emission Control Labels*" means a paper, plastic, metal or other permanent material, welded, riveted or otherwise permanently attached to an area within the engine compartment (if any), or to the engine, in such a way that it will be visible to the average person after installation of the engine in allnew *vehicles* certified for sale in California, in accordance with Title 13, California Code of Regulations Section 1965.

(f) " *Fleet Average Emission*" means a *vehicle manufacturer's* average vehicle emissions of all greenhouse and non-methane organic gases from all *new vehicles* delivered for sale or lease in Vermont in any model-year.

(g) "Greenhouse gas" means the following gases: carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons.

(h) "GHG Credit" means *greenhouse gas* credit.

(i) "*Light-duty Truck*" means any 2000 and subsequent model *vehicle* certified to standards in Title 13, California Code of Regulations Section 1961(a)(1) rated at 8500 pounds gross*vehicle* weight or less, and any other *vehicle* rated at 6000 pounds gross vehicle weight or less, which is designed primarily for purposes of transportation of property or is a derivative of such a vehicle, or is available with special features enabling off-street or off-highway operation and use.

~~(h)~~ (j) "*Manufacturer*" means any small, intermediate or large volume vehicle manufacturer as defined in Title 13, California Code of Regulations Section 1900.

(k) "Medium-duty passenger vehicle" means any medium-duty vehicle with a gross vehicle weight rating of less than 10,000 pounds that is designed primarily for the transportation of persons. The medium duty passenger vehicle definition does not include any vehicle which: (1) is an "incomplete truck," i.e., a truck that does not have the primary load carrying device or container attached; or (2) has a seating capacity of more than 12 persons; or (3) is designed for more than 9 persons in seating rearward of the driver's seat; or (4) is equipped with an open cargo area of 72.0 inches in interior length or more. A covered box not readily accessible from the passenger compartment will be considered an open cargo area, for purposes of this definition.

(l) "*Medium-duty Vehicle*" means any 2003 through 2006 *model-year* heavy-duty low-emission, ultra-low-emission, super-ultra-low-emission or zero-emission vehicle certified to the standards in Title 13, California Code of Regulations Sections 1956.8 (g) or (h) or 1960.1(h)(2), having a *manufacturer's* gross vehicle weight rating of 14,000 pounds or less; any 2000 through 2003 *model-year* heavy duty *vehicle* certified to the standards in Title 13, California Code of Regulations Section 1960.1(h)(1) having a manufacturer gross vehicle weight rating of 14,000 lbs. or less; and any 2000 and subsequent model heavy-duty low-emission, ultra-low-emission, super ultra-low-emission or zero-emission vehicle certified to the standards in Title 13, California Code of Regulations Sections 1956.8 (g) or (h), 1961(a)(1) or 1962 having a manufacturer's gross vehicle weight rating between 8,501 and 14,000 pounds.

~~(i)~~ (m) "Model-year" means, for each vehicle manufacturer the period which begins January 1 of the calendar year in which the model is first offered for sale and ends December 31 of the final calendar year of sale or, if the manufacturer has no annual production period, the calendar year. In case of any vehicle manufactured in two or more stages, the time of manufacture shall be the date of completion of the chassis.

~~(j)~~ (n) "New Vehicle" means any vehicle with 7,500 miles or fewer on its odometer.

~~(k)~~ (o) "NMOG Credit" means non-methane organic gas credit.

~~(m)~~ (p) "Passenger Car" means any vehicle designed primarily for transportation of persons and having a design capacity of twelve persons or less.

~~(n)~~ (q) "PZEV Credit" means partial zero emission vehicle credit.

~~(o)~~(r) "Recall" means:

(1) the issuing of notices directly to consumers that vehicles in their possession or control should be corrected, and/or

(2) efforts to actively locate and correct vehicles in the possession or control of consumers.

~~(p)~~(s) "Smog Index Label" means a decal securely affixed by the manufacturer to a window of all passenger cars and light-duty trucks which discloses the smog index for the vehicle in accordance with Title 13, California Code of Regulations Section 1965.

~~(q)~~(t) "VECs" means vehicle equivalent credits.

~~(r)~~(u) "vehicle" means a motor vehicle.

~~(s)~~(v) "ZEV Credit" means zero emission vehicle credit.

5-1102 INCORPORATION BY REFERENCE

(a) This subchapter incorporates by reference certain sections of Title 13, California Code of Regulations. Appendix F lists the sections Title 13, California Code of Regulations incorporated by reference and the respective amended date for each section. The sections of Title 13, California Code of Regulations incorporated by reference in this subchapter are the version of the section as of the amended date in Appendix F.

(b) For purposes of applying the incorporated sections of the California Code of Regulations, unless clearly inappropriate, "California" shall mean "Vermont". For example, "delivered for sale in California" and "placed in service" are interpreted, except for determinations of whether a manufacturer is a large, medium, small or independent low volume manufacturer, as referring to vehicles in "Vermont".

5-1103 NEW VEHICLE EMISSION REQUIREMENTS

(a) No person, including a *manufacturer* or *dealer*, shall deliver for sale or lease, offer for sale or lease, sell or lease, import, acquire, receive, purchase, or rent a new vehicle that is a 2000 or subsequent *model-year passenger car* or *light-duty truck* or a 2004 or subsequent *model-year medium-duty vehicle* in Vermont unless the vehicle is *California-certified* and complies with the following criteria:

(1) the exhaust emissions standards in Title 13, California Code of Regulations Sections 1956.8(g) or (h), 1960.1, 1961(a) or 1962(a), and

(2) the *emission control label* and for 2002 or subsequent *model-years*, the *smog index label* requirements, in accordance with Title 13, California Code of Regulations Section 1965, and

(3) the evaporative emissions standards in Title 13, California Code of Regulations Sections 1976, and

(4) the refueling emissions standards in Title 13, California Code of Regulations Section 1978, and

(5) the malfunction and diagnostic system requirements in Title 13, California Code of Regulations Section 1968.1, and

(6) the assembly-line testing procedure requirements in Title 13, California Code of Regulations Section 2062, and

(7) the specifications for fill pipes and openings of motor *vehicle* fuel tanks in Title 13, California Code of Regulations Section 2235.

(b) No person, including a manufacturer or dealer, shall deliver for sale or lease, offer for sale or lease, sell or lease, import, acquire, receive, purchase, or rent a new 2009 or subsequent *model-year passenger car, light-duty truck,* or a *medium-duty passenger vehicle* in Vermont unless the *vehicle* is *California-certified* and complies with the California greenhouse gas exhaust emission standards and meets all other applicable requirements of California Code, Title 13, Section 1961.1 and this Subchapter.

~~(b)~~ (c) Subsection 5-1103(a) shall not apply to a *new vehicle*:

(1) defined as an *emergency vehicle*;

(2) with a right hand drive configuration that is not available in a *California-certified* model, purchased by a rural route postal carrier and used primarily for work;

(3) designed exclusively for off-highway use; or

(4) certified to standards promulgated pursuant to the authority contained in 42 U.S.C. Section 7521 and which is in the possession of a vehicle rental agency in Vermont and is next rented with a final destination outside of Vermont.

~~(c)~~ (d) Subsection 5-1103(a) shall not apply to new vehicles in the following transactions:

(1) a transfer by court decree;

(2) a transfer by inheritance;

(3) a purchase by a nonresident prior to establishing residency in Vermont; or

(4) a sale for the purpose of being wrecked or dismantled.

5-1104 WARRANTY

(a) For all 2000 and subsequent model-year California-certified vehicles delivered for sale or lease in Vermont, each

manufacturer shall provide a warranty for the ultimate purchaser and each subsequent purchaser that complies with the requirements of Title 13, California Code of Regulations Sections 2035 through 2038, 2040 and 2046.

(b) For 2002 and subsequent model-years, each manufacturer shall include the emission control system warranty statement required by Title 13, California Code of Regulations Sections 2039, modified by some means (e.g. printed within the text or a sticker) to clearly inform Vermont owners of California-certified vehicles that the California Warranty applies to the vehicle. This statement shall provide a telephone number appropriate for Vermont.

5-1105 RECALL

(a) For all 2000 and subsequent model-year California-certified vehicles registered in Vermont, each manufacturer shall undertake an action equivalent to that which is required by any order or enforcement action taken by CARB, or any voluntary or influenced emission related recall initiated by any manufacturer pursuant to Title 13, California Code of Regulations Sections 2101 through 2129, 2122 through 2133, and 2135 through 2149, unless within 30 days of CARB approval of said recall, the manufacturer demonstrates to the Agency that such recall is not applicable to vehicles registered in Vermont. Each manufacturer must send to owners of Vermont registered California-certified vehicles the same notice that is used for California owners required by Title 13, California Code of Regulations Sections 2118 or 2127, except that it should contain a telephone number appropriate for Vermont.

5-1106 MANUFACTURER FLEET REQUIREMENTS.

(a) Each manufacturer shall meet the following fleet requirements for the new vehicles delivered for sale or lease in Vermont.

(1) Effective for 2004 and subsequent model-years, each manufacturer shall comply with the fleet average emission requirements and, for 2000 and subsequent model-years, may earn and bank NMOG credits, both in accordance with Title 13, California Code of Regulations Section 1961, except NMOG credits earned prior to model-year 2004 shall be treated as though they were earned in model-year 2004.

(2) Each manufacturer shall comply with the medium-duty vehicle phase-in requirements and, for 2004 and subsequent model-years, may earn and bank VECs, both in accordance with Title 13, California Code of Regulations Section 1961, except VECs earned prior to model-year 2007 shall be treated as though they were earned in model-year 2007. Starting with MY 2007, all medium-duty vehicles must be LEV II certified ~~and manufacturers must meet the Fleet Average Emissions for NMOG~~ in accordance with Title 13, California Code of Regulations Section 1961.

(3) Effective for 2004 and subsequent model years, each manufacturer shall comply with the LEV II phase-in requirements, in accordance Title 13, California Code of Regulations Section 1961.

(4) Effective for 2007 and subsequent model year vehicles, each manufacturer shall comply with the Zero Emission Vehicle sales requirement and, for 2000 and subsequent model year vehicles, may earn and bank ZEV and PZEV credit, both in accordance Title 13, California Code of Regulations Section 1962.

(5) Effective for the 2009 and subsequent *model year passenger cars, light-duty trucks*, and *medium-duty passenger vehicles*, each *manufacturer* shall comply with the *fleet average emission greenhouse gas* requirements, and for 2000 and subsequent *model-years* may earn and bank *GHG credits*, both in accordance with Title 13, California Code of Regulations Section 1961.1.

~~(5)~~ (6) If the ZEV and PZEV credit provisions in Title 13, California Code of Regulations Section 1962 or the GHG provisions in Title 13, California Code of Regulations Section 1961.1 are changed, application of the revised credit provisions will be taken into account in any enforcement decisions regarding compliance with the sales requirement imposed by paragraph (4).

5-1107 MANUFACTURER REPORTING REQUIREMENTS

(a) Delivery Reporting.

(1) Commencing with the 1999 model-year for passenger cars and light-duty trucks and the 2000 model-year for medium-duty vehicles, each manufacturer shall submit annually, to the Agency, by March 1 following the end of each model-year, a report, itemized by test group and emissions standard, documenting total new vehicles delivered for sale or lease in Vermont.

(b) Fleet Reporting.

(1) Each manufacturer shall submit annually to the Agency, by March 1 following the end of each model-year, a report, itemized by test group and emissions standard, that demonstrates that the manufacturer has met the fleet requirements of subsection 5-1106(a) in Vermont.

(2) For 2000 and subsequent model-year passenger cars and light-duty trucks and for 2004 and subsequent model year medium-duty vehicles, each manufacturer shall submit by March 1 of the model-year, a report, itemized by test group, emissions standard, and California Executive Order, projecting the manufacturer's compliance with the model-year fleet requirements of subsection 5-1106(a) in Vermont. Manufacturers shall supply copies of CARB certification of

test groups and Executive Orders in advance of projected sales.

(3) If a manufacturer wants to bank VECs orGHG, NMOG, ZEV or PZEV credits, the manufacturer shall submit annually, by March 1 following the end of the model-year, a report which demonstrates that such manufacturer has earned VECs orGHG, NMOG, ZEV or PZEV credits in Vermont. Credits are to be calculated to three (3) decimal places.

(c) Recall Reporting.

(1) For information and not for approval by Vermont, for 2000 and subsequent model-year vehicles, each manufacturer shall submit, within 30 days of CARB approval, a copy of any CARB approved voluntary, influenced or ordered recall plan specified by Title 13, California Code of Regulations Sections 2114 and 2125, supplemented with the number of affected vehicles registered in Vermont.

(2) For information and not for approval by Vermont, each manufacturer shall submit recall campaign progress reports for vehicles registered in Vermont, within the timelines of, and containing the information required by, Title 13, California Code of Regulations Sections 2119 and 2133. Reports need not be submitted to the Agency if the equivalent reports have been waived by CARB.

(e) Documentation.
A manufacturer, a dealer or a transporter of new vehicles shall, upon request, provide to the Agency of Natural Resources or the Agency of Transportation any documentation which either Agency determines to be necessary for the effective administration and enforcement of this subchapter.

(f) Reports and other information required by this subsection must be sent to: Director, Air Pollution Control Division, Vermont Agency of Natural Resources, Department of Environmental Conservation, Building 3 South, 103 South Main Street, Waterbury, Vermont, 05671-0402.

5-1108 INSPECTIONS

(a) The Secretary of the Agency of Natural Resources or the Secretary of the Agency of Transportation or their designees may conduct inspections of any new and used vehicles and any related documentation for the purpose of determining compliance with the requirements of this subchapter.

(1) Inspections may be conducted on any conveyance used to transport new vehicles or on any premises owned or controlled by any dealer or manufacturer.

(2) Inspections may extend to all emission-related parts and may require the on-premises operation and testing of an engine or vehicle.

(3) Inspections may include functional tests and other tests as necessary to verify compliance with this subchapter.

(c) Upon request, during an inspection, such dealer or manufacturer must make available to either Agency any related records, including records documenting vehicle origin, certification, delivery, or sales and records of emission related part repairs performed under warranty.

5-1101 SEVERABILITY

Each provision of this Subchapter is severable, and in the event that any provision of this Subchapter is held to be invalid, the remainder of the Subchapter shall continue in full force and effect.

Appendix F

| Title 13 CCR | Title | Section Amended Date |
|---|---|---|
| Chapter 1 | Motor Vehicle Pollution Control Devices. | |
| Article 1 | General Provisions. | |
| 1900 | Definitions. | ~~12/19/03~~ |
| Article 2 | Approval of Motor Vehicle Pollution Control Devices (New Vehicles). | |
| 1956.8(g) and (h) | Exhaust Emissions Standards and Test Procedures – 1985 and Subsequent Model Heavy-Duty Engines and Vehicles. | 11/17/03 |
| 1960.1 | Exhaust Emissions Standards and Test Procedures -- 1981 and through 2006 Model Passenger Cars, Light-Duty and Medium-Duty Vehicles. | 10/16/02 |
| 1961 | Exhaust Emission Standards and Test Procedures – 2004 and Subsequent Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles | Insert eventual date |
| 1961.1 | Greenhouse Gas Exhaust Emission Standards and Test Procedures – 2009 and Subsequent Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles. | Insert eventual date |
| 1962 | Zero-Emission Vehicle Standards for 2005 and Subsequent Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles. | 12/19/03 [Adoption date] |
| 1965 | Emission Control and Smog Index Labels – 1979 and Subsequent Model-Year Motor Vehicles. | 01/23/01 |
| 1968.1 | Malfunction and Diagnostic System Requirements – 1994 and Subsequent Model-Year Passenger Cars, Light-Duty Trucks and Medium-Duty Vehicles and Engines. | 11/27/99 |
| 1976 | Standards and Test Procedures for Motor Vehicle Fuel Evaporative Emissions. | 11/27/99 |
| 1978 | Standards and Test Procedures for Vehicle Refueling Emissions. | 11/27/99 |
| Article 6 | Emission Control System Warranty. | |
| 2035 | Purpose, Applicability, and Definitions. | 12/26/90 |
| 2036 | Defects Warranty Requirements for 1979 Through 1989 Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles; 1979 and Subsequent Model Motorcycles and Heavy-Duty Vehicles; and Motor Vehicle Engines Used in Such Vehicles. | 5/15/99 |
| 2037 | Defects Warranty Requirements for 1990 and Subsequent Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles, and Motor Vehicle Engines Used in Such Vehicles. | 11/27/99 |

| | | |
|---|---|---|
| 2038 | Performance Warranty Requirements for 1990 and Subsequent Model Passenger Cars, Light-Duty Trucks, Medium-Duty Vehicles and Motor Vehicle Engines Used in Such Vehicles. | 11/27/99 |
| Title 13 CCR | Title | Section Amended Date |
| 2039 | Emissions Control System Warranty Statement. | 12/26/90 |
| 2040 | Vehicle Owner Obligations. | 12/26/90 |
| 2046 | Defective Catalyst. | 1/16/79 * |
| Chapter 2 | Enforcement of Vehicle Emission Standards and Surveillance Testing. | |
| Article 1 | Assembly-Line Testing. | |
| 2062 | Assembly-Line Test Procedures - 1998 and Subsequent Model-years. | 11/27/99 |
| Article 2 | Enforcement of New and In-Use Vehicle Standards. | |
| 2101 | Compliance Testing and Inspection — New Vehicle Selection, Evaluation and Enforcement Action. | 11/27/99 |
| 2109 | *New Vehicle Recall* Provisions. | 11/30/83 * |
| 2110 | Remedial Action for Assembly-Line Quality Audit Testing of Less Than a Full Calendar Quarter of Production Prior to the 2001 *Model-year*. | 11/27/99 |
| Article 2.1 | Procedures for In-Use Vehicle Voluntary and Influenced Recalls. | |
| 2111 | Applicability. | 8/21/02 |
| 2112 | Definitions. | 8/21/02 |
| | Appendix A to Article 2.1. | 8/21/02 |
| 2113 | Initiation and Approval of Voluntary and Influenced Emission-Related Recalls. | 1/26/95 |
| 2114 | Voluntary and Influenced Recall Plans. | 11/27/99 |
| 2115 | Eligibility for Repair. | 1/26/95 |
| 2116 | Repair Label. | 1/26/95 |
| 2117 | Proof of Correction Certificate. | 1/26/95 |
| 2118 | Notification. | 1/26/95 |
| 2119 | Recordkeeping and Reporting Requirements. | 11/27/99 |
| 2120 | Other Requirements Not Waived. | 1/26/95 |
| Article 2.2 | Procedures for In-Use Vehicle Ordered Recalls. | |
| 2122 | General Provisions. | 1/26/95 |
| 2123 | Initiation and Notification of Ordered Emission-Related Recalls. | 1/26/95 |
| 2124 | Availability of Public Hearing. | 1/26/95 |
| 2125 | Ordered Recall Plan. | 1/26/95 |
| 2126 | Approval and Implementation of Recall Plan. | 1/26/95 |
| 2127 | Notification of Owners. | 1/26/95 |
| 2128 | Repair Label. | 1/26/95 |
| 2129 | Proof of Correction Certificate. | 1/26/95 |

| Title 13 CCR | Title | Section Amended Date |
| --- | --- | --- |
| 2130 | Capture Rates and Alternative Measures. | 11/27/99 |
| 2131 | Preliminary Tests. | 1/26/95 |
| 2132 | Communication with Repair Personnel. | 1/26/95 |
| 2133 | Recordkeeping and Reporting Requirements. | 1/26/95 * |
| 2135 | Extension of Time. | 1/26/95 |
| Article 2.3. | In-Use Vehicle Enforcement Test Procedures. | |
| 2136 | General Provisions. | 1/26/95 |
| 2137 | Vehicle Selection. | 12/28/00 |
| 2138 | Restorative Maintenance. | 11/27/99 |
| 2139 | Testing. | 6/21/02 |
| 2140 | Notification and Use of Test Results. | 6/21/02 |
| Article 2.4 | Procedures for Reporting Failure of Emission Related Components. | |
| 2141 | General Provisions. | 12/28/00 |
| 2142 | Alternative Procedures. | 2/23/90 |
| 2143 | Failure Levels Triggering Recall. | 11/27/99 |
| 2144 | Emission Warranty Information Report. | 11/27/99 |
| 2145 | Field Information Report. | 11/27/99 |
| 2146 | Emissions Information Report. | 11/27/99 |
| 2147 | Demonstration of Compliance with Emission Standards. | 6/21/02 |
| 2148 | Evaluation of Need for Recall. | 11/27/99 |
| 2149 | Notification of Subsequent Action. | 2/23/90 |
| Chapter 4.4 | Specifications for Fill Pipes and Openings of Motor Vehicle Fuel Tanks | |
| 2235 | Requirements. | 9/17/91 |

* file date, effective 30 days later