COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

GREEN MOUNTAIN CHRYSLER- *
PLYMOUTH-DODGE, et al. *
*
THE ASSOCIATION OF *
INTERNATIONAL AUTOMOBILE *
MANUFACTURERS *
v *
*
THOMAS W. TORTI, Secretary *
of Vermont Agency of *
Natural Resources, et al. * Civil File No. 05-302 & 304

RULE 16 CONFERENCE
Tuesday, February 14, 2006
Burlington, Vermont

BEFORE:

THE HONORABLE WILLIAM K. SESSIONS III
Chief District Judge

APPEARANCES:

ROBERT B. HEMLEY, ESQ. and MATTHEW B. BYRNE, ESQ., Gravel and Shea, 76 St. Paul Street, Burlington, Vermont; Attorneys for Plaintiffs (CV 05-302)

STUART A. DRAKE, ESQ., Kirkland & Ellis, LLP, 655 Fifteenth Street, N.W., Washington, D.C.; Attorney for Plaintiffs (CV 05-302)

Continued.....

ANNE E. NICHOLS
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont 05402
(802) 860-2227

APPEARANCES CONTINUED:

R. JEFFREY BEHM, ESQ., Sheehey, Furlong & Behm, P.C., 30 Main Street, Burlington, Vermont; Attorney for Plaintiff (CV 05 304)

CHARLES H. HAAKE, ESQ., Gibson, Dunn & Crutcher, LLP, 1050 Connecticut Avenue, N.W., Washington, D.C.; Attorney for Plaintiff (CV 05-304)

KEVIN O. LESKE, ESQ. and ERICK E. TITRUD, ESQ., Vermont Attorney General's Office, Pavilion Office Building, 109 State Street, Montpelier, Vermont; Attorneys for Defendants

*** ** ***

ANNE E. NICHOLS
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont 05402
(802) 860-2227

TUESDAY, FEBRUARY 14, 2006

(The following was held in open court at 10:05 a.m.)

COURTROOM DEPUTY: This is civil case 05-302 and 05-304, Green Mountain Chrysler-Plymouth-Dodge, et al. versus Thomas Torti. Present for the plaintiffs are Robert Hemley, Matthew Byrne, Stuart Drake, Charles Haake and Jeff Behm. Present for the defendants is Erick Titrud and Kevin Leske. The matter before the Court is a Rule 16 conference.

THE COURT: All right. There was a request filed by the plaintiffs for a Rule 16 conference, and of course there's been a most recent motion for stay filed by the State. And, I felt it was important to proceed at this particular point to a scheduling conference, but before we do that, I have read the pleadings, and I am interested to find out what the status of the discovery is, as well as the appeal, in California, in regard to the similar case. Can you tell me that?

Does anyone -- Mr. Hemley, or --

MR. HEMLEY: I may not be the best person to give you up-to-the-minute information on that. I believe that the discovery has been exchanged, and is the paper discovery has been exchanged. There's still ongoing anticipated deposition discovery.

As far as the appeal is concerned, I am going to

have to defer on that, or get the information --

MR. DRAKE: Good morning, your Honor.

THE COURT: Good morning.

MR. DRAKE: Good morning, your Honor. Stuart Drake.

THE COURT: Welcome.

MR. DRAKE: Thank you, your Honor. Glad to be here.

The appeal --

THE COURT: You enjoy the flight up from Washington?

MR. DRAKE: Yes, sir, indeed.

THE COURT: I take it twice a month.

MR. DRAKE: It's not bad.

THE COURT: It's not bad.

MR. DRAKE: You were north of the snow this time.

THE COURT: Right.

MR. DRAKE: The permission for appeal of Judge Coyle's venue decision was denied by the Ninth Circuit in an admitted order, I want to say, the end of last month, your Honor, so we are present for sure on that case.

THE COURT: Okay. Second, I read the magistrate judge's pretrial order there setting January

16, 2007 as the trial date in Fresno, and I also noticed that he had said that it was a certain date, although you did not consent to trial by the magistrate judge. Is that -- is that certain? Is the trial date January 16, 2007 certain?

MR. DRAKE: Your Honor, I believe it is. That's certainly Magistrate Judge O'Neill's view. He was quite clear at the Rule 16 conference in Fresno that he would enforce that trial date. What is uncertain is, your Honor, we have noticed is, Senior Judge Coyle would probably not be trying the case in Fresno. We are not sure who the assignment will be for the trial, your Honor. It may go to the Magistrate Judge O Neill. It may go to a new judge.

THE COURT: Well, I noticed that, and the magistrate judge said the case would be transferred to a district court judge with the understanding, or subject to the understanding that the trial date would remain firm. Is that your understanding as well?

MR. DRAKE: That is my understanding as well, yes.

THE COURT: So discovery is proceeding, the venue motion has been resolved by the Ninth Circuit, and so the case continues on.

MR. DRAKE: That is correct, your Honor. We

are -- if I may, your Honor. We are attempting to negotiate a protective order in the case in Fresno. That would permit the exchange of confidential information to the defendants. And that's delaying the case somewhat. There may be some slippage in the intermediate dates but the trial date, in our view, needs to remain firm in California.

THE COURT: Since you are standing now, let me ask you as well, other states have adopted the California regulations. Are there other lawsuits filed in other states aside from Vermont, and California?

MR. DRAKE: Yes, your Honor. There are other cases and -- your Honor will have noticed from the government's papers, there's a list of the other cases that are pending.

THE COURT: Oh, I didn't see actually the list. I know that the other states had adopted them, but I didn't, I didn't notice that.

MR. LESKE: Kevin Leske.

THE COURT: Yes.

MR. LESKE: We filed, the State filed a notice of related cases at the same time that we filed our motion for enlargement of time.

THE COURT: Well, I didn't see that, but there are -- so there are other cases in each of the other

jurisdictions?

MR. LESKE: Not quite. The -- currently there is state litigation in the states of Maine, Oregon, and New York, I believe. The additional states that have adopted the rule also include New Jersey, Connecticut, Massachusetts, and those other ones where there is ongoing litigation.

THE COURT: Well, how about in federal court?

MR. LESKE: To our knowledge, besides the California case, Vermont is the only other state that has faced federal litigation.

THE COURT: Okay.

MR. DRAKE: If I may, your Honor?

THE COURT: Yes.

MR. DRAKE: In the district of Rhode Island, actions were filed, I believe yesterday afternoon, the blizzard notwithstanding, by a group of new vehicle dealers in Rhode Island, and various OEMs for manufacturers.

THE COURT: Same party --- I mean, aside from the individual dealerships, the same parties? DaimlerChrysler, GM and the associations?

MR. DRAKE: I believe that's correct, your Honor.

THE COURT: All right. And that's in federal

court?

MR. DRAKE: Yes, your Honor. I believe it's currently assigned to judge -- Chief Judge Torres in Providence.

THE COURT: Okay. All right. That's -- that's what I needed to know. So that discovery continues on in the California case for certain, assuming that you get the protective order resolved.

MR. DRAKE: Exactly, your Honor.

THE COURT: And in regard to the negotiations over the protective order, I assume that even though the parties may be different, at least in part, in the Vermont action as opposed to the California action, the discovery in California would be shared with Vermont authorities, the Vermont parties; would that be fair to say?

MR. HEMLEY: Correct.

MR. LESKE: Your Honor, we haven't -- the State hasn't engaged in any discussions with either California or these plaintiffs about the discovery in California. I believe they were discussing the, strictly the California litigation that they were -- protective order going between those parties.

THE COURT: No, right. I'm sure that's true, but I would assume that in their negotiations, they

would be talking about exceptions to the protective order, and hopefully those exceptions would apply to the parties in this case.

MR. HEMLEY: It would be our intention to share all of the discovery with the litigants in this case.

THE COURT: Okay.

MR. HEMLEY: Assuming that there are similar kinds of protections provided.

THE COURT: All right.

Now, the State has filed a motion for stay.

MR. HEMLEY: Right.

THE COURT: You want some time to respond to that or do you want to respond to it orally at this point?

MR. HEMLEY: I can do two things, Judge. I'd like to -- to answer your question directly, our answer, according to the rules, by our calculation is due by the 24th of February. We will certainly file a response before that date.

In addition to the legal arguments that we will be making, which I can preview but I don't want to presume to be able to cite chapter and verse on all of the authority that's going to be provided to the Court, we are going to be providing declarations from economists,

in particular, Richard Bower, who are all familiar with -- who is a professor at the Tuck School, to establish the harm that is being visited on Vermont dealers presently because of the pendency of these regulations, and the harm that will be visited in the future on Vermont dealers, as well as other aspects of the Vermont economy, as a means of demonstrating to the Court that there is substantial harm to be done to the plaintiffs if this case is stayed and to demonstrate to the Court that that harm, in with other factors, outweighs any other factor that might militate in favor of a stay.

Our clients regard this court as the best court to make a decision on the effectiveness, the constitutionality of these regulations. As the Court knows, this is a very important regulation, and it will impact not, not only the state of Vermont, but it will impact the regulation of greenhouse gases throughout the United States, and we are very anxious, it's critical to the clients, and to the economies of the various states, but in this case particularly to the state of Vermont, to get a decision quickly because if there is a delay because of waiting for other jurisdictions, or because of any other factors, the cost runs into the hundreds of millions if not more dollars, and will impact severely

across the entire economy of this state and other states.

We think that this court, because of its location, its situation, its relatively smaller docket in comparison to some of the other jurisdictions where federal -- there are only two other jurisdictions where federal cases have been filed, is best situated to assist all of the parties, not obviously just the plaintiff, but the defendants as well, in getting this case to resolution.

We -- you have correctly identified January of '07 as the trial date in California. What hasn't yet been articulated, and you may already be aware of this, is that the delay for resolution of cases appealed to the Ninth Circuit is expected to be two years, which means that if the case were to be resolved by the district court in the Eastern District of California in January of '07, and that just means tried to the court, resolution would be in the spring sometime, it would likely be the spring of '09 before there were any final resolution.

By that time, the implementation of these regulations will already have been accomplished because they affect the model year 2009, and they really will begin to take effect in 2008 as those models begin to

roll off.

THE COURT: Unless you get a stay. Unless you are successful at the trial court level, and you get an injunction.

MR. HEMLEY: Yes, correct.

THE COURT: That's essentially --

MR. HEMLEY: Yes. That would obviously be a different situation.

THE COURT: Right.

MR. HEMLEY: But in this court, what we have done is we have proposed -- we initially proposed back in December of '05 a discovery schedule that would have called for trial in this court by October of '06, within the regular -- regular scheduled trial process as called for by our local rules, federal rules.

We have, because of the delays that have been encountered, now prepared for submission and discussion today a proposal that would call for trial by November of '06.

Now, that seems ambitious. However, because much of the discovery has already been underway in California, we can piggyback on that and we can take advantage of that. That would leave essentially just the depositions of experts. This is essentially going to be a battle between experts in a number of discrete

areas to determine whether or not the economic and the environmental impact of these regulations is such that the federal -- in our view, the federal law preempts the state regulation or not.

I mean, those -- that's the way I think we are going to frame the issue. There are some express preemption, legal discussions to have as well, but there are factually driven arguments that will require some discovery.

We should be --

THE COURT: Well, let me go back just one bit. January 16th, you assume it's a fairly firm date. Is there any particular reason why you feel that this case should be heard before the California case? Certainly the California case will proceed whether or not this case goes to trial in November.

MR. HEMLEY: Well, it's our intention to try the case once, and we think this is the jurisdiction which is best suited to hear the evidence efficiently, quickly, and make a decision.

THE COURT: Well, then how would you get the California court to choose not to hold a trial?

MR. HEMLEY: Well, I think -- I think that we would obviously address that issue as time passes, but if this Court were to schedule a trial, for example, in

November of '06, and a trial were to be accomplished in November of '06, and the Court were to indicate that it would be prepared to reach a decision by January of '07, I am speaking obviously hypothetically, and we anticipate that given the way in which the Second Circuit proceeds, that a final decision would be reached -- if you were to reach a decision by January of '07, it would be surprising to me if the Second Circuit did not have an answer to the appeal before the end of '07.

I think off that -- on that circumstance, the California court might consider deferring until -- until things have proceeded here.

Obviously there is not going to be a lot of point -- I want to be clear that there are variations from state to state in terms of some of the evidentiary impact; the overriding issues are essentially the same. And I think that our clients' intention is to try the case once and have it appealed once.

Now, that does not preclude the possibility that there may be a multiple trial and then ultimately different decisions in different circuits, and then ultimately a review by the United States Supreme Court, and because of -- I don't want to sound grandiose here, and obviously I am not the most knowledgeable person

about these regulations in this room, but given the importance of the regulations, it would not be terribly grandiose to imagine that the United States Supreme Court would give consideration to this.

THE COURT: Not only is that not grandiose, my guess is that that wouldn't be a virtual certainty, but a high likelihood, especially if you have got conflicting views from the Second and Ninth Circuits.

MR. HEMLEY: Which could possibly --

THE COURT: Or First. Now the First Circuit as well, if you have got --

MR. HEMLEY: Right. And that's why we have -- we have no intention, I should say, so the Court is clear, of filing more than one action in any one circuit, so this is the action for the Second Circuit. And it's really critical to us that this case proceed quickly and towards resolution. I don't think it's --

THE COURT: Let me ask you about that more precisely. The models affected are 2009 to 2016. Back that up. When does -- well, GM and DaimlerChrysler need a final resolution so that they don't suffer economic loss by being caught in a state of limbo?

MR. HEMLEY: Very -- very quickly is the imprecise answer. The regulations call for a phasing in so that the, the effort to comply becomes increasingly

difficult as the years proceed.

THE COURT: Well, early 2008, is that realistic or --

MR. HEMLEY: Well, early 2008 is certainly pushing the, the end of the preparation time because you are talking about model year 2009, and those cars begin to role off the assembly line in the spring and summer of 2008.

So, again, I apologize, but I am probably not -- and maybe Mr. Drake may have something more specifically to add to that. I don't know the precise answer. I don't want to mislead you on that.

THE COURT: Mr. Drake, do you have any more precise information?

MR. DRAKE: Your Honor, the record that's being developed, and we will file papers on this as Mr. Hemley indicates, would indicate to us the people who are most directly affected by the regulation right now are the DaimlerChrysler and General Motors dealers here in Vermont. They have already been advised by the factory in Michigan that they are not going to have a full product line to sell if this regulation goes into effect. And that has an immediate impact on the current value of those dealerships.

In California, this was an issue in the venue

matter there, and the evidence there indicated that a typical California dealership is already injured to the tune of about $4 million just by the pendency of regulations in the future.

THE COURT: What you are suggesting is they are not going to have a full product line in 2009 which impacts their, their value as of today?

MR. DRAKE: That's correct, your Honor. And the product line will be increasingly restricted each year the regulation continues, as it becomes more and more stringent. The particular models that were withdrawn need to be -- need to be filed, need to be filed under seal with the Court and will be given to the defendant. But the restrictions are quite substantial within two or three years of the implementation of the regulation.

So with regard to the situation back at the factory, your Honor, as Mr. Hemley says, we really need to know quite soon what we are going to have to do with regard to this regulation. Several of the overseas manufacturers, whom we also represent, have very long lead times to plan their product lines, and they're under significant pressure to make changes in what they can do for the 2009, 2010, 2011 model years. Those decisions are being made right now.

The longer we wait, the harder it's going to be to unscramble the eggs once we have committed to a particular plan.

THE COURT: Now, I saw in the scheduling order in California that you estimated, or at least the magistrate judge set 20 days aside. I assume that's 20 trial days aside. Is that based upon the estimate of the parties as to how long a trial of this type would last?

MR. DRAKE: Your Honor, I believe that estimate was the estimate provided by the defendant in that case. The defendant asked for that period of time for the trial. I believe the plaintiffs in the California case indicated that we could try -- we felt the case could be tried in about half that time.

MR. LESKE: Your Honor --

THE COURT: Okay? Yes?

MR. LESKE: I'm sorry. I believe the, the State estimated a 25- to 35-day trial in the California, and the plaintiffs estimated five to 10 days, and the Court bound 20 days.

MR. DRAKE: I appreciate the correction, your Honor. That's correct. My recollection's been refreshed.

THE COURT: Okay.

MR. DRAKE: The judge picked a slot he hoped would be reasonable.

THE COURT: And set it in stone. Cast it in concrete?

MR. DRAKE: Well, your Honor, he did his best in that regard. He also did point out on the record to all the parties that it wasn't clear which judge would be trying the case. So we are at, somewhat at the mercy of the trial calendar in California. The Fresno division, your Honor, is I believe one or two judges short of its full allotment at present, so, it's a fairly congested place to litigate.

THE COURT: Okay. All right. So you want at least until -- Mr. Hemley, you want at least until the 24th to file a response for their motion to stay?

MR. HEMLEY: I think we would like that as the fixed deadline, but I think we will have our papers before that date.

THE COURT: They are relying upon the first file rule and res judicata, and a fairly central question is, as a prerequisite for those doctrines to apply, do they have to be similar parties? Or are they different?

First file rule, it is fair to say, and I will address this with the defense, the first file rule

requires that the parties are identical. It's essentially a venue issue, and there's strong law to suggest that res judicata is the same.

MR. HEMLEY: Well, we -- again, I don't know that we should argue that motion before you today, but I would say this much. We are very confident that we will be able to convince the court that a stay is inappropriate here, and that we should proceed with this litigation and certainly should proceed with the scheduling of this litigation.

We have come to the same conclusion with regard to the first to file rule, and res judicata, and we also, on the balancing issues that are otherwise implicated, feel that there really isn't going -- it's not going to be a difficult question for the Court.

What the State is essentially saying is, you know, wait for California to do something; and what we are saying is, we can't wait. We need a court that has the resources and the focus and the attention and the ability to deal with this issue to do so without waiting for anybody else to act, and there's just too much at stake here for us to be content to say, you know, well, we don't want to be burdened with the efforts, so we will let it run its course in California. It's just there's just too much involved here.

THE COURT: Okay.

MR. HEMLEY: Thank you.

THE COURT: All right. Let me turn to the defense. My first question is in regard to the request for a stay, and I don't mean to raise an opportunity to argue the issue, but is not the first file rule applied only in cases involving the same parties? And isn't res judicata a similar doctrine, and that generally applied only to lawsuits involving same parties?

MR. LESKE: Well, your Honor, to be clear, we are resting, or our principal reason that we are seeking a stay appeals to the inherent power of this court to control its docket, and we cited two principles, including the first filed rule and possibly res judicata issues, as well as to the notion of just judicial economy, and comity to the, basically the first filed federal suit out in California, again, demonstrating that what the plaintiffs are doing here is essentially asking this Court to duplicate litigation that they already themselves commenced in California.

It may be true that they, you know, need to know, but the regulations were developed in California pursuant to a California state law. These plaintiffs filed in California, going to the court and starting to commence litigation there. There is ongoing discovery

in California.

The California Attorney General's Office and the California Resources Board are not a party here. I mean, in, in essence, they're simply just choosing this court as a more preferable forum for them to adjudicate their claims when they already commenced litigation out there.

The one major point is that unlike the litigation, typical litigation where you have states adopting by reference or adopting similar regulations, it's a slightly different situation here under the Clean Air Act. In other words, only California is allowed to develop these regulations. They're -- they're basically the California car and the federal car. And other states, as we have described, are able to then adopt it.

So, the very authority for all these other states, whether it's Oregon, Washington, Maine, Massachusetts, New Jersey, New York, and of course Vermont, to -- to adopt these regulations, rests on the validity of the regulations in California. And that's the precise issue that the California courts are well -- are undertaking right now with the, the CARB, the California Air Resources Board, who developed the rule.

THE COURT: Sure, but this is not the kind of case that is going to require a whole lot of factual

development. What they raised are five -- well, you said five, but they actually had six counts which are essentially legal in nature. I mean, the legal issues involved in California are fairly similar to the ones in Vermont. In fact, you have acknowledged that. So I don't think how California necessarily adopted its regulations is particularly significant.

MR. LESKE: I'd have to disagree, your Honor, in that the -- a decision here by this Court would affect the status of the regulations here as they are applied in Vermont, to, you know, these dealers here, which, as we argue, will suffer -- the plaintiffs here will suffer very little harm in, you know, the, the amount of cars that are required to be sold and will, compared to their ongoing obligation in all those other states which account for about a third of the cars in the country. But more importantly, the -- the decision here really could -- if this Court found before the California did, basically a decision in California could really almost moot out this entire case, because if the -- if the regulations are struck down out in California, then arguably, all the other states that adopted it no longer have California regulations to, to adopt or enforce.

And I don't want to get too complicated because

there s a lot of intricacies here, but suffice it to say that the validity of California's regulations must be -- must happen.

THE COURT: Well, let's go on the -- put the shoe on the other foot. Let us say that the regulations in the Eastern District of California are upheld. Do you think that that necessarily means that the plaintiffs will terminate their litigation in other jurisdictions, assuming that the matter has not gotten to the U.S. Supreme Court?

MR. LESKE: Of course that would be a better question for the plaintiffs, but --

THE COURT: I mean, I could ask them, but I can tell you what their response is. If the Eastern District of California says those regulations are fine, it goes up to the Ninth Circuit -- which may take two years. It goes up to the Ninth Circuit and they say it's fine, well, don't you think that at the same time, in fact, even before it gets up on appeal, if the -- if the judge in the Eastern District says those regulations are fine, they're going to be out pursuing litigation in the Second Circuit and the First Circuit, at a minimum; if New Jersey is involved, they will be going to the Third Circuit.

As a practical matter, isn't this the kind of

litigation that is going to be maintained in various circuits, various decisions arrived at with the ultimate disposition going to the U.S. Supreme Court? Don't you think?

MR. LESKE: Not necessarily, in the sense that the California courts that are weighing in on this, this issue, I believe will have -- and the decision here will have a significant impact on their decision to seek, to litigate in these other forums, and I believe that the courts in those forums will look to the California decision on this issue of, of uniquely California issues with great weight.

THE COURT: Do you think that, do you think that the plaintiff -- just being practical here.

MR. LESKE: I realize that, your Honor.

THE COURT: Do you think that the plaintiffs in this case are going to put all of their eggs in one basket, i.e., the Ninth Circuit? As opposed to the potential of other circuits, in the first place?

Second, if you -- if I stay this action, practically speaking, and they want to bring this case before the Second Circuit as quickly as possible, what is stopping them from filing in the Northern, Western, Southern or Eastern District of New York to get this matter decided in the Second Circuit?

MR. LESKE: Well, as to your first question, I can understand that the, these plaintiffs probably don't want to be in the Ninth Circuit. I think the truth of the matter is they have to be there. It's California's regulations that and given the number of cars they are going to have to produce for California and some of these other states, you know, they are going to be there and they are going to most likely take it up to the Ninth Circuit.

As to your second question, the fact -- I guess nothing can stop them from filing. We just found out about this Rhode Island suit here this morning. And this goes to a, something we said in our motion for enlargement of time, was that we were discussing with other states' attorneys general and California, and other parties, you know, looking at all the various litigation, but the presence of yet an additional federal district court case, you know, makes it at least more likelier, at least we would probably start talking with other attorneys generals about the prospect of maybe multi-district litigation.

It's just, fundamentally, it just does not seem like it is a valuable use of resources by both -- all the various district courts in the country, and certainly all the -- all the different states, for these

plaintiffs to simply start filing the same complaint, crossing out California, and writing in there, you know, the state they are in, and try to litigate this in every single place in the country.

And so, in that regard, we felt like our best choice, both for the courts and our own resources, would be to move this Court to for a stay pending the resolution of the California case where all this development is ongoing, and the very parties that developed the rule are there responding to discovery and defending the rule.

THE COURT: Okay. Well, I am going to afford the plaintiffs an opportunity to file a responsive pleading, but, first file rule is a venue issue and requires the same parties. These parties are different, clearly. Four of the parties are different on the plaintiffs' side, and obviously all of the parties are different on the defendants' side.

Second, same with res judicata. You are asking for an inherent authority within the court to close off the courtroom doors to Vermont residents and Vermont businesses who may be impacted. Apparently Mr. Hemley is going to file an affidavit suggesting that they're going to be significantly impacted by these regulations. And what you are asking for is the Court to essentially

foreclose the door, or close the door.

Anyway, that leads me to the ultimate issue that we are here for today and that's the Rule 16 conference. And assuming that I do not stay the litigation, and this is proceeding, my question is, what is your response to the plaintiffs' suggestion that the case be tried in November as opposed to post-January 16th?

MR. LESKE: Well, as you can see from the scheduling order in the California case, which as we have talked about is near identical, the -- from when the date of the scheduling order to the trial date was 16 months, and that was a negotiation, a compromise between the parties, much like the even the trial date of five to 10 days versus the State, which asked for 25- to 35-day trial. So at the very least, we should be using California's numbers.

They filed an extensive scheduling statement that the court then reviewed, so, you know, at the very least, the Court should have -- you know, if we had to choose a trial, we would be looking at anywhere from 16 to 20 months for a trial date from here. I mean, there's no reason to believe that, that we should be able to go any faster. In fact, I would submit, due to both the resources and the fact that it's not our regulation that we have information here, that we would

be able to proceed any faster than, than what the courts and the Attorney General's Office in California recommended to the court.

THE COURT: Well, they did file in November, and second, discovery has started in California, so at least some of the sharing has already occurred. So why would it necessarily require 16 months, certainly from today's date, but 16 months from November?

MR. LESKE: To be clear, they did file in November. We didn't -- we weren't served until December, you know. But again, that may be helpful from their point of view because they have been in ongoing litigation in California. These are all filings and discovery that -- that they have been doing. We are not a party in California.

We don't, frankly, know that much about the litigation that is ongoing in California, besides, you know, obviously keeping, keeping in touch with the Attorney General's Office out there. So, you know, it may be an advantage to them because they're already doing all this, but from the State's point of view, you know, we are starting from, we are starting from scratch.

So that's where we would look to what the California Attorney General's Office recommended as they

were starting to discuss the discovery schedule and trial schedule, you know, in that case, as what we would feel like we would need. In fact, we would probably need even more than that.

THE COURT: Okay. Mr. Hemley?

MR. HEMLEY: I'd just like to address a couple of points, Judge, on the Rule 16 issues.

I do have a proposed schedule, but I don't think it's necessary for the Court to burden itself with anything more than the trial date and then we can work backwards from that.

Having said that, a few things which the Court undoubtedly already has focused on, but I will mention for the record, we already have the benefit of the California discovery, so there isn't any need to have as extensive a schedule as they do.

Secondly, it's -- I want to be careful and respectful of my colleagues, but at the same time I don't want the Court to be left with the impression that this is a so-called California regulation or a function of California process that is under examination.

These are all federal questions that are being presented here. The California regulations were promulgated pursuant to a federal act, as were the Vermont regulations.

What needs to be examined here is whether or not the regulatory scheme is preempted by the federal legislation. It is not a matter of unique California issues at all, and that's --

THE COURT: Right. There are no factual issues to be developed in regard to how those regulations were passed.

MR. HEMLEY: That's exactly right. It has nothing to do with this litigation.

THE COURT: Does that mean that much of this litigation may be resolved in -- by way of motion?

MR. HEMLEY: Some of it certainly can be addressed by way of motion. I don't believe --

THE COURT: The preemption arguments, I mean, I guess I am asking you, in light of the fact that I am just starting in this litigation, but can this -- can much of this be resolved by way of summary judgment?

MR. HEMLEY: Some of it can. You know, I -- I am going to now start sounding more of an expert than I am, but I am good at repeating what other people teach me, so bear that in mind, and Mr. Drake is here to give you the source --

THE COURT: Well, I will accept that as your statement as how you approach the law and this is to be applied universally every time you appear in court.

MR. HEMLEY: I don't want to be too general in my -- in how the Court accepts that, but it's not altogether wrong.

In any event, there're two different kinds of preemption concepts at play here. One would be the express preemption, which would be purely a matter of law, and that is whether or not the statute that the Clear Air Act does in fact preempt, as a matter of reading the statute, the state regulation; and then there is the implied preemption concept, which requires a balancing of different factors to determine whether or not the state is able to regulate in a way that is different from the federal regulation.

THE COURT: This is what, the foreign policy argument that you have got?

MR. HEMLEY: No, it's not the foreign policy argument. It is an argument that suggests that the Court needs to look at impacts on the economy, it needs to look at impacts on jobs, it needs to look at impacts on safety to determine whether or not these, these concerns are such that the federal regulations need to preempt the state. If in fact the --

THE COURT: If that is the case, does that mean that there is extensive evidence on the other side of the coin? The flip side of the coin? That is, the

impact of carbon dioxide as a greenhouse gas contributor?

MR. HEMLEY: I don't know how extensive it is, to be quite honest with you, but I also think that it is correct that there will be evidence on this presented exclusively from our point of view through competing expert testimony so that the Court will have to give some consideration to, for example, whether or not, if the Vermont regulations were permitted to go into effect, it would have an adverse impact on the safety of car occupants, for example.

I am going to give you an example that I only offer by way of purely a gross illustration. If making the cars lighter makes them more dangerous, for example, that may be an issue that relates in fact to safety.

If reducing the greenhouse emission, gas emissions results in older cars being on the road longer because of the economic reality, which results in a sort of an anti-intuitive, or counterintuitive creation of more pollution, then if there are not these Vermont regulations in effect, that may be something that the Court considers militates in favor of a generalized federal regulation. And as I understand it, those are factors which weigh in the concept of implied preemption as opposed to express preemption.

So it's not going to be a process that is entirely without factual development. But it is not going to be an extensive factually based discussion. It is going to be experts offering opinions on these subjects. And the Court will have to make a decision on that. But there's nothing particularly California about it at this point. What applies -- what impacts safety in Vermont is going to impact safety in California in exactly the same way.

THE COURT: Well, you have asked for a trial date in November, and it's -- that's real fast.

MR. HEMLEY: It's ambitious, yes.

THE COURT: And you have also indicated that you filed in various circuits. You may very well file in the Third Circuit, for that matter. I guess my question is, why do you feel it necessary to have this case tried before the California one? Why is there this reason -- I mean, you made this argument that there should only be one case, and quite frankly, I think your strategy appears to be filing in various circuits and developing law across the country, not just the Ninth Circuit, but across the country. Why do you necessarily have to have it before the California case?

MR. HEMLEY: Well, it's not a question of having it in Vermont before it occurs in California. It's a question of getting a decision as quickly as we

possibly can, and the reality is, I think the undeniable reality is that even starting as we did in November of 2004, we will get to the finish line in Vermont before California, and because of the importance of not wasting a day or losing a day -- I shouldn't say waste -- we want to get a decision as fast as we can. This jurisdiction is attractive because it can offer us a decision faster than any other jurisdiction.

Now, you raise obviously a very good point. I mean, it would be, it would be un -- untruthful to suggest that if we lose in this state, we will not pursue remedies elsewhere and get the case to the Vermont -- to the United States Supreme Court.

THE COURT: Sure.

MR. HEMLEY: However, we don't know what the states would do if we are successful here. So that is again a question we don't really need to answer, but if we succeed here, perhaps they will rethink allowing the federal government to control this issue.

THE COURT: Well, my thought is to schedule the trial slightly after California; that perhaps you could arrive at agreements with the other side to submit much of the contested evidence in California here as well. You want separate -- you want a separate Second Circuit approach. Quite frankly, my guess is that I

will be able to give you a decision relatively quickly. I mean, this is just -- I would feel fairly certain that that could be.

So my question is, why is it important necessarily to have the evidence elicited here in November or December as opposed to having it slightly after California?

MR. HEMLEY: Well, I don't think that there's any magic to when the evidence is introduced. The goal here remains the same, that we want to have a decision as quickly as possible. Having decisions in California and Vermont quickly would be good, and if the Court's plan is to take advantage of the California presentation, and then make a decision, which even though the evidence may be heard subsequent to California, will not necessarily be slower than California, I don't think that that's --

THE COURT: Okay. I see that you are passed notes.

MR. HEMLEY: Yes. I am being very careful here, Judge, because I realize what the stakes are and I don't want to be seen to make some pronouncement for the United States automobile industry that we then are told Mr. Hemley agreed to this and another thing.

THE COURT: Correct.

MR. HEMLEY: I would like to be able to submit something that addresses your proposal, perhaps after consultation with others.

THE COURT: My suggestion is we take a break for 15 minutes at this point --

MR. HEMLEY: That would be great.

THE COURT: and you consult, and and I am just throwing this out as a, as an option, and that is that the trial would be slightly after January, which gives you obviously the tremendous advantage of insuring that there will be full litigation early in 2007, that there would be a decision within the Second Circuit soon thereafter, but at the same time, it just seems sort of unseemly for me to jump in and take over this case from California when in fact the litigation is proceeding on pace at this moment.

MR. HEMLEY: Understood.

THE COURT: Anyway, that's what I am thinking at this point.

MR. HEMLEY: Thank you.

THE COURT: So let's take a 15-minute recess and then let me know what your thoughts are.

MR. HEMLEY: Appreciate it. Thank you.

(Court was in recess at 10:56 a.m.)

(The following was held in open court at 11:15 a.m.)

THE COURT: Okay, both sides have had an opportunity to consult?

MR. HEMLEY: Yes, Judge. We consulted among ourselves and concluded that your suggestion seems very good, and we're prepared to accept it, with one clarification point, and that is that when you talk about proceeding after the California action has been tried, we want it to be clear that if for whatever reason, because of a new judge seeing things differently than the magistrate judge, there is a delay in California, that whatever trial date you decide upon, let's assume February of '07 or something in that range, we'll get to proceed here. We would hope the case -- that the guaranteed trial date is in fact guaranteed, but if it turns out to be an illusory promise, then we would like to proceed here.

THE COURT: Okay. All right? How about from the State's perspective? I know you have a motion to stay and I am going to consider the plaintiffs' response as well, but if you lost the motion to stay, what do you think about that as a proposal?

MR. LESKE: Well, there are a couple of things. First, as the plaintiffs were talking about it, it seems to me that they can't have it both ways. They are talking on the one hand, oh, okay, there's legal

issues, but on the other hand, their own statements, oh, this case is going to be driven by expert testimony, you know.

Again, the State strongly believes that, given the California litigation, this case should be stayed, or at the very least, perhaps maybe with the Rhode Island other federal litigation, this it could be very suitable for a multi-district litigation. So, I wanted to be clear about that.

THE COURT: This, generally speaking, is not the case that goes multi-district, but obviously you can consider filing that. Usually multi-district are multiple, multiple plaintiffs, similar litigation. These are, you know, they're oftentimes litigation in which there're cases in one circuit as opposed to another circuit, and ultimately there seems to be a consensus perhaps even at the Supreme Court.

MR. LESKE: Again, there is a slight difference given that, unlike other cases where it's just a matter of a state adopting the same regulations, the underlying authority rests with the California courts. If the court -- if the California's regulations are struck down, all the other states -- I mean, I can't imagine a scenario where this wouldn't happen, but all the other states would not be able to enforce or have

these regulations --

THE COURT: When do you anticipate we would know whether the California regulations are struck down? I mean, what year would you anticipate we would know that?

MR. LESKE: Of course it would depend primarily on the trial, in January, and then most likely an appeal, you know, from there. I would think that's

THE COURT: Would it be fair to say three years from now is when we would know? That's what the plaintiff is going to say, it's going to take two years for an appeal in the Ninth Circuit. Three years?

MR. LESKE: It might be, but your Honor correctly pointed out that they can seek an injunction and they have in other litigations involving this, these same issues, the same low emission vehicle. They have not sought one in California. They have not sought one in Vermont.

They did seek one, the same plaintiffs, in Maine and it was denied, just last -- I think a couple weeks ago or so. So clearly if they are worried about getting a decision, and knowing about their obligations and their planning, they have that, they have that option. And, they have not used it, so their argument --

THE COURT: Let me ask you a question as to what you would do. If they sought an injunction in California requiring California authorities not to implement the regulations, is that binding upon you?

MR. LESKE: It's not -- and here, this is another thread. There's no question that the rules are effective. That's the way they work. They are effective upon adoption.

THE COURT: And you have adopted them.

MR. LESKE: After we have adopted them. However, they are not enforceable right now. They are not enforceable until the EPA approves the waiver application that California sent to the Environmental Protection Agency. So therefore, the rules are in place but not enforceable.

We would concede that we can't enforce these regulations until EPA decides to grant California the waiver. That will be appealed, certainly, to the D.C. Circuit. So, at the very least, we already have that they are looking for a split or a potential split, the EPA's decision whether to grant California the waiver, and the California -- the Ninth Circuit deciding, having its view on both the EPCA issue and the Clean Air Act issue.

So it's almost like, you know, they are looking for

maybe more circuits to do that. But, it very well may be that EPA for some reason doesn't rule on the waiver. January 2nd, 2008, which is the, quote, model year 2009, may come and go and EPA may not have ruled on it and the states couldn't enforce it at that point.

So we are already waiting for, we all -- you know, realistically, the Ninth Circuit, and we are all waiting for the D.C. Circuit as well.

THE COURT: But that's a separate question from the one I asked you. The one I asked you related to whether or not you would accept a decision in the California litigation by a district court judge in the Eastern District of California granting an injunction.

MR. LESKE: Our position -- and if I am in error, I will contact you immediately, but if the rules are not enforceable in California, they are not enforceable in Vermont. So, I think that speaks to that issue.

The -- getting back to where I started talking about facts. You know, we do believe that certainly there are some legal issues here and -- but we also, as they said, that there are some factual development they clearly want to do. I mean, perhaps the commerce clause can involve discovery or, you know, separate burdens on Vermont or whatnot, you know, if this Court does deny

the motion to stay. You know, we would submit that we would like discovery to, to be stayed and set up a schedule for dispositive motions, you know, whether they be a judgment on the pleadings, given that our -- we are supposed to answer by February 24th, or if this Court feels like we should wait till the whole stay issue is resolved, you know, we won't respond on that date. We can wait till the motion to stay is resolved and then we can set up a dispositive motion schedule and then revisit that issue there, and then assuming that there are no claims left, or at least it will -- we could get rid of a couple of the claims that they have, we can then proceed to try to, you know, proceed with discovery there.

THE COURT: So, are you asking for a stay of all discovery pending resolution of dispositive motions, if that --

MR. LESKE: Well, of course we would rather have this case stayed altogether, but --

THE COURT: No, I appreciate that.

MR. LESKE: -- in the event that you don't, I believe that's the proper, the proper course. You have to appreciate the extreme disadvantage that the State of Vermont is at when you are -- when we are talking about sharing discovery with, with -- ongoing in California.

Obviously all these same plaintiffs are out there, so to them, it's no problem, but we are not working with the California Attorney General's Office. We haven't seen any of the discovery. We haven't, of course -- we have had no involvement in it, and so to be able to suggest that we could somehow step in the shoes and get up to either to speed or to, to share discovery with the California Attorney General's Office and the California Air Resources Board is, is daunting to say the least.

THE COURT: Well, I appreciate it's daunting, but we have been talking about practicalities here, and I have been trying to figure out exactly what is strategy and what are practicalities, and I certainly am aware of the fact that it is not just the California Attorney General's Office that is involved in the litigation; that there are numerous organizations that have intervened successfully in California on this particular issue. And I would be surprised if they didn't make similar efforts to join this litigation.

So -- and if that, if they were accepted, if their request for intervention was accepted, you have a number of organizations that are all involved in this litigation.

In addition, earlier on you said you were going to negotiate and perhaps coordinate with various attorney

generals' offices. I just don't see this as, as that overwhelming difficulty.

MR. LESKE: I would request that your Honor examine the, one of the affidavits that we submitted in support of our motion to stay, and that would be from Thomas Moye, who is the chief of the mobile sources section, talking again just about burden on the agency. Of course we can speak for the State as far as our resources, but I mean --

THE COURT: No, I actually read that in detail. He talked about 31 employees. He talked about the number of lawyers, essentially three that could be -- it would take 75 percent of your work. But it's the Attorney General's Office of the State of Vermont that, I would assume, that would be involved in this litigation. This is --

MR. LESKE: Just to correct, it wasn't three lawyers. They were talking -- that's the whole, that's the staff of the mobile sources.

THE COURT: Oh, all right.

MR. LESKE: I don't believe Miss Brady here is an attorney for the agency, but yeah, we were speaking -- he was speaking more towards the technical and the burden on the agency as far as what defendants have said a case driven by plaintiffs, or by expert testimony, and

as far as, you know, experts and some of the other details, so that was strictly talking -- it wasn't talking about legal, the legal resources.

Of course the State's fully committed to defend this case if the case is not stayed, but we honestly are, are adamant in that, given the situation here, and what we are dealing with, both as far as, you know, the EPA's forthcoming decision, and the California decision which has to occur, it just doesn't make sense to be litigating these cases, certainly not ahead of the California case, and certainly not duplicating all the discovery issues that, that are ongoing in California.

And again, that's sort of the other part of the stay is that we were -- again, I wanted to stress, we weren't relying saying this is, this is, you know, the first filed rule and res judicata.

You know, again it was, it was that this is duplicate litigation in the statement -- in the meaning of the word in Colorado River, not abstention, but just under the principles that you have two federal district courts essentially analyzing the same legal issues. And that's, and that's what, as a general matter, as a matter of comity or just the principles of judicial efficiency just shouldn't happen.

I am sure your Honor would agree that having 10

district court cases reviewing the same preemption issue just doesn't make sense.

THE COURT: Well, just then in perhaps supplemental pleadings you might want to think about a couple of other broader concepts. That is, federal courts are here to serve the organizations and persons of particular districts, and what you are suggesting is that if a particular organization was to suffer in Vermont, that they should not have access to federal courts until it's resolved in some other place.

Second, you assume that whatever litigation is going to happen in California is going to resolve this issue with certainty. The fact is, if by chance California was to win in the Ninth Circuit, then you are suggesting that that plaintiff -- that the plaintiffs would withdraw and we wouldn't be involved in litigation down the road. Well, that's just naive.

The fact is, this litigation is, is not going to happen just in California. It's going to happen across the country, and I -- I just, I just don't think that you are being realistic when you say that if I stayed this, there would be no litigation in New Jersey, in Rhode Island, and perhaps various other districts within the Second Circuit, because that's where this is headed.

Fair to say that's my assessment, and any way, I

have come up with a proposal then, that this trial would be set for March, the first week in March, and I would block off the entire month of March for this litigation. It has -- this has a number of advantages.

It permits California to go first. I would tell you that I would follow the California case closely. There's always the possibility, in light of the fact there may be similar witnesses, the parties might stipulate to the submission of witnesses' testimony from California. That's a possibility. In which case it would shorten the litigation.

I would certainly make every effort to resolve at least my view of this case relatively quickly so that all parties could go to the Second Circuit relatively quickly.

So on the one hand, this does not come before the California case. I just don't think that's appropriate. It was filed first in California. Let the California court deal with it. But I just think that to say that we postpone it any longer is, is unfair to parties who actually reside within this state.

I will consider, again, plaintiffs' response to the stay, but you are getting a definite date, and so I'd ask the parties to get together and figure out discovery in the meantime. I think it is fairly unwise to stay

discovery for any period of time, and so I would be extraordinarily reluctant to suggest that discovery should be stayed until dispositive motions are resolved, because the dispositive motions, as far as I can tell, are going to deal with one of the three preemption issues, and that the others may very well require extensive discovery. That's, that's my guess. There may be more than that. But not all issues. And we should just move forward in litigation.

So, I'd ask that you all get together and submit a proposal, and -- do you need to stand, Mr. Behm?

MR. BEHM: I did want to raise one issue.

THE COURT: Oh, were you going to stand? I thought you were stretching.

MR. BEHM: No, I was going to stand but I didn't want to interrupt you. I guess I already have.

THE COURT: No, you wouldn't dare do that, Mr. Behm, would you?

MR. BEHM: No. Not intentionally.

I wanted to raise the consolidation issue because technically these cases are still separate, and on behalf of the Association of International Automobile Manufacturers, we think they should be consolidated.

I guess I'd speak for Mr. Hemley, I think that's his client's position like too, and I don't think the

State has any objection to that general principle, although there may be some differences as to how we would do it. I mean, we think we should consolidate them and that we can represent our clients and Mr. Hemley would represent his clients, and we would each be able to file our own position papers and briefs.

THE COURT: All right. Do you need some time to think about that request?

MR. LESKE: I think it's fair to say that we agree that the cases should be consolidated, but when it came to discussing the actual, you know, terms of, if this case went to trial, how that would proceed or, you know, the suggestion that they could submit, you know, separate briefs in even, infra-plaintiffs in 302 could possibly file separate briefs, the language of our proposed consolidation order kind of fell apart a little bit.

THE COURT: Well, why don't you just work on that.

MR. HEMLEY: I would just say, on that issue, your Honor, I think you were correct, particularly there will be intervenors or people who want to intervene, who presumably are going to want to be heard, not just have their names on the paper, so it would seem unbalanced to have intervenors appearing and filing papers and then

have people who were actually parties to the case be deprived of the opportunity to express themselves on behalf of their clients. So we would hope to file similar if not identical papers but we certainly don't want to give up the opportunity to file independently because there are differences between the international interests and the American interests, or I should say the alliance interests with some international --

THE COURT: Well, I guess the parties should actually get together and discuss that issue as opposed to argue it at this point.

Is there anything else to be submitted?

MR. HEMLEY: I don't think so.

THE COURT: How long do you need to take to submit a proposed schedule?

MR. HEMLEY: We have got one prepared, so if -- with the Court's guidance having been provided, we really should be able to do it in a day or two. There's nothing --

THE COURT: Well, I think it's -- they should have more time than that. The motion to stay has not been ruled upon at this point, but, 10 days?

MR. HEMLEY: Fine.

THE COURT: Any difficulty with 10 days? From the State? This is just to propose a schedule of

discovery.

MR. LESKE: Okay.

THE COURT: All right.

MR. HEMLEY: This is preliminary, but since it's going to be part of the schedule, we do have to address the early neutral evaluation issues. I would submit this is not a case that would do anybody any good to bring people in, flying in --

THE COURT: I noticed in California they waived settlement conference and it seems to me this is not a case that would be suitable for ENE and that would be waived.

MR. HEMLEY: So we will leave that out at this point.

THE COURT: Unless there's an objection on the part of the State, but this is not a case in which the mediator would come and resolve it.

Anything else at this point?

MR. HEMLEY: I don't think so, Judge.

THE COURT: All right. Thank you.

(Concluded at 11:35 a.m.)

*** ** ***

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

3/8/06 ... Anne E. Nichols

Date Anne E. Nichols