# **Exhibit A to Plaintiffs' Consolidated Memorandum In Support of Objections to Defendant's Second Motion to Dismiss**

Excerpt of Brief of the United States as Amicus Curiae, filed in *Green Mountain Chrysler-Plymouth-Dodge-Jeep, et al., v. Crombie*, Case No. 07-4342(L) (2nd Cir. April. 16, 2008)

# 07-4342(L), et al.

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

GREEN MOUNTAIN CHRYSLER-PLYMOUTH-DODGE-JEEP, et al.,
Plaintiffs-Appellants,

v.

GEORGE CROMBIE,
Secretary of Vermont Agency of Natural Resources, et al.,
Defendants-Appellees.

On Appeal From the United States District Court
For The District Of Vermont

**PROOF BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

JEFFREY S. BUCHOLTZ
*Acting Assistant Attorney General*

THOMAS D. ANDERSON
*United States Attorney*

MARK B. STERN
(202) 514-5089
H. THOMAS BYRON III
(202) 616-5367
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*Department of Justice*
*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530-0001*

In 2006, NHTSA published an extensive analysis of EPCA's preemptive effect on the proposed California GHG regulations, and also considered whether the state regulations would conflict with the federal CAFE regulations. NHTSA is currently planning a new rulemaking to promulgate CAFE standards for both passenger vehicles and light trucks from MY 2011 through MY 2015. Because that rulemaking may well again address preemption, it would be that new action by the agency that would be relevant to any future determination of EPCA's preemptive effect on state GHG regulations (if such a determination were to become ripe for judicial resolution). The pendency of such potentially relevant agency action further confirms the need to await a ripe controversy before reaching out to decide the questions urged by the parties in this case.

NHTSA concluded that federal law both expressly and impliedly preempts state laws regulating emissions of carbon dioxide from motor vehicles covered by federal fuel economy standards. See 71 Fed. Reg. 17566, 17654-17670 (Apr. 6, 2006), remanded on other grounds, Center for Biological Diversity v. NHTSA, 508 F.3d 508 (9th Cir. 2007) (pet. for reh'g filed Feb. 6, 2008); see id. at 513 n.1 (noting that the court in that case did not address the issue of preemption). NHTSA determined that a state requirement limiting carbon dioxide emissions from motor vehicles is related to average fuel economy standards under EPCA and thus expressly preempted. In reaching this conclusion, NHTSA followed established precedent on interpreting preemption provisions and on the broad scope of the central phrase "related to" in EPCA's preemption provision, 49 U.S.C. § 32919(a). See, e.g., Morales v. Trans

World Airlines, Inc., 504 U.S. 374, 383-384 (1992). The district court, however, avoided direct application of EPCA's preemption provision and gave a narrow meaning to the statutory phrase "related to." See Op. 120-130. NHTSA also concluded that federal law impliedly preempts state regulation of carbon dioxide emissions because of a conflict with NHTSA's standards.

NHTSA explained that, "as a matter of basic chemistry, the burning of a gallon of gasoline produces about 20 pounds of [carbon dioxide]." 71 Fed. Reg. at 17659. The agency determined that carbon dioxide "emissions are always and directly linked to fuel consumption because [carbon dioxide] is the ultimate end product of burning gasoline." Ibid.[4] NHTSA explained that the amount of carbon dioxide emissions is "the controlling independent variable" in the calculation of fuel economy. Id. at 17661. Indeed, for purposes of CAFE standards compliance, automobile manufacturers use a formula developed by EPA, which "calculates fuel economy based on carbonaceous emissions from the vehicle." 71 Fed. Reg. at 17660; see also Op. 99 & n.49. Thus, "compliance with federal fuel economy standards is based primarily on [carbon dioxide] emission rates of covered vehicles." Ibid. Conversely, the method of calculating greenhouse gas emissions adopted by California and Vermont is essentially equivalent to fuel economy measurements: "Just as in the case

[4] Although combustion in a motor vehicle engine is imperfect, and thus also results in the emission of other substances, including carbon monoxide and hydrocarbons, those other emissions have declined in their significance as the Clean Air Act has required manufacturers to reduce such emissions, with the result "that fuel economy has become virtually synonymous with [carbon dioxide] emission rates." 71 Fed. Reg. at 17659-17660. Unlike other motor vehicle emissions, carbon dioxide cannot be meaningfully reduced other than by reducing fuel usage.

of compliance with federal fuel economy standards, compliance with [California's] regulation is largely a function of tailpipe [carbon dioxide] emissions." Id. at 17666. NHTSA determined that "the only technologically feasible, practicable way for vehicle manufacturers to reduce [carbon dioxide] emissions is to improve fuel economy." 71 Fed. Reg. at 17656.

Although the district court recognized the direct relationship between fuel economy and carbon dioxide emissions (see, e.g., Op. 122-124), the court ignored the logical consequence that this relationship results in preemption of state GHG regulations. Instead, to avoid preemption, the court improperly relied on provisions in the Vermont regulations that overall do not vary the relationship between fuel economy and GHG emissions. For example, the court acknowledged that "one way a motor vehicle manufacturer may choose to comply with the GHG regulations is to improve the average fuel economy of its fleet," but concluded that "the GHG regulations embrace much more than a simple requirement to improve fuel economy, cloaked in the rhetoric of reducing carbon dioxide emissions." Id. at 122. The court identified other compliance mechanisms, including "credits for air conditioning, * * * alternative fuels, or * * * plug-in hybrid vehicles." Id. at 126. Thus, in the court's view, "[c]ompliance with the regulation is not achieved solely by improving a fleet's fuel economy." Ibid. The court recognized that those other compliance mechanisms "would not enable a manufacturer to comply with the regulation without [also] improving fuel economy," but the court sidestepped the fact that manufacturers must improve fuel economy in order to comply with the regulations by observing that "the

fact that manufacturers may have to increase fuel economy to some degree in order to comply does not per se convert an emissions standard to a fuel economy standard." Id. at 124. The court also emphasized the differing carbon content of various fuels, and the effect of plug-in hybrids or electric vehicles. id. at 124-125.

The court failed to recognize that strategies such as use of "alternative fuels," and "plug-in hybrid vehicles," are among the technological means a manufacturer may use to improve the fleet average fuel economy, and EPCA specifically takes account of those approaches. See, e.g., 49 U.S.C. §§ 32901(a)(1),(10) (defining fuel and alternative fuel), 32904(a)(2) (defining electric vehicle and directing Administrator to calculate equivalent petroleum-based fuel economy values), 32905 (establishing incentives and calculating fuel economy for alternative-fuel vehicles). The district court acknowledged that, in formulating the state greenhouse gas emissions standards, California considered the same factors that NHTSA considers in setting CAFE standards, but came to a different conclusion. See Op. 89 ("CARB examined virtually the same factors that NHTSA examines when it sets a CAFE standard: technological feasibility and economic impact, including cost to manufacturers, cost to consumers, and job loss"). Yet the court failed to realize that the overlap in considerations creates the potential to frustrate the purpose of the federal regulatory scheme.

The district court also mistakenly believed that an EPA waiver under the Clean Air Act would effectively immunize the California/Vermont standards from preemption analysis under EPCA. See Op. 104-119. However, an EPA decision